STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY KERRIGAN, LORI MIKOVICH and
RYAN M. VALLI, individually, and on behalf of all
others similarly situated,

     Plaintiffs,

vs.

VISALUS, INC., a corporation, ROPART ASSET MANAGEMENT
FUND, LLC, a limited liability corporation ROPART ASSET
MANAGEMENT FUND II, LLC, a limited liability corporation,
VISALUS HOLDINGS, LLC, a limited liability corporation, MOJOS
LEGACY, LLC, a limited liability corporation, FRAGMOB, LLC, a limited
liability corporation, iCENTRIS, INC., a corporation, FREEDOM
LEGACY, LLC, a limited liability corporation, WEALTH BUILDER
INTERNATIONAL, INC., a corporation, RESIDUAL MARKETING, INC., a
corporation, JAKETRZ, INC., a corporation, INSIDER CORPORATE
AND PARTNERSHIP DEFENDANT COMPANY DOES 1-10

and

NICK SARNICOLA, ROBERT GOERGEN, SR., TODD
GOERGEN, RYAN BLAIR, BLAKE MALLEN, FRANK VARON,
KYLE PACETTI, JR., JAKE TRZCINSKI, MICHAEL CRAIG,
LAVON CRAIG, TIMOTHY KIRKLAND, HOLLEY KIRKLAND,
JOSHUA JACKSON, AARON FORTNER, RACHEL JACKSON,
TARA WILSON, ANTHONY LUCERO, AND RHONDA LUCERO,
INDIVIDUAL DEFENDANT JOHN DOES 1-10, domestic individuals

and

JASON O'TOOLE, a foreign individual, and LORI PETRILLI, a foreign
individual

     Defendants.

_____/

> **CLASS ACTION
> COMPLAINT
> AND JURY DEMAND**

SOMMERS SCHWARTZ, P.C.
Andrew Kochanowski (P55117)
Lance C. Young (P51254)
Tiffany R. Ellis (IL Reg. No. 6305795)
Attorneys for Plaintiffs
One Towne Square, Suite 1700
Southfield, MI 48076
(248) 355-0300
akochanowski@sommerspc.com
lyoung@sommerspc.com
tellis@sommerspc.com

PREBEG, FAUCETT & ABBOTT, PLLC
Matthew J.M. Prebeg
(TX State Bar No: 00791465)
Brent T. Caldwell
(TX State Bar No: 24056971)
Attorneys for Plaintiffs
8441 Gulf Freeway, Suite 307
Houston, TX 77017
(832) 743-9260
mprebeg@pfalawfirm.com
bcaldwell@pfalawfirm.com

WEXLER WALLACE LLP
Edward A. Wallace (IL Reg. No. 6230475)
Attorneys for Plaintiffs
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
(312) 589-6272
EAW@wexlerwallace.com

_____/

## INTRODUCTION

1.      This Racketeer Influenced Corrupt Organizations, 18 U.S.C. §§1961 –
1968, ("RICO") action arises out of a pyramid scheme perpetrated by modern,
Internet-savvy company peddling powdered weight-loss shakes. Well over 100,000
innocent people paid the scheme up to $999 for the "business opportunity" to
become distributors, or Independent Promoters ("IPs"), for a soy protein and
sucralose concoction. The vast majority lost their money. The pyramid was
operated by a Troy, Michigan company called ViSalus, Inc. ("ViSalus"). While it

sponsored "Challenge Parties" for people to buy shakes that tasted like "cake mix," the company's real goal was for people to become "distributors", to buy its weight-loss concoction and recruit others to do the same. The hook here, as with so many pyramid schemes, was the lure of lots of money for getting others in the door, then for those others to do the same on down the line, each new recruit paying for the right to recruit others.   As with every pyramid scheme, the money from new entrants paid those at the top. As with every pyramid scheme, after a burst of new recruits, the scheme collapsed. And as with every other pyramid scheme, the scheme's promoters got rich on other people's money.

2.    When it opened its doors the company announced:

> Prosperity is something that everyone hopes for. Unfortunately, many individuals never find a vehicle that is simple, easily learned, has little risk, and still has the potential to be extremely lucrative. With the ViSalus business opportunity, every single person with a strong desire now has a documented vehicle that can drive them to their goal or vision.
>
> (https://web.archive.org/web/20060207045657/http://visalus.com/company/viSalusStory.asp) ……With extraordinary ViSalus products channeling through such a lucrative compensation plan, this vehicle is truly a life changing opportunity. (https://web.archive.org/web/20050623020124/http://www.visalus.com/opportunity/index.asp) ... Click on the link below and see just how quickly you can have your own income generating machine! (https://web.archive.org/web/20041013141907/http://visalus.com/opportunity/presentation.asp)

3.     The company is operated by three veterans of chain sales schemes. ViSalus was also financed by a Greenwich, Connecticut investment banker and his family's private equity company, who became intimately involved in the scheme's operation. The common "business opportunity" pitched by these hucksters was visions of large checks, a shiny new BMW, and a fancy vacation. In reality these luxuries existed only for the company insiders and those willing to convince other people to pay the company money. The only way a distributor could make money was to recruit others. Not surprisingly, the company mostly sold its shakes to its new distributors, who in turn tried to find others to duplicate the transaction. A pyramid scheme only works when enrollees in the "business opportunity" in turn recruit other people into the pyramid.  The scheme's promoters can then tout the number of people who have "joined the program" as proof that there is huge demand for the product. To attract innocent people, ViSalus used a host of professional pyramid scheme recruiters, then touted their "success" at getting million dollar commissions— commissions that weren't actually paid.

4.     The scheme's promoters knew that the vast majority of the new "distributors" would drop out and their enrollment fees and whatever sales are made to them would fund the payments to those at the top of the pyramid. Indeed the scheme depends on the drop-out rate of new recruits, since there isn't enough

money to pay everyone. Like a Ponzi scheme this pyramid used the money paid by new recruits to pay-off the recruiters and the promoters until the growth of the new recruits in the United States stopped. The scheme is now busy in Canada and Europe hoping to find new recruits in those markets.

5.      The ViSalus pyramid scheme operated for several years but ramped up in earnest in 2010. The promoters and professional recruiters worked frenetically to recruit thousands and tens of thousands of others to join in the "business opportunity."  Among the ones recruited by the scheme were the three Plaintiffs in this case.

6.      The scheme attracted well over 100,000 "promoters" for the company after the ramping up. The professional marketers who recruited huge "teams" of unsuspecting people have been promised millions of dollars in "commissions." After touting absurd numbers throughout the Internet, posting hundreds of "interviews" and YouTube videos showing off the millions of dollars allegedly being made in the business, the pyramid began collapsing in the third quarter of 2012.  Knowing that the pyramid was collapsing, the inside principals and the Connecticut investor who helped fund it pulled out over $80 million profits from the enterprise.

7.     Pyramid schemes are illegal.  The individual plaintiffs named in this action, individually and on behalf of a class of similarly situated individuals, file this complaint against the defendants for damages and other relief under RICO and state law claims to recover their losses and to stop these defendants from perpetuating this scheme on others.

## THE PARTIES

## PLAINTIFFS

8.     Plaintiff, Timothy Kerrigan ("Kerrigan"), is an individual residing in Northville, Michigan. For a period of time in 2012, Kerrigan was an IP on behalf of Defendant ViSalus, Inc. Kerrigan purchased two $499 IP enrollments. Kerrigan lost money as an IP.

9.     Plaintiff, Lori Mikovich ("Mikovich"), is an individual residing in Livonia, Michigan. Mikovich was an IP for ViSalus, Inc. in 2013. Mikovich purchased one $499 IP enrollment. Mikovich lost money as an IP.

10.    Plaintiff, Ryan M. Valli ("Valli"), is an individual residing in Canton, Michigan. In 2013 Valli was also an IP for ViSalus. Valli purchased one $499 IP enrollment. Valli lost money as an IP.

**DEFENDANTS**

**CORPORATE DEFENDANTS**

11.    Defendant, ViSalus, Inc. ("ViSalus") is a Nevada corporation headquartered in Troy, Michigan, where it maintains a "Global Headquarters" and several hundred employees.  ViSalus also conducts business in Los Angeles, California. It is now a company primarily owned by Blyth, Inc., ("Blyth") a company connected to ViSalus through several defendants in this matter. Blyth is not a defendant in this action.

12.    Defendant, ViSalus Holdings, LLC ("ViSalus Holdings") is or was, upon information and belief, the owner of ViSalus. At various times other defendants set forth below purchased shares of ViSalus Holdings and exchanged them for equity shares in ViSalus. The combined company also at times represented itself to the public as "ViSalus Sciences," operating from Troy, Michigan. For purposes of this litigation, all of the ViSalus entities will be referred to as "ViSalus" unless specifically indicated otherwise.

7

13.     Defendant, Ropart Asset Management Fund, LLC ("Ropart Asset") is a Delaware limited liability company operating as a private equity fund and is headquartered in Greenwich, Connecticut. It is owned by Defendant Robert Goergen, Sr. and managed by Defendant Todd Goergen. Ropart Asset was part owner of ViSalus between 2005 and 2012, and conducted business with ViSalus in Michigan throughout that time.

14.     Defendant, Ropart Asset Management Fund II, LLC ("Ropart Asset II") is a Delaware limited liability company and private equity fund also headquartered in Greenwich, Connecticut. It is owned by Defendant Robert Goergen, Sr. and at various times has been managed by Defendant Todd Goergen. Since 2005 both Ropart Asset and Ropart Asset II owned shares of ViSalus, and conducted business with ViSalus in Michigan throughout that time. Since October, 2008 the Ropart entities have obtained at least $15 million for their interest in ViSalus.

## INDIVIDUAL INSIDER CORPORATE DEFENDANTS

15.     Defendant Robert Goergen, Sr. ("Goergen Sr.") is an individual residing in Connecticut. Goergen Sr. is a former investment banker. He and family

members own Ropart Asset and Ropart Asset II and have a connection to Blyth. Since December, 2012, Goergen Sr. has obtained at least $5.1 million for his interest in ViSalus. Goergen Sr. has served on the ViSalus board and has appeared in ViSalus-sponsored videos.  Goergen Sr. has transacted business in Michigan since at least 2005 at least in part through his association with ViSalus.

16.    Defendant Todd Goergen ("Goergen") is an individual residing in Connecticut. Goergen is the Chief Operating Officer with ViSalus. Previously or concurrently to that position he has run Ropart Asset and Ropart Asset II. Goergen is also the former head of mergers and acquisitions at Blyth. Prior to his investment and employment with ViSalus, Goergen operated a multi-level marketing ("MLM") company. Since December, 2012, Goergen has sold part of his interest in ViSalus for $1.7 million. Goergen has transacted business in Michigan since at least 2005 at least in part due to his association with ViSalus.

17.    Defendant, Ryan Blair ("Blair") is an individual residing in Michigan. Blair is the Chief Executive Officer of ViSalus. In approximately 2004, Blair purchased an interest in ViSalus.  Blair has a performance-based contractual relationship with ViSalus. Since October, 2008 Blair has sold part of his interest in

ViSalus for $19.5 million. Blair is one of the primary promoters of the pyramid scheme.

18.     Defendant, Nick Sarnicola ("Sarnicola") is an individual residing in Florida and Michigan. Sarnicola is a substantial shareholder of ViSalus, and represents himself to be a "Global Ambassador" for ViSalus. Prior to his leaving the employment of ViSalus in 2010, Sarnicola was employed at the company's predecessor and holds himself out as one of the founders of ViSalus. Sarnicola is represented as controlling over 74% of the ViSalus "downline."  Since October, 2008 Sarnicola has sold part of his interest in ViSalus for $19.5 million. Sarnicola is one of the primary promoters of the pyramid scheme.

19.     Defendant, Blake Mallen ("Mallen") is an individual residing alternately in California and Michigan and employed in an executive capacity by ViSalus.  Mallen has a performance-based contractual relationship with ViSalus. Along with Sarnicola, Mallen was an employee of ViSalus' predecessor, and holds himself out with Sarnicola and Blair as a co-founder of ViSalus. Since October, 2008 Mallen has sold part of his interest in ViSalus for $19.5 million. Mallen is one of the primary promoters of the pyramid scheme.

20.   Unless referred to individually, these defendants will be referred to as "Individual Insider Corporate Defendants."

## INSIDER INDIVIDUAL PROMOTER DEFENDANTS

21.   In an effort to expand the pyramid scheme, beginning in approximately 2010, ViSalus procured the series of a number of professional network recruiters familiar with the network sales industry and with existing "downlines" and contacts.   These individuals are sophisticated Internet and conventional marketers, who tout their alleged financial success in the "industry" to new recruits into whatever network scheme chooses their service.

22.   Defendant Jason O'Toole ("O'Toole") is an individual residing in Ottawa, Ontario. O'Toole operates a promoter business for ViSalus through, among other means, www.jasonotooleonline.com. In addition to offering his services to others as a network marketing "coach" and lead generator (http://www.learnbuildlead.com/tag/mlm/, http://success.yourprospex.com/), O'Toole represents himself to be the top "earner" for ViSalus, appears in ViSalus promotional materials as a "millionaire" or "Crown Ambassador" through his involvement with ViSalus, and appears in an online "documentary reality series" sponsored by ViSalus called "The Pyramid Thing," http://thepyramidthing.com/.

O'Toole has been featured in numerous videos posted to YouTube by ViSalus or others extolling his alleged financial success due to their ViSalus distributor relationship. Upon information and belief, O'Toole was one of the professional network marketers who was paid or given preferential inducements to become a "top" distributor in the ViSalus pyramid scheme. He and other individuals are believed to have been given undisclosed special incentives, payments or deals to be placed within the commission-payment scheme ahead of or "upline" of Plaintiffs and others, and thus benefitted from the pyramid payment structure. O'Toole has been a primary promoter in Canada for ViSalus. He has appeared multiple times at ViSalus events in Canada and the United States. Upon information and belief, O'Toole has been paid or promised to be paid over $2.5 million by the ViSalus pyramid scheme for recruiting others into the scheme. O'Toole has been a willing participant in the pyramid scheme.

23.     Defendant, Kyle Pacetti, Jr. ("Pacetti") is an individual residing in Orlando, Florida. Pacetti is a significant distributor for ViSalus, represented by the company as responsible for over 10% of the company's "downline." Pacetti is described as a "legend in the network marketing industry" and "Crown Ambassador" for ViSalus. Prior to joining ViSalus, Pacetti was a top distributor with MonaVie, another weight-loss network company selling vitamin-laced juice

through a network selling system. Upon information and belief, Pacetti was one of the professional network marketers who was paid or given inducements to become a "top" distributor in the ViSalus pyramid scheme. Pacetti and his ex-wife Susan Pacetti, have been featured in numerous videos extolling their financial success due to their ViSalus distributor relationship. They have conducted numerous recruiting seminars or events. Pacetti has been given credit for generating much of the pyramid schemes in 2011.  He and other individuals are believed to have been given undisclosed special incentives, payments or deals to be placed within the commission-payment scheme ahead of or "upline" of Plaintiffs and others, and thus benefitted from the pyramid payment structure. Upon information and belief, Pacetti has been paid or promised to be paid over $2.5 million for recruiting others. Pacetti is a willing participant in the pyramid scheme.

24.    Defendant Anthony "Mojo" Lucero is an individual residing in Lincoln, Nebraska. Defendant Rhonda Lucero is an individual residing in Lincoln, Nebraska (together "the Luceros"). The Luceros are significant distributors for ViSalus. Unlike O'Toole and Pacetti who were brought over with an old "downline," Rhonda Lucero has been with ViSalus since 2005, acting as a National Director for ViSalus Science, the company's predecessor in name. Anthony Lucero began as a distributor in 2008. The Luceros have been featured in

numerous videos extolling their alleged financial success due to their ViSalus distributor relationship. The Luceros are often shown in ViSalus promotional literature waving giant ViSalus checks, and have been paid or promised to be paid an estimated over $4 million for recruiting others. The Luceros own and operate Mojos Legacy, LLC, another defendant (discussed below). They have conducted numerous recruiting seminars or events. They benefitted from the pyramid payment structure and have been willing participants in the promotion of the scheme.

25.     Defendant Joshua Jackson is an individual residing in Magnolia, Texas. Defendant Rachel Jackson is an individual residing in Magnolia, Texas (together "the Jacksons"). The Jacksons operate a website promoting ViSalus at http://boomski.bodybyvi.com/. Rachel Jackson also operates a lead generation system business for network marketers. She posts numerous YouTube videos touting her alleged successful financial relationship with ViSalus. She has been featured in numerous videos and printed materials extolling her alleged financial success due to the ViSalus distributor relationship. She has been a featured "ViSalus Top Money Earner," http://visalus.com/pdf/visalus_rst.pdf in ViSalus promotional materials. Rachel Jackson was connected to ViSalus through defendant Aaron Fortner and a promoter named Jonathan Budd who were

previously involved in another network sales company, GeneWize. The Jacksons are significant distributors for ViSalus, and have been paid or promised to be paid at least $1.8 million for recruiting others. They have conducted numerous recruiting seminars or events. The Jacksons are willing participants in the promotion of the scheme.

26.    Defendant Michael Craig is an individual residing in Jacksonville, Florida. Defendant LaVon Craig is an individual residing in Jacksonville, Florida (together "the Craigs"). Michael Craig is a veteran of the network distribution industry and was formerly the ViSalus Director of Sales, North America. In 2010 he left the formal employment of ViSalus to become an independent promoter, and currently holds himself out as a ViSalus "Ambassador." The Craigs together and Mike Craig alone have been featured in numerous videos and written and mailed brochures, magazines, and DVD's extolling their alleged financial success. The Craigs are significant distributors for ViSalus, and have been paid or promised to be paid at least $4 million for recruiting. They are featured as "5-Star ViSalus Ambassadors" waving a $1 million check. They operate a website promoting ViSalus at http://www.mikecraigvisalus.com/. They have conducted numerous recruiting seminars or events. The Craigs are willing participants in the promotion of the scheme.

15

27.    Defendant Jake Trzcinski ("Trzcinski") is an individual residing in California. Trzcinski is a significant distributor for ViSalus and was one of the original founders of the predecessor in name to ViSalus. Trzcinski operates websites promoting the ViSalus pyramid scheme at http://jaketrz.wordpress.com/ and http://www.jaketrzcinskivisalus.com/.  On one of his websites he represents that he is "part owner and top promoter" of ViSalus, with over 10,000 people in his "downline." His corporate entity, defendant Jake Trz, Inc., together with its "downline," is said to control over 10% of the ViSalus "downline." Trzcinski has resided in Michigan and is a willing participant in the promotion of the pyramid scheme.

28.    Defendant Tara Wilson ("Wilson") is an individual residing in California. Wilson is a significant distributor for ViSalus, who was recruited from a competitor network marketing company, MonaVie, in 2011. Prior to her involvement with MonaVie, Wilson was a distributor and pitchwoman for GeneWize, a company selling nutritional supplements.  Wilson is a professional network marketer who appears on "The Pyramid Thing" Internet reality series promoted by ViSalus (along with at least Sarnicola, Pacetti and O'Toole). Wilson has been featured in numerous videos extolling her alleged financial success due to

ViSalus. Wilson has been featured in written promotional materials mailed by ViSalus. Upon information and belief, Wilson is among the professional network marketers who were paid or was given an inducement to become a "top" distributor in the ViSalus pyramid scheme. She and other individuals are believed to have been given undisclosed special incentives, payments or deals to be placed within the commission-payment scheme ahead of or "upline" of Plaintiffs and others, and thus benefitted from the pyramid payment structure. Upon information and belief, Wilson has been paid or promised to be paid over $1.7 million for recruiting others. Wilson is a willing participant in the promotion of the pyramid scheme.

29.     Defendant, Lori Petrilli ("Petrilli") is an individual residing in Montreal, Quebec. Petrilli is a significant distributor for ViSalus. Defendant Frank Varon ("Varon") is an individual residing in Palm Beach, Florida. Varon is a significant distributor for ViSalus. Upon information and belief, Petrilli and Varon were related. Petrilli and Varon have been professional network marketers who began in the late 1990's with Excel Communications, an eventually bankrupt Texas direct sales company selling phone subscriptions. They are, and for several years have been, featured in various ViSalus materials holding checks of $250K. They have conducted numerous recruiting seminars. Upon information and belief,

Petrilli and Varon were two of the professional network marketers who were paid or were given inducements to become a "top" distributor in the ViSalus pyramid scheme. Petrilli has been responsible for recruiting ViSalus in Quebec, Canada. She, together with Varon, has appeared in events sponsored by ViSalus in the United States. They and other individuals are believed to have been given undisclosed special incentives, payments or deals to be placed within the commission-payment scheme ahead of or "upline" of Plaintiffs and others, and thus benefitted from the pyramid payment structure. Petrilli and Varon have been paid or promised to be paid over $1.5 for recruiting others. Petrilli and Varon are willing participants in the promotion of the pyramid scheme.

30.    Defendant Timothy Kirkland ("Kirkland") is an individual residing in Jacksonville, Florida. He is identified as a "5-Star Ambassador" for ViSalus and was a former top distributor for MonaVie. Defendant Holley Kirkland is an individual residing in Jacksonville, Florida, and is often portrayed as half of the "team" that makes up the allegedly successful ViSalus distributors (together "the Kirklands"). The Kirklands own and operate Freedom Legacy, LLC, another defendant (discussed below). They operate a ViSalus promotional website, among other places, at http://timandholley.weebly.com/. The Kirklands have been featured in videos and written promotional materials mailed by ViSalus since 2011.  These

18

materials promote their alleged financial success as a result of being a ViSalus distributor.  They have conducted numerous recruiting seminars or events.  Upon information and belief, the Kirklands were among the professional network marketers who were paid or given inducements to become a "top" distributor in the ViSalus pyramid scheme. They and other individuals are believed to have been given undisclosed special incentives, payments or deals to be placed within the commission-payment scheme ahead of or "upline" of Plaintiffs and others, and thus benefitted from the pyramid payment structure. Upon information and belief, the Kirklands have been paid or promised to be paid over $1.5 million for recruiting others. The Kirklands are willing participants in the promotion of the pyramid scheme.

31.    Defendant Aaron Fortner is an individual residing in the San Diego, California, area.  He is a ViSalus "Diamond Ambassador" who maintains a ViSalus promotional website at www.aaronfortner.com. Fortner also owns and operates corporate defendant Residual Marketing, Inc. (discussed below), through which he is believed to conduct much of his ViSalus business. Fortner was previously a distributor for GeneWize, who joined ViSalus as a promoter in June, 2010. Upon information and belief, Fortner is among the professional network marketers who were paid or was given an inducement to become a "top"

distributor in the ViSalus pyramid scheme. He and other individuals are believed to have been given undisclosed special incentives, payments or deals to be placed within the commission-payment scheme ahead of or "upline" of Plaintiffs and others, and thus benefitted from the pyramid payment structure. Fortner, who claims to make over $100K a month due to his relationship with ViSalus, has been paid or promised to be paid over $4 million for recruiting others. He appears in videos produced by himself promoting ViSalus. He has conducted numerous recruiting seminars or events. He is a willing participant in the promotion of the pyramid scheme.

32. Individual Defendants John Does 1-10 are individuals whose identities are not yet known to Plaintiffs. These are individuals who are believed to have been recruited from other network sales companies to pump up the IP distributor numbers for ViSalus. These individuals are believed to have been given undisclosed special incentives, payments or deals to be placed within the commission-payment scheme ahead of or "upline" of Plaintiffs and others, and thus benefitted from the pyramid payment structure.

33. Unless otherwise indicated, these individual defendants will be referred to as "Insider Individual Promoter Defendants."

## INSIDER CORPORATE AND PARTNERSHIP PROMOTER DEFENDANTS

34.     Defendant, Mojos Legacy, LLC ("Mojos Legacy") is a limited liability corporation organized in Nebraska. Its members are the Defendants Luceros. Mojos Legacy is a significant distributor for ViSalus. Mojos Legacy is the vehicle through which the Luceros' proceeds from the ViSalus pyramid scheme have been funneled.

35.     Defendant JakeTrz, Inc. ("JakeTrz") is a company owned by Defendant Trzcinski. JakeTrz is incorporated in California and maintains its place of business in California. The company is a significant distributor for ViSalus. JakeTrz is the vehicle through which Jake Trzcinski's proceeds from the ViSalus pyramid scheme have been funneled.

36.     Defendant, Wealth Builder International LLC ("Wealth Builder") is, upon information and belief, a Missouri limited liability corporation owned by an individual whose identity is not known to Plaintiffs. Wealth Builder is a significant distributor for ViSalus. Upon information and belief, Wealth Builder was ordered to desist from selling unregistered business opportunities by the State of Washington and may no longer be in operation.

37.     Defendant Residual Marketing, Inc. ("Residual Marketing") is a Florida corporation with its principal place of business in St. Petersburg, Florida, owned by defendant Fortner, a ViSalus "Diamond Ambassador."  On information and belief, Fortner does his work for ViSalus, at least in part, through Residual Marketing.  Residual Marketing is a significant distributor for ViSalus. Residual Marketing is the vehicle through which Fortner's proceeds from the ViSalus pyramid scheme have been funneled.

38.     Defendant, Freedom Legacy, LLC ("Freedom Legacy") is a Florida limited liability corporation owned by the Kirklands, "5-Star Ambassadors" and former distributors for the MonaVie network selling company. Freedom Legacy is a significant distributor for ViSalus. Freedom Legacy is the vehicle through which the Kirklands' proceeds from the ViSalus pyramid scheme have been funneled.

39.     Insider Corporate and Partnership Defendants Company Does 1-10 are entities whose identities are not yet known to Plaintiffs. These entities are believed to have been recruited from other network sales companies to pump up the IP distributor numbers for ViSalus. These entities are believed to have been given undisclosed special incentives, payments or deals to be placed within the

commission-payment scheme ahead of or "upline" of Plaintiffs and others, and thus benefitted from the pyramid payment structure.

40.     Unless otherwise indicated, these defendants will be referred to as "Insider Corporate Promoter Defendants."

## RELATED/ASSOCIATED CORPORATE DEFENDANTS

41.     Defendant, FragMob, LLC ("FragMob") is a California limited liability company in part owned by Defendant Blair. ViSalus paid FragMob, LLC millions of dollars for development of an application for mobile phones, as well as some credit card swipers relating to the direct selling enterprise. Goergen is a member of FragMob's board and Defendants Blair, Sarnicola and Mallen own a portion of FragMob's interest. It has systematically transacted business in Michigan since at least 2011.  FragMob performs services related to the illegal pyramid scheme and has obtained benefits as a result.

42.     Defendant, iCentris ("iCentris") is a Utah company headquartered in Utah. iCentris performs software and database services related to the illegal pyramid scheme and has obtained substantial benefits as a result. It has systematically transacted business in Michigan since at least 2012.  iCentris was started by a former CEO of another direct sales marketing company and serves that

industry by developing custom database software for tracking the "upline" and "downline" sales and calculate commissions and bonuses. It purchased a company called Solutions X, which had previously performed work for ViSalus in 2012. Defendants Blair, Sarnicola and Mallen own a portion of iCentris's interest.

43.     Unless referred to individually, these defendants will be referred to as "Related Party Corporate Defendants."

## JURISDICTION AND VENUE

44.     All Defendants are subject to the jurisdiction of this Court. This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332(d). This court has personal jurisdiction over each defendant. As set forth above, the Defendants continuously and systematically engaged and engage, in business in Michigan. The Defendants do business as individuals, limited partnerships or limited liability companies in Michigan. In accordance with 18 U.S.C. § 1965(a) and (b), all of the Defendants are subject to this Court's jurisdiction in that they "transact affairs" in the Eastern District of Michigan.

45.     To the extent not specifically alleged above, each of the individual defendants in this case who were or are also IPs, have received numerous

payments from ViSalus, located in Michigan. Each of those individuals has appeared in advertising and/or promotional materials generated from Michigan and disseminated for a period of years in, among other states, the State of Michigan.

46.    Certain of the individual defendants, including Blair and Sarnicola, reside or have residences in Michigan. Each of them has systematically communicated with ViSalus in Michigan in connection with ongoing promotional work performed on behalf of the company.

47.    Each of the corporations related to ViSalus has systematically transacted business in Michigan by virtue of common ownership and/or common boards and continuous sales activity within this state.

48.    Each of the limited liability company defendants in this case has likewise transacted business in Michigan by virtue of systematically receiving payments from ViSalus or performing services for ViSalus within Michigan for a period of years.

49.    ViSalus operates in Troy, Michigan.  Venue is proper in this Court pursuant to 28 U.S.C. §1391.

### BACKGROUND: VISALUS SCIENCE AND EARLY CONNECTIONS BETWEEN THE CORPORATE DEFENDANTS

50.     In 2002, Blair, a self-proclaimed ex-Los Angeles gang member, met Goergen Sr., and his equity company, Ropart Asset.  Ropart Asset is run by Goergen Sr.'s son Todd Goergen. Goergen Sr. individually and/or the Goergen equity fund in its own name invested a small sum in the Blair-run business unconnected to this pyramid scheme.

51.     Three years later, in late 2004 or 2005, Blair learned of network company operating in Troy, Michigan, ViSalus Science.  ViSalus Science's chief salesman was Sarnicola and Mallen its chief marketing officer. ViSalus Science had been operating under Mallen and Sarnicola for approximately a year or two before Blair came along.

52.     ViSalus Science sold weight-loss shakes through a network marketing plan.  Although its website and promotional materials played on the "sciences" behind its weight-loss shakes, it did not have any kind of laboratories, had no connection with any legitimate hospital or university research project, and employed no one with credentials to sustain any manner of health-related claims for its products.

53.     Instead, since at least 2003 ViSalus Science had promoted an affiliation with Dr. Michael Seidman, an ear, nose, and throat specialist at Henry Ford Hospital, West Bloomfield, Michigan.  Blair, together with Sarnicola and Mallen, pitched Seidman as a patent-holder, recipient of 20 years of NIH grants, and world-famous vitamin and nutrition researcher behind its weight-loss shakes. At all times, however, Seidman had his own practice in an unrelated field, ran his own side business vitamin supplements company, and the company paid him a license fee.

54.     The company also listed Michael Sheffield as a part of its management team, in the realm of "MLM Consulting." Sheffield advertises himself as an expert witness in the field of compensation plans and lists many network marketing companies as clients. ViSalus Sciences held out Seidman and Sheffield as part of its management team (Seidman and Sheffield and others who played a role in the pyramid scheme will be referred to at times as "nonparty entities").

55.     In 2005, Ropart Asset and Goergen Sr. lent Blair $1.5 million to buy to some or all of the assets of ViSalus Science. After his buy-out, Blair became Visalus Science's CEO.  Ropart Asset and Ropart Asset II, together with the

Goergens, became shareholders in ViSalus Science, although none of their names or ownership affiliations were then listed or disclosed by the closely-held company.

56.    After the Goergen/Ropart Asset-backed buy-in, Sarnicola, Blair and Mallen began calling themselves the "founders" of ViSalus Science. ViSalus Science continued to be marketed through a network marketing plan. The company used Seidman, Sarnicola and others as promoters to convince people to "join" the ViSalus "business opportunity." They actively promoted a "lucrative" opportunity to sell the weight-loss formula shakes for the company. A compensation plan encouraged untrained people to become "Independent Distributors" for ViSalus Science for a fee.

### BACKGROUND: BLYTH PURCHASES OPTION TO PURCHASE CONTROLLING INTEREST IN VISALUS

57.    After the silent investment by Ropart Asset and the Goergens into ViSalus Sciences, the company grew slowly.  Three years later, in August, 2008, non-party Blyth (which was run by Goergen Sr.) bought out a part of Ropart Asset's 2005 investment in the remaining stock of ViSalus.  After the transaction Todd Goergen became the Chief Strategy Officer and later Chief Operating Officer of ViSalus.  Goergen Sr. and Goergen began to be identified as board members of

ViSalus, although Blair, Sarnicola and Mallen continued as the company's frontmen to the public.

58.     The principals behind ViSalus were all experienced in network marketing. In late 2009 or early 2010, they began to systematically induce and buy professional marketers from other network companies like MonaVie and GeneWize to "join" ViSalus. This deliberate influx greatly accelerated the number of IPs that recruited others into the system and was designed to induce an aura of "success" or "momentum" into the ViSalus operation.

59.     Professional marketers like O'Toole, Varon, Pacetti, Fortner, Wilson and others, who had built up significant, many-thousand strong "downlines" in other network companies, were brought over to ViSalus. One of the benefits of doing this was to be able to portray these people to the unsuspecting public as "success" stories of how much money could be made by selling ViSalus shakes.

60.     The influx of these individuals dramatically boosted the ViSalus numbers of distributors and sales. The reported growth was astonishing.  Its annual sales in 2010 were $32.8 million.  Its sales in 2011 were $230 million.  Its sales in 2012 were $623 million, almost 20 times higher in two years.  At the same time,

the company added tens of thousands of new distributors, from well under 10,000 to over 114,000 people, increasing each year by over 50,000 in 2011 and 65,000 in 2012.

## PYRAMID SCHEMES ARE ILLEGAL

61.    One reason why pyramid schemes are illegal is that they must eventually collapse due to market saturation as the market for potential participants fills. There is no natural market demand for the product sold by the scheme's promoters, resulting in little to no demand for the product beyond sales made internally to new recruits.   As the market for new distributors saturates, new distributors are left with unsellable, higher-than-market-price inventory and little to no chance to recoup their money from legitimate customers who actually want the product for itself.   The only market for the inventory, and the only opportunity to recoup the cost of maintaining the distributorship rights lies in recruiting another person. Another reason why pyramid schemes are illegal is that they naturally funnel money only to a small percentage of people at the top, money that is funded by the large base at the bottom presented by the pyramid's operators with the same false "business opportunity" to make money.

62.     Pyramid schemes are uniformly held to be illegal in both the United States and in Canada. The FTC uses the following test (from *In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1181 (1975), followed by *US v. Gold Unlimited,* 177 F.3d 472 *(6th Cir.)*) to characterize a pyramid scheme:

> [Pyramid] schemes are characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product and (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users.  In general such recruitment is facilitated by promising all participants the same 'lucrative' rights to recruit.

63.     Michigan law, MCLA 445.1528, is part of the Michigan Franchise Investment Act. It defines a pyramid, which the Act deems an illegal scheme under Michigan law, as:

> [A]ny plan or scheme or device by which (a) a participant gives a valuable consideration for the opportunity to receive compensation or things of value in return for inducing other persons to become participants in the program or (b) a participant is to receive compensation when a person introduced by the participant introduces one or more additional persons into participation in the plan, each of whom receives the same or similar right, privilege, license, chance, or opportunity.

64.     The Sixth Circuit Court of Appeals has approved the use of a jury instruction which defines a network-sales based pyramid scheme as follows:

> MLM [multilevel marketing] programs survive by making money off product sales, not new recruits. In contrast, "pyramids schemes" reward participants for inducing other

people to join the program; over time, the hierarchy of participants resembles a pyramid as newer, larger layers of participants join the established structure. Ponzi schemes operate strictly by paying earlier investors with money tendered by later investors. No clear line separates illegal pyramid schemes from legitimate multilevel marketing programs; to differentiate the two, regulators evaluate the marketing strategy (*e.g.*, emphasis on recruitment versus sales) and the percent of product sold compared with the percent of commissions granted.

65.   Substantial federal common law has evolved on the subject of pyramid schemes. Well-recognized elements of a pyramid scheme, particularly in companies attempting to masquerade as a "legitimate" network marketing company, are: (1) whether the entire scheme is more associated with recruiting other participants rather than selling the alleged product to outside customers; (2) whether sales are primarily made internally to new distributors rather than to outside customers; (3) whether there is a high drop out or "churn" rate among newly-signed distributors (indicating the reason why product was purchased was for the business opportunity to recruit others); (4) whether the scheme's promoters spread implied or express promises of great wealth or financial independence if one is to participate in the "business opportunity"; (5) whether the scheme's promoters cause distributors to load up on the product (inventory loading) in order to receive commissions; and (6) whether there is market saturation leading to collapse.

66.     Each of these elements is present in the pyramid scheme devised and operated by the defendants. These are detailed in Paragraphs 67 to 136 below.

## THE VISALUS COMPENSATION PLAN REQUIRES PAYMENT FOR THE RIGHT TO SELL A PRODUCT

67.     The only way for an individual to obtain the right to sell the ViSalus weight loss products is to pay ViSalus money to become its distributor. ViSalus pitches the distributorship of its products as a "business opportunity."  ViSalus refers to these people, like the individual Plaintiffs and all others in the class, as members of the "Individual Promoter Sales Force." By enrolling as an IP, the IP Sales Force, including Plaintiffs and all members of the class, have paid for the right to sell a product.

68.     No training or experience is necessary to become an IP. A person can become an IP through a personal "event" in which information is given out by the company, or through another IP, who may or may not hand out written or audiovisual materials.   A written form takes the prospective enrollee through several sign up steps, the most important of which involves the payment by the enrollee to ViSalus of a fee. The enrollee chooses whether to become a "basic" distributor (at $49), or a distributor with additional features of the ViSalus

promoter system (at either $499 or $999). In written form, the enrollee may be handed a form like this:



The two high-priced distributorship rights packages, the $499 Executive Success System ("ESS") or the $999 ESS with samples (also known as the "Star Kit"), bundle expanded rights to commissions and bonuses (over the base package) with some product and a quantity of product samples. The company pushes the $499 and $999 distribution kits at prospective distributors.

69.   Additional features presented to the enrollee for purchase include an auto-ship program at up to $249/month of shakes, which creates a monthly

automatic shipment of product charged to the IP's credit card. Upon enrolling, the new enrollee provides ViSalus with a social security number and a credit card number. The new IP is also sold a recurring, monthly website subscription for $24 to $29 per month. Various fees associated with the process are added as well, such as an annual "administrative fee," $3 handling fees and so on.

## VISALUS PAYS DISTRIBUTORS FOR RECRUITING OVERWHELMINGLY MORE THAN FOR SALES TO OUTSIDERS

70.     ViSalus product sales are primarily made to new distributors recruited into the system. The principals of the scheme know this and know that the company's sales are directly correlated to the number of new recruits. For example, in the 1st quarter of 2012, during ViSalus' peak year of operation, its reported sales of $136.7 million were the result of purchases by and through 92,000 recruits, for an average of $1,485 per IP. In the first quarter of 2013, after its sales slide began in earnest, sales of $104.3 million were the result of 70,200 recruits, again for an average of $1,485 per IP. In the first quarter of 2014, sales of $57.4 million were the result of the work of 36,100 IPs, for an average of $1,590 per IP.

71.     The compensation plan operates by promoting an IP upwards through a variety of tiers and structures, and paying a multitude of "commissions" and

"bonuses" to the IP. If the new IP sells ViSalus weight-loss shakes to legitimate outside customers the "business opportunity" only generates a token income.  The presence of outside customers is incidental: the purpose and goal of the compensation plan is to recruit new people to become IPs.

72.    The Individual Insider Corporate Defendants know that without a constant stream of new recruits and sales to new recruits the whole operation would grind to a halt in a matter of weeks. The Individual Insider Promoter Defendants likewise know that the sole reason they were paid, or promised to be paid, massive amounts of money by the company was if they were successful in recruiting a large number of people to become promoters for the company.

73.    Simply by retailing the weight-loss shakes to legitimate outside customers, the IP has virtually no chance to cover the monthly cost of his product. In order to remain "active" and retain the right to "earn" a commission, the new IP must maintain a $125/month purchase level. The compensation plan pays a sales commission on sales monthly over $200. Monthly sales of between $201 and $500 are paid 10%, or $30. Sales of $501 to $1,000 are paid 15%, or $75. Sales of $1,000 to $2,500 are paid 20% or $300. Thus, in order to just stay ahead of the monthly cost to *be* an IP eligible to earn the bonus, the IP must find enough

customers *each* month who order over $1,000 worth of weight-loss shake product. Very few IPs do that.

74.     In contrast to these small sales commissions, the monetary incentives built into the compensation plan lucratively reward recruiting activity. Many of the numerous "commissions" and "bonuses" available to IPs are nothing more than direct payments for recruiting, or as the FTC characterizes it, "the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users," or under Michigan law, "the opportunity to receive compensation or things of value in return for inducing other persons to become participants in the program," or "to receive compensation when a person introduced by the participant introduces one or more additional persons into participation in the plan, each of whom receives the same or similar right, privilege, license, chance, or opportunity." Among the explicit recruiting-based payments made to IPs are the following.

75.     Once a distribution kit is purchased, the IP receives a First Order Bonus when he or she enrolls a new promoter into the system. That bonus is a 20% commission on all products ordered by the new IP beyond their promoter cost. The First Order Bonus is paid to all IPs "upline" of the sponsoring IP at a decreasing

percentage, so that an IP can get paid this bonus for the recruiting activities of previously-recruited distributors up to three levels below the IP.

76.    A successful recruiter is paid a higher amount of per capita commission. A Fast Start Bonus is paid to an IP when he or she successfully recruits a new distributor who purchases a $499 ESS or $999 Star Kit. If the IP is at an "Associate" rank, the company pays a bonus is $50. If the IP is at a "Director" rank at the time of the recruitment the bonus is $100. The company's bonus increases to $130 if the IP is at a "Regional Director" rank and up to $180 if the IP is at an "Ambassador" rank. The higher "ranks" are eligible for "override" bonuses of $10 to $15 as well. Thus, the IP is given a monetary incentive to rise in "rank." The only way to rise in rank is to build a "team" of recruited new distributors and to "assist" them in themselves becoming highly-ranked by recruiting others.

77.    The company's training materials depict the bonuses as follows:





78.     The types and amounts of bonuses offered to new distributor recruits are directly dependent on the recruiting success of the IP. ViSalus has summarized the incentives as follows:

> "An individual promoter with the rank of associate can earn "team commissions" on a monthly basis equal to 5% of the [Bonus Volume, or "the amount of each product sale that counts towards bonuses and commissions. In most cases, BV is equal to the selling price of each product"] generated during such period in the two down-line "levels" below him in his or her down-line sales organization. **As an individual promoter achieves higher ranks, he or she is able to earn 5% of the monthly BV generated by an increased number of levels**

**below them**. … In addition, an individual promoter with the rank of ambassador can earn additional commissions through the leadership depth bonus, which pays 2% on all the bonus volume from level nine through the remaining levels in such individual promoter's down-line sales organization. **When an ambassador has another ambassador in their down-line sales organization, the leadership depth bonus will increase to 4% of bonus volume through that second ambassador's eight levels, and the top ambassador will still earn a 2% leadership depth bonus through the remaining levels in the top ambassador's down-line sales organization**."   (quote appears in a ViSalus prospectus, 9/2012, emphasis added)

79.   These "team commissions" are depicted in the ViSalus Plan Book like this:



80.   The Rising Star Weekly Enrollers Pool commission is another direct commission for recruiting others. An IP who "qualifies" for a share of that commission, which amounts to 2% of the company's revenue, is guaranteed at least $75 for the week he or she qualifies. A significant portion of the "qualifying"

requirement is enrolling or recruiting, three new IPs into the system. Thus, this bonus is a direct bonus for recruiting another into the system.

81.     The company has described this commission as follows:

- "We place a portion of the BV [bonus volume] from the previous four weeks of company-wide production into a "rising star **weekly enroller's** [sic] pool," and one quarter of this pool is paid each week. The amount placed in the pool is shared among those who qualify for the pool.

- We place a portion of BV from the month's company-wide production into a "leadership pool" that is shared by promoters who achieve the rank of presidential director or ambassador during such period, **with each such individual promoter being entitled to an amount based upon the highest rank achieved in each sales leg of his down-line sales organization** during such period.

- We place another portion of BV from the month's company-wide production into a "leadership pool" that is shared by promoters who achieve the rank of ambassador during such period, **with each such individual promoter being entitled to an amount based upon the highest rank achieved in each sales leg of his down-line sales organization** during such period.

- We offer an "ambassador bonus" to individual promoters who achieve one of five ambassador ranks in a given month, **with the amount of the bonus based on the sublevel of ambassador rank** obtained, as well as the length of the period of time for which such sublevel was maintained."

(emphasis added.)

82.     Regardless of the token inclusion of a sales requirement into the distributor's plan, all of the scheme's promoters understood that the plan rewarded recruiting above all else. In a lawsuit filed in this court, ViSalus admitted, "In order to encourage distributors to encourage growth of product sales **through the recruitment of other distributors**, ViSalus … rewards its top performing distributors through a generous compensation plan." (Par. 8, *ViSalus v. Bohn,* Eastern District of Michigan, Case No. 2:13-cv-10366, January 29, 2013 (emphasis added)). According to the company,

> "As distributors meet certain goals designed to measure the sales success of the network of distributors that they bring to ViSalus, they are assigned a "rank" to recognize their success. The metric used to measure a distributor's sales success and assign ranks is known as Growth Qualification Volume ("GQV"). The GQV measures the volume of sales generated by the distributor's team. **A distributor's success in recruiting, training, and developing other distributors—which is known as their downline network—is measured by the number of distributors that they directly recruit and the rank achieved by these distributors.**" (Par. 9, emphasis added).

83.     In a Welcome Booklet extolling "the power of 3," ViSalus emphasizes that just finding three new people and helping them find three new people "do what you just did" generates so-called "Immediate Income" and "Leadership Income" bonus levels. These bonuses are explicitly paid for successful recruiting at even the lowest level of participation:

**Understanding The Power of 3**

The best way to get your ViSalus™ business started is to invite some friends over to your home for a Challenge Party so they can try the products and hear about the Body by Vi™ Challenge. Your support team will help you out, but the key is to keep it casual and fun.

First, focus on finding at least 3 people who want to be Challenge Kit Customers so that you can get your product for free each month. Once you've done that, you'll want to find 3 people who are interested in becoming Distributors and promoting the Challenge. Help them do what you just did, and you're on your way!

It's the Power of 3, and it lets you earn 3 kinds of income through ViSalus:

1. **Immediate Income:** Get paid every Monday for referring new Customers and new Distributors to the Challenge.

2. **Recurring Income:** Get paid over and over again as all of the Customers in your referral line continue to use ViSalus products.

3. **Leadership Income:** Help other Distributors become successful and take advantage of special Bonuses and Promotions reserved for ViSalus Leaders.

84.    In various other publications ViSalus tells IPs that they can be paid in weekly bonuses or by encouraging others to join ViSalus and moving up the ranks to the different levels of so-called Directors or Ambassadors based on what the enrollees, that is recruited IPs, under them purchase. This emphasis on recruiting is made at all levels of promotion.

85.    The ranking system explicitly pays for recruiting success, and prospective enrollees are shown the alleged value of that success. A "new" Ambassador receives a $25K check, and recruits are told that "potential earnings" of $10-$14K per month are available. A "1-Star" Ambassador, who helped sponsor another Ambassador, has represented "potential earnings" of $14-$20K per month.

A "2-Star" Ambassador, who sponsored two Ambassadors in his/her downline, has represented "potential earnings" of $20-$30K per month. The Ambassador "ranking" continues with a represented upward tier of "potential earnings" of $40-$75K per month for a "5-star" Ambassador. The next tier of Ambassadors continues to "Diamond" and "Royal," who may obtain "potential earnings" of up to $150K per month. These tiers and their explicit money claims are widely distributed on the Internet and in personal meetings sponsored and encouraged by the company.

86.     That the incentives tilt to recruiting over selling to outside customers is built into the pyramid scheme's very operation. Defendants make virtually all their sales of the weight-loss product on the initial enrollment sale to a new IP and that IP's subsequent transaction to his or her new recruit, and comparatively few sales are made to true outside customers. For example, in a lawsuit filed by ViSalus against a distributor in this Court, ViSalus acknowledged that a high-ranking IP had 1,755 distributors and only 152 customers in his "downline." The IP's wife allegedly had 16,300 distributors and 24,850 customers in her "downline" (*ViSalus Inc. v. Hockmuth et al.*, 5:14-cv-11762), making the entire huge downline succeed in each distributor selling to less than two customers.

87.     The only way that the weight-loss shakes could be sold in the market is through a pyramid scheme that couples the "business opportunity" with the purchase of the shake. Standing alone, the ViSalus weight loss shakes compete against a glut of similar market products, often much cheaper and available on local store shelves. ViSalus itself compares its products to "competitors" such as Herbalife (an MLM), Shaklee (an MLM), MonaVie (an MLM), Pharmanex (an MLM), Melaluca (an MLM), Isagenix (an MLM), Evolv, Slimfax, Myoplex and MetRx. Without the lure of becoming a new recruit and him/herself recruiting others and getting paid, the ViSalus product has little to no market appeal. Defendants know that IPs purchase grossly more product by dollar volume than non-IPs, and it is the IPs rather than outside customers who are the product's actual "customer" base.

88.     Defendants know there is little natural demand for the weight loss shakes – particularly at the prices ViSalus charges for them – outside the sale to new distributor system. Customers buy significantly less product or at significantly lower volume than distributors do. A search of eBay listings, for example, shows thousands of failed attempted sales at full price and completed sales of the product at an average price well below that charged the IP. Craigslist ads show product dumping, with people asking for much less than the auto-ship price:

46

> Selling 11 bags of Visalus Meal Replacement Shake Mix and 1
> bag of misc. flavor packs. We used to be a dealer for this but we
> have a overstocked of leftovers from promotions. These bags
> go for over $90.00 for a months supply which is 2 bags. So at
> 11 bags for $400.00 you are getting a STEAL and can't find it
> anywhere this cheap' the stuff works great as well. OR make me
> an offer on them all!
>
> (http://chicago.craigslist.org/nwc/hab/4526020739.html, *June 18, 2014*)

89.     ViSalus has a tremendous churn or turnover rate (sometimes known in the network industry as "breakage"), estimated as nearly 200% per year.  Each "churned" IP is "non-active."   A non-active IP cannot receive commissions, and has lost money with the company. Each of the Individual Corporate Insider Defendants and Individual Insider Promoter Defendants know and follow the churn rate and know about the financial effect of the "business opportunity" on most of the people they recruited.

90.     Defendants also know that the actual average amount paid in commissions to the vast majority of ViSalus IPs is much less than the IP's cost of getting into the system in the first place. In the absence of bonuses paid for recruiting (described earlier) this "average" level of sales activity by a distributor generates very little commissions per IP per year (and only to "active" IPs at that). Thus, even the average "active" distributor (who continues to purchase product

from the company to stay "active") comes out well short of the cost of recouping his or her distribution costs unless he or she participates in recruiting activities.

91.     The company (and the insider defendants) know that the true average ratio of "customers" to "IPs" (even by the "nonactive" definition employed by the company to mask the true small number of customers), is no more than 2:1. The majority of the sale activity for each recruited IP occurs during and shortly after his or her signup. Defendants know that the vast bulk of the people recruited to be distributors lose money.

## VISALUS TOUTS "UNLIMITED EARNING POTENTIAL" AND THE "BIMMER CLUB" TO ENTICE NEW RECRUITS

92.     Pyramid schemes suck in participants by appealing to the notion that the new participant may get to be as rich as the examples promoted by the scheme's promoters. Although the get rich promises are often accompanied by small print disclaimers or words like "earnings potential" appear in the company's "official" written materials, sophisticated promoters, like defendants here, spread the word in other ways that the same, vast riches of people "just like you" are attainable by anyone who "works" the system, *i.e.,* recruits other suckers to join the pyramid beneath them in their "downlines."

93. Although the defendants know that the overwhelming majority of new signups will lose money as a distributor, the overriding message ViSalus promotes is that of profitability, earnings, and getting rich by participating in the "business opportunity." These messages appear on the web at ViSalus's own website, in written promotional materials, and are disseminated through and with the active assistance of the Individual Insider Promoter Defendants.

94. Virtually every ViSalus promotion, from its own website to YouTube videos of its meetings and conventions to its monthly magazine touts the alleged monetary "success" of its distributors. These often include or feature depictions of the Individual Insider Promoter Defendants. The company does not identify them as professionals who have been paid for recruiting others, but as people just like the newest recruit who worked the "lucrative" ViSalus system selling weight-loss shakes to a willing public to personal riches. These representations are false.

95. The allegedly most "successful" company distributors are publicly identified as ViSalus "Ambassadors." Graded as 1-star up to "Global" Ambassadors (and recently a new rank called Diamond), these promoters cooperate in success stories posted on the ViSalus website or the blog the company runs. The company often holds out Individual Corporate Promoter Defendants like

the Craigs, O'Toole, Pacetti, and the Kirklands and others as examples of success. These people are pictured in ads and promotions being quoted attributing the money that the system brought to them to the intrinsic worth of the product and the ViSalus "system."

96.    The company expressly, deliberately and willfully creates the association between advancement within its ranking system and making large amounts of money. ViSalus-branded "millionaires" appear heavily promoted in print and on its website. The company makes explicit money claims relating to the rise in rankings available to its distributors. For example, in its website it announced:

> **"New Ambassadors**: Receive the coveted Black Jacket and a $25,000 Bonus Check … **3-Star Ambassadors**: A $100,000 Bonus Check awaits… **5-Star Ambassadors**: Take home the $250,000 Bonus Check… **Royal Ambassadors**: Gain a $500,000 Bonus Check … **Crown Ambassadors**: Earn a cool $1,000,000 Bonus Check"

(https://web.archive.org/web/20130510091852/http://visalus.com/rewards/promoter-rewards).

97.    Defendant Sarnicola is no longer identified as a ViSalus executive or major shareholder but as its "Global Ambassador," often shown with his wife on glamorous vacations.   ViSalus pays Sarnicola large sums to market this

"opportunity" to new recruits (paying him well over $1 million per year just for his expenses) by having him attend ViSalus events to inspire individuals with assurances of easy profitability and unlimited earning potential and by presenting "evidence" to new promoters showing they can make close to $2.4 million dollars in "residual income" with a team close to 10,000 promoters.  In these videos, he often claims, "even if you fail this by 99% it's still an extra $24,000." A selected handful of other promoters, often appearing as couples or with their children on stage, are rewarded publicly in presentations throughout the United States, Canada and now the United Kingdom.

98.    Videos and downloadable PowerPoint presentations sponsored and disseminated by the company on its own and pushed to websites tout the same message of "free" luxury cars, "financial freedom" and "exponential" income, as in the following:



99.    In addition to the company's own branded materials, the defendants actively push a web and social media presence. The company and its promoters maintain numerous individual accounts on Facebook, YouTube, and Twitter, associated with the ViSalus "opportunity." The defendants push out their videos, or the videos produced by Individual Insider Promoter Defendants to YouTube and Vimeo, and spread content out to a variety of MLM-related websites frequented by people who may be attracted to the pyramid scheme.

100.    The defendants' Internet presence actively pushes its money-making "opportunity" on (undisclosed) paid network marketing "blogs" (in reality paid

advertisers). These sites typically publish inflated or false or misleading lists of so-called Top Earners of the ViSalus system.   They feature bogus "interviews" between the defendants or "interviews" on paid sites in which the millions of dollars that can be "earned" by associating with ViSalus are explicitly or implicitly stated. All or virtually all of the Individual Insider Promoter Defendants, in addition to Blair and Sarnicola, have cooperated in being "interviewed" about the ViSalus system and have spread the word about their incredible money-making success in the system. The purpose of all of this activity is two fold: the company can spread its recruiting and money-making message apart from its conventions and events, and can maintain a distance from sites and feeds that tout the money-making claims on its behalf.

101.   The effect of all of this coordinated Internet activity is to blanket the web with visions of being a ViSalus "promoter" and getting rich in the process. A search on Vimeo results in nearly 300 ViSalus-related videos, many if not most showing in some fashion or other allegedly how to make lots of money from the ViSalus opportunity.   A simple Google search for "ViSalus" and "unlimited earning potential" yields over 38,000 hits. A search for "ViSalus millionaires" yields 394,000 hits.   A search for ViSalus and "exponential earnings potential" yields over 12,000 hits. A search on YouTube for ViSalus and "earnings potential"

yields over 340 videos. Thousands of the "interviews" and lists of "Top Earners" with associated dollar figures are spread through a variety of anonymously-owned network-marketing opportunity websites (many concealed by Domains By Proxy owner identity). In short, the company and its promoters have succeeded in associating throughout the web the promise of getting rich with distributing ViSalus weight-loss shakes.

102.   The company produces slick slideshows of its own that spread the money-making message. For example, Regional Director, the rank above a Director in the ViSalus system, is a status achieved by continuing as an "active" promoter with three qualifying "downlines" and a minimum group volume of $12.5K in sales a month. ViSalus-produced videos and PowerPoint presentations disseminated by the company suggest that the average income of a Regional Director is around $1- $3K a month and imply that new IP's will soon find themselves driving a "shiny black new Bimmer [BMW automobile]." In a downloadable PowerPoint from its website, defendants show and widely disseminate illustrations like this:



(http://visalus.com/sites/default/files/docs/corporate/visalus_overview_prese ntation.pdf)

103.   The company has pushed the so-called "Bimmer Club" as an overt inducement to recruit new IPs. ViSalus boasts of the number of BMWs it has given away to IPs both directly in a variety of its own marketing materials and through third-parties. For example, in 2010 ViSalus lured a well-known promoter named Rick Gutman from MonaVie to join ViSalus and build a new promoter "team." In a promotional video put up by the company, Gutman talks of his "decision" to walk away from selling $50 vitamin-laced juice for MonaVie to selling $250 soy and Splenda shakes for ViSalus. In the video he tells prospective promoters that he "knows" his team has gotten 600 BMWs "free." This statement and many more like it concerning the "Bimmer Club" are not true.

104.   In reality, the BMW cars are only conditionally and partially subsidized. The IP remains legally responsible for the lease payments. The ViSalus "payments" for the BMW continue only for as long as the IP can maintain a certain level of sales by himself and his "downline," thus ensuring continual internal product loading and recruiting activity.

105.   The company pushes the slogan, "3 For Free- Stars and Cars" on numerous web videos of ViSalus events.   In a typical video describing the promotion, for example, Sarnicola, shown on stage, encourages the room to repeat his slogan and explains how easy it is for an IP to get the product for free and the car too, all by supporting other team members in one's "downline" and urging them to reach 'Rising Star' status by getting additional individuals to join the pyramid.  The posted video shows a variety of slides including this:



106.   A ranking system emphasizes the amount of money that an IP could make. The company self-publishes its own magazine, sent to IPs as part of the so-called Vi-Net subscription (a $24/month charge), and partners up with "Success" magazine, a glossy network marketing vehicle, to show what IPs are being promoted and how successful they are.

107.   The company emphasizes how much money moving "up" in rank is worth. For example, the next rank up from Regional Director is the National Director. The company claims that the average income of a National Director ("ND") is between $3K and $6K a month, and NDs are invited to attend the "ND

Experience," an "inside secret" training for the promoter to learn how to encourage additional individuals to join ViSalus.

108.   As is typical with all direct-selling companies, part of the overall scheme is to generate excitement for the "opportunity" to make money.  In a public filing, ViSalus explained how that excitement is spread:

> "We generate excitement around the ViSalus products and brand through events held throughout the year. At challenge parties, which are held in private homes or public spaces such as hotel conference rooms, prospective customers and individual promoters gather to learn about the ViSalus opportunity. These challenge parties may be attended by as many as a thousand people. Regional events, held several times a year, also range in size up to several thousand people … Thousands of people attend our national events, which are typically held three times per year and also provide training opportunities and recognition on a large scale. Our largest national event is Vitality, held once a year. Approximately 18,000 individuals registered to attend our July 2012 Vitality event in Miami, Florida."

109.   It is well-established in the network marketing business that one hook to get new recruits in the door is the check-waving ritual. The ritual is typically performed before a large crowd, videotaped and photographed, and images of the happy recipient shown to potential recruits in printed materials, on the Internet and wherever they can be spread. The defendants all participate in this show. For example, defendants the Jacksons are shown on stage like this:



110.   While ViSalus has staged the check ritual countless times it adds a twist to the ritual: *the checks are not actually paid*.  The company does not explain that the distributors waving the giant check were brought on board through special deals. Nor does it explain, except in very small print, that it will pay the check in 10 years and only if the recipient continues to be "active" with the company, and if, and only if, it chooses to do so.

111.   The dissemination of the check-waving is an integral part of nearly all of ViSalus' printed or Internet materials. The Individual Insider Promoter

Defendants are featured in company-sponsored materials, such as a downloadable PowerPoint from the ViSalus website. For example, defendant Pacetti is prominently shown holding a $1 million check:



112.   The company's so-called "founders" Blair, Mallen and Sarnicola also distribute professionally-edited videos posted on the web which tout the success of the system, the company and themselves. For example, through a series of videos posted on the ViSalus.com website, Mallen, the Chief Marketing Officer of ViSalus, enthusiastically pitches how easy it is to start earning an income.  As he explains, the more people an individual can 'help' with the serious spread of the obesity epidemic, the more money there is to be made. Other videos feature

Sarnicola walk prospective enrollees in the IP system through the wealth that Sarnicola has made, implying that the new enrollee can too earn $350K per month as Sarnicola has allegedly done. Blair has self-published a book and appears in many videos, the object of which is to suggest if not explicitly state that his wealth is due to the success that ViSalus weight-loss shakes have in the market.

113.   Some of the Individual Insider Promoter Defendants as well as Sarnicola appear on the company-created and sponsored reality series "The Pyramid Thing." The series widely disseminates the message of achievable success, wealth and earnings allegedly obtained by being a ViSalus IP and following the company's recruiting plan.

114.   The Individual Insider Promoter Defendants, with the company's cooperation and knowledge, publish fawning statements of their alleged success through ViSalus on their own websites and links to each other's sites, thus enabling easy search engine optimized- messages of ViSalus wealth to be found throughout the web.

115.   Defendant Aaron Fortner, for example, exhorts that:

> To get to the next Promoter rank, you need to completely trust in the promotions that ViSalus offers and then do exactly what

the plan says. I made a personal commitment to achieve Diamond Ambassador, and then I learned how to get there as fast as possible. Sometimes the best leader is the best follower– one who consistently follows the play. The system is already in place; you just need to follow it.

http://www.businessforhome.org/2013/09/aaron-fortner-visalus-hits-diamond-ambassador/

116.    Defendant Rachel Jackson touts these numbers in an interview:

Our team has expanded greatly, representing every single state in the US and every single province in Canada. We now have over **6,000** active (*active!* that's the only number that counts guys) promoters on our team and tens of thousands of customers. In April 2012, we're on track to close out over **$4,000,000** in group revenue. That's translated to an income for Josh & I [sic] that's topping **$100,000** a month [sic] our 14 month in ViSalus (emphasis in the original).

http://www.businessforhome.org/2012/04/rachel-jackson-visalus-top-earner-interview/

117.    Defendant O'Toole allows himself to be quoted as earning over $200K per month by using the company's easy-to-follow formula:

**Jason O'Toole**, ViSalus Nr. 2 Top Earner was rewarded with $1 million bonus in June 2011. Jason went from over $100K in debt and never making it in [multi-level-marketing], to earning over **$200,000** as of April 2012.

http://www.businessforhome.org/2012/05/visalus-jason-otoole-and-jennifer-creamer-hit-200000-per-month/.

118.   Defendant Pacetti not only promotes himself on his own but is promoted by the ViSalus "ViBlog" (along with many of the other defendants). In 2014 (after the defendants knew that the number of IPs had dropped by over two-thirds since 2012) Pacetti's recruiting success is described as follows:

> "It's hard not to be impressed by Kyle's growth already in 2014. His team's monthly sales volume has increased by 36%. New Customers joining his team each month have increased by over 100%, while the number of new Promoters added to his team has increased by over 200%. He's also seen the number of new Rising Stars double during the past three months.

119.   Defendants Lucernos gave an "interview" where they are quoted as follows: ""[Our] $42.00 residual check was a real eye opener to residual income. In just a few days we are [sic] receiving a **$500,000** bonus check on stage in front of 20k people."

http://www.businessforhome.org/2012/07/tony-and-rhonda-lucero-visalus-top-earner-interview/.

120.   Defendants Petrilli and Varon gave an "interview" where they said the following:

> Lori and Frank have earned millions of dollars in Network Marketing in the past 12 years and have helped close to **250,000** people enter into the industry. Since their start on February 15th of 2011, in ViSalus they have watched their team grow from 14 distributors to almost **10,000 in less than 40 weeks**. They have broken every rank achievement record since joining ViSalus including the fastest to Ambassador – 13

days, fastest to 4 Star Ambassador – 45 days and fastest to 5 Star Ambassadors – 150 days…. Frank says, "ViSalus allows any individual, no matter what their background to rise to a new pinnacle of achievement." 'It's actually quite amazing." Lori says, "The differences in this team's backgrounds is startling and yet they all share an amazing level of achievement, there are thousands working "very" part time and earning a fantastic extra income" She continues: "…and hundreds who have won a free BMW and are earning up to tens of thousands a month and all of this achieved in less than nine months, it's quite extraordinary.' " "That level of universal reward is a living validation that success can be achieved by all who claim it to be theirs" Lori says, "we've never seen anything like this before simply because there never has been anything like it…..this is it!' "

http://www.businessforhome.org/2011/12/lori-petrilli-and-frank-varon-visalus-top-earner-interview/.

121. The Kirklands filmed and published a YouTube video on the HealthPlusWealth channel entitled "Promoter Testimonial," in which they claim to generate $2 million a month" in sales, their "big expense" is a $29 Vi-Net subscription, and state: " I don't know of anything else where you can have a six-figure income with an overhead of $29/month."

https://www.youtube.com/watch?v=5qK0tQBAdDs

122. There are literally hundreds of similar "testimonials" disseminated on video through the Internet by these defendants and the scheme's promoters that

say, imply or point to statements like these. For example, another top ViSalus earner  (who was later sued by ViSalus after taking her "team" to a competitor network company) stated the following facts and figures in an "interview" posted by one of the anonymously owned websites that carries ViSalus-related information:

> "*How many people did you sponsor?*
>
> Ted, these are amazing numbers.  I have personally sponsored 48 people.  Those 48 people have turned into a team of over 8,000 active as of July 2012! That's the kind of duplication you hear about and dream about and with ViSalus is a reality.  Our success is truly about our incredible team.
>
> *Those are impressive numbers—What's your secret?*
>
> Oh easy, not really a secret, it's a straightforward formula, which provides viral growth when partnered with ViSalus' tools driven system….
>
> o  We get started TODAY.
> o  We get people into Profit Mode TODAY."

http://www.10incomes.com/page/tina-hockmuth-visalus-top-earner-interview

123.   Typically ViSalus tries to hook potential enrollees to ViSalus with the notion that they can lose weight using the ViSalus shakes and obtain a healthy lifestyle by drinking the shakes daily. Sarnicola and his wife Ashley often team up to speak at events – Ashley Sarnicola begins with an inspirational speech about getting motivated to be healthy and then turns the stage over to her husband who

encourages the potential enrollees to "help" others to get healthy too. This initial pitch is the excuse to then make the real pitch.  While the excitement is high, potential enrollees are persuaded with the idea that they also can make large amounts of money and drive free luxury automobiles funded by the company by selling the ViSalus products to friends and family and strangers.

124.   The coupling of the "business opportunity" with the initial come-on of buying a diet shake is constant in every ViSalus promotional material and the events and parties it sponsors. ViSalus immediately pushes individuals to become promoters with materials that revolve around jingles like "3 for Free" and "ViSalus is going to pay someone for the referrals, it might as well be you and not the person that referred you."  The structure of the bonus system is, naturally, in the shape of a pyramid:



125.   ViSalus training videos and promotional materials encourage new promoters to immediately set up a "Challenge Party" where close friends and family are invited and encouraged to join the team.  ViSalus provides promoters with an aggressive step-by-step scripted approach for the challenge party and suggests marketing tactics such as "if your friends can't make it to your party, go to their house" or "invite them to attend an open challenge party near their location" – there is one available everyday in a multitude of locations listed on the ViSalus event calendar. At the party the promoter is taught to pitch the opportunity along with the diet shake.

126.   Promoters are also persuaded to attend Regional Success Training events and participate in daily or weekly Challenge Overview calls so that they can stay motivated and in touch with other successful promoters and receive advice on how to get their business profitable as quickly as possible. The substance of the training consists of how to recruit others into the pyramid as quickly as possible. For a time the company teamed up with a web-marketing firm to "teach" new recruits how to duplicate their recruiting.

## DOWNLINE MANIPULATION TO BENEFIT INSIDERS

127.   The potential distributor is not told that the recruiting opportunity is not evenly or fairly applied: the defendants have not only run an unlawful pyramid scheme but managed to run an unlawful and otherwise *crooked* pyramid scheme. The promotional materials give the explicit impression that the compensation system is neutral: join, sell, recruit and be paid. For one example among many others, distributors like Sarnicola the Craigs, Pacetti, the Kirklands and O'Toole are prominently quoted by the company in its downloadable PowerPoint, "If we can do it, so can you!":

68







128.   In reality, these defendants "did it" because their co-conspiritor defendants stacked the deck and paid them for positions or gave them preferential treatment in the pyramid "downline." The commission and bonus system set out by the compensation plan and implemented by the defendants is enormously complicated and opaque to non-insiders. The funneling of commissions and bonuses, together with deductions of various fees charged by ViSalus, the monthly ranking of each of the over 100,000 IPs and other people labeled as "customers," and the precise placement of each individual within a "downline" or "upline" is handled by a sophisticated database designed and maintained by defendant iCentris. The placement of each IP within the system determines how much commission that IP will receive. The assignment of new recruits to be in a particular IP's "downline," or the association of customer sales to a particular IP is

not visible to an IP. The entire system can be manually overridden by the ViSalus administrators.

129. Sarnicola has admitted in an interview that the company paid a professional marketer named Robert Dean $350K to move to ViSalus. That payment was routed through third parties and undisclosed to people being asked to enroll in the "business opportunity." The new professional recruits, which upon information and belief include defendant Wilson and her husband, defendants Varon and Patrelli, defendant O'Toole, and defendant Pacetti, were given preferential "upline" treatment, payments, assigned existing "downlines" and/or assisted in placement ahead of other IPs.

130. The recruitment of professional marketers and their "downlines" artificially swelled the numbers of IPs. By contrast, in all of its promotional materials, on its website, and in the hotel rallies ViSalus continued to give the impression that its "huge" growth, especially from 2010 to 2012, was due to the popularity of its weight-loss shakes among the general public and the money its distributors were making.

131.   ViSalus manipulated its database and set up certain promoters to their advantage. It admitted as much in court filings in this court. In *ViSalus v. Bohn*, the company sued Lorene Bohn for allegedly breaching her non-competition agreement and taking herself and her 264-distributor downline to an alleged network-sales competitor, OceanView. In the lawsuit ViSalus admitted:

> ViSalus helped Bohn build her downline network to ensure her success in her company by placing distributors and customers in her organization even though Bohn did not recruit such distributors or customers. (Par. 16).

## NONENFORCEMENT OF 70% RULE AND INVENTORY LOADING

132.   The FTC in 1979 in a decision involving the Amway Corporation set forth what is commonly known as the "70% rule." That rule mandates that a seller ensure that its distributors do not buy inventory for the purpose of obtaining commissions, but actually retail 70% the product they buy to outside customers during each purchase cycle.

133.   ViSalus' compensation plan and policies and procedures mention the 70% rule, but there is no mechanism by which it is enforced. As a result, there are widespread purchases made that violate the rule. The auto-ship program is virtually mandated, and once in it is virtually impossible to turn off. As a result, IPs are

often loaded with weight-loss shakes that are impossible to sell on the open market.

## SATURATION AND COLLAPSE

134.    The ViSalus "business opportunity" is now saturated in the United States. The number of IP's enrolling in the "business opportunity" rose from 8,000 in 2010, to 29,000 on June 30, 2011, to 59,000 on December 31, 2011 and to 114,000 on June 30, 2012. The company at one point in 2012 had over 140,000 promoters. The numbers collapsed soon thereafter, falling to 76,000 on December 31, 2012 and to less than half of that, 35,000 as of the end of 2013. The company has expanded to Canada and the UK and is trying to market itself in other foreign markets without success.  The US sales of the company have collapsed since the third quarter of 2012. The company's revenues are now a third of those at its peak, and those due almost exclusively from sales through and to new recruits and new markets that the company is frantically trying to establish.

135.    The defendants know that the sales of network marketing companies like ViSalus in a given market eventually collapse, and new markets must be found where the "business opportunity" is not yet tapped out.  Virtually all network sales

companies that survive the initial two or three year (transient) sales rise, move sales internationally.

136.   Many of the imported distributors from other network companies have now left for other networking companies. All or virtually all of the IPs who were recruited between 2010 and 2013, like Plaintiffs, have lost their money paid to ViSalus for the "business opportunity."  And, as detailed elsewhere, shortly after the peak of the recruited sales force peaked, various individual corporate defendants pulled out over $80 million from the pyramid scheme. The company is now attempting to replicate its 2010-2012 rise in IPs by embarking on a new round of soliciting "professional" marketers with their pre-established "downlines."

## CLASS ACTION ALLEGATIONS

137.   Plaintiffs Kerrigan, Mikovich and Valli bring this suit as a class action pursuant to the FED. R. CIV. P. 23(b)(2&3).

138.   Kerrigan, Mikovich and Valli bring this action individually and for a class tentatively defined as:

> All purchasers of the ViSalus "business opportunity" (the "Class"). Excluded from the Class are all persons named as a defendant (or a spouse of a defendant or a related entity of

defendant) and any purchaser who has not experienced a financial loss as a result of their ViSalus distributor enrollment.

139.   Kerrigan, Mikovich and Valli's claims are typical of the claims of the class in that they paid money to become IPs in the Defendants' pyramid scheme and lost money as IPs.

140.   Kerrigan, Mikovich and Valli will fairly and adequately represent the interests of the class because their claims are typical of those of the class and their interests are fully aligned with those of the class.  Kerrigan, Mikovich and Valli have retained attorneys that are experienced and skilled in complex class action litigation, including in class action pyramid scheme litigation.

141.   Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged herein, because such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.

142. The Defendants have acted on grounds that apply generally to the class, *i.e.*, running a pyramid scheme, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. (FED. R. CIV. P. 23(b)(2)). If Kerrigan, Mikovich and Valli prove that the defendants operate a pyramid scheme in violation of the RICO Act, the Court should enjoin the defendants from operating that pyramid scheme in the future.

143. This case presents questions of law or fact common to class members that predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. (FED. R. CIV. P. 23(b)(3)).

144. The questions of law and/or fact common to the class, include but are not limited to the following:

    a.   Whether the defendants were operating an unlawful pyramid scheme;

    b.   Whether the defendants encouraged or required class members pay money to the defendants for the illusory "right" to sell ViSalus product;

    c.   Whether the defendants engaged in acts of mail and/or wire fraud or violated the Hobbs Act when operating the unlawful pyramid scheme; and

    d.   Whether the defendants caused injury to the business or property of class members.

145.   These and other questions of law and/or fact that are common to the class predominate over any questions affecting only individual class members. No element of establishing RICO liability requires individualized proof.

146.   Kerrigan, Mikovich and Valli's claims are typical of the claims of the class.

147.   A class action under FED. R. CIV. P. 23(b)(3) is superior because:

    a.    No class member has an interest in individually controlling the prosecution of his/her/its separate action. No class member can be expected to incur the cost of attorneys' fee and cost to recover their $499 ESS or $999 ESS plus other payments to become an IP and maintain IP status.

    b.    There is no other pending litigation over these issues.

    c.    It is manifestly desirable to concentrate the litigation of the class's claims in Michigan and this district.

    d.    The Court will encounter no difficulties in managing this case as a class action.

## THE COMMON ELEMENTS OF THE RICO ACT, 18 U.S.C. §§ 1961-68

148.   RICO prohibits the following conduct:

It shall be unlawful for **[1]** any person **[2]** employed by or associated with **[3]** any enterprise **[4]** engaged in, or the

activities of which affect, interstate or foreign commerce, **[5]** to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs **[6]** through a pattern of racketeering activity or collection of unlawful debt. 18. U.S.C. § 1961-68 (numbering added to text of statute)

## ALL DEFENDANTS ARE RICO "PERSONS"

149.   Each defendant named here is a RICO "person." RICO requires that a "person" violate its provisions." 18 U.S.C. § 1962(c-d).   A RICO "person" includes any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).   A RICO person can be either an individual or a corporate entity. All defendants are RICO persons.

## THE RICO ENTERPRISE

150.   All of the Defendants have acted as an "association-in-fact" for a common purpose, have and maintained relationships between and among each other (and nonparties), and the association-in-fact has a longevity sufficient to permit those associates to pursue the enterprise's purpose - - the unlawful pyramid scheme.

151.   The group composed of Ropart Asset, Ropart Asset II, Goergen, Sr., and Goergen purchased an interest in ViSalus Science in 2005 for the purpose of

operating and ultimately benefitting from the pyramid scheme. Blair, Sarnicola and Mallen have joined since at least 2005 for the same purpose, and joined with the Goergens and their family-controlled equity fund since that time. The Individual Insider Promoter Defendants and their business entities joined the association between 2005 and 2011, and have operated for the common purpose. The Related Entity Defendants have joined the association between 2011 and 2012.

152.  Each of the defendants has an existence that can be defined apart from the commission of the predicate acts constituting the pattern of racketeering activity. That is, each defendant has a separate, legitimate existence as an operating business or individual.

153.  A defendant can be both a RICO "person" and part of another RICO "enterprise." Plaintiffs and the class allege the following:

- Individual Insider Corporate Defendants is each a RICO "person."

- Insider Individual Promoter Defendants is each a RICO "person."

- Related Party Corporate Defendants is each a RICO "person."

- Individual Insider Corporate Defendants is each a RICO "person."

- Each individual defendant, *i.e.*, each person, combination of persons or combination one or more person and an entity as defined above, is a RICO "person."

- Insider Individual Promoter Defendants, Insider Corporate Promoter Defendants, Related Party Corporate Defendants, and Individual Insider Corporate Defendants are an "enterprise," (*e.g*., a *de facto* corporation acting as a single legal entity, or, alternatively, an association in fact).

- "The pyramid scheme" is itself an association in fact.  It is composed of ViSalus, the Insider Individual Promoter Defendants, Insider Corporate Promoter Defendants, Individual Insider Corporate Defendants and nonparties associated with the pyramid scheme.  The pyramid scheme exists to sell the ViSalus IP program and reap profits that it then distributes among each of these defendants.

154.  There is an identifiable hierarchy and framework within the enterprise.  It is directed by the Goergens and the founders of ViSalus, to whom the remaining Defendants report. The hierarchy has operated within the framework of the inter-related operation of Ropart Asset, non-party Blyth (its now majority owner), and ViSalus as set forth herein.

155.  Each of the defendants is "employed by or associated with" each other for purposes of RICO. Ropart Asset, Ropart Asset II and ViSalus is associated with the pyramid scheme.  They conduct and participate in the operation or management of ViSalus and the pyramid scheme through a pattern of racketeering activity, *i.e.*,

conducting the affairs and supporting the acts of the pyramid scheme. Ropart Asset, Ropart Asset II and ViSalus direct, in whole or part, the affairs of the pyramid scheme, including the operation of the pyramid scheme, discussions concerning the scope and size of the pyramid scheme, and the distribution of unlawful profits to individuals associated with the scheme.

156.   Not only do the Individual Insider Corporate Defendants have some part in the conduct of Ropart Asset, Ropart Asset II and ViSalus and the pyramid scheme, they control and direct the websites, web presentations, events, sponsored conventions and speeches of each of them, and the dissemination of video of same, and the Individual Insider Promoter Defendants.

157.   The Individual Insider Corporate Defendants have complete and absolute control over ViSalus.   They are owners or employees of Ropart Asset, Ropart Asset II and ViSalus, and they are associated or employed by Ropart Asset, Ropart Asset II and ViSalus in various interlocking relationships, including officers and directors, shareholders, and debtholders.  These defendants conduct and participate in the operation or management of ViSalus through a pattern of racketeering activity, *i.e.*, conducting the affairs and supporting the acts of the pyramid scheme.

## ALL DEFENDANTS ARE "EMPLOYED BY OR ASSOCIATED WITH" THE RICO "ENTERPRISE"

158. Under Section 1962(c), a defendant must be "employed by or associated with" the RICO enterprise. Section 1962(c) operates equally to both "insiders" and "outsiders" who participate directly or indirectly in the conduct of the enterprise's affairs through a pattern of racketeering activity. All Defendants are employed by or associated with the enterprise, as set forth in detail previously.

## ALL RICO "PERSONS" ARE DISTINCT FROM THE RICO "ENTERPRISE"

159. RICO requires the involvement of a RICO "enterprise." 18 U.S.C. § 1964 (a-d). An "enterprise" "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(5). The enterprise itself is not the liable entity, rather it is the RICO person who conducts the affairs of the enterprise through a pattern of racketeering activity.

160. The corporations and individuals described in this complaint are distinct from each other. The individual defendants are distinct from the corporate defendants. The corporate defendants are distinct from the RICO enterprise because they are functionally separate, perform different roles within the enterprise

or use their separate legal incorporation to facilitate racketeering activity. Each of the corporations, even those related to one another (non-party Blyth and ViSalus) have distinct markets and roles in the scheme. The vast majority of the corporations are entirely unrelated to each other except through common shareholders.

161.   The different functionality of non-party Blyth and ViSalus, by design, helped facilitate the pyramid scheme. Blyth operates its own direct selling division, marketing candles and other products through PartyLite, a different system of direct selling. It had been in existence since 1976, founded by defendant Goergen Sr.  The Insider Individual Corporate Defendants publicly bragged about the Blyth "billion dollar" company "standing behind" or "partnering" with the ViSalus sales scheme. Such promotion was made with the knowledge of Goergen Sr. and Goergen, each of whom held positions in ViSalus or was identified publicly as a member of the ViSalus Board.

162.   Blyth was presented as the financially stable, strong and legitimate company which would give credence to the outlandish money pitches and offers of BMWs made by the young and "hip" ViSalus. The intent was to prop up the legitimacy of the ViSalus scheme. ViSalus and the individual defendants who

called themselves its founders (Blair, Sarnicola and Mallen), needed the reputation, experience and legitimacy that Goergen Sr., Ropart Asset and Ropart Asset II brought to their operation. For example, the company released a press release that said in part:

> "Our partnership with the founders of ViSalus is mutually beneficial in that Blyth is entering a third direct selling product category marketing consumable wellness goods and ViSalus can leverage expertise from Blyth's direct selling core competency, as well as various corporate functions required by a growing enterprise. Moreover, longer term, our experience entering international markets should be beneficial to ViSalus' expansion."

163.    Related entities Frag Mob and iCentris are each distinct from the other corporate defendants. Each is related to Blyth and/or ViSalus and the Individual Corporate Insider Defendants by various common stock ownership and contractual payments. The services that each brought to the pyramid scheme allowed the scheme to continue. iCentris markets and sells an enormously sophisticated database used by companies that create schemes such as this one. Frag Mob creates applications by which mobile users can make transactions related to the pyramid scheme.

## THE DEFENDANTS ENGAGED IN ACTIVITIES WHICH
## AFFECT INTERSTATE AND FOREIGN COMMERCE

164.   Each of the defendants engaged in, and/or each others' activities affect, interstate or foreign commerce. The pyramid scheme has operated in the United States and Canada and in recent years in the United Kingdom.

## THE DEFENDANTS PARTICIPATED IN THE
## CONDUCT OF THE ENTERPRISE'S AFFAIRS

165.   Each of the defendants conducted, or participated directly or indirectly, in the conduct of such enterprise's affairs.

## THE DEFENDANTS ENGAGED IN A
## "PATTERN OF RACKETEERING ACTIVITY" OVER AN
## EXTENDED PERIOD OF TIME WITH A THREAT OF
## REPETITION INTO THE FUTURE

166.   RICO requires a "pattern of racketeering activity." A "pattern of racketeering activity" is one that is performed by at least two acts of racketeering activity, or violations of a "predicate" offense (an act "indictable under any of" certain provisions of" 18. U.S.C. § 1961 (1) (D)). *See* 18 U.S.C. § 1961(5). A "pattern of racketeering activity" can be a past conduct that by its nature projects into the future with a threat of repetition.  It can also be conduct over a closed

period through a series of related predicates extending over a substantial period. Both of these apply here.

167.   The defendants' pattern of racketeering activity is well established and has continued from 2004 to the present and intends to continue into the future. The defendants have taken every imaginable step to sell the pyramid program to IPs and potential IPs.  They each also expect to continue to receive income from the pyramid scheme.  With each new person recruited, the defendants increase the value of their control of the pyramid scheme.  The defendants have stated their intentions to continue to grow the pyramid throughout the United States, have expanded to Canada and to the UK. They have announced an intention to expand to additional international markets in 2014.  They have recently announced a new round of "professional marketers" who have "joined" the company, intending to attempt to replicate the false boom of 2010-2012, and have flooded the web with "ground floor" opportunities in Germany and Austria to perpetuate the scheme there. It is certain that their conduct is a continuing threat due to their racketeering activities.

## DEFENDANTS HAVE USED AND CAUSED TO BE USED FRAUDULENT MAIL AND WIRE COMMUNICATIONS IN INTERSTATE COMMERCE, 18 U.S.C. § 1341 AND 18 U.S.C. § 1343

168.   Mail and wire fraud are enumerated predicate acts that can constitute RICO "racketeering activity" under Section 1961(1)(D).

169.   Mail fraud occurs when an individual devises a plot to defraud and subsequently uses the mail in furtherance of it. 18 U.S.C. § 1341. The defendants have transmitted, caused to be transmitted or invited others to transmit material, by mail or private or commercial carriers, such as UPS, for the purpose of executing their scheme or artifice to defraud in violation of RICO.  Likewise, they have distributed the by UPS (mail) to many individuals literally hundreds of thousands or millions of pieces of promotional literature, statements, checks, and other mailings all between 2005 and the present.  Without limitation, each statement sent monthly to a distributor is a mailing and an act of mail fraud, and each promotional literature sent by U.S. Mail is a mailing and an act of mail fraud.

170.   Wire fraud occurs when an individual devises a plot to defraud and subsequently uses wire means in furtherance of it. 18 U.S.C. § 1343. The defendants have used the Internet since 2005 to disseminate, publish and spread the

pyramid scheme throughout the United States and (since 2011) Canada and (since 2013) the United Kingdom for the purpose of executing their scheme or artifice to defraud in violation of RICO. Thus, the defendants have transmitted, caused to be transmitted and invited others to transmit, by means of wire in interstate commerce, writings, signs, signals, pictures, or sounds for the purpose of executing their scheme or artifice to defraud in violation of 18 U.S.C. §1343. Without limitation, for example, each transmission of a video to be posted on YouTube, Vimeo, Facebook, or through Twitter, or establishment of a website to disseminate information about the pyramid scheme or transmission of signals, pictures or information to such website is a separate act of wire fraud.

171. Each of the defendants acted with requisite intent to establish, perpetuate and/or carry out the pyramid scheme to defraud. Each defendant acted with either specific intent to defraud or with such recklessness with respect to the false or misleading information mailed or wired in furtherance of the pyramid scheme as to constitute requisite *scienter* to commit mail and wire fraud. That *scienter* can be inferred from, among other things at least the following:

- ViSalus has acknowledged that "pyramid schemes" are "illegal" and there is a "risk" that a governmental agency or court could … require ViSalus… to alter [its] distribution model or cease operations.

- Defendants Ropart Asset, Ropart Asset II, Blair, Mallen, Sarnicola, Goergen Sr., and Goergen each understood that the operation of the business could be deemed illegal. Each of these individuals made all fundamental decisions regarding the scheme's operation and finances and knew that the true facts concerning the operation of the scheme fit every criterion of an illegal pyramid or were reckless to that possibility. Each of these defendants was not a passive investor in ViSalus, rather each was an active and knowing participant in the operation of the company and the commission of the pyramid scheme that formed the core of its operation. Each of the individual defendants was aware of the compensation plan, the company's essential form of doing business, identified himself with the company as a management employee, and formulated specific decisions relating to the operation of the pyramid scheme.

- Various of the Individual Insider Promoter Defendants and Sarnicola participated in the reality show "The Pyramid Thing" (*see* www.thatpyramidthing.com ) in part spoofing and ridiculing the notion that the ViSalus network sales are in fact an illegal pyramid scheme. The title and intended thrust of this show demonstrates defendants' acute awareness of ViSalus' vulnerability to being accused of being an illegal pyramid scheme. Moreover, each of these defendants is a veteran of the chain sales industry who has bragged in public and/or in interviews with his/her familiarity with the idea that pyramid schemes are illegal, further demonstrating *scienter*.

- Defendants Ropart Asset, Ropart Asset II, Goergen Sr. and Goergen were all directly involved in the financing and active management of the ViSalus company and individually knew and/or recklessly disregarded that that the operation of that entity was an illegal pyramid scheme.

- Various other of the Individual Insider Promoter Defendants and their wholly-owned LLC's were veterans of the network marketing industry and were involved in multiple allegations of their companies operating as a pyramid scheme. Indeed, there is a network industry awareness that the FTC has closed down similar operations for being an illegal pyramid (for example BurnLounge, Equinox and others) and an awareness on the part of each of the defendants that recruiting others into a particular sales scheme has been deemed by the FTC and courts to be an illegal pyramid scheme.

- A number of the individual promoters are also in the separate business of "coaching" new recruits on how to themselves recruit others. Some of the individual promoter defendants are members of an alleged industry trade group that issues seminar materials and mp3 downloadable files on the difference between a "legitimate" network sales company and a pyramid scheme. These defendants therefore have for years had an opportunity to understand that their participation in the ViSalus scheme is an illegal pyramid and/or recklessly disregarded the notion and consciously participated in an illegal pyramid scheme.

- iCentris and FragMob derive a substantial part of their revenue from providing database and computer assistance to the network marketing industry and are owned in whole or in part by certain of the defendants. Each of these defendants knew or recklessly disregarded the notion that their assistance and services were to an illegal pyramid scheme.

**THE DEFENDANTS ALSO ENGAGED IN A "PATTERN OF RACKETEERING ACTIVITY" BY PARTICIPATING IN AN INHERENTLY WRONGFUL MEANS TO PERPETUATE A SCHEME TO DEFRAUD IN VIOLATION OF THE HOBBS ACT, 18 U.S.C. §§ 1951 (b)(2)**

172.   Another enumerated predicate offense under Section 1961 (1) (D) is the Hobbs Act, 18 U.S.C. §§ 1951 (b)(2).  A RICO Hobbs Act predicate offense occurs whenever property is obtained by "inherently wrongful means." The conduct described in this complaint has resulted in the loss of money from over 100,000 individuals by inherently wrongful means.

173.  Among other things, during a fight between another network marketing company and ViSalus, as detailed in another RICO-related complaint filed by OceanView Corporation in 2013, earlier that year ViSalus and certain of its individual officers hired a private investigator who purloined certain materials from a number of former ViSalus distributors. The company also allegedly retained commissions and earnings from these individuals in an effort to not have them take their "downlines" to an alleged competitor. Similar actions have occurred to assist in perpetuating the pyramid scheme.

## THE DEFENDANTS' PROMOTION OF THE PYRAMID IS A *PER SE* SCHEME TO DEFRAUD UNDER THE MAIL AND WIRE FRAUD STATUTES

174.   The defendants have used a false and fraudulent scheme, or a scheme to defraud within the meaning of federal law, to harm Plaintiffs and the class.   In all respects, the defendants have conducted their affairs unlawfully, intentionally, willfully and with intent to defraud, that is, knowingly and with such specific intent to deceive as is in violation of the mail and wire fraud statutes and the Hobbs Act. They have done so in order to cause financial gain for themselves and for others, all to the detriment of Kerrigan, Mikovich and Valli and the class.

175.   First, each defendant has promoted the pyramid scheme that, by its very nature, is a *per se* scheme and artifice to defraud to obtain money by false pretenses.  As detailed in this complaint, all defendants have promoted the pyramid scheme. Each of the enumerated acts of wire and mail fraud in furtherance of the pyramid scheme is an act of racketeering.   The defendants' promotion of the pyramid scheme is enough to state a RICO claim based upon their pattern of racketeering.

176.   Second, as part of the pyramid scheme the defendants made numerous false statements in furtherance of the scheme, all to obtain profit. The mail and or

wire were used over a period of years and will continue to be used until it is

stopped. Examples of the falsity of these statements include:

- Creating and disseminating the false impression that through the pyramid scheme, IPs can get "free" BMWs, and/or can get a sizeable monthly or "residual" income.

- Creating and disseminating the false impression that the IP program has "enormous" or "unlimited income potential" and that the IP Sales Force can make enormous money as a result of participating as a promoter for the program.

- Creating and disseminating the false impression that the IP program is a "ground floor" opportunity. The defendants have over the years continually spread the suggestion, or explicitly stated that the opportunity to become a ViSalus promoter is a "ground floor" opportunity even after the sales collapse in late 2012.

- Creating and disseminating the false impression that there are many available persons who will want to purchase the weight-loss shakes and other merchandise and that the purchase of an IP enrollment will enable the purchaser to make money from legitimate sales. In reality, the defendants know that sales of the weight-loss products are made almost exclusively to people who are promoters.

- Creating and disseminating the false impression that the success stories featured by ViSalus are typical or, in some cases, even possible when defendants knew that the persons portrayed were being paid (unreal) amounts of money for committing an illegal activity and/or were assisted by the defendants in setting up a sufficiently large "downline" that the income generated was in fact large.

177.   Third, as part of the pyramid scheme the defendants omitted material facts for the purpose of and with the intention of the fraudulent pyramid scheme by obtaining money from the victims.  Examples of these omissions include:

- Failure to reveal that the multilevel marketing program and its IP program are illegal pyramid schemes.

- Failure to reveal that under defendants' multilevel marketing program and its IP program the majority of the IP Sales Force have and likely will lose their money.

- Failure to disclose that many of the top IP earners paraded by the company (at company-sponsored check waving spectacles and through other publicly disseminated events, videos, documents, and other media) as examples of what IPs can hope to attain through following the ViSalus compensation plan were in fact already well established salespeople for other network companies who were recruited to bring large, preexisting "downlines" to ViSalus by the company and were placed in their positions, aided in their attainment of their ViSalus ranks, and/or otherwise compensated beyond what is paid to ordinary IPs under the compensation plan.

- Failure to reveal that the company knowingly spread unreal and misleading accounts and claims of the success of its "Director" and "Ambassador" IPs throughout the web, all in an effort to attract new IPs but avoid disclosing a direct connection between the statements and ViSalus.

## DEFENDANTS' CONDUCT HAS PROXIMATELY
## CAUSED THE PLAINTIFFS' RICO INJURY

178.   Plaintiffs were injured in their business or property by reason of a violation of 18 U.S.C. § 1962. 18 U.S.C. §1964(c). A plaintiff need not show that he or she relied on any allegedly fraudulent misrepresentations to state a claim under RICO.  Establishing a proximate cause of a RICO "scheme to defraud" requires only showing use of the mail or wire in furtherance of a scheme to defraud and an injury proximately caused by that scheme. Proximate cause exists where there is "some direct relation between the injury asserted and the injurious conduct alleged." Considerations of foreseeability, directness, and logic are parts of RICO-related proximate cause.

179.   The Plaintiffs and the class each suffered the same injury—loss of money—that was directly foreseeable and directly related to the pyramid scheme. The object of a pyramid scheme is to obtain money from innocent people and funnel it to a group of promoters and insiders like the defendants. Alternatively, the scheme acts akin to a "fraud on the market" where proof of no one individual misrepresentation nor receipt or reliance need be shown.  The market here was composed of the Plaintiffs and the class.

180.   Here, the defendants have operated the same scheme, with the same general participants, to attract the collective payment of several hundred million dollars by well over 100,000 participants to become promoters for a fraudulent enterprise. Defendants intended to attract such participants as evidenced by their massive web presence, web-related videos, its own and related websites, and other broadly disseminated offers for people to become promoters for ViSalus. Defendants themselves have disseminated quotations from participants indicating that they have joined the ViSalus "team" as a result of the invitation. To the extent proof of third-party reliance is a part of proximate causation, such reliance is itself proven by the actual years-long large-scale money-losing participation of over 100,000 people in an illegal pyramid scheme.

### PLAINTIFFS AND THE CLASS HAVE SUFFERED A RICO INJURY TO BUSINESS

181.   A "violation" of RICO is committed if "individuals and entities," use the mails or interstate wire facilities in the execution of "any scheme to defraud." 18 U.S.C. §§ 1341, 1343, Sections 1961(1) (B), 1962.  Sections 1964 (a), (c) and (d) authorize persons "injured" in their "business or property,"  "by reason of" RICO's "violation" to sue for appropriate redress, including equity relief, treble damages and attorneys' fees.

182.   The Plaintiffs and the class have suffered an injury to business as defined by RICO.  Each of the Plaintiffs and the class have spent more money on the cost of becoming an IP than they have obtained in commissions and/or bonuses as a result of their business involvement with defendants.

183.   The precise amount lost by the class has not yet been determined but is believed to be well over $100 million. Upon information and belief, the precise amounts that each and every participant in the pyramid scheme has spent on (1) costs associated with the IP "business opportunity" and (2) has received in commissions or bonuses or other payments from ViSalus as a result has been tracked, maintained and accounted for by ViSalus through the iCentris-generated software database. Thus, the precise loss of every class member is easily capable of being ascertained in this litigation, and the total business injury capable of being computed for the class.

## COUNTS

### COUNT ONE
### VIOLATION OF 18 U.S.C. §§ 1961(5), 1962(c)

184.  Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

185.  Each of the defendants named in this action has violated Section 1962(c) and is liable, jointly and severally, for the business injury caused to the Plaintiffs and the class by his or her actions.

### COUNT TWO
### VIOLATION OF 18 U.S.C. §§ 1961(5), 1962(a)

186.  Section 1962(a) makes it unlawful, "for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity … to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate commerce."

187.   Defendants Blair, Sarnicola and Mallen, and other presently unknown, have received an income derived from the pattern of racketeering activity and have subsequently used the income in acquisition of an interest in the enterprise. Specifically, the defendants have publicly claimed that but for their investment in the company in 2008, after several years of operation, including each of the three "founders" additional bailing out of the company, the company would have gone bankrupt. This reinvestment caused a separate RICO injury to the Plaintiffs and the class by allowing the pyramid scheme to be perpetuated.

188.   These Defendants have violated Section 1962 (a) and, jointly and severally, have caused Plaintiffs and the class a business injury.

## COUNT THREE
## THE DEFENDANTS CONSPIRED TO VIOLATE 18 U.S.C. § 1962(c) AND ARE IN VIOLATION OF 18 U.S.C. §§ 1961(5), 1962(d)

189.   Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

190.   Each of the defendants named in this action have participated in a conspiracy to violate Count One. Defendants Blair, Sarnicola, and Mallen conspired to violate Count Two.

191.   As stated above, each of the defendants has participated in the pyramid scheme and their participation is necessarily a combination of more than two individuals.

192.   As stated above, the defendants' and unknown John Doe and nonparty entities' creation, support or maintenance of the pyramid scheme is illegal.

193.   The defendants, John Doe defendants and the nonparty entities had a meeting of the minds on the object or course of action, specifically to create, support and maintain the pyramid scheme for their financial benefit as evidenced by each defendant's voluntary and knowing participation in the pyramid scheme.

194.   Each of the defendants and others have committed one or more overt acts to achieve or further the unlawful objects and purposes of the pyramid scheme detailed herein.

195.   The defendants used false and fraudulent means and conducted their affairs unlawfully, intentionally, willfully and with the intent to defraud, for their own financial gain and benefit and for the financial gain and benefit of others, all

to the detriment of Kerrigan, Mikovich and Valli and others that purchased the IP Program.

196.   Each of the defendants has violated Section 1962(c) and is liable, jointly and severally, for the business injury caused to the Plaintiffs and the class by his or her actions.

**COUNT FOUR**
**THE DEFENDANTS ARE IN VIOLATION OF THE**
**MICHIGAN CONSUMER PROTECTION ACT**

197.   Plaintiffs and the class repeat and re-allege every allegation above as if set forth herein in full.

198.   To the extent that the law provides, Plaintiffs and the class defined by the statute at issue in this Count Four bring this claim on their own behalf and on behalf of each of the class members.

199.   The defendants have violated the Michigan Consumer Protection Act, MCLS § 445.901 *et seq*. ("MCPA") entitling Plaintiffs and the members of the class to damages and relief under the MCPA.

200. The defendants have engaged in "trade or commerce" within the meaning of MCLS § 445.902(1)(g), which specifically includes pyramid and chain promotions in that definition.

201. The Michigan Consumer Protection Act prohibits unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce such as:

      a.    Representing that a consumer will receive a rebate, discount, or other benefit as an inducement for entering into a transaction, if the benefit is contingent on an event to occur subsequent to the consummation of the transaction;

      b.    Representing that a consumer will receive goods or services "free" or "without charge", or using words of similar import in the representation, without clearly and conspicuously disclosing with equal prominence in immediate conjunction with the use of those words the conditions, terms, or prerequisites to the use or retention of the goods or services advertised;

      c.    Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;

      d.    Gross discrepancies between the oral representations of the seller and the written agreement covering the same transaction or failure of the other party to the transaction to provide the promised benefits;

      e.    Making a representation of fact or statement of fact material to the transaction such that a person reasonably

believes the represented or suggested state of affairs to be other than it actually is; and

f.   Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

202.   Defendants have violated the MCPA in that they used deception, false pretense, misrepresentation, and omitted key facts to induce plaintiffs and other members of the class to enter into an agreement with ViSalus and suffer a financial loss thereby.

203.   Defendants also are in violation of the "mini-FTC Act" portion of the MCPA at § 445.903b, which requires registration of all business opportunities offered at more than $500, in that ViSalus charges $999 for one of the three ViSalus IP membership levels that all defendants promote, among other things (*see*, *e.g*., http://visalus.com/docs/corporate/D1000US_PromoterApp.pdf).

204.   MCPA section 445.911 permits (individual and class-action) private rights of action for any violation of the Act's Section 3 (i.e., §§ 445.903-903i), including those discussed in the preceding paragraphs of this Count, as well as private class actions for anything:

> [D]eclared by a circuit court of appeals or the supreme court of the United States to be an unfair or deceptive act or practice within the meaning of section 5(a)(1) of the federal trade commission act, 15 U.S.C. 45(a)(1), in a decision which affirms or directs the affirmance of a cease and desist order issued by the federal trade commission if the order is final within the meaning of section 5(g) of the federal trade commission act, 15 U.S.C. 45(g), and which is officially reported not less than 30 days before the method, act, or practice on which the action is based occurs.

*See* Section 445.911(c) (emphasis added).

205.   Defendants are thus also in violation of the MCPA in that one or more of their acts and omissions discussed in the preceding paragraphs of this Complaint took place 30 or more days after acts and/or omissions of the same type were declared by one or more federal circuit courts of appeal and/or the United States Supreme Court to constitute unfair or deceptive acts or practices within the meaning of section five of the federal FTC Act [15 U.S.C. 45(a)(1), *et seq*.] in decisions affirming final FTC cease-and-desist orders.

206.   As a result, Plaintiff and the class have suffered injury which is compensable under the MCPA together with attorney's fees.

## COUNT FIVE
## <u>THE DEFENDANTS HAVE BEEN UNJUSTLY ENRICHED</u>

207.   Plaintiffs and the class repeat and re-allege every allegation above as if set forth herein in full.

208.   Plaintiffs bring this claim on their own behalf and on behalf of each of the class members.

209.   Unjust enrichment occurs when a plaintiff confers a benefit to the defendant, the defendant accepts and retains the benefit, and defendant does not pay the plaintiff the value of the benefit.

210.   The defendants set forth in Paragraphs 211 and 212 of this Count Five have been unjustly enriched at the expense of, and to the detriment of, plaintiffs and the members of the class in that the financial benefits derived by them as a result of the unlawful pyramid scheme rightfully belong to Plaintiffs and the members of the class.

211.   Specifically, while the pyramid scheme was ongoing, and was being funded by payments made by innocent purchasers of the IP "business opportunity," beginning in October, 2008, and continuing through transactions in April, 2011,

January, 2012, December, 2012, and January, 2013, Defendants ViSalus, Ropart
Asset, Ropart Asset II, Goergen Sr., Goergen, Blair, Sarnicola and Mallen
individually extracted some of the proceeds of the pyramid scheme to their benefit.
These defendants and certain others, identity presently unknown but believed to be
in part family members of the defendants, received at least the following payments
which would not have been made but for the success of the unlawful pyramid
scheme:

- *October, 2008-* Ropart Asset and Ropart Asset II: $3 million; Blair: $2.5 million; Sarnicola: $2.5 million; Mallen: $2.5 million; ViSalus: $3 million.

- *April, 2011-* Ropart Asset and Ropart Asset II: $1 million; Blair: $300,000; Sarnicola: $300,000; Mallen: $300,000; "others": $600,000

- *January, 2012-* Ropart Asset and Ropart Asset II: $11 million; Blair: $3.333 million and additional shares of ViSalus; Sarnicola: $3.333 million and additional shares of ViSalus; Mallen: $3.333 million and additional shares of ViSalus; "others": $7.6 million.

- *December, 2012-* Goergen Sr: $5.1 million; Goergen: $1.7 million; Blair: $13.3 million; Sarnicola: $13.3 million; Mallen: $13.3 million; "others": $13.6 million. In addition, Blair, Sarnicola and Mallen received $25.3 million in a buyout of an equity incentive plan, and they together with the Goergens received an option for purchase of their remaining shares of ViSalus by 2017 at $147 million.

- Thus, the known total amounts received by these defendants are as follows: Ropart Asset and Ropart Asset

106

II: $15 million; Goergen Sr: $5.1 million; Goergen: $1.7 million; Blair: $19.5 million plus stock and portion of EIP; Sarnicola: $19.5 million plus stock and portion of EIP; Mallen: $19.5 million plus stock and portion of EIP; "others": $20.8 million.

- In addition, in April and July, 2013, as the sales in ViSalus evaporated, the Defendants declared dividends of $33 million and paid $6.1 million to "noncontrolling shareholders," believed to be the Goergens and Blair, Sarnicola and Mallen.

212.   In addition, the Individual Insider Promoter Defendants and their corporate entities have each been enriched by at least $1.8 million paid or promised as a result of the performance of their various illegal duties.

213.   In addition, Sarnicola has since 2010 left his employment and been a "Global Ambassador" for ViSalus. He has received (or acknowledged receiving) $350K per month as a result of being the head of the largest "downline" for the company. Upon information and belief, therefore, Sarnicola has benefitted at least another $15 million from the illegal pyramid scheme in addition to the sums set forth above.

214.   In addition, the John Doe Defendants and others are believed to have obtained substantial sums or inducements to become ViSalus IPs and recruit others.

215.   The revenue that resulted in these payments came from the Plaintiffs and the class. It would be unjust to permit these defendants to retain these ill-gotten gains.

## COUNT SIX
## THE DEFENDANTS HAVE ENGAGED IN STATUTORY AND/OR COMMON LAW CONVERSION

216.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

217.   Plaintiffs bring this claim on their own behalf and on behalf of each of the class members.

218.   Statutory conversion under MCLS § 600.2919a provides that a person damaged by another person's stealing or embezzling property or converting property to the other person's own use may recover three times the amount of actual damages sustained, plus costs and reasonable attorney fees.

219.   The defendants have wrongfully exerted dominion over plaintiffs' funds inconsistent with plaintiffs' rights to such funds in violation of the statute.

220.   Defendants are also liable for common law conversion.   Under Michigan law, a common law cause of action for conversion also exits for "[A]ny distinct act of dominion wrongfully exerted over another's personal property in denial or inconsistent with his rights therein."

221.   Defendants are thus also liable for common law conversion because, as discussed in the other paragraphs of this Complaint, they have wrongfully taken and otherwise exerted dominion over the enrollment and other fees and costs they induced Plaintiffs to pay in connection with the ViSalus IP "business opportunity," denying and/or otherwise inconsistent with the Plaintiffs' rights therein.

**COUNT SEVEN**
**THE DEFENDANTS HAVE ENGAGED IN A CIVIL CONSPIRACY**

222.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

223.   Plaintiffs bring this claim on their own behalf and on behalf of each of the class members.

224.   The elements of a cause of action for civil conspiracy are: (1) a concerted action (2) by a combination of two or more persons (3) to accomplish an

unlawful purpose or a lawful purpose by criminal or unlawful means, (4) causing

damage to the Plaintiffs.

225.   Defendants have conspired and combined with each other and

engaged in practices to obtain a profit by way of a pyramid scheme, which has

caused damage to Plaintiffs and other class members.

## COUNT EIGHT
## VIOLATION OF MICHIGAN FRANCHISE INVESTMENT LAW

226.   Plaintiffs repeat and re-allege every allegation above as if set forth

herein in full.

227.   Michigan's Franchise Investment Law, M.C.L.A 445.1501 et *seq*. at

Section 1505 prohibits the following conduct:

> A person shall not, in connection with the filing, offer, sale, or purchase of any franchise, directly or indirectly:
>
> (a) Employ any device, scheme, or artifice to defraud.
>
> (b) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.
>
> (c) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

228.   M.C.L.A 445.1513 further prohibits the sale of a franchise where the following applies: "(a) The franchisor's method of business includes or would include activities which are illegal where performed."

229.   M.C.L.A. 445.1525 further prohibits the following:

> A person shall not publish an advertisement concerning the offer or sale of a franchise in this state if the advertisement contains a statement that is false or misleading or omits to make any statement necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

230.   M.C.L.A. 445.1528 further provides the following:

> (1) A person may not offer or sell any form of participation in a pyramid or chain promotion. A pyramid or chain promotion is any plan or scheme or device by which (a) a participant gives a valuable consideration for the opportunity to receive compensation or things of value in return for inducing other persons to become participants in the program or (b) a participant is to receive compensation when a person introduced by the participant introduces one or more additional persons into participation in the plan, each of whom receives the same or similar right, privilege, license, chance, or opportunity.

> (2) A pyramid or chain promotion is declared to be illegal and against the public policy of the state. Any contract made in violation of this section is voidable at the sole option of the purchaser.

231.   M.C.L.A 445.1531 further provides the following:

(1) A person who offers or sells a franchise in violation of section 5 or 8 is liable to the person purchasing the franchise for damages or rescission, with interest at 6% per year from the date of purchase until June 20, 1984 and 12% per year thereafter and reasonable attorney fees and court costs.

232.   Under the Franchise Disclosure Law, each defendant is liable jointly and severally for violations of the law.

233.   The defendants' conduct in offering the "Business Opportunity" constitutes an offering of a franchise under this law. Their conduct as set forth in this complaint establishes violations of the sections of the Act set forth above.

234.   As a result, the Plaintiffs and the class, to the limits of the applicability of the Franchise Disclosure Law, have been damaged.

## COUNT NINE
## ACCOUNTING AND CONSTRUCTIVE TRUST

235.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

236.   Plaintiffs bring this claim on their own behalf and on behalf of each of the class members.

237.   To the extent their remedies at law ever may be determined to be inadequate to make them whole, Plaintiffs, in the alternative to their legal remedies, or to the extent they otherwise may be entitled to such relief, also assert their equitable right to an accounting and a constructive trust.

238.   Under Michigan law, the imposition of a constructive trust is appropriate under equity and/or to prevent unjust enrichment. A constructive trust can be imposed when property has been obtained through fraud, misrepresentation, concealment or other unconscionable circumstances which render it unjust for the holder of the legal title to retain and enjoy the property.

239.   As set forth in this complaint, all of the individual defendants, along with Ropart Asset, Ropart Asset II and the LLC's formed by certain promoters have reaped substantial payments that are proceeds of the pyramid scheme. These payments have been funded by the losses of the innocent purchasers of the "business opportunity." Defendants Blair, Mallen and Sarnicola, as well as

Goergen Sr. and Goergen have obtained tens of millions of dollars collectively, and hope to obtain tens or hundreds of millions more in 2017.

240.   It is unconscionable to permit these defendants to keep the proceeds of this scheme.

241.   As a result, the court should impose a constructive trust and an accounting on all of the profits reaped by the defendants. The amount of such profits is no less than the aggregate loss sustained by the innocent participants in the pyramid scheme. An accounting is necessary to identify the full amount of the loss.

## **PRAYER FOR RELIEF**

Kerrigan, Mikovich and Valli and the plaintiff class request the following relief:

a.   Certification of the class;

b.   A judgment against the defendants;

c.   Damages in the amount of the injury to business incurred by Kerrigan, Mikovich and Valli and the class as a result of defendants' conduct and for injury to their business and property, all as a result of defendants' violations of 18 U.S.C. § 1962(a), (c) and (d) and that such sum be trebled in accordance with 18 U.S.C. § 1964(c);

d.  Temporary and permanent injunctive relief enjoining the defendants from further unfair, unlawful, fraudulent and/or deceptive acts, including, but not limited to, supporting, continuing or operating the pyramid scheme;

e.  Imposition of a constructive trust for Plaintiffs' benefit;

f.  Disgorgement of all proceeds of the pyramid scheme by each defendant;

g.  An accounting to the extent Plaintiffs' remedies at law may be shown to be inadequate to make them whole or to the extent they otherwise are entitled to such relief;

h.  Relief under the Michigan Franchise Disclosure Act including damages as provided and rescission of any contract made with ViSalus;

i.  The costs of investigation and litigation reasonably incurred, as well as attorneys' fees in accordance with 18 U.S.C. § 1964(c); and

j.  For such other damages, relief and pre- and post-judgment interest as the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Kerrigan, Mikovich and Valli, on their own behalf, and on behalf of the class they represent, demand a jury trial.

Filed this 9th day of July, 2014.

Respectfully submitted,

SOMMERS SCHWARTZ, P.C.

s/ Andrew Kochanowski
Andrew Kochanowski (P55117)
Lance C. Young (P51254)
Tiffany R. Ellis (IL Reg. No. 6305795)
Attorneys for Plaintiffs
One Towne Square, Suite 1700
Southfield, MI 48076
(248) 355-0300
akochanowski@sommerspc.com
lyoung@sommerspc.com
tellis@sommerspc.com

PREBEG, FAUCETT & ABBOTT, PLLC
Matthew J.M. Prebeg
(TX Bar No: 00791465)
Brent T. Caldwell
(TX Bar No: 24056971)
Attorneys for Plaintiffs
8441 Gulf Freeway, Suite 307
Houston, TX 77017
(832) 743-9260
mprebeg@pfalawfirm.com
bcaldwell@pfalawfirm.com

WEXLER WALLACE LLP
Edward A. Wallace (IL Reg. No. 6230475)
Attorneys for Plaintiffs
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
(312) 589-6272
EAW@wexlerwallace.com

116