# EXHIBIT A

2:14-cv-12693-MFL-DRG Doc # 35-2 Filed 10/24/14 Pg 2 of 12 Pg ID 267

D.M. Robinson Chiropractic, S.C. v. Encompass Ins. Co. of..., Not Reported in...

2013 WL 1286696
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

D.M. ROBINSON CHIROPRACTIC, S.C., M.W. Widoff, D.C., P.C., and Back Doctors Ltd., individually and on behalf of all others similarly situated, Plaintiffs,
v.
ENCOMPASS INSURANCE COMPANY OF AMERICA, the Allstate Corporation, Allstate Insurance Company, and Mitchell International, Inc. Defendants.

No. 10 C 8159.  |  March 28, 2013.

## MEMORANDUM OPINION AND ORDER

REBECCA R. PALLMEYER, District Judge.

*1 Defendant automobile insurers rely on a software program called Decision Point to determine how much they will pay to reimburse their insureds for claimed medical expenses. Plaintiffs are medical service providers who contend that Defendants use Decision Point as a mechanism for systematically underpaying them. In this lawsuit, Plaintiffs charge the Defendant insurers and the Defendant software manufacturer of the program with breach of contract, consumer fraud, and RICO violations.

The insurance company Defendants, referred to collectively as "Allstate," are the Allstate Corporation and two of its subsidiaries—Encompass International Insurance Company of America ("Encompass") and Allstate Insurance Company ("Allstate Insurance"). The two Allstate subsidiaries (Encompass and Allstate Insurance) licensed Decision Point from Defendant Mitchell International, Inc. ("Mitchell"). Plaintiffs D.M. Robinson Chiropractic, S.C. ("Robinson"); M.W. Widoff, D.C., P.C. ("Widoff"); and Back Doctors Ltd. ("Back Doctors") are corporations that employ medical providers. They bring this suit as assignees of Allstate Insurance and Encompass policy holders whom they treated, and on behalf of a class of similarly situated patients. Plaintiffs allege that the Allstate Defendants violated the Illinois Consumer Fraud Act, 815 ILCS 505/1, *et seq.*, (Count I); that the Allstate Defendants breached insurance contracts with policyholders (Count II); and that all of the Defendants violated RICO, 18 U.S.C. § 1962(c) and (d) (Counts III and IV) by scheming to use Decision Point to depress medical reimbursements to policyholders. Defendants moved to dismiss Plaintiffs' claims and for judgment on the pleadings. For the reasons explained here, Defendants' motion to dismiss is granted as to the RICO claims (Counts III and IV). The court notes concerns regarding the adequacy of Plaintiffs' state law claims, as well, but as all federal claims have been resolved, the court invites the parties to show cause why the remaining claims should not be dismissed without prejudice to appropriate proceedings in state court.

## PROCEDURAL HISTORY

This case began more than two years ago, when Plaintiff Widoff filed a class action complaint against Encompass and Mitchell. The case was assigned to Judge William Hibbler of this court. (Class Action Compl. [1].) In an amended complaint filed on February 14, 2011, Robinson joined Widoff in alleging breach of contract, state consumer law violation, and RICO violation claims against Encompass, Mitchell, and Allstate Insurance Company. (Am. Class Action Compl. [13].) Encompass, Mitchell, and Allstate Insurance Company moved to dismiss. (Mot. of Defs. Allstate Ins. Co. and Encompass Ins. Co. of America to Dismiss Pls.' Am. Compl. [20]; Mitchell Int'l's Mot. to Dismiss [24].) Judge Hibbler denied the motions to dismiss as to the breach of contract claims, but granted them as to the state-law consumer fraud and RICO claims. *M.W. Widoff, P.C. v. Encompass Ins. Co. of Am.*, No. 10 C 8159, 2012 WL 769727, *3–4, 6 (N.D.Ill. Mar. 2, 2012). As explained in his March 2, 2012 ruling, Judge Hibbler concluded that Plaintiffs had alleged "nothing more than a naked breach of contract claim." *Id.* at *4. He dismissed the RICO claims because the complaint did not adequately assert that a RICO enterprise existed. Instead, the court explained, Plaintiffs alleged a mere customer-supplier relationship between the Defendants; they failed to establish RICO violations or a RICO enterprise. *Id.* at 5–6.

*2 After the case was transferred to this court, the court permitted Robinson and Widoff to file a second amended class action complaint on May 4, 2012 against Encompass, Mitchell, and a new Defendant, the Allstate Corporation, alleging claims similar to the ones they raised earlier. (Corrected 1st Am. Class Action Compl. [77], hereinafter "2d Am. Compl.") Robinson and Widoff did not include claims against Allstate Insurance Company in their second amended complaint. This new

2:14-cv-12693-MFL-DRG Doc # 35-2 Filed 10/24/14 Pg 3 of 12 Pg ID 268

D.M. Robinson Chiropractic, S.C. v. Encompass Ins. Co. of..., Not Reported in...

complaint did depart from the earlier ones in emphasizing that "the participation of Mitchell and Allstate was essential to the scheme, and that both participated in the scheme by exercising direction and control of the enterprise." (2d Am.Compl.¶ 1.) Plaintiffs added some factual allegations that reflected this participation. (2d Am.Compl.¶¶ 14, 48, 54.) Mitchell again moved to dismiss for failure to state a claim under Rule 12(b)(6) on July 2, 2012. (Mitchell Int'l's Mot. to Dismiss the 1st Am. Compl. [87], hereinafter "Mitchell's Mot.") The Allstate Corporation and Encompass filed their own motion to dismiss under Rule 12(b)(1) and (b)(6) and for judgment on the pleadings under Rule 12(c) on August 3, 2012. (Mot. of Defs. the Allstate Corp. and Encompass Ins. Co. of America to Dismiss Pls.' Corrected 1st Am. Compl. [94].) Back Doctors joined Robinson and Widoff in a third amended class action complaint on September 18, 2012 that once again included Allstate Insurance Company as a Defendant, along with Encompass, Mitchell, and the Allstate Corporation. (2d Am. Class Action Compl. [107], hereinafter "3d Am. Compl.") Defendants' motions are aimed at the Second Amended Complaint. The Third Amended Complaint added Allstate Insurance Company and Back Doctors as parties, but is otherwise identical to the Second Amended Complaint. (3d Am.Compl.¶¶ 1, 30, 32–33, 48.) Since the additional parties did not change Plaintiffs' substantive allegations, the court considers the motions in relation to the current complaint.

## FACTUAL BACKGROUND

In reviewing the allegations of the complaint, the court notes that Plaintiffs refer to Encompass, Allstate Insurance, and the Allstate Corporation collectively as "Allstate" throughout their current complaint. The court does so, as well, differentiating the parties' roles where possible. Allstate Corporation is alleged to be the parent to Encompass and Allstate Insurance, however, and in adhering to Plaintiffs' convention, the court expresses no conclusions that any entity is a party to contracts signed only by its corporate affiliate(s) or that any entity is liable for actions taken by its affiliates.

Decision Point is a computer software program, developed and sold by Mitchell, that is used by insurance companies for medical reimbursement determinations. (3d Am.Compl.¶ 7.) The Decision Point program incorporates a medical fee database created by another company, Ingenix, and compares the Ingenix database information against medical bills submitted for review and reimbursement. (3d Am .Compl.¶¶ 2–4, 6.) (Ingenix is not a party to this litigation.) Mitchell licensed Decision Point to Allstate and agreed to provide Allstate with "continuous customer support" for the program. (3d Am.Compl.¶ 8.) The automobile insurance policies issued by Allstate require the insurer to pay "reasonable" medical expenses for insureds. (3d Am.Compl.¶ 9.) Though Plaintiffs allege that the collective "Allstate" issued the relevant policies, the court notes that it is Allstate Corporation's subsidiaries (Allstate Insurance and Encompass), not Allstate Corporation itself, that issues insurance policies. (Corrected Reply in Further Supp. of the Mot. to Dismiss of Defendants the Allstate Corporation, Allstate Insurance Company and Encompass [124], hereinafter "Allstate's Reply", at 14.) The policies define unreasonable medical expenses as "fees ... which are substantially higher than the usual and customary charges for those services." (3d Am.Compl.¶ 9.)

### A. Allstate's Method of Determining "Unreasonable" Medical Charges

*3 When Allstate receives a medical charge it deems excessive, it reimburses only that portion of the charge it deems reasonable. (3d Am.Compl.¶¶ 44, 46–48.) According to Plaintiffs, Allstate used Decision Point to determine what qualified as a "reasonable" medical expense. That practice, Plaintiffs allege, contravenes the policy language because Decision Point is "*not* designed ... to determine whether a charge is 'reasonable' " even though "Allstate uses it, and Mitchell Medical sells it, for these very purposes." (3d Am.Compl.¶¶ 9–10.) According to Plaintiffs, Decision Point does not serve the purpose of determining reasonable charges and is instead a " 'garbage in, garbage out' product" that is "suffused with fraud." (*Id.* ¶¶ 2–3.) Plaintiffs assert that Defendants knowingly engaged in a fraudulent scheme to depress healthcare reimbursements to Allstate policyholders by using Decision Point to mislabel valid expenses as unreasonable. (3d Am.Compl.¶¶ 2, 13, 18, 46–48.)

Reimbursement reductions by Allstate for unreasonable medical expenses were denoted in a computer-generated Explanation of Medical Bill Payment ("EOB") form[1] with the indicator codes "41" or "X41" (collectively "code 41"). (3d Am.Compl.¶¶ 7, 45.) Each EOB reflecting a code 41 reduction or exclusion notified Plaintiffs and members of the alleged class that "[t]he amount allowed is based on provider charges within the provider's geographic region." (3d Am.Compl.¶ 45.) Plaintiffs allege that Allstate failed to meet its responsibility under the policies to pay "all reasonable expenses actually incurred for necessary medical treatment, medical services or medical products actually provided to the insured person"[2] because Defendants knowingly used a flawed program,

2:14-cv-12693-MFL-DRG Doc # 35-2 Filed 10/24/14 Pg 4 of 12 Pg ID 269

D.M. Robinson Chiropractic, S.C. v. Encompass Ins. Co. of..., Not Reported in...

Decision Point, in a flawed way in order to "create [ ] an appearance [that Allstate was] conducting a line-by-line audit of provider bills" without disclosing Allstate's methods to policyholders or medical providers. As a result, Plaintiffs allege, Allstate failed to pay reasonable medical charges. (3d Am.Compl.¶¶ 9, 53.)

In support of this claim, Plaintiffs assert that the Ingenix database incorporated into Decision Point is "suffused with fraud." They cite an investigation by the New York Attorney General ("NYAG") which concluded that Ingenix understates the market prices for medical charges.[3] (3d Am.Compl.¶ 3.) The NYAG's investigation found that Ingenix's fee schedules were unreliable, and that Ingenix had a conflict of interest that compromised the fairness of its fee schedules: specifically, the conflict created by Ingenix's status as a subsidiary of a health care insurance company, UnitedHealth. (3d Am.Compl.¶ 3.) UnitedHealth settled the charges subsequently brought by the NYAG by funding the creation of a new independent fee schedule database by the nonprofit FAIR Health, Inc. to replace Ingenix's database.[4] (3d Am.Compl.¶ 5.) The criticized Ingenix database nevertheless was allegedly incorporated into Decision Point (Plaintiffs do not say when). (3d Am.Compl.¶ 6.)

*4 In considering the proposed settlement of another case, in which defendant health care insurer agreed to stop using Ingenix to determine payment of claims, a New Jersey District Court noted problems with the data sample Ingenix used, the number of data points per procedure, and other errors. See *McCoy v. Health Net, Inc.*, 569 F.Supp.2d 448, 465–69 (D.N.J.2008) (class action by subscribers against health insurer challenging charge limitation policies for out-of-network claims). Plaintiffs allege that although Ingenix issues a "specific disclaimer" to users about the accuracy of its data, Defendants acted "in total disregard of the disclaimer" by using the Ingenix data to help determine reasonable fees. (3d Am.Compl.¶ 66.)

Plaintiffs allege, further, that Defendants relied on the flawed Ingenix database to set a percentile "benchmark" in Decision Point for reimbursement of individual medical expenses. Plaintiffs assert that Mitchell programmed Decision Point to incorporate the percentile benchmark for Allstate-a violation of the insurance policies, according to Plaintiffs, because use of an arbitrary benchmark to determine reimbursement amounts for medical expenses does not constitute a determination of whether medical expenses are "reasonable." (3d Am.Compl.¶¶ 11, 49, 51.) Allstate then reimbursed medical expenses at amounts equal to or below benchmark for each line-item expense. The Decision Point program automatically denied reimbursement for any amount greater than the payment benchmark, Plaintiffs assert. (3d Am.Compl.¶¶ 11, 44, 49 .) Plaintiffs do not identify the specific percentile benchmark that Allstate used, but assert that Allstate adopted a particular percentile for each line-item that appeared in medical bills and reimbursed for no more than that arbitrarily-chosen amount.

Finally, Plaintiffs allege that Mitchell and Allstate worked together to suppress programming and data analysis errors in the Decision Point software program. (3d Am.Compl.¶ 52.) Once Decision Point began displaying error codes "in the thousands per day" as a result of "programming and data errors," Plaintiffs assert, Mitchell suppressed error messages with Allstate's "knowledge and acquiescence." (3d Am.Compl.¶ 52.) Plaintiffs assert that Defendants should have instead identified and corrected the causes of the errors. (*Id.*) Plaintiffs allege that because Decision Point was not functioning properly, Allstate's determinations about what medical expenses were unreasonable and therefore not reimbursable were not valid or reliable. (3d Am.Compl.¶ 52.) As the court understands their allegations, Plaintiffs contend that disregarded error codes resulted only in underpayment errors, rather than both overpayment and underpayment errors.

In sum, Plaintiffs assert that Allstate's use of the Ingenix database harmed them because Ingenix is systematically slanted in favor of insurance companies, and the percentile benchmark and error suppression practices Allstate employed further biased results in Allstate's favor. Mitchell "intentionally slanted Decision Point to serve the purposes of the enterprise by actively working to ensure that the reimbursement decisions made by Decision Point were lower than the internal price schedules Allstate utilized as a cross-check." (3d Am.Compl. ¶ 14.) Plaintiffs therefore allege not only that the database was flawed, but also that it was flawed in ways that were designed to benefit insurers at the expense of policyholders.

**B. The Alleged RICO Scheme**
*5 According to Plaintiffs, Allstate, Mitchell, and Ingenix formed an association-in-fact enterprise to profit by shifting Allstate's costs to policyholders. Plaintiffs assert that Defendants used Decision Point to create "an appearance of legitimacy for [Allstate's] benefit reductions" and concealed from policyholders and providers that Allstate's determinations about what qualified as a reasonable medical expense were based on "sham reimbursement amounts." (3d Am. Compl. ¶¶ 56,

2:14-cv-12693-MFL-DRG   Doc # 35-2   Filed 10/24/14   Pg 5 of 12   Pg ID 270

D.M. Robinson Chiropractic, S.C. v. Encompass Ins. Co. of..., Not Reported in...

59, 69 71.) Without offering any specifics, Plaintiffs assert that Ingenix and Mitchell and Mitchell and Allstate made agreements to further the scheme. (3d Am.Compl.¶ 56.) According to Plaintiffs, Allstate benefitted by paying reduced reimbursement amounts, and Mitchell benefitted by "enhancing its ability to earn licensing fees [from Allstate] from the sale and support of Decision Point." (3d Am.Compl.¶¶ 64, 71 .) Plaintiffs allege that unless Decision Point were slanted in favor of insurers, the Defendant insurance companies would not have chosen to license Decision Point from Mitchell. (3d Am.Compl.¶ 14.)

Plaintiffs assert that both Allstate and Mitchell directed the enterprise to defraud Allstate's policyholders. Allstate implemented Decision Point and made reimbursement decisions, and Mitchell acted as "a director of the operations of the enterprise" by (1) selling Decision Point to Allstate as a cost-containment device; (2) customizing Decision Point for Allstate to maximize Allstate's interests over those of policyholders, including "intentionally slant[ing] Decision Point ... to ensure that the reimbursement decisions made by Decision Point were lower than the internal price schedules Allstate utilized as a cross-check"[5]; (3) providing regular data updates to Decision Point; (4) licensing the flawed Ingenix database; (5) providing fee determination verifications and "act[ing] as a bridge to Ingenix"; (6) programming Decision Point to suppress errors; and (7) manufacturing artificially low values for inclusion in the Decision Point analysis of reimbursement rates. (3d Am.Compl.¶ ¶ 14, 16–17, 52, 58, 63.) Though Plaintiffs allege some new facts in their Third Amended Complaint, their core allegations against Defendants remain the same as those in their earlier complaints.

Plaintiffs assert that Defendants committed predicate acts of racketeering activity through mail fraud and wire fraud. (3d Am.Compl.¶ 72.) According to Plaintiffs, "[e]ach use of the mail or wire in furtherance of the fraudulent scheme" was a predicate act, including, among others, mailing EOBs and information about rate determinations to policyholders and providers, and the "regular and repeated communications between Allstate and Mitchell ... regarding the implementation, use and/or maintenance" of Decision Point. (3d Am.Compl.¶¶ 72, 124.) Specifically, Plaintiffs allege that Defendants committed mail fraud by sending EOB forms with code 41 reimbursement reductions (1) to Robinson on July 23, 2008, September 4, 2008 and October 16, 2008; (2) to Widoff in three separate EOB forms on May 25, 2010; and (3) to Back Doctors on February 16, 2009. (3d Am.Compl.¶ 124.)

## DISCUSSION

*6 As noted, Plaintiffs contend these allegations support claims under RICO, as well as state law breach of contract and Consumer Fraud Act claims. The court turns, first, to the RICO allegations, as they provide the basis for the court's jurisdiction.[6] Before considering those allegations, however, the court pauses to address two concerns: Plaintiffs' standing to sue, and Plaintiffs' "group pleading" practice.

### A. Standing

Plaintiffs have brought these claims as assignees of the Allstate policyholders that Plaintiffs treated, and on behalf of a class of persons who, from January 2007 to the present, submitted medical claims to Allstate but received reimbursements in amounts less than the submitted line-item medical expense, as a result of Decision Point fee review.[7] (3d Am.Compl.¶ 88.) As the court understands this proposed class definition, however, it may well include a number of persons who were not harmed at all, or were not harmed directly. In situations where Defendant insurers paid less than a line-item medical expense, but the doctors or other medical service providers did not demand the balance from patients, the patients themselves suffered no harm. *Cf. Illinois Brick Co. v. Illinois,* 431 U.S. 720, 746 (1977) (only direct purchasers, not indirect purchasers, may recover for antitrust violations).

Allstate has asked the court to dismiss Widoff's claims on this basis-specifically, Allstate argues that Plaintiffs have not alleged that any of Widoff's patients themselves suffered an injury. (Allstate's Reply at 14.) (The court is uncertain why this argument is aimed only at Widoff; presumably the same defense could be aimed at the other Plaintiffs, as well.) Standing requires an injury that is "concrete and particularized" as well as "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992); *G & S Holdings LLC v. Cont'l Cas. Co.,* 697 F.3d 534, 540 (7th Cir.2012) (standing requires "a personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief") (internal quotation marks and citations omitted). According to Allstate, because Plaintiffs do not allege that Widoff's patients were forced to make any out-of-pocket payments or were the target of collection efforts, Plaintiffs were not injured by any medical bill underpayment. (Allstate's Reply at 14.) Even if Widoff is

2:14-cv-12693-MFL-DRG Doc # 35-2 Filed 10/24/14 Pg 6 of 12 Pg ID 271

D.M. Robinson Chiropractic, S.C. v. Encompass Ins. Co. of..., Not Reported in...

an assignee of its patients, Allstate urges, Widoff has no greater standing to sue than its uninjured patients would have had. (Allstate's Reply at 14, citing *K.B. v. State Farm Fire & Cas. Co.*, 189 Ariz. 263, 267, 941 P.2d 1288, 1292 (Ariz.Ct.App.1997).)

Plaintiffs respond that Widoff's patients remain liable for their full medical bills, whether or not Widoff actually demanded that patients pay the portions of their bills that Allstate did not reimburse. (Pls.' Consolidated Resp. to Defs.' Mot. to Dismiss [103], hereinafter "Pls.' Resp.", at 32.) Because the court has disposed of this case on other grounds, it has not reached the issue of standing here, but cautions that the matter is not free from doubt. *See, e.g., Bemis v. Safeco Ins. Co. of America*, 407 Ill.App.3d 1164, 1169, 948 N.E.2d 1054, 1060 (5th Dist.2011) (reversing class certification in a case challenging underpayment by auto insurer of medical claims, the court notes "a split of authority under Illinois law regarding what contractual language amounts to an assignment versus an authorization for payment.") The language of the written assignments themselves—which were not included in the record-may well be relevant with respect to Plaintiffs' standing.

**B. Pleading Standard**

*7 Under Rule 12(b)(6), a party may seek dismissal of a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). A complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Limestone Dev. Corp. v. Village of Lemont*, 520 F.3d 797, 803 (7th Cir.2008) (in complex RICO cases "a fuller set of factual allegations ... may be necessary"). The complaint is read in the light most favorable to Plaintiffs. *DeGuelle v. Camilli*, 664 F.3d 192, 195 (7th Cir.2011).

As noted earlier, Plaintiffs have referred to Encompass, Allstate Insurance, and the Allstate Corporation collectively as "Allstate" throughout their complaint, and have not identified which of the Defendants took any specific action. Again, because the court has disposed of the only federal claim on other grounds, the court need not address this concern-but the court's silence on this issue should not be read as an endorsement of Plaintiff's "group pleading" practice. *See Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 730 (7th Cir.1998) ("treat[ing] all the defendants as one" by "lumping together" defendants is "clearly insufficient to state a RICO claim"); *cf. Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir.2008) (in securities fraud action, the court observed: "We have rejected the 'group pleading doctrine,' a judicial presumption that statements in group-published documents are attributable to officers ... thus, the plaintiffs must create a strong inference of scienter with respect to each individual defendant.") (citations omitted); *but see Chu v. Sabratek Corp.*, 100 F.Supp.2d 827, 836 (N.D.Ill.2000) (some "group pleading" may be permissible when plaintiffs supply "ample detail" about alleged misrepresentations).

**B. RICO § 1962(c): Pattern of Racketeering Activity in Enterprise's Affairs**

RICO was enacted to combat organized crime and racketeering. *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). In addition to its application in criminal law, RICO creates a civil claim for relief for "[a]ny person injured in his ... property by reason of a violation of section 1962 ...." *DeGuelle v. Camilli*, 664 F.3d 192, 198 (7th Cir.2011) (citing 18 U.S.C. § 1964(c)). Plaintiffs who establish civil RICO claims by a preponderance of the evidence can recover treble damages, costs, and attorney's fees. 18 U.S.C. § 1964(c).

To establish a violation of § 1962(c), a plaintiff must show that the defendant participated in the (1) conduct (2) of an enterprise's (3) pattern (4) of racketeering activity. *See, e.g., Corley v. Rosewood Care Ctr., Inc.*, 388 F.3d 990, 1002 (7th Cir.2004). The plaintiff must also "properly allege [ ] that the RICO violation was the proximate cause of his or her damages." *James Cape & Sons Co. v. PCC Const. Co.*, 453 F.3d 396, 403 (7th Cir.2006) (citing *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006)). RICO did not "federalize[ ] every state common-law cause of action available to remedy business deals gone sour." *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1025 (7th Cir.1992). Nor can a breach of contract claim "be transmogrified into a RICO claim by the facile device of charging that the breach was fraudulent." *Carr v. Tillery*, 591 F.3d 909, 918 (7th Cir.2010). RICO "does not cover all instances of wrongdoing ... [and is] concerned with eradicating organized, long-term, habitual criminal activity." *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir.2006).

*8 The first showing required to establish a RICO violation is conduct. A RICO defendant "must have some part in directing those affairs" of the RICO enterprise such that the defendant "participated in the operation or management of the enterprise itself." *Reves*, 507 U.S. at 179, 183; *see also Slaney v. Int'l Amateur Ath. Found.*, 244 F.3d 580, 598 (7th Cir.2001) (defendant "must have asserted some control over the enterprise"). A RICO violation therefore requires more than that a defendant

2:14-cv-12693-MFL-DRG Doc # 35-2 Filed 10/24/14 Pg 7 of 12 Pg ID 272

D.M. Robinson Chiropractic, S.C. v. Encompass Ins. Co. of..., Not Reported in...

"had a business relationship with a putative RICO enterprise or ... performed services for that enterprise." *Crichton v. Golden Rule Ins. Co.,* 576 F.3d 392, 399 (7th Cir.2009); *see also Goren v. New Vision Int'l, Inc.,* 156 F.3d 721, 728 (7th Cir.1998) ( "simply performing services for an enterprise, even with knowledge of the enterprise's illicit nature" does not meet the operation or management requirement under RICO).

For purposes of this analysis, the court will assume that Plaintiffs have alleged RICO conduct on the part of Encompass, Allstate Insurance, and the Allstate Corporation. Plaintiffs have not sufficiently alleged RICO conduct on the part of Mitchell, however. In his March 2, 2012 ruling, Judge Hibbler concluded that Plaintiffs did not sufficiently plead that Mitchell was engaged in RICO conduct or a RICO enterprise because Plaintiffs alleged no more than a customer-supplier relationship between Mitchell and Allstate. *M.W. Widoff,* 2012 WL 769727, at *5–6. In their current pleading, Plaintiffs' new assertions of fact do little to bolster these allegations. They instead largely rephrase their previous assertions: that Mitchell provided ongoing support to Allstate for Decision Point, and that Mitchell was aware that Allstate was defrauding policyholders. (Pls.' Resp. at 3–4.) Plaintiffs nevertheless urge that, following *MCM Partners, Inc. v. Andrews–Bartlett & Assocs., Inc.,* 62 F.3d 967, 978 (7th Cir.1995), Mitchell's actions constitute RICO conduct because Mitchell was a "lower-rung participant" acting at the direction of "upper management" within a RICO enterprise. In *MCM Partners,* two exhibition contractors refused to rent equipment and personnel from the plaintiff, a rental equipment company, at the direction of a competing rental equipment company. The Seventh Circuit held that the contractors could be liable for RICO conduct as part of an association-in-fact to make one rental equipment company the exclusive provider at McCormick Place in Chicago. According to Plaintiffs, when Mitchell performed work on Decision Point at Allstate's request, Mitchell was similarly conducting enterprise activity under the direction of Allstate. (Pls.' Resp. at 5–7.) Mitchell's activities differ from those of the exhibition contractors in *MCM Partners,* though, at least in that Mitchell had no direct dealings with Plaintiffs or other victims of the alleged RICO enterprise.

Even if Plaintiffs' argument under *MCM Partners* that Mitchell participated in RICO conduct is correct, however, Plaintiffs still have not adequately alleged a RICO enterprise. Plaintiffs contend that Defendants formed an association-in-fact enterprise that schemed to depress medical reimbursements. (Pls.' Resp. at 1–2.) Defendants respond that Plaintiffs merely allege a customer-supplier relationship between Mitchell and the Defendant insurers, and accordingly fail to allege a RICO enterprise. (Mitchell Int'l's Mem. of Law in Supp. of its Mot. to Dismiss [89], hereinafter "Mitchell's Mem.", at 8–9; Mitchell Int'l's Reply in Supp. of its Mot. to Dismiss [122], hereinafter "Mitchell's Reply", at 2; Allstate's Reply at 6–7.) Referencing some of the allegations Plaintiff added to their amended complaint after Judge Hibbler's order, Mitchell argues that "these allegations are no more than a rehashing of the original complaint, with additional rhetoric built in." (Mitchell's Reply at 3.) Mitchell contends that the new allegations, "which purport to specify how Mitchell supposedly designed and implemented the system (Mitchell is now said to have suppressed system errors) and acted as a 'bridge' between Allstate and Ingenix, add nothing" because they simply echo the original complaint while "us[ing] considerably more words to do so." (Mitchell's Reply at 4.)

*9 An association-in-fact enterprise under RICO is "any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise requires a structure, evidenced by (1) a common purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit the associates to pursue the enterprise's purpose. *Boyle v. United States,* 556 U.S. 938, 944–45 (2009). An alleged pattern of racketeering activity does not by itself constitute an enterprise. *Jennings v. Emry,* 910 F.2d 1434, 1440 (7th Cir.1990) ("although a pattern of racketeering activity may be the means through which the enterprise interacts with society, it is not itself the enterprise, for an enterprise is defined by what it is, not what it does"); *see also Crichton,* 576 F.3d at 400 (an enterprise is "an organization with a structure and goals separate from the predicate acts themselves").

Plaintiffs fail to assert that Defendants shared a true common purpose, and thus fail to allege a RICO enterprise. Plaintiffs allege that Defendants' common purpose was "reducing the price paid for medical reimbursements, and increasing the profits of the [enterprise] participants." (2d Am.Compl.¶ 62.) As Defendants observe, however, the shared goal of financial profit, by each party conducting its own business, does not qualify as a "common purpose" under RICO. Defendants also note that Plaintiffs have identified fraudulent billing as predicate acts; but they have not identified an organization with a common purpose separate from the predicate acts themselves. (Allstate's Reply at 7, citing *United Food & Comm'l Workers Union & Emp'rs Midwest Health Ben. Fund v. Walgreen Co.,* No. 12 C 204, 2012 WL 3061859, *5 (N.D.Ill. July 26, 2012) (dismissing RICO claims when defendants were each conducting their own affairs, and the plaintiffs failed

2:14-cv-12693-MFL-DRG   Doc # 35-2   Filed 10/24/14   Pg 8 of 12   Pg ID 273

D.M. Robinson Chiropractic, S.C. v. Encompass Ins. Co. of..., Not Reported in...

to identify separate goals for the alleged enterprise beyond the predicate acts of overbilling). The Seventh Circuit has explained that a RICO enterprise must be "meaningfully distinct from the entities that comprise it such that the entity sought to be held liable [under RICO] can be said to have controlled and conducted the enterprise rather than merely its own affairs." *Crichton,* 576 F.3d at 399 (citations omitted) (no association-in-fact between health insurer and non-profit organization that offered group discounts on its insurance).

The court is not satisfied that Plaintiffs have alleged participation by each member of the alleged enterprise—Allstate, Ingenix,[8] and Mitchell-in the enterprise's affairs, rather than its own affairs. As Judge Hibbler pointed out in his March 2, 2012 ruling, though Ingenix and Mitchell aided Allstate in acquiring and using Decision Point, their only alleged interest in Allstate's use of the product was as suppliers. Plaintiffs now allege that Ingenix "verif [ied] pricing when a customer such as Allstate asked ... [and] Ingenix 'experts' [would] testify about the purported accuracy of the Ingenix database." (3d Am.Compl.¶ 15.) As the Seventh Circuit explained in *Crichton,* however, a "garden-variety marketing arrangement" between defendants, in which one defendant functions "merely [as] a conduit for the sale of [another defendant's] insurance" does not qualify as an association-in-fact. 576 F.3d at 400. In *Crichton,* the plaintiff alleged that defendant insurer induced him to purchase insurance by an artificially low introductory premium, without warning him that the renewal premium would escalate as a result of defendant's business practices. The Seventh Circuit affirmed the dismissal of RICO allegations; it found no association-in-fact between the defendant insurer and a non-profit organization through which defendant marketed the policies and offered the introductory discounts.

*10 Mitchell's and Ingenix's roles in licensing Decision Point to Allstate also do not form the basis for an association-in-fact enterprise to defraud policyholders. Mitchell and Ingenix had no apparent objective aside from encouraging and enabling Allstate's use of Decision Point. Though Plaintiffs make much of the fact that Mitchell was interested in retaining Allstate's business, a vendor's interest in retaining its business relationship is neither unusual nor suspicious. Mitchell's profit motive in tailoring Decision Point to Allstate's desires was not a "common purpose" shared with Allstate to defraud Allstate policyholders. Plaintiffs have not alleged, for example, that Mitchell profited directly from Allstate's alleged underpayments. Nor have Plaintiffs alleged any specific role that Mitchell may have played in Allstate's medical reimbursement decisions. Plaintiffs have alleged that Mitchell's and Ingenix's interests were in ensuring that Allstate continued to license Decision Point, not in defrauding Allstate policyholders.[9]

The parties cite several district court decisions assessing RICO allegations. These cases are not authoritative, but the court notes that they are consistent with the result reached in this case. Thus, in *Guaranteed Rate, Inc. v. Barr,* the court dismissed a RICO claim when plaintiffs failed to plead that defendants had an interest in the ultimate outcome of a scheme, for example "shar[ing] in the profits of the alleged enterprise as opposed to merely taking their own respective profits from their respective actions related to the scheme." No. 12 C 5362, —— F.Supp.2d ——, 2012 WL 6189013, *11 (N.D.Ill. Dec. 12, 2012). Similarly, in *Cement–Lock v. Gas Tech. Indus.,* this court concluded that no enterprise existed where the participants' only common purpose was their individual gain. No. 05–cv–0018, 2005 WL 2420374, *19 (N.D.Ill. Sept. 30, 2005). Plaintiffs argue that *Guaranteed Rate* is inapposite because in that case (1) a defendant furthered the alleged enterprise unknowingly; and (2) there was no contract defining the defendants' roles in the alleged enterprise. (Pls.' Resp. to Defs.' Notice of Supplemental Authority [135], at 1–3.) In this case, Plaintiffs argue, Mitchell and Ingenix facilitated Allstate's use of Decision Point though they knew that Allstate was using the program in fraudulent ways and that the program was faulty. In Plaintiffs' view, the Allstate policyholder agreements and the Decision Point licensing agreement qualify as "a written contract that defines the roles to be played in the enterprise." (*Id.* at 3.) Plaintiffs cite cases from the Eastern District of Pennsylvania and the Northern District of California to argue that "recent cases have found sufficient pleading of relationships that are much looser than the relationship that is pled here." (*Id.,* citing *Walther v. Patel,* No. 10–706, 2011 WL 382752, *5 (E.D.Pa. Feb. 4, 2011) (agreement between dental defendants and bank defendants to promote impulse buying of dental procedures by providing in-office credit to patients was sufficient association-in-fact relationship), *Mitsui O.S.K. Lines Ltd. v. Seamaster Logistics, Inc.,* 871 F.Supp.2d 933, 942 (N.D.Cal.2012) (showing of formal agreement or structure not required for association-in-fact enterprise among shipping companies where plaintiff alleged that defendants engaged in a scheme to charge it for unnecessary or non-existent inland carriage of freight).)

*11 While Plaintiffs are correct that no formal agreement is required to show a common purpose or relationships in an association-in-fact enterprise, the separate agreements between Allstate and its policyholders and between Mitchell and Allstate simply do not lay out the common

2:14-cv-12693-MFL-DRG Doc # 35-2 Filed 10/24/14 Pg 9 of 12 Pg ID 274

D.M. Robinson Chiropractic, S.C. v. Encompass Ins. Co. of..., Not Reported in...

purposes of a criminal enterprise. The cases Plaintiffs cite as evidence that a formal structure is not required for an association-in-fact also do not eliminate the requirement that any association-in-fact must share such a common purpose. (Pls .' Resp. to Defs.' Notice of Supplemental Authority at 4–5.) For example, unlike *City of New York v. Chavez,* where a group of defendants operated a distribution center for bootlegged cigarettes, Plaintiffs here have not adequately alleged that Defendants shared a common purpose to defraud policyholders. No. 11 C 2691(BSJ), 2012 WL 1022283, *6 (S.D.N.Y March 26, 2012). Unlike *Walther v. Patel,* where a bank and dental office contracted to provide inoffice credit for elective procedures, Mitchell and Allstate did not mutually benefit from defrauding consumers. No. 10–706, 2011 WL 382752, *5. In *Walther,* each credit transaction directly benefitted both the bank and the dental office. In contrast, Mitchell did not receive any benefit from allegedly defrauding individual policyholders-the only benefit alleged is that Mitchell retained Allstate as a customer by creating a product favorable to Allstate. *Mitsui O.S.K. Lines Ltd. v. Seamaster Logistics, Inc.* is also inapposite because the defendants in that case did not even challenge the existence of an enterprise. 871 F.Supp.2d at 941.

Plaintiffs have amended their complaint since Judge Hibbler's March 2, 2012 order to emphasize that Mitchell's participation, direction, and control was essential to the alleged scheme. Plaintiffs now allege, for example, that Mitchell suppressed system errors in Decision Point and acted as a "bridge" between Allstate and Ingenix. Nevertheless, their new complaint still does not allege more than the customer-supplier relationship between Mitchell and Allstate that Judge Hibbler found insufficient for an association-in-fact enterprise. Mitchell's collaborative work with Allstate to license and service Decision Point is within the bounds of a typical vendor-vendee relationship. Even Mitchell's alleged error suppression, and its alleged efforts to "slant" Decision Point to ensure its reimbursement determinations met Allstate's needs, do not go beyond efforts to tailor the program for the customer-activity that is common in a customer-supplier relationship. Plaintiffs' allegations about Mitchell's role in the supposed enterprise suggest only that Mitchell serviced a software program that Allstate used improperly. *See Crichton,* 576 F.3d at 400 (no association-in-fact between insurance company and non-profit organization that disseminated its marketing information). Nor did Plaintiffs allege any direct relationship between Allstate and Ingenix that would suggest an enterprise. Since Plaintiffs have not alleged an association-in-fact enterprise, Plaintiffs' claims under 18 U.S.C. § 1962(c) are dismissed. Accordingly, the court need not decide whether Plaintiffs adequately pleaded a pattern of racketeering activity under Rule 9(b) or whether Defendants proximately caused Plaintiffs' injuries.

### D. RICO 1962(d): Conspiracy to Commit Racketeering Activity

*12 To violate 18 U.S.C. § 1962(d), a defendant must conspire to violate another RICO subsection. In this case, since Plaintiffs allege only violations of § 1962(c), Defendants must have conspired to participate in a criminal enterprise with a pattern of racketeering activity to have a § 1962(d) claim. *See Stachon v. United Consumers Club, Inc.,* 229 F.3d 673, 677 (7th Cir.2000) (when a plaintiff fails to establish a § 1962(c) violation, plaintiff's § 1962(d) claim based on the same facts also fails). Because Plaintiffs did not adequately allege a RICO enterprise, their § 1962(d) claims are also dismissed.

### E. Breach of Contract

Having dismissed the only federal claim in this lawsuit, the court anticipates relinquishing jurisdiction over the state law claims Plaintiffs alleged. Because the parties have briefed arguments concerning those claims, however, the court addresses certain of those arguments briefly.

Breach of contract claims require allegations of (1) a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) resultant injury to the plaintiff. *Van Der Molen v. Washington Mut. Fin., Inc.,* 359 Ill.App.3d 813, 823, 835 N.E.2d 61, 69 (1st Dist.2005). Plaintiffs here allege that Allstate violated insurance contracts with policyholders by failing to determine and reimburse "reasonable" medical expenses. Allstate did not reimburse "reasonable" medical expenses, Plaintiffs allege, because the Ingenix database they used was "suffused with fraud" and Allstate "systematically fail[ed] to make a good faith determination of the extent of medical benefits through the use of biased, skewed data, unreliable and faulty analysis algorithms and processes." (3d Am.Compl.¶¶ 3, 108.) In his March 2, 2012 order, Judge Hibbler concluded these allegations were sufficient to state a breach of contract. Defendants have asked the court to revisit that conclusion, however, in light of the addition of the Allstate Corporation as a Defendant and standing issues not dealt with in Judge Hibbler's order. (Allstate's Reply at 14–15.) Allstate first contends that the breach of contract claim against the Allstate Corporation should be dismissed because the Allstate Corporation, unlike

2:14-cv-12693-MFL-DRG   Doc # 35-2   Filed 10/24/14   Pg 10 of 12   Pg ID 275

D.M. Robinson Chiropractic, S.C. v. Encompass Ins. Co. of..., Not Reported in...

Encompass and Allstate Insurance, does not issue insurance policies, and therefore did not contract with Plaintiffs. (Allstate's Reply at 14.)

Plaintiffs argue in response that the Allstate Corporation is liable for breach of contract because it negotiated with Mitchell for the licensing of Decision Point and signed off on the relevant policies before they became effective. (Pls.' Resp. at 23.) Significantly, however, those facts were not explicitly alleged in Plaintiff's complaint; instead, Plaintiffs made their assertions against "Allstate" collectively, not the Allstate Corporation. (3d Am.Compl.¶ 26.) Allstate Insurance and Encompass are subsidiaries of the Allstate Corporation, and Plaintiffs' attempt to plead that contracts with them were contracts with the Allstate Corporation overlooks the fact that they are distinct corporate entities. Plaintiffs' argument that "Allstate Corporation is the entity controlling the insurance products ... [and] 'Allstate' and 'Encompass' are merely brand names for the ... policies sold by The Allstate Corporation" (Pls.' Resp. at 23–24) is not enough to allege a contract between policyholders and the Allstate Corporation .[10] Since Plaintiffs have not adequately pleaded that a contract existed between the Allstate Corporation and policyholders, Plaintiffs' breach of contract claim against the Allstate Corporation is dismissed.

**F. Illinois Consumer Fraud Act Claim**
*13 The Illinois Consumer Fraud Act ("ICFA") prohibits "unfair or deceptive acts or practices" in Illinois that harm consumers, including the "misrepresentation or the concealment, suppression, or omission of any material fact." 815 ILCS 505/2. The law is "liberally construed to effectuate its purpose." *Wigod v. Wells Fargo Bank*, 673 F.3d 547, 574 (7th Cir.2012) (quoting *Robinson v. Toyota Motor Credit Corp.*, 201 Ill.2d 403, 416, 775 N.E.2d 951, 960 (2002)). Mere breaches of contractual promises, however, do not amount to consumer fraud. *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill.2d 100, 168–70, 835 N.E.2d 801, 843–44 (2005). The elements of an ICFA claim are (1) a deceptive or unfair act or practice; (2) with an intent that the plaintiff rely; (3) during a course of conduct involving trade or commerce. *Wigod*, 673 F.3d at 574 (internal quotation marks and citations omitted.) An ICFA plaintiff must also show that the defendant's conduct proximately caused her injury. *Id.* ICFA claims are subject to the heightened pleading standards of other fraud claims under Rule 9(b). FED. R. CIV. P. 9(b); *Greenberger v. GEICO Ins. Co.*, 631 F.3d 392, 399 (7th Cir.2011).

Plaintiffs assert that Allstate engages in unfair or deceptive practices (1) by misleading policyholders and providers about the information used to make reimbursement determinations; (2) by providing misleading information concerning the basis for denying "unreasonable" charges; and (3) by reducing line-item medical charges based on a "secret benchmark" without considering how the cost of the medical bill as a whole compares to the benchmark. (3d Am.Compl.¶ 103.) Plaintiffs also add to their previous allegations, which were dismissed by Judge Hibbler, an assertion that Allstate "knowingly misrepresents to medical providers and its policy holders that it has refused a portion claim submitted for payment ... based upon a valid and reliable determination of the usual and customary charges for medical services" under code 41. (3d Am.Compl.¶ 103.)

Judge Hibbler held in his March 2, 2012 order that "[t]he fraud, misrepresentation, or concealment alleged by the Plaintiffs concerns only the alleged means employed by the Defendants to avoid keeping their [contractual] promises." *M.W. Widoff*, 2012 WL 769727, at *4. The Illinois Supreme Court has held that an alleged deceptive act must be more than a failure to do what is promised by a policy. *Avery*, 216 Ill.2d at 169, 835 N.E.2d at 844 (no ICFA claim where plaintiff alleged that a defendant failed to restore his vehicle to "pre-loss condition" after an accident, as promised by the relevant policy). Similarly, the Seventh Circuit held in *Greenberger* that a plaintiff policyholder's allegation that an insurance company committed fraud by using damage-estimating software that "systematically omits or underestimates the cost of repairs" was insufficient to allege an ICFA claim. 631 F.3d at 399. The *Greenberger* plaintiff alleged both a "false promise" that the insurance company would restore insureds' vehicles to their pre-loss condition and a "material omission", but the court noted that those allegations "were nothing more than restatements of the claimed breach of contract, albeit using the language of fraud." *Id.* (internal quotation marks omitted). Nor did alleging a "widespread or systematic" breach of contract support a consumer fraud claim if the deceptive conduct was not distinct from the alleged breach of the contractual promise. *Id.* at 400 (internal quotation marks omitted); *cf. Petri v. Gatlin*, 997 F.Supp. 956, 968 (N.D.Ill.1997) (ICFA claim proper when defendants lured consumers into contracts by disseminating promotional brochures containing misrepresentations of material facts). In this case, Plaintiffs claim that Allstate deceived policyholders and medical providers about the nature of its unreasonable medical expense analysis and systematically underpaid medical reimbursements. As Judge Hibbler did, this court concludes those allegations support only a claim that the insurer breached its contractual commitment to pay reasonable medical expenses. Havng so concluded, the

court declines to address (1) Allstate's argument that Widoff, an Arizona service corporation, may not state a claim under the ICFA (Allstate's Reply at 4–5); (2) Defendants' argument that Plaintiffs cannot meet the consumer nexus test for an ICFA claim; (3) Defendants' argument that Plaintiffs did not plead the materiality element of an ICFA claim; or (4) whether Plaintiffs successfully allege an ICFA claim. (Allstate's Mem. 11–14.)

*CONCLUSION*

**\*14** The Allstate Defendants' motion to dismiss [94] is granted as to Counts III and IV. Breach of contract allegations are dismissed as against Defendant Allstate Corporation. Defendant Mitchell's motion to dismiss [87] is granted, and Mitchell is dismissed from this case. The court invites the parties to show cause why the court should not relinquish jurisdiction over Counts I and II.

Footnotes

1   The complaint does not say to whom the EOB forms are sent.

2   Encompass's policy similarly obligates Allstate to pay "reasonable charges for medical ... services."

3   Though Plaintiffs do not include this information in their complaint, the court takes judicial notice that the NYAG announced in February 2008 that it had conducted a six-month investigation. Press Release, New York Attorney General, Cuomo Announces Industry-wide Investigation Into Health Insurers; Fraudulent Reimbursement Scheme (Feb. 13, 2008), available at http://www.ag.ny.gov/press-release/cuomo-announces-industry-wide-i nvestigation-healthinsurers-fraudulent-reimbursement. The record does not specify the time period that the NYAG accused Ingenix of understating market prices. Nor does the record stat

4   The record does not reveal when the settlement occurred, when FAIR Health, Inc. was selected to develop the new database, or whether the new independent database has been developed.

5   Plaintiffs do not explain how Mitchell had access to Allstate's internal price schedules, but they assert that Mitchell "actively work[ed] to ensure" that the Decision Point reimbursement decisions "were lower than the internal price schedules" and "knew and discussed internally the need to ensure Decision Point reached these lower reimbursement decisions." (3d Am.Compl.¶ 14.)

6   Plaintiffs have alleged that Allstate Corporation is a corporation under Delaware law with its principal place of business in Northbrook, Illinois, and that Allstate Insurance and Encompass are corporations organized under Illinois law that "do[ ] business in and [are] headquartered within this District." (3d Am.Compl.¶¶ 31–33.) (Mitchell is a corporation organized under Delaware law with its principal place of business in California, but it does business in Illinois. (3d Am.Compl.¶ 34.)) As Robinson and Back Doctors are service corporations that are also citizens of Illinois (3d Am.Compl.¶¶ 28, 30), there is no diversity jurisdiction. (Widoff is a service corporation that is a citizen of Arizona. (3d Am.Compl.¶ 29.))
   Though Plaintiffs allege that they also have jurisdiction under 28 U.S.C. § 1332(d)(2)(A), part of the Class Action Fairness Act ("CAFA"), they do not adequately assert an amount in controversy that exceeds five million dollars. (3d Am.Compl.¶ 20.)

7   Plaintiffs exclude from their proposed class those who released their claims as part of a 2007 settlement in *Coffell et al. v. Allstate Ins. Co.,* No. 05–2–33183–6SEA (Superior Court, King County, WA Nov. 19, 2007). Plaintiffs also exclude those whose claims were referred to Allstate's special investigative unit for review and were found fraudulent and those whose claim amounts were denied because of duplicate bills, occurrences that were not covered, treatment before the date of the occurrence, or coding errors. (3d Am.Compl.¶ 88.)

8   Plaintiffs have not named Ingenix as a Defendant, but do identify it as a member of the enterprise. (3d Am.Compl.¶ 13.)

9   Plaintiffs argue that Allstate are judicially estopped from opposing their RICO claims because of the position Allstate took in another case, *Allstate Ins. Co. v. Linea Latina De Accidentes, Inc.,* No. 09–cv–3681 JNE/JJK, 2012 WL 1694605, \*2–5 (D.Minn. May 15, 2012), where Allstate Insurance Company survived summary judgment on an argument that chiropractic clinics, a massage therapy business, and a marketing company formed a RICO enterprise. (Pls.' Mem. in Supp. of Their Mot. for Collateral Estoppel [111], at 1; Pls.' Reply in Further Supp. of Their Mot. for Judicial Estoppel [126], at 1.) In that case, Allstate Insurance Company alleged that the defendants collaborated to submit fraudulent bills to it. *Linea Latina,* 2012 WL 1694605 at \*3–4.
   The doctrine of judicial estoppel protects the integrity of the judicial process by prohibiting parties from "deliberately changing positions according to the exigencies of the moment." *Kimbrell v.. Brown,* 651 F.3d 752, 757 (7th Cir.2011) (quoting *New Hampshire v. Maine,* 532 U.S. 742, 749–50 (2001)). Plaintiffs argue that Allstate used a "flexible and broad" interpretation of

RICO when it was a plaintiff in *Linea Latina,* and in this case, where it is a RICO defendant, attempts to use a "rigid and narrow" interpretation. (Pls.' Reply in Further Supp. of Their Mot. for Judicial Estoppel at 1.) Plaintiffs point specifically to Allstate Insurance Company's contention in *Linea Latina* that a doctor who did not control the purported enterprise in that case was nevertheless part of the enterprise. (Pls.' Reply in Further Supp. of Their Mot. for Judicial Estoppel at 3–4.)

The circumstances do not fit the requirements of judicial estoppel. The position that Allstate adopted in that earlier case is not "clearly inconsistent" with its arguments here. *Cf. Mungo v. Taylor,* 355 F.3d 969, 981 (7th Cir.2004) (quoting *evinson v. United States,* 969 F.2d 260, 264 (7th Cir.1992)). Plaintiffs are correct that in *Linea Latina,* Allstate Insurance Company pursued a RICO claim against a doctor who did not control the alleged enterprise. Plaintiffs neglect to mention, however, that Allstate Insurance Company alleged that the doctor also received $600 weekly for his role in the alleged enterprise, suggesting active participation. (Pls.' Mem. in *Linea Latina,* Ex. B to Pls.' Mem. in Supp. of Their Mot. for Collateral Estoppel [111–2], at 32.) The allegation of kickbacks readily distinguishes the allegations in *Linea Latina* from this case.

10   In making this determination, the court does not rely on Allstate's affidavit from Jennifer M. Hager [96–1], and therefore need not convert this motion into one for summary judgment. In the Hager affidavit, submitted as evidence that the Allstate Corporation does not issue insurance policies, Hager asserts as a Vice President for the Allstate Corporation and Allstate Insurance, as well as an Assistant Secretary of Encompass, that the Allstate Corporation does not have the authority to issue or sell insurance policies. (Hager Aff. ¶¶ 3, 7.)

**End of Document**                                © 2014 Thomson Reuters. No claim to original U.S. Government Works.