UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY KERRIGAN *et al.*,

      Plaintiffs,                          Case No. 14-cv-12693
                                            Hon. Matthew F. Leitman

v.

VISALUS, INC. *et al.*,

      Defendants.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS (ECF ##35-37) AND DIRECTING PLAINTIFFS TO FILE AN AMENDED COMPLAINT

In 2012 or 2013, Plaintiffs Timothy Kerrigan, Lori Mikovich, and Ryan M. Valli (collectively, "Plaintiffs") each paid money to Defendant ViSalus, Inc. ("ViSalus") for the opportunity to sell ViSalus' weight-loss products. Plaintiffs now allege that they lost the money that they paid to ViSalus. Plaintiffs claim that ViSalus operates a pyramid scheme.

In this action, Plaintiffs assert claims against ViSalus and numerous allegedly-related parties (collectively, the "Defendants") for violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, and various Michigan state laws. (*See* the "Complaint," ECF #1.) The Defendants have moved to dismiss. (*See* the "Motions," ECF #35-37.) For the

1

reasons explained below, the Motions are **GRANTED IN PART** and **DENIED IN PART**. Plaintiffs are directed to file an Amended Complaint as set forth below.

## RELEVANT FACTUAL ALLEGATIONS[1]

### A. ViSalus

ViSalus is a retailer of powdered weight-loss shakes and products. The company is headquartered in Troy, Michigan. (*See* Compl. at ¶¶1, 11, 52.) ViSalus maintains a network of "individual promoters" ("IPs") who sell ViSalus' weight-loss products and recruit other IPs to do the same. (*See id.* at ¶¶67-68.) ViSalus pays each IP commissions and/or bonuses for selling the weight-loss products and for recruiting new IPs. (*See id.* at ¶¶73-74.) The system through which IPs earn commissions and/or bonuses for sales and recruitment is hereinafter referred to as the "ViSalus Program."

### B. How the ViSalus Program Works

#### 1. ViSalus Promotes the Opportunity to Enroll in the ViSalus Program

ViSalus advertises the chance to enroll as an IP in the ViSalus Program as a "business opportunity" with "unlimited earning potential." (*Id.* at ¶¶93, 101.) Among other things, ViSalus claims that its IPs can earn thousands of dollars per month through the ViSalus Program and are eligible for bonuses of up to

---

[1] For purposes of the Motions, the Court accepts as true the factual allegations in the Complaint.

$1,000,000.  (*See id.* at ¶¶96-102.)  ViSalus also touts that it has given away more than 600 BMW automobiles to successful IPs.  (*See id.* at ¶103.)  ViSalus promotes the ViSalus Program through social media, Internet advertisements, and promotional videos.  (*See id.* at ¶¶94, 98-101, 113-14.)

ViSalus also relies on its network of IPs to advertise the ViSalus Program. (*See id.* at ¶125.)  ViSalus encourages IPs to host "challenge parties" for friends and family to encourage them to enroll as IPs.  (*See id.*)  In addition, ViSalus urges IPs to promote the benefits of becoming an IP in the ViSalus Program whenever they sell ViSalus products to a customer.  (*See id.*)

## 2.  IPs Enroll in the ViSalus Program By Paying Money to ViSalus

A new IP must pay an enrollment fee to ViSalus in order to join the ViSalus Program and thereby obtain the right to sell ViSalus' products.  (*See id.* at ¶68.)  A new enrollee can become a "basic" IP for $49, or the enrollee can pay $499-$999 for "distribution kits" that include product samples.  (*See id.*)   In addition, new IPs are automatically subscribed to ViSalus' proprietary website for $29 per month.  (*See id.* at ¶¶68-69.)  Upon enrollment, new IPs are also given the option to purchase a recurring auto-shipment of ViSalus shakes for $49-$250 per month. (*See id.* at ¶¶68-69.)

### 3. ViSalus Compensates its IPs Through Sales Commissions and Recruitment Bonuses

ViSalus compensates IPs enrolled in the ViSalus Program in three ways: (1) commissions for selling ViSalus products, (2) bonuses for recruiting other people who enroll as IPs, and (3) commissions and/or bonuses for product sales and recruitment by the new recruits whom the IP enrolls into the ViSalus Program. (*See id.* at ¶¶73-74, 78.)

First, "active" IPs receive commissions from ViSalus for their monthly sales of ViSalus weight-loss products. (*See id.* at ¶73.) In order to remain "active" – and thus, eligible to receive commissions – an IP must generate sales of $125 per month. (*See id.*) ViSalus pays commissions on all sales by an active IP in excess of $200 per month. (*See id.*) An IP earns a 10-percent commission on monthly sales between $201 and $500; 15-percent on monthly sales between $501 and $1,000; and 20-percent on monthly sales between $1,000 and $2,500. (*See id.*) Thus, for example, an active IP would receive $30 in commissions for generating $500 in monthly sales; $105 in commissions for $1,000 in monthly sales; and $405 in commissions for $2,500 in monthly sales. (*See id.*)

Second, ViSalus pays IPs bonuses related to the recruitment of new IPs. (*See id.* at ¶74.) For instance, ViSalus pays a "Fast Start Bonus" ranging from $50 to $180 whenever an IP enrolls a new recruit who purchases a distribution kit. (*See id.* at ¶76.) In addition, ViSalus offers a "First Order Bonus" equal to 20

4

percent of the initial sale that an IP makes to a new enrollee.  (*See id.* at ¶75.)
ViSalus also earmarks two percent of its revenue to the "Rising Star Weekly
Enrollers Pool," which is paid out on a weekly basis to IPs who qualify by, among
other things, recruiting three new IPs into the ViSalus Program.  (*See id.* at ¶80.)
An IP who qualifies for the "Rising Star Weekly Enrollers Pool" is guaranteed to
receive at least $75 per week.  (*See id*.)

Finally, ViSalus rewards an IP for sales in his or her "downline" – i.e., sales
by recruits whom the IP directly or indirectly enrolls into the ViSalus Program.
(*See id.* at ¶78.)  ViSalus pays each IP a "Team Commission" equal to five percent
of the sales revenue generated by every recruit that the IP directly enrolls in the
ViSalus Program (the "first-level downline").  (*See id.*)  ViSalus also pays each IP
a five percent "Team Commission" on sales by new IPs recruited by his or her
first-level downline (the "second-level downline").  (*See id.*)  IPs can earn
additional bonuses for sales farther down his or her downline.  (*See id.*)  For
instance, ViSalus states that "[i]f you personally sponsored 3 [a]ctive [IPs] who
each have 3 customers on a $49 [auto-shipment] every month, and duplicated that
effort through 8 levels of referral, you would earn **$72,324 per month** just from
your Team Commissions!"  (*Id.* at ¶79 (emphasis in original).)

5

### 4. The Market for the ViSalus Program is Saturated, and Most IPs Lost the Money that They Paid to ViSalus

As a result of the emphasis that ViSalus places on recruitment, ViSalus has "attracted well over 100,000" IPs into the ViSalus Program. (*Id.* at ¶6.) However, the market for the ViSalus Program is now "saturated" and the number of IPs has dropped precipitously. (*Id.* at ¶134.) "All or virtually all of the IPs who were recruited between 2010 and 2013 … lost their money paid to ViSalus for the 'business opportunity.'" (*Id.* at ¶136.) Meanwhile, high-level IPs and ViSalus insiders have profited handsomely through generous employment contracts and/or by selling their interests in the company. (*See id.* at ¶¶22-31, 136.)

### C. The Parties in this Action

#### 1. The Plaintiffs

In 2012 or 2013, Plaintiffs each paid ViSalus at least $499 in order to enroll as IPs in the ViSalus Program. (*See id.* at ¶¶8-10.) Plaintiffs allege that they lost the money that they paid to ViSalus. (*See id.* at ¶136.) Each Plaintiff is a resident of Michigan. (*See id.* at ¶¶8-10.)

#### 2. The Defendants

Plaintiffs bring this action against 31 different defendants (collectively, the "Defendants"). The Defendants and their alleged connections to the ViSalus Program are as follows:

6

### a. *ViSalus and its Corporate Shareholders*

Plaintiffs have named ViSalus and three companies that directly or indirectly own shares in ViSalus as defendants. (*See id.* at ¶¶11-14.) Defendant ViSalus Holdings, LLC ("ViSalus Holdings") directly owns or owned shares of ViSalus. (*See id.* at ¶12.) Defendants Ropart Asset Management Fund, LLC ("Ropart Asset") and Ropart Asset Management Fund II, LLC ("Ropart Asset II") (collectively, the "Ropart Entities") are Connecticut-based private equity funds that own or owned shares in ViSalus and/or ViSalus Holdings. (*See id.* at ¶¶13-14.)

### b. *The Individual Insider Defendants*

Plaintiffs also name as defendants five individuals who own an interest in and/or hold an executive role with ViSalus and/or ViSalus Holdings (collectively, the "Individual Insider Defendants"):

- Defendant Robert Goergen, Sr. ("Goergen Sr.") is a partial owner of the Ropart Entities. (*See id.* at ¶15.) Goergen Sr. serves on the executive board of ViSalus and has appeared in ViSalus-sponsored videos. (*See id.*)

- Defendant Todd Goergen ("Goergen") is the Chief Operating Officer of ViSalus. (*See id.* at ¶16.) In addition, Goergen is or was employed by the Ropart Entities. (*See id.*)

- Defendant Ryan Blair ("Blair") is the Chief Executive Officer and a shareholder of ViSalus. (*See id.* at ¶17.) Blair identifies himself as one of the founders of ViSalus. (*See id.* at ¶19.)

- Defendant Nick Sarnicola ("Sarnicola") is a "Global Ambassador" for ViSalus. (*See id.* at ¶18.) Sarnicola describes himself as one of the founders of ViSalus, and he controls almost 75 percent of the company's "downline." (*See id.*) Sarnicola is also a shareholder of ViSalus. (*See id.*)

- Defendant Blake Mallen ("Mallen") also identifies himself as one of the founders of ViSalus. (*See id.* at ¶19.) Mallen has a performance-based contract with the company. (*See id.*)

  c. *The IP Defendants*

Plaintiffs also name as defendants 15 individuals who are paid to promote the ViSalus Program (collectively, the "IP Defendants").[2] (*See id.* at ¶¶22-31.) Prior to becoming affiliated with ViSalus, many of the IP Defendants were successful promoters for other companies that, like ViSalus, are "multi-level marketing companies" that rely on promoters to both sell products and recruit other promoters. (*See id.* at ¶¶22-23, 25-26, 28-31.) ViSalus has given certain IP Defendants special incentive payments and has preferentially moved them "upline" of other IPs enrolled in the ViSalus Program. (*See id.* at ¶¶22-23, 28-31.) Many of the IP Defendants operate their own websites promoting ViSalus. (*See id.* at ¶¶22, 25-27, 30-31.) Some of the IP Defendants are featured in ViSalus promotional materials touting their financial success by, among other things, holding large, cardboard checks in amounts ranging from $250,000 to $1,000,000. (*See id.* at ¶¶26, 29-30.)

---

[2] The IP Defendants are Jason O'Toole, Kyle Pacetti, Jr., Anthony Lucero, Rhonda Lucero, Joshua Jackson, Rachel Jackson, Michael Craig, LaVon Craig, Jake Trzcinski, Tara Wilson, Lori Petrilli, Frank Varon, Timothy Kirkland, Holley Kirkland, and Aaron Fortner.

### d. The Corporate Promoter Defendants

Plaintiffs name as defendants five companies that are "significant distributors for ViSalus" (collectively, the "Corporate Promoter Defendants"). (*Id.* at ¶¶34-38.) Four of the Corporate Promoter Defendants – Mojos Legacy, LLC; JakeTrz, Inc.; Residual Marketing, Inc.; and Freedom Legacy, LLC – are owned by one or more of the IP Defendants (the "IP Corporate Promoter Defendants"). (*See id.* at ¶¶34-35, 37-38.)[3] The Corporate Promoter Defendants are the "vehicle[s] through which [certain] proceeds from the ViSalus [Program] have been funneled." (*Id.*)

The final Corporate Promoter Defendant, Wealth Builder International LLC, "was ordered to desist from selling unregistered business opportunities by the State of Washington and may no longer be in operation." (*Id.* at ¶36.) The ownership of Wealth Builder International LLC is unknown. (*See id.*)

### e. The Vendor Defendants

Finally, Plaintiffs name as defendants two companies that provide technology services to ViSalus (the "Vendor Defendants"). Defendant FragMob, LLC ("FragMob") was paid by ViSalus to develop a mobile phone application and

---

[3]  Anthony Lucero and Rhonda Lucero are members of Mojos Legacy, LLC;  Jake Trzcinski owns JakeTrz, Inc.; Aaron Fortner owns Residual Marketing, Inc.; and Timothy Kirkland and Holley Kirkland own Freedom Legacy, LLC. (*See id.* at ¶¶34-35, 37-38.)

credit-card swipe devices that ViSalus used in its business operations. (*See id.* at ¶41.) Defendant iCentris "performs software and database services" for ViSalus. (*Id.* at ¶42.) Specifically, iCentris "develop[s] custom database software for tracking … 'upline' and 'downline' sales and calculate[s] commissions and bonuses." (*Id.* at ¶42.) Blair, Sarnicola, and Mallen own interests in FragMob and iCentris. (*See id.* at ¶¶41-42.) In addition, Georgen sits on FragMob's board of directors. (*See id.* at ¶41.)

## PROCEDURAL HISTORY AND PLAINTIFFS' CLAIMS IN THIS ACTION

Plaintiffs filed their nine-count Complaint on July 9, 2014. (*See* Compl.) Plaintiffs bring their claims on their own behalf and on behalf of a purported class of all IPs in the ViSalus Program who suffered a financial loss. (*See id.* at ¶138.)

Counts I-III of Plaintiffs' Complaint allege federal RICO violations. Count I alleges that Defendants formed an enterprise in fact, operated an alleged pyramid scheme, and participated in the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). (*See id.* at ¶¶184-85.) Specifically, Plaintiffs allege that Defendants engaged in wire fraud and/or mail fraud and obtained property through "inherently wrongful means" in violation of the Hobbs Act, 18 U.S.C. § 1951(b)(2). (*See id.* at ¶¶168-73.) Count II alleges that Defendants Blair, Sarnicola, and Mallen received income derived from the pattern of racketeering activity and reinvested that income into the RICO enterprise in violation of 18

10

U.S.C. § 1962(a).  (*See id.* at ¶¶186-88.)  Count III alleges that (1) the Defendants conspired to violate § 1962(c) and (2) Blair, Sarnicola, and Mallen conspired to violate § 1962(a), each in violation of 18 U.S.C. § 1962(d).  (*See id.* at ¶¶189-96.)

Count IV alleges several violations of the Michigan Consumer Protection Act ("MCPA"), M.C.L. § 445.901 *et seq.*  Plaintiffs contend that Defendants violated M.C.L. § 445.903 by "us[ing] deception, false pretense, misrepresentation, and omit[ing] key facts to induce [P]laintiffs … to enter into an agreement with ViSalus and suffer a financial loss thereby."  (*See id.* at ¶202.)  Plaintiffs also assert that Defendants violated M.C.L. § 445.903b by offering unregistered business opportunities to potential IPs for more than $500.  (*See id.* at ¶203.)  Plaintiffs further claim that Defendants violated M.C.L. § 445.911 by engaging in conduct declared by a federal circuit court of appeals or the United States Supreme Court to constitute an unfair or deceptive trade practice under 15 U.S.C. § 45(a)(1).  (*See id.* at ¶205.)

Count V alleges that certain Defendants were unjustly enriched.  Specifically, Plaintiffs contend that ViSalus, the Ropart Entities, Georgen Sr., Goergen, Blair, Sarnicola, Mallen, the IP Defendants, and the IP Corporate Promoter Defendants have each received substantial payments from ViSalus or by selling their interests in ViSalus.  (*See id.* at ¶¶211-213.)  Plaintiffs contend that "[t]he revenue that resulted in these payments came from the Plaintiffs and … [i]t

11

would be unjust to permit these [D]efendants to retain these ill-gotten gains." (*Id.* at ¶215.)

Count VI alleges statutory and common law conversion. Plaintiffs contend that the Defendants violated M.C.L. § 600.2919a and committed common law conversion by "wrongfully exert[ing] dominion over [P]laintiffs' funds" – i.e., the funds that Defendants allegedly induced Plaintiffs to pay in order to enroll in the ViSalus Program. (*Id.* at ¶219.)

Count VII alleges that Defendants engaged in a civil conspiracy to "obtain a profit by way of a pyramid scheme." (*Id.* at ¶225.)

Count VIII alleges violations of Michigan's Franchise Investment Law ("MFIL"), M.C.L. § 445.1501 *et seq.* Plaintiffs contend that Defendants' promotion of the ViSalus Program constituted the offering of a franchise under the MFIL, and that Defendants' conduct violated the MFIL. (*See id.* at ¶233.)

In Count IX, Plaintiffs seek the imposition of a constructive trust and an accounting "to identify the full amount" of Plaintiffs' losses. (*Id.* at ¶241.)

Defendants have now moved to dismiss Plaintiffs' Complaint in its entirety pursuant to Fed. R. Civ. P. 8(a), 9(b), and 12(b)(6). (*See* the Motions.)[4] Defendants move to dismiss on several grounds:

---

[4]  The Defendants have filed three separate motions to dismiss. ViSalus, ViSalus Holdings, Blair, Mallen, Goergen Sr., and Goergen have filed one motion (the

- The Defendants argue that Plaintiffs have not adequately pleaded facts establishing that the ViSalus Program was a pyramid scheme (*see* ViSalus Defendants' Mot. at 5, Pg. ID 321; Additional Defendants' Mot. at 4, Pg. ID 289; iCentris' Mot. at 6, Pg. ID 253);

- The Defendants contend that the Private Securities Litigation Reform Act ("PSLRA"), as codified in 18 U.S.C. § 1964(c), bars Plaintiffs' RICO claims because the underlying alleged conduct would be actionable as a claim for securities fraud (*see* ViSalus Defendants' Mot. at 16, Pg. ID 332; Additional Defendants' Mot. at 4, Pg. ID 289; iCentris' Mot. at 6, Pg. ID 253);

- The Defendants argue, in the alternative, that Plaintiffs' RICO claims fail as a matter of law because Plaintiffs have not sufficiently alleged every essential element of a RICO claim (*see* ViSalus Defendants' Mot. at 20-25, Pg. ID 336-41; Additional Defendants' Mot. at 5-16, Pg. ID 290-301; iCentris' Mot. at 7-13, Pg. ID 254-60);

- The Defendants contend that each of Plaintiffs' state law claims fails as a matter of law (*see* ViSalus Defendants' Mot. at 25-34, Pg. ID 341-50; Additional Defendants' Mot. at 16, Pg. ID 301; iCentris' Mot. at 14-16, Pg. ID 261-63); and

- iCentris argues that Plaintiffs have not alleged any facts connecting iCentris to the alleged pyramid scheme and that all of Plaintiffs' claims as to iCentris therefore fail as a matter of law (*see* iCentris Mot.).

The Court heard oral argument on the Motions on April 20, 2015.  (*See* Transcript, ECF #53.)  The Court thereafter permitted the parties to file

---

"ViSalus Defendants' Motion").  (*See* ECF #37.)  iCentris has filed a second motion (the "iCentris Motion").  (*See* ECF #35.)  The Ropart Entities, Sarnicola, the IP Defendants, the Corporate Promoter Defendants, and FragMob (collectively, the "Additional Defendants") filed a third motion (the "Additional Defendants' Motion").  (*See* ECF #36.)

supplemental briefs on the issue of proximate causation as to the alleged RICO violations.  The parties filed their supplemental briefs on April 30, 2015.  (*See* ECF ##49-52.)

## GOVERNING LEGAL STANDARDS

Defendants seek relief under Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6).  Rule 8(a) requires a plaintiff to give "a short and plain statement of the claim showing the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Rule 9(b) provides that when pleading fraud or mistake, a plaintiff must "state with particularity the circumstances constituting fraud or mistake," but "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *See* Fed. R. Civ. P. 9(b).

Rule 12(b)(6) provides for dismissal of a complaint when a plaintiff fails to state a claim upon which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  A claim is facially plausible when a plaintiff pleads factual content that permits a court to reasonably infer that the defendant is liable for the alleged misconduct.  *Id.* (citing *Twombly*, 550 U.S. at 556).  When assessing the sufficiency of a plaintiff's claim, a district court must

14

accept all of a complaint's factual allegations as true.  *See Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 512 (6th Cir. 2001).  "Mere conclusions," however, "are not entitled to the assumption of truth.  While legal conclusions can provide the complaint's framework, they must be supported by factual allegations."  *Iqbal*, 556 U.S. at 664. A plaintiff must therefore provide "more than labels and conclusions," or "a formulaic recitation of the elements of a cause of action" to survive a motion to dismiss.  *Twombly*, 550 U.S. at 556.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

## ANALYSIS

## I.  PLAINTIFFS' PYRAMID SCHEME ALLEGATIONS

Defendants first argue that Plaintiffs have not adequately alleged that the ViSalus Program is a pyramid scheme.  (*See* ViSalus Defendants' Mot. at 5, Pg. ID 321.)[5]  Defendants contend that this shortcoming is fatal to Plaintiffs' Complaint because each of their nine claims is premised on the allegation that the ViSalus Program is in fact a pyramid scheme.  (*See id.*)  Defendants candidly acknowledge that Plaintiffs' factual allegations would allow the Court to infer that the ViSalus Program is a *possible* pyramid scheme, but they argue that the allegations "stop[] short of the line between *possibility* and *plausibility*."  (*Id.* at 6, Pg. ID 322

---

[5]  All of the other Defendants adopt the ViSalus Defendants' argument on this issue.  (*See* Additional Defendants' Mot. at 4, Pg. ID 289; iCentris' Mot. at 6, Pg. ID 253.)

(quoting *Iqbal*, 556 U.S. at 678) (emphasis added).)   The Court believes that the Plaintiffs' allegations do cross that line and do plausibly allege that the ViSalus Program is a pyramid scheme.

The parties agree that the applicable definition of a pyramid scheme is derived from *In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106 (1975).  The *In re Koscot* definition provides that a pyramid scheme is

> characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product and (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users.

*Id.* at 1181.  The Sixth Circuit has adopted this definition of a pyramid scheme. *See United States v. Gold Unlimited, Inc.*, 177 F.3d 472, 480 (6th Cir. 1999).

"The satisfaction of the second element of the [*In re*] *Koscot* test is the sine qua non of a pyramid scheme." *Id.*  Thus, the key inquiry is whether the alleged scheme pays rewards "primarily for recruitment rather than for sales of merchandise." *Fed. Trade Comm'n v. BurnLounge, Inc.*, 753 F.3d 878, 884 (9th Cir. 2014).  Indeed, an alleged pyramid scheme "cannot save itself simply by pointing to the fact that it makes some retail sales … [if t]he mere structure of the scheme suggests that [its] focus was in promoting *the program* rather than selling *the products*." *Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 782 (9th Cir. 1996).

16

Here, Plaintiffs' allegations place the ViSalus Program within the definition of a pyramid scheme.  First, Plaintiffs allege that new IPs must pay money – at least $49 and, in some cases, up to $999 – in order to enroll in the ViSalus Program and thereby earn rewards for sales and recruitment.  (*See* Compl. at ¶68.) Defendants counter that the "payment of money" element of the *In re Koscot* test is not satisfied here because the minimum enrollment fee is just $49 and, thus, "there is no *significant* investment required to become an IP."  (ViSalus Defendants' Mot. at 9, Pg. ID 325 (emphasis added).)  But Defendants cite no authority for the proposition that a pyramid scheme requires an individual to pay a "significant" amount of money.  Moreover, the Plaintiffs allege that they each invested at least $499 to enroll in the ViSalus Program.  (*See* Compl. at ¶¶8-10.)  Plaintiffs have satisfied the "payment of money" element of the *In re Koscot* test.

Plaintiffs have also adequately pleaded that the ViSalus Program pays compensation primarily for recruitment rather than for sales of weight-loss products.  Plaintiffs have pleaded that the average IP generates monthly sales of approximately $500 (*see* Compl. at ¶70), for which the IP earns approximately $30 in commissions.  (*See id.* at ¶73.)  The potential rewards for recruitment are far more lucrative.  Indeed, the Fast Start Bonus and First Order Bonus allow an IP to earn hundreds of dollars simply by enrolling a new recruit in the ViSalus Program.

17

(*See id.* at ¶¶75-76.)[6]  Moreover, an IP who enrolls three or more new recruits in the ViSalus Program earns at least $75 – and potentially much more – through the Rising Star Weekly Enrollers Pool.  (*See id.* at ¶80.)  Thus, as Plaintiffs have alleged, an IP who "sells ViSalus weight-loss shakes to legitimate outside customers … generates a token income," while "the monetary incentives built into the compensation plan lucratively reward recruiting activity."  (*Id.* at ¶¶71, 74.) This compensation structure suggests that IPs have strong incentive to focus on recruiting rather than outside sales.  *See Omnitrition*, 79 F.3d at 782 ("The promise of lucrative rewards for recruiting others tends to induce participants to focus on the recruitment side of the business at the expense of their retail marketing efforts, making it unlikely that meaningful opportunities for retail sales will occur.").

Plaintiffs' descriptions of ViSalus' promotional and training materials further indicate that the ViSalus Program prioritizes recruiting over outside sales. Plaintiffs assert that a typical advertisement states: "ViSalus is going to pay someone for the referrals, it might as well be you and not the person that referred

---

[6]  The Court acknowledges that in order for an IP to earn a Fast Start Bonus and/or a First Order Bonus, the new recruit must first order ViSalus merchandise.  Thus, the Fast Start Bonus and First Order Bonus earned by the IP are at least arguably related to the new recruit's purchase of ViSalus' products.  However, as the Ninth Circuit held in *BurnLounge, supra*, where, as here, new recruits join an alleged pyramid scheme by purchasing merchandise, "the rewards the [promoters] receive[] in return [are] largely for recruitment, not for product sales." *BurnLounge*, 753 F.3d at 886.

you." (Compl. at ¶124.) Plaintiffs also allege that ViSalus conducts training events that focus on "how to recruit others into the [ViSalus Program] as quickly as possible." (*Id.* at ¶128.) Plaintiffs further contend that ViSalus partnered with a web-based marketing firm to train new IPs "how to duplicate their recruiting." (*Id.*)

Plaintiffs' allegations in this case resemble the pyramid scheme allegations found sufficient in *Day v. Fortune Hi-Tech Mktg., Inc.*, No. 10-305, 2014 WL 4384443 (E.D. Ky. Sept. 3, 2014). The *Day* plaintiffs alleged that Fortune Hi-Tech Marketing ("Fortune") and its high-level members operated a pyramid scheme in violation of the federal RICO Act. The plaintiffs alleged that new recruits into the Fortune scheme paid $75-$299 in exchange for the right to sell Fortune's products and recruit new members. The plaintiffs acknowledged that a "modest commission and advancement could be made through selling [Fortune's] services and products," but they alleged that "the focus of the organization and the source of most of the income and upward mobility were in the recruitment of members." *Id.* at *2. For instance, the plaintiffs alleged that a Fortune representative received a "Quick Start Bonus" when she recruited a new representative who met certain benchmarks and an additional $100 bonus for each new representative recruited by her "downline." *See id.* The plaintiffs further alleged that a high-level member of Fortune gave a presentation in which he said that recruiting is "the key to making

19

money in Fortune." *See id.* Plaintiffs also alleged that Fortune's official training materials encouraged representatives to recruit new representatives and lacked "any discussion of techniques for selling products to third parties." *Id.*

The *Day* defendants moved to dismiss the complaint on the grounds that plaintiffs did not allege a plausible pyramid scheme and, therefore, failed to plead a viable RICO claim. The court held that the complaint *did* allege a plausible pyramid scheme:

> Whether or not Fortune is actually [a] pyramid scheme under the [*In re*] *Koscot* test, the … Plaintiffs have alleged sufficient facts to make it plausible that it is…. Plaintiffs assert that Fortune focused on recruitment of new participants rather than the actual sale of products. The Complaint supports this claim with factual allegations detailing statements by high level officials, training techniques, corporate policies, compensation methods, and a corporate structure that emphasized recruitment over sales.

*Id.* at *5.

Defendants here have made no effort to distinguish the facts alleged in *Day* from those alleged in Plaintiffs' Complaint. Instead, Defendants attempt to distinguish *Day* on the ground that "none of the motions in *Day* addressed the plausibility of inferences supporting the pyramid scheme allegations." (ViSalus Defendants' Reply Brief, ECF #46 at 3, Pg. ID 704.) Defendants are technically correct that the motions in *Day* did not expressly attack the plausibility of pyramid scheme allegations. *See, e.g., Day*, dkt. 105-1 (Jan. 31, 2014). Rather, the motions

20

in *Day* contended that the plaintiffs failed to allege a scheme to defraud. *See id.* at 3-4, Pg. ID 1236-37. But the *Day* plaintiffs opposed the motions on the grounds that (1) the complaint alleged that Fortune was a pyramid scheme and (2) a pyramid scheme is a *per se* scheme to defraud. *See Day*, dkt. 141 at 14, Pg. ID 1346. In addressing the Plaintiffs' position, the *Day* court did have to assess the sufficiency of the pyramid scheme allegations. Implicit in *Day* (if not explicit) is a recognition that the allegations about Fortune (which, again, resemble the allegations about the ViSalus Program) plausibly describe a pyramid scheme.

For the reasons discussed above, Plaintiffs have alleged sufficient facts to make it plausible that the ViSalus Program is a pyramid scheme. The Court will therefore analyze Plaintiffs' RICO claims and state law claims in turn.

## II. PLAINTIFFS' RICO CLAIMS

### A. The Court Cannot Conclude At This Stage of the Proceedings That the PSLRA Bars Plaintiffs' RICO Claims as a Matter of Law

Defendants contend that Plaintiffs' RICO claims (i.e., Counts I, II, and III of the Complaint) are barred by the PSLRA. The PSLRA prohibits a plaintiff from "rely[ing] upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of [RICO]." 18 U.S.C. § 1964(c). In other words, the PSLRA "eliminate[s] any conduct actionable as fraud in the purchase or sale of securities as a predicate act for a private cause of action under RICO." *Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321,

21

327 (3d Cir. 1999) (internal citation omitted). "[A] plaintiff cannot avoid the [PSLRA's] bar by pleading mail fraud, wire fraud, [or other] fraud as predicate offenses in a civil RICO action if the conduct giving rise to those predicate offenses amounts to securities fraud. Allowing such surgical presentation of the cause of action … would undermine the congressional intent behind the [PSLRA]." *Id.* at 330.

Defendants argue that the opportunity to enroll in the ViSalus Program as an IP (the "ViSalus Business Opportunity") is a security and that their allegedly-fraudulent scheme to market that opportunity would be actionable as a claim for securities fraud.[7] Defendants contend, therefore, that the PSLRA prohibits Plaintiffs from bringing their claims pursuant to RICO. (*See, e.g.,* ViSalus Defendants' Mot. at 18, Pg. ID 334.) But, as described below, the ViSalus Business Opportunity, as alleged in the Complaint, is not necessarily a security as a matter of law. While Defendants may ultimately establish that the ViSalus Business Opportunity qualifies as a security and may ultimately prevail on their PSLRA defense, the Court cannot hold at this stage that the PSLRA bars Plaintiffs' RICO claims.

---

[7] When pressed to identify how the conduct alleged in the Complaint would be actionable as securities fraud, the ViSalus Defendants argued that the conduct, if properly pleaded, would be actionable pursuant to 15 U.S.C. § 78j(b), 17 CFR § 240.10b-5, or 15 U.S.C. § 77*l*(2). (*See* Tr. at 47, Pg. ID 822.)

**1. Legal Framework For Assessing Defendants' Argument That the ViSalus Business Opportunity is a Security**

Under federal securities laws, the term "security" includes, among other things, "any note, stock, treasury stock, security future … [or] investment contract…." 15 U.S.C. §§ 77b(a)(1), 78c(a)(10). Defendants argue that the ViSalus Business Opportunity is an investment contract. (*See* ViSalus Defendants' Mot. at 17, Pg. ID 333; ViSalus Defendants' Reply Br. at 7-11, Pg. ID 708-12.) In *SEC v. Howey Co.*, 328 U.S. 293 (1946), the United States Supreme Court defined an "investment contract" as a "contract, transaction, or scheme" that "involves [1] an investment of money [2] in a common enterprise [3] with profits to come solely from the efforts of others." *Id.* at 298-99, 301. Here, the ViSalus Business Opportunity satisfies the first two elements of the *Howey* investment contract test, but it is not yet clear that it satisfies the third element of the test.

**2. The ViSalus Business Opportunity Involves an Investment of Money**

Plaintiffs acknowledge that the ViSalus Business Opportunity involves an investment of money by new IPs. (*See* Tr. at 37-38, Pg. ID 812-13 (stating that Plaintiffs do not contest the first element of the *Howey* investment contract test).) Accordingly, Defendants have shown that the "investment of money" element of the *Howey* investment contract test is satisfied.

23

### 3.  The ViSalus Program is a Common Enterprise

#### a.  Legal Framework for Commonality

Courts have developed two approaches for determining whether a contract, transaction, or scheme is a common enterprise.  The first approach, known as "vertical commonality," defines a common enterprise as "one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties."  *SEC v. Glenn W. Turner Enter., Inc.*, 474 F.2d 476, 482 n. 7 (9th Cir. 1973).  Vertical commonality exists if "an investor's fortunes are tied to the promoter's success rather than to the fortunes of his or her fellow investors."  *SEC v. SG Ltd.*, 265 F.3d 42, 49 (1st Cir. 2001); *see also SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 479 (5th Cir. 1974) ("[t]he critical factor is not the similitude or coincidence of investor input, but rather the uniformity of impact of the promoter's efforts").  The Fifth and Ninth Circuits have adopted the vertical commonality approach in the pyramid scheme context. *See SEC v. Koscot*, 497 F.2d at 479; *Glenn W. Turner*, 474 F.2d at 482.

The second approach to commonality is "horizontal commonality." Horizontal commonality "involves the pooling of assets from multiple investors so that all share in the profits and risks of the enterprise."  *SG Ltd.*, 265 F.3d at 49. Whereas vertical commonality "focuses on the community of interest between the individual investor and the manager of the enterprise," horizontal commonality

24

"examines the relationship among investors in a given transaction, requiring a pooling of investors' contributions and distributions of profits and losses on a pro-rata basis." *SEC v. Infinity Group Co.*, 212 F.3d 180, 187-88 n. 8 (3d Cir. 2000). Horizontal commonality is a more "stringent" test than vertical commonality. *SEC v. Prof'l Associates*, 731 F.2d 349, 354 (6th Cir. 1984); *see also Deckebach v. La Vida Charters, Inc. of Florida*, 867 F.2d 278, 281 (6th Cir. 1989).

It is not clear which approach to commonality applies in the Sixth Circuit. Soon after the Ninth Circuit adopted the less stringent vertical commonality approach in *Glenn W. Turner*, the Sixth Circuit appeared to endorse – without expressly adopting – that approach. In *Nash & Associates, Inc. v. Lum's of Ohio, Inc.*, 484 F.2d 392 (6th Cir. 1973), the Sixth Circuit cited *Glenn W. Turner* as an example of the less stringent approach and said: "We find the general concept of [the] less restrictive approach attractive in view of the broad remedial purposes of the federal legislation and the importance of flexibility as stressed in *Howey*." *Id*. at 395. The Sixth Circuit later reversed course and, without acknowledging *Nash,* adopted and applied the horizontal approach in a series of published decisions. *See, e.g.*, *J.J. Curran v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 622 F.2d 216, 222 (6th Cir. 1980) ("We reject plaintiffs' assertion that a pooling of investors interests is not essential to the finding of a common enterprise…"); *Newmeyer v. Philatelic Leasing, Inc.*, 888 F.2d 385, 394 (1989) ("This circuit … has repeatedly

25

said that proof of a vertical relationship between seller and buyer is not in itself enough to establish the existence of investment contracts; there must also be a horizontal relationship between or among investors, with the funds of two or more investors going into a common pool from which all may benefit."); *Prof'l Associates*, 731 F.2d at 354 (applying horizontal commonality approach and noting that Sixth Circuit adopted the horizontal approach in *Curran*); *Union Planters Nat'l Bank of Memphis v. Commercial Credit Bus. Loans, Inc.*, 651 F.2d 1174, 1183 (6th Cir. 1981) (same).

But not long after adopting the horizontal approach, in *Davis v. Avco Fin. Svcs., Inc.*, 739 F.2d 1057 (6th Cir. 1984), *overruled on other grounds by Pinter v. Dahl*, 486 U.S. 622, 649-50 & n. 25 (1988), the Sixth Circuit expressly "concur[red] with and adopt[ed] the analysis in" *Glenn W. Turner* and *SEC v. Koscot* – the decisions in which the Ninth Circuit and the Fifth Circuit, respectively, adopted and applied the more liberal, vertical commonality approach. *Davis*, 739 F.2d at 1063.  *Davis* is especially significant because it involved an alleged pyramid scheme, and it was in that context – the very same context presented in this action – that the Sixth Circuit adopted the vertical commonality approach and held that the business opportunity at issue was an investment contract.  *See Davis*, 739 F.2d at 1063.

26

Trying to make sense of the Sixth Circuit's precedents in this area is not easy.   On one hand, the Sixth Circuit expressly adopted the horizontal commonality approach in *Curran* and its progeny.  None of those cases, however, involved an alleged pyramid scheme, as this case does.  *See Curran*, 622 F.2d at 219-220 (alleged investment contract was commodities trading account); *Newmyer*, 888 F.2d at 386-87 (leasehold interests in postage stamp printing plates); *Prof'l Associates*, 731 F.2d at 351-52 (trust accounts); *Union Planters*, 651 F.2d at 1176 (loan participation agreement).  Yet when confronted with a pyramid scheme case involving facts like those alleged here, the Sixth Circuit "concur[red] with and adopt[ed]" the vertical approach from *Glenn W. Turner* and *SEC v. Koscot.  Davis*, 739 F.2d at 1063.  Thus, the Sixth Circuit appears to apply the vertical approach to determine whether a pyramid scheme satisfies the common enterprise element of the investment contract test.  The Court concludes that vertical commonality is the appropriate approach to apply here.

        *b. The ViSalus Program is a Common Enterprise under the Vertical Commonality Test*

The vertical commonality test is satisfied here.  Vertical commonality exists in the pyramid scheme context where an investor in the scheme and the scheme operators share the profits that are generated when the investor recruits new investors/members.  As the Seventh Circuit explained, "[i]n both [*Glenn W. Turner* and *SEC v. Koscot*,] the investors and defendants shared the profits made when

27

new investors were induced to become the new base for the pyramid.  In this situation the investors' fortunes are clearly interwoven with those of the promoters, and accordingly there is vertical commonality." *Stenger v. R.H. Love Galleries, Inc.*, 741 F.2d 144, 147 (7th Cir. 1984).[8]

That is precisely what Plaintiffs allege here.  Plaintiffs assert that when an IP enrolls a new recruit in the ViSalus Program, ViSalus (and/or its owners and operators) profit and the IP earns a commission or bonus.  The ViSalus Program – which new recruits join by purchasing the ViSalus Business Opportunity – thus satisfies the "common enterprise" element of the *Howey* investment contract test.

### 4. The Court Cannot Yet Conclude That the ViSalus Program Satisfies the "Profits from Others" Element of the Investment Contract Test

As noted above, the final element of the *Howey* investment contract test focuses on whether investors expected "profits to come solely from the efforts of others." *Howey*, 328 U.S. at 301.  But in applying this element, the Courts of Appeals have not required that profits come *solely* from the efforts of others.

---

[8]  *See also United States v. Holtzclaw*, 950 F.Supp. 1306, 1316 (S.D. W.Va. 1997) (recognizing that vertical commonality exists where "the pyramid scheme … was structured so that when an investor made a sale, the profits were split between the investor" and the corporation at the center of the pyramid scheme), *rev'd on other grounds*, 131 F.3d 137 (4th Cir. 1997); *SEC v. Int'l Loan Network, Inc.*, 770 F.Supp. 678, 692 (D. D.C. 1991) ("[I]nvestors' profits are linked to the success or failure of [the scheme] as a whole because it is the ability to proclaim the organization's success that is the central selling point of the program."), *aff'd*, 968 F.2d 1304 (D.C. Cir. 1992).

Instead, they have instructed that "the word 'solely' should not be read as a strict or literal limitation on the definition of an investment contract, but rather must be construed realistically, so as to include within the definition those schemes which involve in substance, if not form, securities." *Glenn W. Turner*, 474 F.2d at 482; *see also Goodman v. Epstein*, 582 F.2d 388, 408 n. 59 (7th Cir. 1978) (same); *Miller v. Central Chinchilla Group, Inc.*, 494 F.2d 414, 416 (8th Cir. 1974) (same). Accordingly, the "profits from others" element of the *Howey* investment contract test is satisfied if "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Id.*; *see also Crowley v. Montgomery Ward & Co., Inc.*, 570 F.2d 875, 877 (10th Cir. 1975) (same). The Sixth Circuit has applied this version of the "profits from others" test. *See Union Planters*, 651 F.2d at 1181 (recognizing that investment contract test does not require profits "solely" from efforts of others); *see also McCoy v. Hilliard*, 1991 WL 132522, 940 F.2d 660 (6th Cir. 1991) (applying "undeniably significant efforts" test as third element of *Howey* investment contract test) (unpublished table opinion).

Some of Plaintiffs' allegations suggest that each IP's primary profits depend most significantly on the efforts of others and not on his or her own efforts. For instance, Plaintiffs highlight the critical role that ViSalus' corporate employees play in the success of the ViSalus Program. They allege that ViSalus produces

29

essential marketing materials, including videos, downloadable PowerPoint presentations, and other social networking materials. (*See* Compl. at ¶¶98, 102, 105.) They further allege that ViSalus sponsors and coordinates national recruiting events where it promotes the ViSalus Program – and the riches that can be obtained by new IP recruits – to thousands of attendees. (*See id.* at ¶108.) Plaintiffs also allege that ViSalus provides specific training materials to its IPs, even going so far as to provide a script for IPs to use at Challenge Parties that they host. (*See id.* at ¶125.) These allegations suggest that the ability of an IP to profit is substantially dependent upon the work that ViSalus and its network of employees and promoters do to promote the ViSalus Program.

Moreover, Plaintiffs allege that the efforts of recruits in an IP's downline are significant in determining the success of the IP and/or the ViSalus Program. (*See id.* at ¶79.) At least one Court of Appeals has held that the "profits from others" element of the investment contract test is satisfied under these circumstances. *See SEC v. Int'l Loan Network, Inc.*, 968 F.2d 1304, 1308 (D.C. Cir. 1992).

But ViSalus, itself, has made statements suggesting that an IP's own efforts play the primary role in his or her own success, and these allegations cut sharply against the conclusion that the ViSalus Program satisfies "profits from others" element of the *Howey* investment contract test. For instance, ViSalus has emphasized the importance of an IP's individual selling and recruiting efforts:

30

> Each individual promoter is responsible for growing his
> or her own business, and for conducting marketing
> activities to attract new customers and enroll other
> individual promoters.   These activities may include
> hosting events such as challenge parties; purchasing and
> using promotional materials; utilizing and paying for
> direct mail and print materials such as brochures, flyers,
> catalogs, business cards, posters and banners; purchasing
> inventory for sale or use as samples; and recruiting,
> training and mentoring customers and other individual
> promoters on how to use our products and/or pursue the
> ViSalus business opportunity.[9]

(*See* ECF #37-2 at 63, Pg. ID 417.)  Moreover, ViSalus has noted that an IP has a

fair degree of freedom in how he or she chooses to promote ViSalus' products or

the business opportunity:

> Our individual promoters are independent contractors
> and, accordingly, *we are not in a position to provide the*

_____

[9]  The statement by ViSalus in text above appears in a prospectus that ViSalus filed
with the Securities and Exchange Commission (the "Prospectus").  Plaintiffs
referred to the Prospectus in the Complaint (*see, e.g.*, Compl. at ¶78), and the
ViSalus Defendants attached a copy of the Prospectus to their Motion.  (*See* ECF
#37-2.)  Under these circumstances, the Court may consider the Prosectus in the
context of the pending motions under Rule 12(b)(6).  Generally, the Court's
consideration of a motion to dismiss pursuant to Rule 12(b)(6) is limited to the
pleadings and reference outside the pleadings converts the motion into one for
summary judgment.  *See Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir.
2008).  However, "[d]ocuments that a defendant attaches to a motion to dismiss are
considered part of the pleadings if they are referred to in the plaintiffs' complaint
and are central to her claim."  *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir.
1997).  Here, Plaintiffs rely on excerpts from the Prospectus in their Complaint,
and those excerpts are central to Plaintiffs' allegations that the ViSalus Program
was a pyramid scheme.  (*See, e.g.*, Compl. at ¶78.)  Accordingly, the Court will
consider the Prospectus without converting the Defendants' Motions into motions
for summary judgment.

> *same direction, motivation and oversight* as we would if
> they were our own employees.  As a result, *there can be*
> *no assurance that our individual promoters will*
> *participate in our marketing strategies or plans, accept*
> *our introduction of new products or comply with our*
> *promoter policies and procedures*.

(*Id.* at 15, Pg. ID 376 (emphasis added).)   Consistent with these statements,

Plaintiffs allege that the "types and amounts of bonuses offered to new distributor

recruits are *directly dependent on the recruiting success of the IP*."   (*Id.* at ¶78

(emphasis added).)

        Given the statements by ViSalus and the allegations by Plaintiff cited

immediately above, the Court cannot conclude as a matter of law at this stage that

the "profits from others" element of the *Howey* investment contract test is

satisfied.[10]  Accordingly, the Court cannot yet conclude as a matter of law that the

ViSalus Business Opportunity is a security.   Therefore, Defendants cannot yet

prevail on their argument that the PSLRA bars Plaintiffs' RICO claims.[11]

---

[10]   Of course, Defendants are free to re-raise this argument at the summary
judgment stage and to argue that the evidence adduced during discovery satisfies
the *Howey* investment contract test as a matter of law.

[11]   The Court rejects Plaintiffs' argument that the PSLRA does not bar their RICO
claim because the alleged security is not "integral to" the alleged scheme.  (*See*
Resp. Br. at 31, Pg. ID 535 (citing *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694
F.3d 783, 791 (6th Cir. 2012)).)  If the ViSalus Business Opportunity, as alleged in
the Complaint, were a security (and, as explained above, the Court cannot conclude
at this point that it is a security as a matter of law), then the security certainly
would have been integral to the alleged scheme.   Indeed, Plaintiffs' theory of the

**B. The Sufficiency of Plaintiffs' RICO Allegations**

The Court now turns to the sufficiency of Plaintiffs' three RICO claims.  All three claims claims rest on Plaintiffs' contention that the Defendants acted together as an "association in fact" for the common purpose of operating the ViSalus Program (the "Alleged RICO Enterprise").  (*See* Compl. at ¶¶150-57.)

In their first RICO claim, Plaintiffs first allege that the Defendants conducted or participated, directly or indirectly, in the conduct of the Alleged RICO Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) (the "§ 1962(c) claim").  (*See id.* at ¶¶184-85.)  Specifically, Plaintiffs allege that the Defendants' pattern of racketeering activity involved mail fraud, wire fraud, and obtaining property through "inherently wrongful means" in violation of the Hobbs Act, 18 U.S.C. § 1951(b)(2).  (*See id.* at ¶¶168-73.)

In their second RICO claim, Plaintiffs allege that Defendants Blair, Sarnicola, and Mallen received income derived from a pattern of racketeering activity and reinvested that income into the Alleged RICO Enterprise in violation of 18 U.S.C. § 1962(a) (the "§ 1962(a) claim").  (*See id.* at ¶¶186-88.)

In their third RICO claim, Plaintiffs contend that the Defendants conspired to violate § 1962(c) and that Blair, Sarnicola, and Mallen conspired to violate §

---

case is that the sale of the business opportunity was critical to the continued operation of the ViSalus Program.  (*See* Compl. at ¶4.)

1962(a), each in violation of 18 U.S.C. § 1962(d) (the "§ 1962(d) claim").  (*See id.* at ¶¶189-96.)

> **1. Plaintiffs Have Engaged in Impermissible Group Pleading That Precludes the Court From Conducting the Necessary Individualized Inquiry Into Each Defendant's Alleged Liability**

Assessing the sufficiency of Plaintiffs' RICO claims is challenging because many of Plaintiffs' RICO allegations are overly broad and imprecise.  Throughout the Complaint – and in the RICO section in particular – Plaintiffs lump together "the Defendants" without specifically identifying which of the Defendants engaged in the conduct alleged.  Consider, for example, the following RICO allegations in which Plaintiffs liberally accuse "the Defendants" – all 31 of them – of promoting the ViSalus Program and committing mail and wire fraud in the same manner:

- "The defendants have taken every imaginable step to sell the pyramid program to IPs and potential IPs…."  (Compl. at ¶167.)

- "The[ defendants] have stated their intention to continue to grow the pyramid throughout the United States, have expanded to Canada and to the UK.  They have announced an intention to expand to additional international markets in 2012."  (*Id.*)

- "The[ defendants] have recently announced a new round of 'professional marketers' who have 'joined' the company … and have flooded the web with 'ground floor' opportunities in Germany and Austria to perpetuate the scheme there."  (*Id.*)

- "The defendants have transmitted, caused to be transmitted or invited others to transmit material, by mail or private or commercial carriers, such as UPS, for the purpose of executing their scheme or artifice to defraud in violation of RICO.  Likewise, they have distributed … by UPS (mail) to many individuals literally hundreds of thousands or

34

millions of pieces of promotional literature, statements, checks, and other mailings all between 2005 and the present." (*Id.* at ¶169.)

- "The defendants have used the Internet since 2005 to disseminate, publish and spread the pyramid scheme throughout the United States…." (*Id.* at ¶170.)

- "Defendants intended to attract … participants as evidenced by their massive web presence, web-related videos, its own and related websites, and other broadly-disseminated offers for people to become promoters for ViSalus." (*Id.* at ¶180.)

- "Each defendant acted with either specific intent to defraud or with such recklessness with respect to the false or misleading information mailed or wired in furtherance of the pyramid scheme…." (*Id.* at ¶171.)

These "shotgun" allegations of general misconduct by a group of thirty-one different Defendants are not sufficient to state RICO claims against each of them. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Universal Health Group, Inc.*, No. 14-10266, 2014 WL 5427170, at *2-3 (E.D. Mich. Oct. 24, 2014) (plaintiff in RICO case involving allegations of mail fraud may not "generally assert all claims against all defendants") (citing *Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 745 (6th Cir. 1992)).

Plaintiffs' imprecise RICO allegations are particularly confusing because it is obvious from Plaintiffs' own narrative that Plaintiffs do not – and cannot – literally mean that *each* Defendant engaged in the alleged acts quoted above. Indeed, Plaintiffs allege that certain Defendants had relatively limited, if any, involvement in the Alleged RICO Enterprise. For instance, Plaintiffs allege that

35

the Vendor Defendants merely designed software and/or performed database services for ViSalus. In addition, Plaintiffs allege that ViSalus Holdings is just a stock holding company for ViSalus. Similarly, Plaintiffs allege that the Ropart Entities are or were shareholders in ViSalus and/or ViSalus Holdings.[12] Yet, by directing their RICO allegations against "the Defendants" generally, Plaintiffs have alleged that each of these entities distributed millions of promotional materials to potential IPs through the mail and wires, used the Internet to publicize the ViSalus Program, and made public announcements concerning the ViSalus Program. Plaintiffs have therefore implicated certain Defendants who – based on Plaintiffs' *own* narrative – could not plausibly have committed the acts that Plaintiffs allege they did.[13]

---

[12]  The Court notes that Plaintiffs do not even allege that the Ropart Entities are or were *controlling* shareholders of ViSalus and/or ViSalus Holdings. Indeed, Plaintiffs allege no facts as to the size of the Ropart Entities' alleged interest in ViSalus and/or ViSalus Holdings.

[13]  Plaintiffs create additional confusion by using imprecise defined terms to refer to subsets of Defendants. For example, Plaintiffs allege that "ViSalus and certain of its individual officers hired a private investigator who purloined certain materials from a number of former ViSalus distributors" in violation of the Hobbs Act. (*Id.* at ¶173.) This allegation is confusing because Plaintiffs use the term "ViSalus" to refer not only to ViSalus, Inc. but also to its corporate shareholder, ViSalus Holdings. (*See id.* at ¶12 ("For purposes of this litigation, all of the ViSalus entities will be referred to as 'ViSalus' unless specifically indicated otherwise.").) It is thus unclear which entity or entities – ViSalus, ViSalus Holdings, or both – Plaintiffs allege to have violated the Hobbs Act.

In sum, Plaintiffs' group pleading has made the Court's analysis of Plaintiffs' RICO claims extraordinarily difficult, if not impossible. While Plaintiffs' Complaint may state a viable RICO claim against some of the Defendants, the Court cannot intelligibly analyze Plaintiffs' RICO allegations as to all 31 Defendants. And that is a real problem because each Defendant is entitled to an individualized analysis of his, her, or its own RICO liability. *See, e.g.*, *Gross v. Waywell*, 628 F.Supp.2d 475, 495 (S.D. N.Y. 2009) (recognizing that plaintiffs must demonstrate the elements of RICO with respect to each defendant individually) (collecting cases). As set forth in more detail below, the Court therefore directs Plaintiffs to amend their RICO claims in order to present them in a manner that allows the Court to appropriately evaluate their sufficiency as to each individual Defendant.

Although the group pleading deficiencies discussed above prevent the Court from conducting a comprehensive, Defendant-by-Defendant analysis of the sufficiency of Plaintiffs' RICO allegations, the Court is able to address and resolve certain legal disputes between the parties concerning the sufficiency of Plaintiffs' RICO allegations. The Court does so below.

### 2.  Plaintiffs' § 1962(c) Claim

Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect,

2:14-cv-12693-MFL-DRG   Doc # 54   Filed 06/12/15   Pg 38 of 78   Pg ID 919

interstate … commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…." 18 U.S.C. § 1962(c).   To state a § 1962(c) claim, a plaintiff must allege the following: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."   *Ouwinga*, 694 F.3d at 792 (internal citations omitted).   A "pattern of racketeering activity" consists of at least two predicate acts – i.e., certain offenses enumerated in 18 U.S.C. § 1961(1) – that occur within a ten-year period.   *See Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006) (citing 18 U.S.C. § 1961(5)).

The Defendants argue that Plaintiffs' RICO claim fails because Plaintiffs have not sufficiently alleged that each Defendant participated in the Alleged RICO Enterprise; that each Defendant committed two predicate acts; that there was the required causal connection between the alleged predicate acts and Plaintiffs' alleged injuries; and that any Defendant committed a predicate act by violating the Hobbs Act.   The Court addresses each of these arguments below.

a. *Plaintiffs Have Failed to Sufficiently Allege That Each Defendant Participated in the Operation or Management of the Alleged RICO Enterprise*

In order to state a § 1962(c) claim, Plaintiffs must allege that each Defendant "conduct[ed] or participate[d], directly or indirectly, in the conduct of" the Alleged RICO Enterprise's affairs.   18 U.S.C. § 1962(c).   "[P]articipation in the conduct of

38

an enterprise's affairs requires proof that the defendant participated in the 'operation or management' of the enterprise." *Ouwinga*, 694 F.3d at 792 (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993)).  "An enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management."  *Reves*, 507 U.S. at 184. Accordingly, "RICO liability is not limited to those with primary responsibility for the enterprise's affairs; only 'some part' in directing the enterprise's affairs is required."  *Ouwinga*, 694 F.3d at 792.  A defendant plays "some part" in directing an enterprise's affairs if he "mak[es] decisions on behalf of the enterprise" or "knowingly carr[ies] them out."  *United States v. Fowler*, 535 F.3d 408, 418 (6th Cir. 2008).  To be liable under § 1962(c), "defendants must have 'conducted or participated in the conduct of the *enterprise's* affairs, not just their *own* affairs." *Ouwinga*, 694 F.3d at 792 (quoting *Reves*, 507 U.S. at 185).

The Plaintiffs have not sufficiently alleged that each Defendant participated in the affairs of the Alleged RICO Enterprise.[14]  For instance, the participation allegations against the Corporate Promoter Defendants fall short.  Plaintiffs' primary allegations against the Corporate Promoter Defendants are that they are the vehicles into which certain of the IP Defendants deposited their proceeds from

---

[14]   The Court assumes, without deciding, that Plaintiffs have plausibly alleged that the Alleged RICO Enterprise in fact constitutes a RICO enterprise.

the ViSalus Program.  (*See* Compl. at ¶¶34-38.)  Even if true, these allegations would not show that the Corporate Promoter Defendants made decisions on behalf of the ViSalus Program or knowingly carried them out.  Plaintiffs do allege that the Corporate Promoter Defendants are "significant distributors for ViSalus," but they do not describe any particular conduct in which the Corporate Promoter Defendants engage *on behalf of the ViSalus Program*, rather than *on behalf of the IP Defendants*.  Thus, Plaintiffs have not sufficiently alleged that the Corporate Promoter Defendants knowingly carried out any activities on behalf of the alleged RICO enterprise.

Nor have Plaintiffs sufficiently pleaded that the Vendor Defendants participated in the Alleged RICO Enterprise.  In general, advisors and/or vendors to a RICO enterprise who are "outside the chain of command through which the enterprise's affairs [are] conducted" do not participate in the RICO enterprise as a matter of law.  *United States v. Oreto*, 37 F.3d 739, 750 (1st Cir. 1994).  Indeed, a RICO violation "requires more than that a defendant 'had a business relationship with a putative RICO enterprise or … performed services for that enterprise."  *D.M. Robinson Chiropractic v. Encompass Ins. Co. of America*, 2013 WL 1286696, at *8 (N.D. Ill. Mar. 28, 2013) (quoting *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 399 (7th Cir. 2009)); *see also Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 728 (7th Cir. 1998) ("simply performing services for an enterprise,

40

even with knowledge of the enterprise's illicit nature" does constitute participation in the enterprise).    Further, a plaintiff's conclusory allegation that a vendor participated in a RICO enterprise is not sufficient to state a § 1962(c) claim as to the vendor.  *See D.M. Robinson Chiropractic*, 2013 WL 1286696 at *9-10.

In their Complaint, Plaintiffs allege that Vendor Defendant FragMob developed a mobile phone application and credit-card swipe devices for ViSalus. Plaintiffs further allege that Vendor Defendant iCentris performs software and database services for ViSalus.    But Plaintiffs do not allege that the Vendor Defendants made business decisions for the Alleged RICO Enterprise or even that they carried out such decisions.    Rather, the Complaint describes the Vendor Defendants as outside contractors who were hired by ViSalus to perform discrete tasks.    Nor do Plaintiffs allege that the Vendor Defendants have any financial interest in the success of the Alleged RICO Enterprise other than their compensation for performing the discrete tasks for which they were hired.  *See, e.g.*, *Guaranteed Rate, Inc. v. Barr*, 912 F.Supp.2d 671, 687 (N.D. Ill. 2012) (allegations of participation in a RICO scheme are insufficient where plaintiff fails to plead that defendants had a financial stake in the ultimate outcome of the enterprise – i.e., "shar[ing] in the profits of the alleged enterprise as opposed to merely taking their own respective profits from their respective actions related to

41

the scheme").  Plaintiffs' Complaint therefore fails to sufficiently allege that the Vendor Defendants participated in the Alleged RICO Enterprise.

Moreover, Plaintiffs have not sufficiently alleged that ViSalus Holdings participated in the Alleged RICO Enterprise.  Indeed, Plaintiffs have not pleaded any facts indicating that ViSalus Holdings – a stock holding company that allegedly owned ViSalus stock – made any decisions on behalf of the Alleged RICO Enterprise or knowingly carried them out.

Nor have Plaintiffs pleaded sufficient facts to support a plausible inference that the Ropart Entities participated in the Alleged RICO Enterprise.  Plaintiffs allege that the Ropart Entities are shareholders of ViSalus and/or ViSalus Holdings, but Plaintiffs do not allege the size of the Ropart Entities' alleged interests.  Nor do Plaintiffs allege that the Ropart Entities had a contractual right – through a shareholder agreement or otherwise – to directly or indirectly control ViSalus.  Plaintiffs simply have not alleged that the Ropart Entities had the authority to make any decisions on behalf of the Alleged RICO Enterprise.  And while Plaintiffs do allege that the Ropart Entities exerted control over ViSalus and/or the Alleged RICO Enterprise (*see, e.g.,* Compl. at ¶155), those allegations are not plausible absent some supporting allegations to explain how the Ropart Entities, in fact, exercised such control.

42

At bottom, Plaintiffs' theory that the Ropart Entities exerted control over, or otherwise participated in, the Alleged RICO Enterprise appears to boil down to the following: (1) Goergen Sr. and Goergen are or were partial owners or employees of the Ropart Entities; (2) the Ropart Entities own or owned stock in ViSalus; (3) Goergen Sr. and Goergen were also officers or directors of ViSalus; and (4) therefore, it may be inferred that the Ropart Entities exercised control over, or otherwise participated in the affairs of, the Alleged RICO Enterprise. But this theory rests on the naked assumption that Goergen Sr. and Goergen were acting on behalf of, or at the direction of, the Ropart Entities when serving as officers or directors of ViSalus. The Complaint does not contain sufficient plausible allegations to support that assumption.[15]

> b. *Plaintiffs Have Failed to Allege that Each Defendant Committed Two Predicate Acts*

The Defendants argue that Plaintiffs' § 1962(c) claim fails because Plaintiffs have not alleged that each Defendant individually committed two RICO predicate

---

[15] This is not the only instance in the Complaint in which Plaintiffs attribute the allegedly-wrongful acts of an individual Defendant to a corporate entity without pleading sufficient facts to support a plausible inference that the corporate entity is liable for the Defendant's conduct. For instance, Plaintiffs' claims against the Vendor Defendants appear to be based in part on their allegations that Blair, Sarnicola, and Mallen own interests in the Vendor Defendants and serve in decision-making roles for ViSalus. (*See* Compl. at ¶¶17-19, 41-42.) But Plaintiffs have not plausibly explained why the Vendor Defendants are liable for any allegedly-wrongful acts that their individual shareholders and/or employees committed in connection with the ViSalus Program.

acts. (*See, e.g.*, ViSalus Defendants' Mot. at 5, Pg. ID 290.) Plaintiffs counter that it is sufficient for them to allege that the Alleged RICO Enterprise as a whole committed two predicate acts. (*See* Resp. Br. at 37-38, Pg. ID 541-42.) Plaintiffs insist that "no court anywhere has taken the position that each defendant needs to have authored or participated in one, much less two predicate acts…." (*See* Resp. Br. at 37, Pg. ID 541.) Plaintiffs are wrong.

A significant number of courts have held that in a multi-defendant § 1962(c) action, such as this one, a plaintiff must allege that *each defendant* individually committed at least two predicate acts. *See, e.g.*, *Crest Construction II, Inc. v. Doe*, 660 F.3d 346, 358 (8th Cir. 2011) (plaintiffs' RICO allegations "fail to meet the requirement of identifying two specific predicate acts for each [d]efendant") (citing *Craig v. Outdoor Adver., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1027 (8th Cir. 2008)); *Barr*, 912 F.Supp.2d at 684 ("In alleging a RICO pattern, liability is limited to persons who have personally committed at least two predicate acts of racketeering.") (internal punctuation and citation omitted).[16]   And the plain

---

[16]   *See also Pennsylvania Chiropractic Assoc. v. Blue Cross Blue Shield Assoc.*, No. 09-5619, 2010 WL 1979569, at *9-10 (N.D. Ill. May 17, 2010) (defendant is not liable under § 1962(c) unless he himself commits at least two predicate acts) (citing *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001)); *Jerome M. Sobel & Co. v. Fleck*, No. 03-1041, 2003 WL 22839799, at *6 (S.D. N.Y. Dec. 1, 2003) (§ 1962(c) focuses on the predicate acts committed by each individual defendant, rather than the collective acts committed by the enterprise as a whole, and in order "to establish a violation of § 1962(c), plaintiffs must allege that each defendant

language of the statute compels that conclusion.  The statute imposes liability only upon those defendants who participate in the affairs of an enterprise "through a pattern of racketeering activity" – i.e., by committing sufficient predicate acts to constitute a pattern.  18 U.S.C. § 1962(c).  Indeed, "the essence of [a § 1962(c) violation is the commission of [predicate] acts in connection with the conduct of an enterprise." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 497 (1985).  Thus, in order to sufficiently allege that a defendant violated § 1962(c), a plaintiff must allege that *that particular defendant* committed a pattern of predicate acts.[17]

The primary authority on which Plaintiffs rely for the proposition that they need not plead two predicate acts as to each Defendant – *Fowler*, 535 F.3d at 421 (cited in Resp. Br. at 37 n. 25, Pg. ID 541) – involved a § 1962(d) conspiracy claim, not a § 1962(c) claim.  This is an important distinction because §§ 1962(d)

---

committed at least two predicate acts of racketeering activity"); *Raineri Construction, Inc. v. Taylor*, --- F.Supp.3d ---, 2014 WL 5427976, at *9 (E.D. Mo. Oct. 24, 2014) ("Alleging two predicate acts in the aggregate is insufficient. Instead, a plaintiff must allege each individual defendant committed two predicate acts of racketeering.") (citing *Craig* 528 F.3d at 1027).

[17]  Plaintiffs argue that "[n]one of the substantive provisions of Sec. 1962 require that each 'person' commit two predicate acts; a thirty-defendant enterprise need not commit thirty, much less sixty predicate acts." (Resp. Br. at 37 n. 25, Pg. ID 541.)  While Plaintiffs are plainly correct that a thirty-defendant enterprise need not commit sixty predicate acts, it does not follow that each defendant need not commit at least two predicate acts.  Simply put, a thirty-defendant enterprise need not commit sixty predicate acts because a single predicate act may be committed by two or more defendants jointly.  For instance, two defendants could participate in the same act of extortion.

45

and 1962(c) impose liability for different conduct. "The focus of section 1962(c) is on the individual patterns of racketeering engaged in by a defendant, rather than the collective activities of the members of the enterprise, which are proscribed by section 1962(d)." *United States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987). Accordingly, federal courts have "reject[ed] [plaintiffs'] attempt[s] to analyze section 1962(c) as if it were a second RICO conspiracy statute." *Id.* Courts have likewise rejected the very argument that Plaintiffs advance here:

> Plaintiffs contend that they need not allege two predicate acts of racketeering activity by each defendant, only by the enterprise as a whole. This would be true if the plaintiffs' claim was for a RICO conspiracy under section 1962(d).... [But a] defendant may be found liable under section 1962(c) ... only if he himself engages in a pattern of racketeering activity.

*Pennsylvania Chiropractic Assoc.*, 2010 WL 1979569 at *9.[18]

---

[18] There is language in *Jackson v. Segwick Claims Mgmt. Svcs., Inc.*, 699 F.3d 466 (6th Cir. 2012), *reh'g en banc granted and opinion vacated*, 731 F.3d 556 (6th Cir. 2013), that arguably supports Plaintiffs' position that it need not plead that each Defendant committed two predicate acts. In *Jackson*, the Sixth Circuit said: "[Defendant] argues that the plaintiffs must plead that each defendant committed two predicate acts, as opposed to the enterprise as a whole having committed at least two predicate acts. He cites no case law in support of this argument, and we have found none." *Id.* at 482. But the court in *Jackson* expressly declined to decide this issue. *See id.* at 483. Moreover, *Jackson* has been vacated and therefore has no precedential effect. Finally, the parties in *Jackson* obviously failed to identify for the court the weight of authority, described above, holding that a plaintiff must allege two predicate acts as to each defendant. Under these circumstances, *Jackson* does not require the conclusion that Plaintiffs may state a §

Plaintiffs insist, in the alternative, that they may satisfy their predicate act pleading obligations by alleging that each Defendant (1) joined a fraudulent scheme and (2) permitted or encouraged another participant in the scheme to mail or transmit information in furtherance of the scheme. (*See* Resp. Br. at 37 n. 25, Pg. ID 541 (citing *West Hills Farms, LLC v. Classicstar*, 823 F.Supp.2d 599, 627 (E.D. Ky. 2011) and *Wyndham Vacation Resorts, Inc. v. The Consulting Group, Inc.*, No. 12-00096, 2013 WL 3834047 (M.D. Tn. Jul. 23, 2013)).) And Plaintiffs contend that they have made these requisite allegations here as to each Defendant. (*See id.* at 37-38, Pg. ID 541-42.) There are two problems with this argument.

First, it far from clear that a defendant "participates in the affairs of an enterprise through a pattern of racketeering activity" by merely "permitting" someone else to commit two predicate acts. The passive act of not preventing another person from committing a predicate act seems to fall short of the active conduct required to establish "participation" in the enterprise – i.e., making decisions or carrying them out – through a pattern of racketeering activity. *See* Part B.2.i., *supra*. Second (and in any event), Plaintiffs have not sufficiently alleged that each Defendant encouraged or knowingly permitted others to commit predicate acts. For instance, Plaintiffs have not pleaded sufficient facts to

1962(c) claim as to each Defendant merely by alleging that the enterprise as a whole committed at least two predicate acts.

plausibly allege that the Vendor Defendants, ViSalus Holdings, the Ropart Entities, or the Corporate Promoter Defendants permitted or encouraged other participants in the RICO enterprise to engage in mail or wire fraud.

In sum, in order to state a § 1962(c) claim against any Defendant, Plaintiffs must allege that the Defendant actually committed two predicate acts.  The Court cannot conclude that Plaintiffs have sufficiently alleged that each Defendant has committed two predicate acts due to the group pleading problem in Plaintiffs' Complaint described above.  In the Amended Complaint, Plaintiffs may only assert a § 1962(c) claim against those Defendants whom they specifically allege to have committed two predicate acts.

Lastly, while Plaintiffs must allege that each Defendant committed at least two predicate acts, it is important to clarify the impact of Fed. R. Civ. P. 9(b) on that pleading obligation.  Defendants insist that because Plaintiffs allege predicate acts of mail fraud and wire fraud, Plaintiffs must identify specific misrepresentations; the "time, place, and contents of the false misrepresentations;" and the "identity of the person making the misrepresentation[s]."  (ViSalus Defendants' Mot. at 21, Pg. ID 337 (quoting *DeLorean v. Cork Gully*, 118 B.R. 932, 940 (E.D. Mich. 1990)).)  The Court disagrees.  While these pleading requirements under Rule 9(b) apply where the alleged mail/wire fraud is based

upon misrepresentations, they do not apply when the alleged mail/wire fraud rests

upon an alleged scheme to defraud that does not involve misrepresentations:

> In cases in which the plaintiff claims that specific
> statements or mailings were themselves fraudulent, *i.e.*,
> themselves contained false or misleading information, the
> complaint should specify the fraud involved, identify the
> parties responsible for the fraud, and where and when the
> fraud occurred.
>
> In cases in which the plaintiff claims that the mails or
> wires were simply used in furtherance of a master plan to
> defraud, the communications need not have contained
> false or misleading information themselves.   In such
> cases, a detailed description of the underlying scheme
> and the connection therewith of the mail and/or wire
> communications, is sufficient to satisfy Rule 9(b)…. [In
> other words,] Rule 9(b) requires only that the plaintiff
> delineate, with adequate particularity in the body of the
> complaint, the specific circumstances constituting the
> overall fraudulent scheme.

*In re Sumitomo Copper Litig.*, 995 F.Supp. 451, 456 (S.D. N.Y. 1998).[19]

Here, Plaintiffs' mail and wire fraud allegations do not rest upon alleged

misrepresentations.   Instead, Plaintiffs claim that Defendants operated and

participated in a pyramid scheme that, as a matter of law, constitutes a scheme to

defraud in violation of the mail and wire fraud statutes.  (*See* Resp. Br. at 34-35,

---

[19]   *In re Sumitomo* also explained the rationale behind this alternative standard for
fraud allegations based on a scheme to defraud: "Once the plaintiff alleges with
particularity the circumstances constituting the fraudulent scheme … the notice
function served by Rule 9(b) would [not] be advanced in any material way by
insisting that a complaint contain a list of letters or telephone calls."   *In re
Sumitomo*, 995 F.Supp. at 456.

Pg. ID 538-39; *see also Gold Unlimited*, 177 F.3d at 484 ("Unquestionably, an illegal pyramid scheme constitutes a scheme to defraud.").)  Because Plaintiffs are not proceeding on a misrepresentation theory of fraud, Rule 9(b) does not require them to identify specific misrepresentations.  It requires them only to provide a detailed description of the fraudulent scheme and a clear explanation of each Defendant's alleged role in it.[20]

### c. Plaintiffs Have Failed to Allege a Clear Causal Relationship Between Predicate Acts Committed by Each Defendant and Plaintiffs' Injuries

To state a § 1962(c) claim, "a plaintiff must show not only that the predicate act was a 'but for' cause of plaintiff's injuries, but also that it was a proximate cause."  *Heinrich*, 668 F.3d at 405 (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992).  Thus, "[a] plaintiff must show 'some direct relation between the injury asserted and the injurious conduct alleged.'"  *Id.* (citing *Holmes*, 503 U.S. at 268).  Proximate cause is a "flexible concept" that must be assessed on a case-by-case basis.  *Wallace v. Midwest Financial & Mortgage Svcs., Inc.*, 714 F.3d 414, 419 (6th Cir. 2013).

Defendants argue that Plaintiffs' Complaint does not allege a causal connection between their alleged predicate acts and Plaintiffs' alleged injuries.

---

[20]   This requirement of Rule 9(b) is in addition to the other RICO pleadings requirements discussed in text above – i.e., that Plaintiffs plead at least two predicate acts by each Defendant and that Plaintiffs sufficiently plead how each Defendant's predicate acts injured them, among other things.

(*See, e.g.*, ViSalus Defendants' Supplemental Brief, ECF #49.)  Plaintiffs deny that they must plead a causal connection between each Defendant's particular predicate acts and their specific injuries.  (*See* Pla.'s Supplemental Brief, ECF #52 at 6, Pg. ID 772.)   Plaintiffs argue that in order to satisfy their causation pleading requirement as to each Defendant, they need only allege that they (the Plaintiffs) were intended targets of the fraudulent scheme in which the Defendant participated. (*See id.*)  Plaintiffs rely on the Sixth Circuit's statement in *Wallace* that a "plaintiff need only show use of the mail in furtherance of a scheme to defraud and an injury proximately caused by that scheme.  Thus, the appropriate inquiry ... [is] whether the fraudulent scheme … proximately caused [plaintiff's] injuries." *See* 714 F.3d at 420   (internal citations omitted).

But *Wallace* cannot fairly be read to alter the settled rule that a claim under § 1962(c) requires a direct causal connection between the *defendant's predicate acts* and the plaintiff's injuries.  Indeed, both the Supreme Court and Sixth Circuit so held well before *Wallace*.  *See, e.g.*, *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 17-18 (2010) (§ 1962(c) "is limited by the requirement of a direct causal connection between the predicate wrong and the harm") (internal citation and quotation marks omitted); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006) ("the compensable injury flowing from a violation of [§ 1962(c)] necessarily is the harm *caused by [the defendant's] predicate acts*") (emphasis

51

added) (internal citation and quotation marks omitted); *Heinrich*, 668 F.3d at 405 ("To allege a valid RICO claim … a plaintiff must show not only that the *predicate act* was a 'but for' cause of plaintiff's injuries, but also that it was a proximate cause.") (emphasis added) (internal citation omitted). *Wallace* cannot reasonably be read as overruling or undermining these binding precedents.[21]

Moreover, and in any event, *Wallace* is readily distinguishable from this case. The plaintiff in *Wallace* – unlike Plaintiffs here – identified specific mailings and wire transfers that allegedly caused his injuries. *See Wallace*, 714 F.3d at 419 (noting that plaintiff cited evidence of specific predicate acts that he alleged were the cause of his injuries). Thus, *Wallace* does not stand for the proposition that Plaintiffs can state their § 1962(c) claims without linking their injuries to a specific predicate act.

Plaintiffs have not pleaded the requisite causal connection between their injuries and predicate acts committed by each Defendant. For instance, Plaintiffs have not clearly linked their losses to any specific act or communication by an IP Defendant. Plaintiffs have not alleged that they personally received or viewed any of the mailings, promotional materials, websites, or communications by these

---

[21] *See, e.g.*, *U.S. v. Mack*, 729 F.3d 594, 609 (Courts of Appeals may not overturn Supreme Court precedent); See *U.S. v. Lanier*, 201 F.3d 842, 846 (6th Cir. 2000) ("It is firmly established that one panel of this court cannot overturn a decision of another panel….").

Defendants described in the Complaint.  Nor have Plaintiffs alleged that they were lured into the ViSalus Program by others who had, in turn, been influenced by the IP Defendants.  Plaintiffs allege only that they were in the "class" of individuals generally targeted by the IP Defendants' promotional activities.  That is not a close enough connection to satisfy the causation element of their § 1962(c) claim.  In their Amended Complaint, in order to state a § 1962(c) claim against any Defendant, Plaintiffs must allege a clear causal connection between that Defendant's alleged predicate acts and their injuries.

To be clear, Plaintiffs need not allege first-party reliance on a Defendant's mailings or wire transmissions in order to sufficiently allege that that Defendant proximately caused their injuries.  *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 659 (2008) ("Proof that the plaintiff relied on the defendant's [mail and wire transmissions] may in some cases be sufficient to establish proximate cause, but there is no sound reason to conclude that such proof is always necessary.")  But Plaintiffs must allege a logical theory directly linking each Defendant's predicate acts to their alleged injuries.[22]

---

[22]  The Court recognizes that proximate causation is often better addressed at the summary judgment stage rather than on a motion to dismiss.  *See Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 615 (6th Cir. 2004).  The Court notes, however, that the Sixth Circuit has addressed proximate causation under § 1962(c) at the pleading stage and has found causation allegations deficient at that stage.  *See Heinrich*, 668 F.3d at 405-407 (alleged mail and wire fraud did not satisfy RICO

53

### d. *Plaintiffs Have Not Sufficiently Pleaded Predicate Acts Pursuant to the Hobbs Act*

Plaintiffs also allege that the Defendants' pattern of racketeering activity included violations of the Hobbs Act.  As relevant here, the Hobbs Act prohibits "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear…."  18 U.S.C. § 1951(b)(2).  The Court concludes that Plaintiffs have not sufficiently alleged that any Defendant violated the Hobbs Act.[23]

Plaintiffs argue that they have pleaded a Hobbs Act violation under the "fear of economic harm theory."  (*See* Resp. Br. at 42-43, Pg. ID 546-47.)  Under that theory, "a private citizen [violates the Hobbs Act] by leading the victim to believe that the perpetrator can exercise his or her power to the victim's economic detriment."  *Id.*  "The fear of economic harm may arise independently of any action by the defendant, it is enough if the fear exists and the defendant

proximate causation requirement).  So have other Circuits.  *See, e.g., Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 984 (9th Cir. 2008) (affirming dismissal of § 1962(c) claim because "proximate causation is lacking"); *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 122 (2d Cir. 2003) (affirming dismissal of § 1962(c) claim because "plaintiffs cannot show that defendants' alleged violations of § 1962 proximately caused their injuries").  If the causation allegations as to any particular Defendant in Plaintiffs' Amended Complaint are plainly deficient, the Court will not hesitate to dismiss the § 1962(c) claim against that Defendant.

[23]  Plaintiffs' Hobbs Act allegations also suffer from the group pleading deficiency discussed earlier.  This section will address the other deficiencies in Plaintiffs' Hobbs Act allegations.

intentionally exploits it." *Id.* In order to plead a Hobbs Act violation under this theory, a plaintiff "must allege facts and circumstances that show (1) that the defendants obtained the plaintiffs' property (2) through the wrongful use of (3) threats or fear of … economic harm." *Id.*

> Plaintiffs' Hobbs Act allegations, in their entirety, are as follows:

> > Among other things, during a fight between another network marketing company and ViSalus, as detailed in another RICO-related complaint filed by OceanView Corporation in 2013, earlier that year ViSalus and certain of its individual officers hired a private investigator who purloined certain materials from a number of former ViSalus distributors. The company also allegedly retained commissions and earnings from these individuals in an effort to not have them take their "downlines" to an alleged competitor. Similar actions have occurred to assist in perpetuating the pyramid scheme.

(Compl. at ¶173.) These allegations fall far short of stating a Hobbs Act violation under the "fear of economic harm" theory. Plaintiffs allege that ViSalus and/or its officers hired an investigator to steal materials from former distributors and withheld funds from those former distributors. But Plaintiffs do not allege that any Defendants ever threatened the former distributors. Nor do Plaintiffs allege that they – or the former distributors in question – were ever in fear of physical or economic harm. And Plaintiffs certainly have not alleged a causal connection between ViSalus' alleged conduct toward the unidentified former distributors and Plaintiffs' alleged losses. If Plaintiffs choose to plead a Hobbs Act violation in

their Amended Complaint, Plaintiffs must clearly explain how the conduct alleged (1) constitutes a violation of that Act and (2) is causally related to Plaintiff's injuries.

### 3. Plaintiffs' §1962(a) Claim

Section 1962(a) makes it "unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering … to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise…."  18 U.S.C. § 1962(a).  Plaintiffs allege that Defendants Blair, Sarnicola, and Mallen (collectively, the "Investor Defendants") "received income derived from a pattern of racketeering activity and have subsequently used that income in acquisition of an interest in the [Alleged RICO E]nterprise" in violation of § 1962(a).  (Compl. at ¶187.)  Plaintiffs further allege that the Investor Defendants acquired an interest in ViSalus in 2008 and subsequently contributed additional funds to the company to help it avoid bankruptcy.  (*See id.*)  Thus, Plaintiffs assert, these investments "allow[ed] the pyramid scheme to be perpetuated." (*Id.*)

The Investor Defendants argue that Plaintiffs' fail to state a § 1962(a) claim because Plaintiffs have not sufficiently pleaded that these Defendants "engaged in a pattern of racketeering activity prior to 2008, such that the funds allegedly

reinvested in 2008 were proceeds from racketeering activity." (ViSalus Defendants' Reply Br. at 14, Pg. ID 715.) The Court agrees that Plaintiffs have failed to state a viable § 1962(a) claim against the Investor Defendants.

As an initial matter, due to the group pleading issues identified above, the Court cannot conclude that Plaintiffs have sufficiently alleged that any of the Investor Defendants, individually, engaged in a pattern of racketeering activity. Moreover, Plaintiffs have not sufficiently alleged that the Investor Defendants received income from a pattern of racketeering activity and *subsequently* invested money in the Alleged RICO Enterprise. *See generally Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639*, 883 F.2d 132, 140 (D.C. Cir. 1989) ("Section 1962(a) prohibits the receipt and a *subsequent* investment of racketeering proceeds into an enterprise.") (emphasis added). In order to state a § 1962(a) claim in their Amended Complaint, Plaintiffs must allege when each Investor Defendant received income from a pattern of racketeering activity; they must clearly identify the pattern of racketeering activity from which the income was derived; and they must plead when each Investor Defendant invested funds in the Alleged RICO Enterprise.

### 4. Plaintiffs' § 1962(d) Claim

Section 1962(d) makes it unlawful for any person to conspire to violate §§ 1962(a), (b), or (c). *See* 18 U.S.C. § 1962(d). Plaintiffs allege that (1) the

Defendants conspired to violate § 1962(c) and (2) the Investor Defendants conspired to violate § 1962(a), each in violation of § 1962(d). (*See* Compl. at ¶¶189-96.)

In order to state their § 1962(d) claim, Plaintiffs must – among other things – plausibly allege all the elements of a substantive RICO violation. *See Heinrich*, 668 F.3d at 411. As discussed above, however, due to the group pleading problems with Plaintiffs' Complaint, the Court cannot determine that Plaintiffs have sufficiently alleged all of the elements of their §§ 1962(c) and 1962(a) claims against each Defendant. Accordingly, in order to state a viable § 1962(d) claim in their Amended Complaint, Plaintiffs must, at a minimum, remedy the pleading deficiencies in at least one of their § 1962(a) or § 1962(c) claims.

## III.   PLAINTIFFS' STATE LAW CLAIMS

### A. Plaintiffs State a Viable Claim Against ViSalus Under Section 3b of the MCPA, M.C.L. § 445.903b, But Plaintiffs' Other MCPA Claims Fail as a Matter of Law (Count III)

#### 1. Plaintiffs State a Viable Claim Under Section 3b of the MCPA, M.C.L. § 445.903b, Only As to ViSalus

Plaintiffs allege that the Defendants offered unregistered business opportunities in violation of M.C.L. § 445.903b. (*See* Compl. at ¶203.) That provision requires the "seller of a business opportunity to … file a notice with the attorney general … if the purchaser pays more than $500.00 in total for the business opportunity from anytime before the date of sale to anytime within 6

58

months after the date of sale."  M.C.L. § 445.903b(1).  By its express terms, this provision applies only to the "seller" of the business opportunity – in this case, ViSalus.[24]  Plaintiffs therefore fail to state § 445.903b claim against all Defendants other than ViSalus.

ViSalus contends that Plaintiffs have not stated a claim pursuant to § 445.903b because they "have not pled that any of them paid more than $500 for the ViSalus [B]usiness [O]pportunity."  (ViSalus Defendants' Mot. at 27, Pg. ID 343.) ViSalus is incorrect.  Plaintiffs allege that they each purchased at least "one $499 IP enrollment."  (Compl. at ¶¶8-10.)  Plaintiffs also allege that when an IP enrolls in the ViSalus Program, the IP is "*automatically subscribed* to Vi-Net Pro plus ViSalus Executive Success Club Subscription for $24/mo."   (Compl. at ¶68 (emphasis added).)  Thus, Plaintiffs have alleged that they paid more than $500 (at least $499 up-front *plus* $24 per month) for the ViSalus Business Opportunity.

ViSalus further argues that Plaintiffs fail to state a § 445.903b claim because Plaintiffs do not allege that they "suffered damages as a result of [ViSalus'] alleged failure to register with the Attorney General."  (ViSalus Defendants' Mot. at 27,

---

[24] Although Plaintiffs allege that certain other Defendants facilitated the sale of the ViSalus business opportunity, the text of the § 445.903b makes clear that the "seller" is the commercial entity that actually sold the business opportunity and not that entity's agents.  For instance, § 445.903b(1)(b) requires that the seller notify the Attorney General of the "name under which the seller intends to do business." This provision makes sense only if the "seller" is the commercial entity – i.e., ViSalus.

Pg. ID 343.)  But Plaintiffs' *do* assert that they suffered damages as a result of all of the alleged violations of the MCPA, including ViSalus' failure to register.  (*See* Compl. at ¶206.)  Whether Plaintiffs can ultimately prove that ViSalus' alleged failure to register caused their damages is another matter.  But at this stage of the litigation, Plaintiffs have stated a viable § 445.903b claim as to ViSalus.

### 2. Plaintiffs Have Failed to State a Claim Under Section 3 of the MCPA, M.C.L. § 445.903

Plaintiffs further allege that the Defendants "used deception, false pretense, misrepresentation, and omitted key facts to induce [P]laintiffs … to enter into an agreement with ViSalus…" in violation of M.C.L. § 445.903.  (Compl. at ¶202.)  That provision prohibits a person from using "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce."  M.C.L. § 445.903(1).

Defendants argue that Plaintiffs' §445.903 claim must be dismissed because that section does not apply to the "purchase or sale of a franchise."  M.C.L. § 445.902(g).  Defendants note that in Plaintiffs' MFIL claim, Plaintiffs expressly allege that Defendants' conduct "constitutes an offering of a franchise" in violation of the MFIL.  (Compl. at ¶233.)  Thus, Defendants argue, "Plaintiffs' allegation that Defendants engaged in the offering of a franchise precludes their claim under

[M.C.L. § 445.903].”   (ViSalus Defendants’ Mot. at 27, Pg. ID 343.)[25]   This argument lacks merit.   At this stage in the proceedings, Plaintiffs may state claims for relief pursuant to both § 445.903 and the MFIL – even if those claims are potentially inconsistent.   *See* Fed. R. Civ. P. 8(d)(3) (“A party may state as many separate claims … as it has, regardless of consistency.”).   Defendants nonetheless insist that dismissal is warranted because Plaintiffs did not expressly state that they pleaded their MCPA and MFIL allegations in the alternative.   (*See* ViSalus Defendants’ Mot. at 27 n. 11, Pg. ID 343.)   But Defendants have cited no binding authority dismissing a claim where, as here, plaintiffs pleaded allegedly-inconsistent claims without expressly indicating that the claims are pleaded in the alternative.

Even though Plaintiffs are permitted to present their § 445.903 claim in the alternative, they have not sufficiently pleaded that claim.   In order to state a claim pursuant to § 445.903, Plaintiffs must “state with particularity the circumstances constituting fraud or mistake,” consistent with Fed. R. Civ. P. 9(b).   *See Burniac v. Wells Fargo Bank, N.A.*, No. 13-12741, 2015 WL 401018, at *17 (E.D. Mich. Jan. 28, 2015); *see also Kiser v. Bank of America, N.A.*, No. 14-585, 2014 WL 6893519, at *6 (W.D. Mich. Dec. 5, 2014)).   Particularity is required here because

---

[25]   The Additional Defendants and iCentris adopt the ViSalus Defendants’ arguments as to each of Plaintiffs’ state law claims.   (*See* Additional Defendants’ Mot. at 16, Pg. ID 301; iCentris Mot. at 14-16, Pg. ID 263.)

Plaintiffs' theory of liability is based on alleged misrepresentations by the Defendants.

To satisfy Rule 9(b), Plaintiffs must specify the allegedly fraudulent statements, identify the speaker, plead when and where the statements were made, and explain what made the statements fraudulent. *See Republic Bank & Trust Co. v. Bear Stearns & Co.*, 683 F.3d 239, 247 (6th Cir. 2012). Plaintiffs have not done so here. Plaintiffs have not specifically identified any particular allegedly-fraudulent statements *that induced them to enroll in the ViSalus Program*. Moreover, while Plaintiffs broadly allege that the Defendants made fraudulent statements to potential IPs, Plaintiffs have not identified the speaker of each statement or when and where the statements were made.[26] (*See, e.g.*, Compl. at ¶202.) In their Amended Complaint, Plaintiffs may attempt to plead with particularity the specific statements that induced them to enroll in the ViSalus Program, the specific Defendants who made those statements, and when and where the statements were made. But as currently pleaded, Plaintiffs' § 445.903 claim does not satisfy Rule 9(b) and therefore fails as a matter of law.

---

[26] Like Plaintiffs' RICO allegations, many of their state law claims suffer from group pleading deficiencies. For instance, Plaintiffs' MCPA allegations lump together "the Defendants" without specifically identifying which of the Defendants engaged in the conduct alleged: "Defendants have violated the MCPA in that they used deception, false pretense, misrepresentation, and omitted key facts to induce [P]laintiffs … to enter into an agreement with ViSalus…." (Compl. at ¶202.)

### 3. Plaintiffs Have Failed to State a Claim Under Section 11 of the MCPA, M.C.L. § 445.911

Plaintiffs also allege that Defendants' participation in the ViSalus Program violated M.C.L. § 445.911.  (*See* Compl. at ¶204.)  That provision prohibits a party from engaging in any:

> method, act, or practice in trade or commerce declared by a circuit court of appeals or the supreme court of the United States to be an unfair or deceptive trade act or practice within the meaning of … 15 U.S.C. § 45(a)(1), in a decision which affirms or directs the affirmance of a cease and desist order issued by the [F]ederal [T]rade [C]omission … and which is officially reported not less than 30 days before the method, act, or practice on which the action is based occurs.

M.C.L. § 445.911(3)(c).

Defendants argue that Plaintiffs fail to state a claim pursuant to § 445.911 because Plaintiffs have not identified a specific federal appellate court decision that satisfies the requirements of the statute.  (*See* ViSalus Defendants' Mot. at 27-28, Pg. ID 343-44.)  Plaintiffs counter that the MCPA does not require them to plead a citation to a specific federal appellate case in their complaint.  (*See* Resp. Br. at 54, Pg. ID 558.)  Plaintiffs insist that the MCPA requires only the "existence" of a case that satisfies the requirements of § 445.911.  (*See id.*)  But Plaintiffs have not identified a single federal appellate case that was officially reported 30 days before Defendants' allegedly-unfair or deceptive acts.  In their Response Brief, Plaintiffs cite *Fed. Trade Comm'n v. Equinox Int'l Corp.*, No. 990969, 1999 WL 1425373

(D. Nev. Sept. 14, 1999). (*See id.*)  But *Equinox* was an *unreported* decision by a federal *district* court.   At oral argument, Plaintiffs attempted to rely on *BurnLounge, supra*. (*See* Tr. at 99, Pg. ID 874.)  But *BurnLounge* was officially reported in 2014, *after* Plaintiffs allegedly enrolled in the ViSalus Program in 2012 or 2013.  Plaintiffs therefore fail to state a § 445.911 claim.

### B. Plaintiffs Fail to State a Claim for Unjust Enrichment (Count V)

In Count V, Plaintiffs bring an unjust enrichment claim against the Ropart Entities, the Individual Insider Defendants, the IP Defendants, and the Corporate Promoter Defendants.[27] (*See* Compl. at ¶¶207-15.)  Plaintiffs allege that these Defendants were unjustly enriched in connection with Plaintiffs' participation in the ViSalus Program. (*See id*.)  Specifically, Plaintiffs contend that these Defendants "have been unjustly enriched at the expense of, and to the detriment of, [P]laintiffs … in that the financial benefits derived by them as a result of the pyramid scheme rightfully belong to Plaintiffs…." (*Id.* at ¶210.)

To state a claim of unjust enrichment, a plaintiff must allege "(1) the receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the

---

[27]   Although Plaintiffs initially purported to bring their unjust claim against ViSalus as well, Plaintiffs acknowledge in their Response Brief that they cannot maintain an unjust enrichment claim against ViSalus because their purchases of the ViSalus Business Opportunity are governed by express contracts, and unjust enrichment is not actionable between parties to a contract. (*See* Resp. Br. at 58, Pg. ID 562.)

plaintiff because of the retention of the benefit by the defendant." *Morris Pumps v. Centerline Piping, Inc.*, 729 N.W.2d 898, 904 (Mich. Ct. App. 2006). Here, the Defendants seek dismissal of Plaintiffs' unjust enrichment claim on only one ground:

> Plaintiffs have not pled that *they* conferred any benefit upon [the Ropart Entities, the Individual Insider Defendants, the IP Defendants, and the Corporate Promoter Defendants]. Rather, Plaintiffs seek the return of monies that *ViSalus* allegedly plaid to various individuals. Such payments do not support an unjust enrichment claim. *See Karaus v. Bank of N.Y. Mellon*, 831 N.W.2d 897, 906 (Mich. Ct. App. 2012) ("[T]he mere fact that a third person benefits from a contract between two other persons does not make such third person liable in quasi-contract, unjust enrichment, or restitution)".

(Additional Defendants' Reply Br. at 8, Pg ID 693 (emphasis in original).)

Defendants have not established that they are entitled to dismissal on this ground. The sole case that Defendants cite, *Karaus*, is readily distinguishable. In that case, a homeowner borrowed money from a bank to finance construction on his house and, in return, the homeowner granted a mortgage to the bank. The plaintiff performed construction work on the home, but the homeowner did not pay the plaintiff in full. The plaintiff then brought an unjust enrichment claim against the bank that held the mortgage. The Michigan Court of Appeals affirmed judgment in favor of the bank on the ground that the bank did not obtain a benefit directly from the plaintiff. *See Karaus*, 831 N.W.2d at 906. The court noted that

the bank was "completely uninvolved" with the agreement between the plaintiff and the homeowner, and it found no evidence that the bank "requested any of the work performed by plaintiff or misled plaintiff to receive any benefit." *Id.* Thus, the plaintiff in *Karaus* did *not* demonstrate – as the Plaintiffs allege here – that the defendant indirectly received a benefit from the plaintiff through its participation in, or knowledge of, a fraudulent scheme. *Karaus* does not stand for the proposition that a plaintiff may prevail against a defendant on an unjust enrichment theory only if the plaintiff directly conferred a benefit upon the defendant. On the contrary, the court in *Karaus* recognized the possibility that a plaintiff may recover from a defendant upon whom he did not confer a benefit if the defendant has engaged in misleading conduct that led to the plaintiff's loss. *See id.* ("A third party is not unjustly enriched when it receives a benefit from a contract between two other parties, *where the party benefited has not requested the benefit or misled the other parties*.") (emphasis added) (internal citation omitted). Moreover, "[n]umerous cases have held that a benefit may be unjustly obtained by a defendant through an intermediary, especially if there is some wrongdoing on the defendant's part." *Hoving v. Transnation Title Ins. Co.*, 545 F.Supp.2d 662, 670 (E.D. Mich. 2008) (collecting cases). Accordingly, Defendants have not shown that Plaintiffs fail to state an unjust enrichment claim on this basis.

66

Nonetheless, in light of Plaintiffs' overly broad and vague allegations and the group pleading problems discussed above, it is impossible for the Court to determine that Plaintiffs have sufficiently pleaded an unjust enrichment claim as to the Ropart Entities, the Individual Insider Defendants, the IP Defendants, and/or the Corporate Promoter Defendants.  In order to state an unjust enrichment claim against these Defendants, Plaintiffs must plausibly allege that each Defendant was unjustly enriched *at plaintiff's expense*.  *See, e.g.*, Restatement (Third) of Restitution and Unjust Enrichment § 1 (2011) ("A person who is unjustly enriched *at the expense of another* is subject to liability….") (emphasis added);  *Kalamazoo River Study Group v. Rockwell Int'l*, 3 F.Supp.2d 815, 818 (E.D. Mich. 1997) ("Th[e] causation requirement is an essential element of [plaintiff's] [unjust enrichment] claim[]….  [U]njust enrichment … require[s], at a minimum, proof of causation….").[28]  If Plaintiffs choose to plead an unjust enrichment claim in their Amended Complaint, they must, among other things, sufficiently allege a

---

[28]  *See also Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 936-37 (3d Cir. 1999) (refusing to allow unjust enrichment claim for lack of causation where plaintiff could not show causation under RICO or common-law tort); *Fairfield Ready Mix v. Walnut Hills Assocs., Ltd.*, 572 N.E.2d 114, 116 (Ohio Ct. App. 1988) ("[T]he concept of unjust enrichment includes not only loss on one side but gain on the other, with a tie of causation between them.") (internal citation omitted).  Although not applying Michigan law, these cases may be instructive on the issue of causation as it pertains to a claim of unjust enrichment.

connection between each Defendant's actions and enrichment, on one hand, and Plaintiffs' losses on the other hand.

## C. Plaintiffs Fail to State a Claim for Common Law and Statutory Conversion Claims against All Defendants *Except* for ViSalus (Count VI)

In Count VI, Plaintiffs allege that the Defendants committed statutory and common law conversion by "wrongfully exert[ing] dominion over [P]laintiffs' funds." (Compl. at ¶¶219, 221.)  Common law conversion is "any distinct act of dominion wrongfully exerted over another person's personal property in denial of or inconsistent with his rights therein."  *Thoma v. Tracy Motor Sales, Inc.*, 104 N.W.2d 360, 362 (Mich. 1960).  Michigan's conversion statute prohibits both common-law conversion and knowing receipt of converted property.  *See* M.C.L. § 600.2919a(1)(a) (prohibition on "converting property to the other person's own use" and "receiving, possessing, [or] concealing … converted property when the person … kn[ows] that the property [i]s … converted."  M.C.L. § 600.2919a(1)(a).

Michigan law distinguishes between claims involving the alleged conversion of money and the alleged conversion of other property.  *See, e.g.*, *Lawsuit Fin., LLC v. Curry*, 683 N.W.2d 233, 241 (Mich. Ct. App. 2004); *Sudden Svc., Inc. v. Brockman Forklifts, Inc.*, 647 F.Supp.2d 811, 815 (E.D. Mich. 2008).  A claim for the conversion of money is available only in very narrow circumstances.  *See id.* Specifically, in order to state a claim for conversion of money, a plaintiff must

68

allege that the defendant had "an obligation to return [certain] specific money entrusted to his care." *Head v. Phillips Camper Sales & Rental, Inc.*, 593 N.W.2d 595, 603-04 (Mich. Ct. App. 1999).

Plaintiffs' conversion claims are based on their allegations that they paid money to ViSalus and that ViSalus ultimately distributed money to each of the Defendants.  (*See* Compl. at ¶¶219, 221.)  As to all of the Defendants other than ViSalus, therefore, Plaintiffs' theory of liability is that they knowingly received payments from ViSalus that *might* have been comprised of Plaintiffs' funds.  That is not sufficient to state a claim for the conversion of money.  Indeed, Plaintiffs do not allege that any of those Defendants received the "specific money" that Plaintiffs had paid to ViSalus.  And it is difficult to see how Plaintiffs *could* allege the receipt of "specific money" by any Defendant (other than ViSalus) under the circumstances here.  Accordingly, Plaintiffs fail to state conversion claims against all Defendants other than ViSalus.

ViSalus argues that Plaintiffs have not stated conversion claims against it because Plaintiffs consented to the transactions in which ViSalus obtained their funds.  (ViSalus Defendants' Mot. at 30, Pg. ID 346).)  Not so.  The crux of Plaintiffs' conversion claims is that the ViSalus obtained Plaintiffs' money through the use of a fraudulent scheme.  "Consent to possession of [property] obtained by fraud … is not effective to prevent recovery … for conversion."  Restatement

69

(Second) Torts, § 252A.  ViSalus therefore cannot defeat Plaintiffs' conversion claims on the ground that Plaintiffs consented to parting with their money.

ViSalus may have viable defenses to Plaintiffs' conversion claims, and it may ultimately prevail on those claims.  But, at this stage, ViSalus has not established that Plaintiffs' conversion claims fail as a matter of law.

### D. Plaintiffs Fail to State a Claim for Civil Conspiracy (Count VII)

In Count VII, Plaintiffs allege that Defendants engaged in a civil conspiracy to profit by way of a pyramid scheme.  (*See* Compl. at ¶225.)  A civil conspiracy is "a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means."  *Urbain v. Beierling*, 835 N.W.2d 455, 463 (Mich. Ct. App. 2013).  Importantly, "a claim for civil conspiracy may not exist in the air; rather, it is necessary to prove a separate, actionable tort."  *Advocacy Org. for Patients and Providers v. Auto Club Ins. Ass'n*, 670 N.W.2d 569, 580 (Mich. Ct. App. 2003). Accordingly, where a plaintiff has not separately pleaded a viable tort claim, dismissal of the plaintiff's civil conspiracy claim is appropriate.  *See id.*

The Court cannot conclude that Plaintiffs have sufficiently pleaded a civil conspiracy claim.  For the reasons discussed above, even reading the Complaint in the light most favorable to Plaintiffs, it is not clear that Plaintiffs have stated a separate, actionable tort as to each Defendant.  The group pleading problems in

70

Plaintiffs' Complaint, and Plaintiffs' failure to adequately plead the alleged underlying torts as to each Defendant, are fatal to their civil conspiracy claim. Plaintiffs may attempt to correct these defects in their Amended Complaint.

### E. Plaintiffs Have Stated Viable Claims Pursuant to the MFIL as to Certain Defendants (Count VIII)

In Count VIII, Plaintiffs allege that Defendants violated four provisions of the MFIL. Plaintiffs have stated viable claims under each provision, but only as to certain Defendants.

#### a. *Plaintiffs' MFIL §§ 13, 25, and 28 Claims*

Plaintiffs first allege that Defendants violated §§ 13, 25, and 28 of the MFIL. *See* M.C.L. §§ 445.1513, 445.1525, 445.1528. Section 13 prohibits the offer or sale of a franchise if the franchisor's business methods include illegal activities. *See* M.C.L. § 445.1513(a). Section 25 proscribes any person from "publishing an advertisement concerning the offer or sale of a franchise … if the advertisement contains a statement that is false or misleading…." M.C.L. § 445.1525. Section 28 prohibits a person from offering or selling "any form of participation in a pyramid or chain promotion." M.C.L. § 445.1528(a)(1). Under § 28, a pyramid or chain promotion includes "any plan or scheme or device by which … a participant gives a valuable consideration for the opportunity to receive compensation or things of value in return for inducing other persons to become participants in the program…." *Id.*

71

The parties agree that Plaintiffs can state a claim for rescission pursuant to §§ 13, 25, and 28 of the MFIL. (*See* ViSalus Defendants' Mot. at 32, Pg. ID 348; Additional Defendants' Mot. at 16, Pg. ID 301; Resp. Br. at 54-57, Pg. ID 558-61.)[29] Plaintiffs, however, have stated such a claim only as to ViSalus. In order to state a rescission claim, Plaintiffs must allege the existence of a contract. *Cf. Vowels v. Arthur Murray Studios of Michigan, Inc.*, 163 N.W.2d 35, 38 (1968) ("Rescission necessarily involves a repudiation of [a] contract…."). ViSalus is the only Defendant with whom Plaintiffs allege that they entered an agreement. (*See* Resp. Br. at 58, Pg. ID 562 (acknowledging that Plaintiffs do not have a contract with any Defendant except ViSalus).) Accordingly, the Court will dismiss Plaintiffs' §§ 13, 25, and 28 claims as to all Defendants except for ViSalus.

### b. Plaintiffs' MFIL § 5 Claim

Plaintiffs' Complaint also contains a claim pursuant to § 5 of the MFIL. Section 5 contains two separate prohibitions that are relevant in this action. Section 5(a) proscribes a person from "employ[ing] any device, scheme, or artifice to defraud" in connection with the filing, offer, sale, or purchase of any franchise. M.C.L. § 445.1505(a). Section 5(b) prohibits a person from "mak[ing] any untrue statement of a material fact" in connection with the filing, offer, sale, or purchase

---

[29]   Plaintiffs do not dispute that rescission is their only remedy for the alleged violations of §§ 13, 25, and 28. (*See* Resp. Br. at 54-57, Pg. ID 558-61.)

of any franchise.  M.C.L. § 445.1505(a).  Here, Plaintiffs allege that Defendants violated § 5(a).  (*See* Resp. Br. at 55, Pg. ID 559 (clarifying that Plaintiffs' first MFIL claim is pursuant to section 5(a)).)  That is, Plaintiffs allege that Defendants engaged in a "scheme to defraud," *not* that they made specific untrue statements.

The ViSalus Defendants and Additional Defendants contend that Plaintiffs fail to state a § 5(a) claim because Plaintiffs have not alleged that they relied on statements by the Defendants in connection with the offer, sale, or purchase of the ViSalus Business Opportunity.  (*See* ViSalus Defendants' Mot. at 32, Pg. ID 348; Additional Defendants' Mot. at 16, Pg. ID 301.)  But the cases that Defendants cite in support of their position that § 5 requires a showing of reliance each involved claims under § 5(b).  (*See* ViSalus Defendants' Mot. at 32, Pg. ID 348 and Additional Defendants' Reply Br. at 9, Pg. ID 694 (citing *Aron Alan, LLC v. Tanfran, Inc.*, 240 Fed. App'x 678 (6th Cir. 2007) and *Cook v. Little Caesar Enterprises, Inc.*, 972 F.Supp. 400 (E.D. Mich. 1997)).)  Defendants have not cited any authority establishing that reliance is a necessary element of a § 5(a) claim.  And it is at least plausible that a plaintiff could prevail under § 5(a) even if he or she did not rely on specific fraudulent statements.  *Cf. Bridge*, 553 U.S. at 648-49 (recognizing that a person may be liable for executing a scheme to defraud "even if no one relied on any misrepresentation").  Accordingly, the ViSalus Defendants

73

and Additional Defendants have not demonstrated that they are entitled to dismissal of Plaintiffs' § 5(a) claim.

As with the rest of Plaintiffs' MFIL claims, iCentris argues that Plaintiffs fail to state a § 5(a) claim against iCentris because Plaintiffs have not plausibly alleged that iCentris used a device, scheme, or artifice to defraud in connection with the ViSalus Program.  (iCentris Mot. at 15, Pg. ID 262.)  The Court agrees. Plaintiffs' § 5(a) claim will be dismissed as to iCentris.

### F. Plaintiffs Fail to State Claims for an Accounting and a Constructive Trust (Count IX)

In Count IX of the Complaint, Plaintiffs seek an accounting and the imposition of a constructive trust.  Plaintiffs insist that "[a]n accounting is necessary to identify the full amount of the[ir] loss."  (Compl. at ¶241.)  Plaintiffs further insist that a constructive trust is necessary to prevent Defendants from being unjustly enriched.  (*See* Compl. at ¶238.)  Defendants counter that Plaintiffs have not alleged facts that establish their entitlement to an accounting or a constructive trust.  Defendants are correct.

#### 1. Accounting

"An accounting is an extraordinary equitable remedy and is only available when legal remedies are inadequate."  *McDonald v. Green Tree Servicing, LLC*, No. 13-12993, 2014 WL 1260708, at *8 (E.D. Mich. Mar. 27, 2014) (citing *Bradshaw v. Thompson*, 454 F.2d 75, 79 (6th Cir. 1972)).  "A plaintiff may bring

74

an action for accounting if the plaintiff is uncertain of the amounts he or she is entitled to recover." *Miller v. Laidlaw & Co. Ltd.*, No. 11-12086, 2012 WL 1068705, at *13 (E.D. Mich. Mar. 29, 2012) (citing *Basinger v. Provident Life & Accident Ins. Co.*, 239 N.W.2d 735, 738 (Mich. Ct. App. 1976)).  "Accounting is inappropriate when discovery could determine the amounts at issue." *Id.* (citing *Basinger*).  Indeed, "[i]n light of the broad discovery available to litigants, accounting actions are of dubious utility." *Gen. Ret. Sys. Of City of Detroit v. Onyx Capital Advisors, LLC*, No. 10-11941, 2011 WL 4528304, at *13 (E.D. Mich. Sept. 29, 2011) (citing *Digital 2000, Inc. v. Bear Commc'ns, Inc.* 130 Fed. App'x 12, 22 (6th Cir. 2005)).

Here, Plaintiffs have not alleged that they would be unable to determine the amount of their alleged losses through discovery.  To the contrary, Plaintiffs admit that "[t]he software that iCentris designed … is able to track each transaction, including the payments made by every Plaintiff and the [purported] class, and from there to a specific corporate or individual defendant."  (Resp. Br. at 60, Pg. ID 564.)  Under these circumstances, Plaintiffs have not stated a claim for the "extraordinary" remedy of an accounting.

## 2. Constructive Trust

Plaintiffs cannot state a claim for a constructive trust "because no independent cause of action for constructive trust exists." *Dingman v. OneWest*

*Bank, FSB*, 859 F.Supp.2d 912, 921 (E.D. Mich. 2012). "[A] constructive trust is merely a remedy." *Id.* (citing *Gaymar Indus., Inc. v. FirstMerit Bank, N.A.*, 311 Fed. App'x 814, 817 (6th Cir. 2009)); *see also Brown-Smith v. Bank of America Corp.*, No. 10-14161, 2011 WL 653642, at *6 (E.D. Mich. Feb. 14, 2011) (collecting cases) ("A constructive trust is a remedy, not a cause of action. That count therefore cannot survive."). Accordingly, Plaintiffs fail to state a claim for a constructive trust.

## CONCLUSION

For all of the reasons discussed in this Opinion and Order, **IT IS HEREBY ORDERED** that iCentris' Motion to Dismiss (ECF #35) is **GRANTED** and the ViSalus Defendants' and Additional Defendants' Motions to Dismiss (ECF ##36-37) are **GRANTED IN PART** and **DENIED IN PART**, as outlined above.

**IT IS FURTHER ORDERED** that Plaintiffs shall file an Amended Complaint in this action by no later than July 10, 2015. In their Amended Complaint, Plaintiffs may attempt to correct any and all pleading deficiencies identified above. Plaintiffs may also amend their Complaint in any other ways they see fit.

**IT IS FINALLY ORDERED** that if Plaintiffs plead RICO claims in their Amended Complaint, they must attach as an Appendix to their Amended Complaint a completed chart in the form attached to this Opinion and Order.

76

Given the large number of Defendants and the complexity of the Plaintiffs' allegations, the Court believes that such an Appendix is necessary to allow the Court to understand and evaluate Plaintiffs' claims.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  June 12, 2015

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on June 12, 2015, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(313) 234-5113

# APPENDIX

## IDENTIFY THE NUMBERED PARAGRAPHS IN THE AMENDED COMPLAINT THAT ALLEGE...

| | This specific Defendant committed at least two predicate acts amounting to a pattern of racketeering activity and that describe the predicate acts | This specific Defendant participated in the operation or management of the RICO enterprise and that describe the nature of the participation | This specific Defendant's predicate acts proximately caused Plaintiffs' alleged injuries and that describe the nature of the causation | This specific Defendant received income from a pattern of racketeering activity; the pattern of racketeering activity from which the Defendant derived the income; when the Defendant received the income; and when the Defendant invested the income into the RICO enterprise (if Defendant is alleged to have violated § 1962(a)) | This specific Defendant entered into an agreement to commit a substantive RICO violation; that evidence the agreement; and that describe the nature of the agreement (if Defendant is alleged to have violated § 1962(d)) |
|---|---|---|---|---|---|
| Defendant A | ¶¶5, 8, 10 | | | | |
| Defendant B | | | | | |
| Defendant C | | | | | |
| Etc. | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |