UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY KERRIGAN, LORI MIKOVICH and
RYAN M. VALLI, individually, and on behalf of all
others similarly situated,

       Plaintiffs,

vs.

VISALUS, INC., a corporation,

and

NICK SARNICOLA, ROBERT GOERGEN, SR., TODD
GOERGEN, RYAN BLAIR, BLAKE MALLEN, FRANK VARON,
KYLE PACETTI, JR., MICHAEL CRAIG, TIMOTHY KIRKLAND, HOLLEY
KIRKLAND, AARON FORTNER, RACHEL JACKSON,
TARA WILSON, ANTHONY LUCERO, RHONDA LUCERO,
JAKE TRZCINSKI, GARY J. REYNOLDS, KEVIN MERRIWEATHER,
domestic individuals,

and

ROPART ASSET MANAGEMENT FUND, LLC,
ROPART ASSET MANAGEMENT FUND II, LLC,
ROCK RIDGE ASSET MANAGEMENT COMPANY, LLC,
ROPART ASSET MANAGEMENT, LLC, LIVING TRUST DATED 9/30/1991
F/B/O ROBERT B. GOERGEN, OCD MARKETING, INC., HASHTAG ONE,
LLC, POWER COUPLE, INC., ARRIVEBY 25, INC., BAM VENTURES, INC.,
JASON O'TOOLE INTERNATIONAL HOLDINGS, INC.,
GOODER, LLC, RED LETTERS, LLC, M-POWER PATH, INC.,
A BERRY GOOD LIFE, INC., NETWORK DYNAMICS AMERICA CORP.,
FREEDOM LEGACY, LLC, RESIDUAL MARKETING, INC., GOT HEART
GLOBAL, INC., JAKETRZ, INC., MOJOS LEGACY, LLC
and BEACHLIFESTYLE ENTERPRISES, LLC.

Case No. 2:14-cv-12693
Hon. Matthew F. Leitman

**THIRD AMENDED
COMPLAINT
AND JURY DEMAND**

and

WEALTH BUILDER INTERNATIONAL LLC, a foreign
limited liability company,
PROSPEX AUTOMATED WEALTH SYSTEMS, INC., and
9248-2587 QUEBEC, INC., foreign corporations,

and

JASON O'TOOLE, a foreign individual, and
LORI PETRILLI, a foreign individual

        Defendants.
_____/

SOMMERS SCHWARTZ, P.C.                PREBEG, FAUCETT & ABBOTT, PLLC
Andrew Kochanowski (P55117)          Matthew J.M. Prebeg
Sarah L. Rickard (P78767)            (TX State Bar No: 00791465)
Lance C. Young (P51254)              Brent T. Caldwell
Attorneys for Plaintiffs             (TX State Bar No: 24056971)
One Towne Square, Suite 1700         Attorneys for Plaintiffs
Southfield, MI 48076                 8441 Gulf Freeway, Suite 307
(248) 355-0300                       Houston, TX 77017
akochanowski@sommerspc.com           (832) 743-9260
srickard@sommerspc.com               mprebeg@pfalawfirm.com
lyoung@sommerspc.com                 bcaldwell@pfalawfirm.com

WEXLER WALLACE LLP
Edward A. Wallace (IL Reg. No. 6230475)
Attorneys for Plaintiffs
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
(312) 589-6272
EAW@wexlerwallace.com

_____/

## INTRODUCTION

1.    This action arises out of a pyramid scheme perpetrated by a modern, Internet-savvy company peddling powdered weight-loss shakes. Well over 100,000 innocent people paid the scheme up to $999 for the "business opportunity" to become distributors, or Independent Promoters ("IPs"), for a soy protein and sucralose concoction. The vast majority lost their money. The pyramid was operated by a Troy, Michigan company called ViSalus, Inc. ("ViSalus"). While it sponsored "Challenge Parties" for people to buy shakes that tasted like "cake mix," the company's real goal was for people to become "distributors", to buy its weight-loss concoction and recruit others to do the same. The hook here, as with so many pyramid schemes, was the lure of lots of money for getting others in the door, then for those others to do the same on down the line, each new recruit paying for the right to recruit others.  As with every pyramid scheme, the money from new entrants paid those at the top. As with every pyramid scheme, after a burst of new recruits, the scheme collapsed. And as with every other pyramid scheme, the scheme's promoters got rich on other people's money.

2.    When it opened its doors the company announced:

> Prosperity is something that everyone hopes for. Unfortunately, many individuals never find a vehicle that is simple, easily learned, has little risk, and still has the potential to be extremely lucrative. With the ViSalus business opportunity, every single

1

person with a strong desire now has a documented vehicle that can drive them to their goal or vision. …With extraordinary ViSalus products channeling through such a lucrative compensation plan, this vehicle is truly a life changing opportunity. ….... Click on the link below and see just how quickly you can have your own income generating machine!

3.     The company is operated by three veterans of chain sales schemes. ViSalus was also financed by a Greenwich, Connecticut investment banker and his family's private equity company, each of whom became intimately involved in the scheme's operation. The common "business opportunity" pitched by these hucksters was visions of large checks, a shiny new BMW, and a fancy vacation. In reality these luxuries existed only for the company insiders and those willing to convince other people to pay the company money. The only way a distributor could make money was to recruit others. Not surprisingly, the company mostly sold its shakes to its new distributors, who in turn tried to find others to duplicate the transaction. A pyramid scheme only works when enrollees in the "business opportunity" in turn recruit other people into the pyramid.  The scheme's promoters can then tout the number of people who have "joined the program" as proof that there is huge demand for the product. To attract innocent people, ViSalus used a host of professional pyramid scheme recruiters, then touted their "success" at getting million dollar commissions— commissions that weren't actually paid.

2

4.    The scheme's promoters knew that the vast majority of the new "distributors" would drop out and their enrollment fees and whatever sales are made to them would fund the payments to those at the top of the pyramid. The scheme depends on the drop-out rate of new recruits, since there isn't enough money to pay everyone. Like a Ponzi scheme, this pyramid used the money paid by new recruits to pay-off the recruiters and the promoters until the growth of the new recruits in the United States stopped. The scheme is now busy in Canada and Europe hoping to find new recruits in those markets.

5.    The ViSalus pyramid scheme operated for a number of years. In 2008 the scheme almost collapsed, but after an influx of money from the controlling owner family of Blyth, Inc., ViSalus obtained the means to expand. Beginning in 2009, and continuing until the market became saturated and essentially collapsed again in 2013, the company, its promoters and professional recruiters worked frenetically to recruit hundreds of thousands of others to become promoters of the ViSalus "business opportunity."  Among the ones recruited by the scheme were the three Plaintiffs in this case.

6.    The scheme attracted well over 500,000 "promoters" for the company. The professional marketers who recruited huge "teams" of unsuspecting people have

3

been promised millions of dollars in "commissions." After touting absurd numbers throughout the Internet, posting hundreds of "interviews" and YouTube videos showing off the millions of dollars allegedly being made in the business, the pyramid began collapsing in the third quarter of 2012. Knowing that the pyramid was collapsing, the inside principals and the investors who helped fund it pulled out over $140 million profits from the enterprise.

7.    Pyramid schemes are illegal. The individual Plaintiffs named in this action, individually and on behalf of a class of similarly situated individuals, file this amended complaint against the defendants for damages and other relief under RICO and state law claims to recover their losses and to stop these defendants from perpetuating this scheme on others.

### THE PARTIES

### PLAINTIFFS

8.    Plaintiff, Timothy Kerrigan ("Kerrigan"), is an individual residing in Northville, Michigan. On two separate occasions Kerrigan was presented with an "income opportunity" to sell ViSalus weight-loss shakes. The first took place in San Diego, California. The meeting was a ViSalus summer "kicker" meeting attended by 15,000 to 20,000 people. The second meeting took place in Orlando, Florida in 2013.

The Orlando meeting featured testimonials, awards for achieving "ranking" status within the distributorship chain, and speakers like Defendant Nick Sarnicola's wife, Ashley Sarnicola. The meeting featured, among other things, Ms. Sarnicola's asking the prospective distributors to imagine what it would be like to walk out in front of "20,000 people" attending the recent ViSalus Miami convention as a 5-Star "ViSalus Ambassador."

9.    Kerrigan was part of the huge wave of IP's recruited by the Defendants in a push to try and spin ViSalus off into an IPO in late 2013.  At both meetings attended by Kerrigan, ViSalus made presentations that touted the visions of free black BMW's and six-figure "income opportunities" or "business opportunities." The presentations did not plainly disclose that ViSalus was a multi-level-marketing company, and made no mention of the fact that it could be (or was) a pyramid scheme. Both times Kerrigan was presented with the opportunity to purchase the weight-loss shakes and also pitched an opportunity to pay additional money to become a ViSalus promoter. The IP opportunity was presented three ways, as a $49 "basic" package, the $499 "Executive" package, and the $999 "Executive + samples" package. All of these were coupled with autoship programs to purchase ViSalus products, and a back-office website that incurred a monthly fee.

10. A ViSalus distributor Compensation Plan ("Your Guide To Prosperity…Welcome To Financial Freedom," **Exhibit A**) was made available to Kerrigan at the presentations and through the ViSalus website. The Compensation Plan is also coupled with advertisements and illustrations made in additional materials such as **Exhibit B**. In addition, the shows attended by Kerrigan featured presentations touting the business opportunity that being a ViSalus distributor meant to prospective enrollees like himself. Kerrigan became aware of pertinent portions of the Compensation Plan by reading the Plan or by explanations of the Compensation Plan provided to him at the presentations. Neither the Compensation Plan nor any of the presentations seen by Kerrigan mentioned that ViSalus was operating an illegal pyramid scheme. In reliance upon the representations and/or omissions in the Compensation Plan, and the related "business opportunity" set out in the presentations, in 2013 Kerrigan purchased two $499 IP enrollments and for a period of time was a ViSalus IP. Had Kerrigan been informed that the business he was paying for by participating in the Compensation Plan was part of a pyramid scheme, he would not have made the purchase of the distribution rights or any successive payments made to ViSalus to maintain such rights.

11. After his initial $499 enrollment, Kerrigan realized that in order to keep being an "active" promoter, and get paid whatever "income opportunities" were being

6

touted, he needed to recruit other people into the system. He re-enrolled, as he was instructed to, and again paid ViSalus $499 to become a promoter. Kerrigan did not realize, either at the time of the meetings or during the time period that he re-enrolled that the only way in which he could earn money was to participate in an illegal pyramid scheme and recruit other people with the false promise of wealth. Upon information and belief, like all Michigan-based IP's who purchased the promoter rights from ViSalus, Kerrigan was placed in a distribution "level" operated by Defendant Nick Sarnicola. Kerrigan lost money as an IP.

12.    Plaintiff, Lori Mikovich ("Mikovich"), is an individual residing in Livonia, Michigan. Mikovich was shown the opportunity to sell ViSalus weight-loss shakes. Mikovich attended a "Body By Vi" regional invitational meeting organized by ViSalus at a hotel near the Detroit airport sometime in 2013. She, like the other Plaintiffs, was presented with the opportunity to purchase the weight-loss shakes and also pitched a "business opportunity" to pay additional money to become a ViSalus promoter:  one of the topics that invitees were told to expect to be covered was "learn how to earn income as a Distributor." The presentations referred to making income eight different ways, similar to a "ViSalus Business Opportunity" video published by Defendant Blake Mallen, at the same general time as Mikovich attended the Detroit-area meeting, and the presentations made on the ViSalus website that, in part showed:

7

**Earn Income 8 Different Ways**

1. **Personal Customer Commissions** - up to 25% paid on all personal purchases & customers. Personal customer referrals count as your customers! First 10% paid weekly. Balance paid monthly. The more customers you have, the more you can earn.
2. **First Order Bonus** - Earn more on the products purchased by n Associates upon enrollment.
3. **Fast Start Bonus** - Paid on product within Executive Success System
4. **Rising Star Enroller's Pool** - Enroll with an ESS and achieve Director in your first 30 days to become a Rising Star and qualify earn from ViSalus' total company revenue every week!
5. **BMW Bonus** - $600 per month Black BMW Car bonus
6. **Team Commissions** - Paid up to 8 Generations in depth. Reac Ambassador to unlock the Infinity Bonus.
7. **Leadership Pool** - Earn a percentage of ViSalus' total company revenue
8. **Ambassador Star Bonus** - Paid from Vi-Net Pro/SUCCESS Subscriptions

**Get Paid Weekly & Monthly!**

- Bonuses for new production are paid weekly! From Friday 12:01 PST - Thursday at midnight PST - Get paid on Monday!
- Monthly Commissions sent on the 15th for the previous month.
- Receive your commissions via check or the ViSalus Prosperity Card.

**Team Building Advantages**

The presentations there made no mention of the fact that ViSalus was a pyramid scheme.

13.     Mikovich was presented with three "promoter" packages, a $49 "basic" package, the $499 "Executive" package, and the $999 "Executive + samples" package.

14.     As part of the sales pitch, Mikovich was given and/or presented with the Compensation Plan. She became aware of pertinent portions of the Compensation Plan by reading the Plan and by explanations of the Plan provided to her at the

8

meeting organized by ViSalus. Mikovich relied upon the Compensation Plan to become a distributor, and paid ViSalus $499 to become an IP. Additionally, she enrolled in the website program. She was placed in Kerrigan's "downline," and therefore was "downline" from Defendant Sarnicola. After her initial $499 enrollment, Mikovich realized that in order to keep being an "active" promoter, and get paid whatever "income opportunities" were being touted, she needed to recruit other people into the system. She attempted to cancel her "automatic" $24.95 per month website, but was unable to for a period of time. Mikovich lost money as an IP. Had Mikovich been informed that the business opportunity she was purchasing was part of a pyramid scheme, she would not have made her purchases. Mikovich was charged for several months of monthly website charges before Defendant ViSalus finally canceled the monthly charge.

15.   Plaintiff, Ryan M. Valli ("Valli"), is an individual residing in Canton, Michigan. Valli, a friend of Mikovich, attended the same meeting as Mikovich and was also shown the opportunity to become a promoter to sell ViSalus weight-loss shakes. He, like the other Plaintiffs, was not only presented with the opportunity to purchase the weight-loss shakes, but was pitched a "business opportunity" to pay additional money to become a ViSalus promoter. Valli relied upon pertinent portions of the Compensation Plan, including the misrepresentations and/or omissions relating

9

to the ViSalus opportunity not being a pyramid scheme. For a period of time in 2013 Valli became an IP. He was placed "downline" from Kerrigan and was therefore "downline" from Defendant Sarnicola. After his initial $499 enrollment, Valli realized that in order to keep being an "active" promoter, and get paid whatever "income opportunities" were being touted, he needed to recruit other people into the system. Upon information and belief, Valli was charged for several months of monthly website charges before ViSalus finally canceled the monthly charge. Valli lost money as an IP. Had Valli been informed that the business opportunity he was purchasing was part of a pyramid scheme, he would not have made his purchases.

## DEFENDANTS

## CORPORATE DEFENDANTS

16.    Defendant, ViSalus, Inc. ("ViSalus") is a Nevada corporation headquartered in Troy, Michigan, where it maintains a "Global Headquarters" and several hundred employees.  ViSalus originally incorporated in 2005 as a California corporation named FVA Ventures, Inc. FVA Ventures represented itself to the public as "ViSalus Sciences," from 2005 to approximately 2010, and thereafter as "ViSalus." FVA Ventures merged into the Nevada corporation on September 14, 2012. The merged entity has continued operating as ViSalus since that time.

10

17.     Defendants (1) Ropart Asset Management Fund, LLC ("Ropart Asset I") a Delaware limited liability company, (2) Ropart Asset Management Fund II, LLC ("Ropart Asset II") a Delaware limited liability company, Rock Ridge Asset Management Company, LLC, a Delaware limited liability company ("Rock Ridge"), and (4) Ropart Asset Management, LLC, a Delaware limited liability company ("Ropart Asset Management"), are each companies who invested in, then operated, managed and profited from the ViSalus scheme. Ropart Asset I and Ropart Asset II are owned and controlled by Defendant Robert Goergen, Sr. and managed by Defendant Todd Goergen through Rock Ridge and Ropart Asset Management. (Hereafter, unless specified, all of these companies will be referred to collectively as "RAM.")  They are headquartered in Greenwich, Connecticut. RAM's connection to the enterprise described herein is as an investor in ViSalus, as a provider of management and strategic advice to enable the scheme to operate and grow, as a lender of funds, and through its membership on ViSalus board of directors and eventual management of the enterprise.

18.     Defendant Robert Goergen, Sr. ("Robert Goergen Sr.") is an individual residing in Connecticut, a former investment banker, and formerly the CEO of Blyth, Inc.  Robert Goergen Sr. has transacted business in Michigan since at least 2005 at least in part through his association with ViSalus.

11

19.    Defendant "Living Trust dated 9/30/1991 f/b/o Robert B. Goergen" ("Trust") is a Connecticut entity which at all times relevant transacted financial transactions for the benefit of Robert Goergen, Sr. Trust is operated by its trustees Robert B. Goergen, Sr., Robert B. Goergen, Jr., and Todd Goergen.  (Hereinafter, unless specified otherwise, both Goergen Sr. and Trust will be collectively referred to as "Robert Goergen, Sr.").  Trust capitalized Ropart Asset I and Ropart Asset II, and received a significant portion of a $50+ million payout from the ViSalus operation in 2008-2012.  Trust's role was to serve as both funder to ViSalus and recipient of the proceeds of a payoff from the operation of the scheme through its interest in RAM.

20.    Defendant Todd Goergen ("Todd Goergen") is an individual residing in Connecticut. Todd Goergen was the Chief Operating Officer for ViSalus. Previously or concurrently to that position he has run Rock Ridge and Ropart Asset Management for the benefit of Ropart Asset I and Ropart Asset II and their unit-holders Robert Goergen, Sr., himself, and for Trust. Todd Goergen has transacted business in Michigan since at least 2005 at least in part due to his association with ViSalus. Todd Goergen, at various times, has also concurrently served as the Chief Operating Officer of ViSalus, served on the ViSalus Board of Directors, and provided

12

management services for ViSalus on behalf of Ropart Asset I and Ropart Asset II. In connection with Defendants Ropart Asset II, Nick Sarnicola, Ryan Blair, Blake Mallen, and Jason O'Toole, through their respective companies, he is also a member of defendant HashTag One, LLC. Todd Goergen's role encompassed managerial, strategic, and funding needs for the enterprise.

21.    Defendant, Ryan Blair ("Blair") is an individual residing in Michigan. Blair is the Chief Executive Officer of ViSalus. Blair is one of the primary promoters of the ViSalus pyramid scheme, and refers to himself as a "co-founder" of ViSalus. He is a recipient of a large payout for his interest in ViSalus, and currently holds a minority interest in ViSalus where he partially underwrites a credit facility to keep the company operating. Blair also owns and operates defendant OCD Marketing, Inc., a Delaware company ("OCD"). Through OCD, Blair is a member of Defendant HashTag One, LLC. OCD was a vehicle for Blair to deposit the payoff from the enterprise. OCD's role also serves, through HashTag One, to divert funds from the ongoing ViSalus operation.

22.    Defendant, Nick Sarnicola ("Sarnicola") is an individual residing in Florida and Michigan and a "co-Founder" of the company. Sarnicola left ViSalus in 2010 as an executive and employee, and is simultaneously one of the primary

13

promoters of the ViSalus pyramid scheme and a recipient of a large payout for his interest in ViSalus. He owns a minority share in ViSalus where he partially underwrites a credit facility to keep the company operating. Sarnicola, together with his wife Ashley Sarnicola, own Defendant Power Couple, Inc., a Delaware corporation ("Power Couple"). Sarnicola also owns Defendant ArriveBy25, Inc., a Delaware corporation ("AB25"). Through Power Couple and AB25, in his role as a ViSalus promoter, Sarnicola entered into agreements with certain other promoters, including several defendant promoters. Defendant Power Couple entered into a "Special Incentive Group" contract with ViSalus in which it received a bounty based on the number of $499 "Executive Success System" kits sold by it and its downline. Through Defendant Power Couple, Sarnicola is a member of Defendant HashTag One, LLC. Through Defendants Power Couple and AB25, Sarnicola and his wife Ashley Sarnicola operated as promoters of the "business opportunity" under ViSalus promoter nos. 1167, 2087094 and 2050966. These entities were paid approximately $10.7 million for recruiting tens or hundreds of thousands of people into the scheme. Sarnicola/Power Couple/AB25 report directly to ViSalus in the compensation system that creates "uplines" and "downlines." Defendants Power Couple and AB25 were also paid varying sums by various promoters outside the commissions and bonus system maintained by ViSalus and billed ViSalus for other activity. Defendant Power Couple, on Sarnicola's behalf, also received approximately $1 million per year in

14

assistance and performance payments, including the use of the ViSalus American Express card for being the top recruiter for the company. Sarnicola therefore used Power Couple and AB25 as the means to carry out his role in the enterprise.

23.    Defendant, Blake Mallen ("Mallen") is an individual residing alternately in California and Michigan, and employed in an executive capacity by ViSalus. Along with Sarnicola and Blair, Mallen holds himself out as a "co-founder" of ViSalus. Although he does not hold a place in the ViSalus compensation plan system, Mallen is one of the primary promoters of the ViSalus pyramid scheme and is a recipient of a large payout for his interest in ViSalus. Mallen is currently a minority shareholder in ViSalus, where he partially underwrites a credit facility to keep the company operating. Mallen also owns Defendant BAM Ventures, Inc. a Delaware company ("BAM"). Through BAM, Mallen is a member of defendant HashTag One, LLC. By 2012, upon information and belief, BAM received over $30 million for Mallen's interest in ViSalus. BAM was a vehicle for Blair to deposit the payoff from the enterprise. BAM's role is also to serve, through HashTag One, to divert funds from the ongoing ViSalus operation.

24.    Defendant HashTag One, LLC ("HashTag One") is a Delaware limited liability company formed in 2006 formerly known as Path Connect, LLC. Through

15

their respective companies, about 96% of HashTag One's membership interest is owned by Defendants Blair, Sarnicola, Mallen, Todd Goergen and Jason O'Toole. HashTag One is an investment company which, among other activities, awards membership shares in a so-called "Founders' Equity Incentive Plan" to highly-placed ViSalus promoter recruiters including a number of defendant promoters described below. HashTag One is receiving payments from ViSalus for unknown services. HashTag One is the means by which the continuing profit from the ongoing scheme continues to be paid for the benefit of its Defendant members. (Hereafter, where collectively referred to, the management/owner group of defendants shall be referred to collectively as "Corporate Defendants.")

## INDIVIDUAL PROMOTER DEFENDANTS

25.    In an effort to expand the pyramid scheme described below, ViSalus procured a number of professional network recruiters familiar with the network sales industry. These individuals are sophisticated Internet and conventional marketers, who tout their alleged financial success in the "industry" to new recruits into whatever network scheme chooses their service (hereafter where collectively identified, this group shall be referred to as "Individual Promoter Defendants").

26.    Defendant Jason O'Toole ("O'Toole") is an individual residing in Ottawa, Ontario. O'Toole owns Defendant Prospex Automated Wealth Systems, Inc., a company organized under the laws of Ottawa, Ontario, Canada ("Prospex"). As with many other defendant promoters, O'Toole signed up Prospex as the actual promoter for ViSalus. O'Toole's ViSalus compensation for his promotional activities was paid to Prospex. In addition to recruiting for ViSalus, Prospex sold recruiting leads to third parties outside the ViSalus promotions business (hereafter, these defendants' promoting business will be referred to as "O'Toole/Prospex"). O'Toole also owns Defendant Jason O'Toole International Holdings, Inc., a Delaware corporation, which is a member of Defendant HashTag One. O'Toole/Prospex operated under promoter no. 416848 in the ViSalus pyramid scheme, and Prospex was paid at least $6.4 million for O'Toole's role in recruiting tens of thousands of people into the scheme. Prospex reports to Sarnicola/Power Couple/AB25 in the ViSalus compensation system, that is, in their "downline." O'Toole/Prospex were also parties to various agreements with ViSalus, Power Couple and/or AB25, and other promoters, to fund promoter activity, and obtain special incentives and bonuses not available to regular promoters. O'Toole/Prospex were a recipient of a "Special Incentive Group" contract in which they received a bounty based on the number of $499 "Executive Success System" kits sold by them and their downline. These agreements allow Prospex to serve O'Toole's promotion business and funnel money

17

outside the compensation plan system to O'Toole, allow O'Toole to make side agreements with other promoters, and assist in the functioning of the enterprise. O'Toole/Prospex still operate as a promoter for ViSalus.

27.    Defendant, Kyle Pacetti, Jr. ("Pacetti") is an individual residing in Orlando, Florida. Pacetti owns and operates defendant Gooder, LLC ("Gooder"), a Florida limited liability company. Pacetti/Gooder operate under promoter no. 416027. Pacetti/Gooder report to Defendant Mike Craig in the ViSalus compensation system. Gooder was paid at least $6.2 million for Pacetti recruiting tens of thousands of people into the scheme. Pacetti also received an equity interest in HashTag One as a result of his recruiting activity. Pacetti/Gooder were also parties to various agreements with Defendants ViSalus, Power Couple and/or AB25 and other promoters, to fund promoter activity, and obtain special incentives and bonuses not available to regular promoters. Pacett/Gooder were recipients of a "Special Incentive Group" contract in which they received a bounty based on the number of $499 "Executive Success System" kits sold. These agreements allow Gooder to serve Pacetti's promotion business and funnel money outside the compensation plan system to Pacetti, allow Pacetti to make side agreements with other promoters, and assist in the functioning of the enterprise. Pacetti/Gooder still operate as promoters for ViSalus.

18

28.    Defendant Rachel Jackson ("Jackson") is an individual residing in Magnolia, Texas. Jackson, together with her husband Joshua Jackson, owns and operates Defendant Red Letters, LLC ("Red Letters"), a Texas limited liability corporation. Jackson received ViSalus equity in 2007 as a reward for recruiting thousands of downline recruits, for which she was later paid a substantial amount. Jackson's ViSalus compensation was paid through Red Letters. Jackson/Red Letters operated under promoter no. 543158, and Red Letters was paid $2.474 million for the Jacksons recruiting tens of thousands of people into the scheme. Jackson also held a position under promoter number 2356012, which was associated with the name "Free Enterprise." Jackson/Red Letters reported to Jennifer May who reported to Sarnicola/Power Couple/AB25 in the ViSalus compensation system. Jackson/Red Letters were also parties to various agreements with Defendants ViSalus, Power Couple and/or AB25 and other promoters to fund promoter activity and obtain special incentives and bonuses not available to regular promoters. These agreements allow the company to serve the promotion business, funnel money outside the compensation plan system, allow side agreements with other promoters, and assist in the functioning of the enterprise. Jackson/Red Letters have left ViSalus as promoters.

29.    Defendant Michael Craig ("Craig") is an individual residing in Jacksonville, Florida. Craig, together with his wife Lavon Craig, owns and operates Defendant M-Power Path, Inc., a Florida corporation ("M-Power"). Prior to being a promoter to ViSalus, Craig was a management employee in sales at ViSalus. Craig has received an equity interest in Defendant HashTag One. Craig/M-Power operated under promoter no. 383868 in the ViSalus pyramid scheme, where M-Power was paid over $5 million for the Craigs recruiting tens of thousands of people into the scheme. Craig/M-Power reported to Sarnicola/Power Couple/AB25 in the ViSalus compensation system. They were also parties to various agreements with ViSalus, Power Couple and/or AB25 and other promoters to fund promoter activity, and obtain special incentives and bonuses not available to regular promoters. Craig/M-Power were recipients of a "Special Incentive Group" contract in which they received a bounty based on the number of $499 "Executive Success System" kits sold. These agreements allow the company to serve the promotion business, funnel money outside the compensation plan system, allow side agreements with other promoters, and assist in the functioning of the enterprise. Craig/M-Power continue as promoters for ViSalus.

30.    Defendant Tara Wilson ("Wilson") is an individual residing in California. Wilson owns and operates Defendant A Berry Good Life, Inc., a

California corporation ("ABGL"). Wilson/ABGL operated under promoter no. 504823 in the ViSalus pyramid scheme, where ABGL was paid $2 million for Wilson's recruiting tens of thousands of people into the scheme. Wilson/ABGL reported to Defendant Aaron Fortner in the ViSalus compensation system. Wilson/ABGL were also parties to various agreements with ViSalus, Power Couple and/or AB25 and other promoters to fund promoter activity, and obtain special incentives and bonuses not available to regular promoters. These agreements allow the company to serve the promotion business, funnel money outside the compensation plan system, allow side agreements with other promoters, and assist in the functioning of the enterprise. Wilson/ABGL have left ViSalus, and together with Defendant Jackson, now promote for a Utah-based multi-level marketing company, LifeVantage.

31.    Defendant, Lori Petrilli ("Petrilli") is an individual residing in Montreal, Quebec. Petrilli owns and operates defendant 9248-2587 Quebec, Inc., a foreign corporation ("9248"). Petrilli/9248 operated under promoter no. 529610. 9248 was paid at least $2.5 million for Petrilli recruiting tens of thousands of people into the scheme, often working with Defendant Frank Varon. Petrilli/9248 reported to Defendant Jason O'Toole in the ViSalus compensation system. They were also parties to various agreements with Defendants ViSalus, Power Couple and/or AB25

and other promoters to fund promoter activity, and obtain special incentives and bonuses not available to regular promoters. Petrilli/9248 were recipients of a "Special Incentive Group" contract in which they received a bounty based on the number of $499 "Executive Success System" kits sold. These agreements allow the company to serve the promotion business, funnel money outside the compensation plan system, allow side agreements with other promoters, and assist in the functioning of the enterprise. Petrilli/9248 are no longer promoters for ViSalus.

32.    Defendant Frank Varon ("Varon") is an individual residing in Palm Beach, Florida. Varon owns and operates defendant Network Dynamics America Corp., a Florida corporation ("NDAC"). Varon/NDAC operated under promoter no. 594171 in the ViSalus pyramid scheme. NDAC was paid $701,553.00 for Varon's recruiting tens of thousands of people into the scheme. Veron/NDAC are no longer promoters for ViSalus, and are currently believed to spend much of their time in the Caribbean islands.

33.    Defendant Timothy Kirkland ("Timothy Kirkland") is an individual residing in Jacksonville, Florida and Wyoming. Defendant Holley Kirkland is an individual residing in Jacksonville, Florida and Wyoming. Defendant Freedom Legacy, LLC ("Freedom Legacy") is a Florida limited liability corporation owned by

the Kirklands.  The Kirklands operated under promoter no. 416074. Freedom Legacy reports to Defendant Pacetti in the ViSalus compensation system. Freedom Legacy was paid $2.47 million for the Kirklands recruiting tens of thousands of people into the scheme. Kirklands/Freedom Legacy were also parties to various agreements with ViSalus, Power Couple and/or AB25 and other promoters to fund promoter activity and obtain special incentives and bonuses not available to regular promoters. They were recipients of a "Special Incentive Group" contract in which they received a bounty based on the number of $499 "Executive Success System" kits sold. These agreements allow the company to serve the promotion business, funnel money outside the compensation plan system, allow side agreements with other promoters, and assist in the functioning of the enterprise. Kirklands/Freedom Legacy continue as promoters for ViSalus, although they have purchased a ranch in Wyoming and are not active in the business.

34.    Defendant Aaron Fortner ("Fortner") is an individual residing in the San Diego, California, area. Defendant Residual Marketing, Inc. ("Residual Marketing") is a Florida corporation owned by Fortner.  Defendant Got Heart Global, Inc. ("GHGI"), is a Florida company also owned by Fortner.  Fortner operated his ViSalus business through Defendant Residual Marketing and then later transferred the business and continued operating through Defendant GHGI. Fortner's ViSalus

23

compensation was and continues to be paid through GHGI and Residual Marketing. RM/GHGI operate under promoter no. 439879 in the ViSalus pyramid scheme, where RM/GHGI were paid $3.1 million for Fortner's recruiting tens of thousands of people into the scheme. Fortner/RM/GHGI report to Defendant O'Toole in the ViSalus compensation system. They were also parties to various agreements to fund promoter activity, and obtain special incentives and bonuses not available to regular promoters. They continue as promoters for ViSalus.

35.    Defendant Wealth Builder International LLC ("Wealth Builder") is an Alberta, Canada corporation owned by Tanis MacDonald (not named as a defendant). Wealth Builder operated under promoter no. 435073. Wealth Builder was paid $2.47 million for MacDonald recruiting tens of thousands of people into the scheme. Wealth Builder was also party to various agreements with Defendants Power Couple and/or AB25 and other promoters to fund promoter activity and obtain special incentives and bonuses not available to regular promoters. Wealth Builder purchased massive amounts of inventory from ViSalus for the purpose of fulfilling the product purchase requirement of its immediate downline sub-promoters, with whom it had contracts. These agreements allow the company to serve the promotion business, funnel money outside the compensation plan system, allow side agreements with other promoters, and assist in the functioning of the enterprise. Wealth Builder no

longer operates as a promoter for ViSalus, as MacDonald has moved on to other MLM companies.

36.    Defendant Jake Trzcinski ("Trzcinski") is an individual residing in California.  Trzcinski owns and operates defendant JakeTRZ, Inc. ("JakeTRZ"), a California corporation. In reward for recruiting thousands of recruits, Trzcinski received equity in ViSalus in 2007, for which he later was paid a sum believed to be in excess of $1.2 million. Trzcinski and/or TRZ operated under promoter no. 1178 in the ViSalus pyramid scheme. TRZ was paid $1.5 million for Trzcinski's recruiting tens of thousands of people into the scheme. Trzcinski/TRZ were also parties to various agreements with Defendants ViSalus, Power Couple and/or AB25 and other promoters to fund promoter activity and obtain special incentives and bonuses not available to regular promoters. Trzcinski/TRZ were recipients of a "Special Incentive Group" contract in which it received a bounty based on the number of $499 "Executive Success System" kits sold. These agreements allow the company to serve the promotion business, funnel money outside the compensation plan system, allow side agreements with other promoters, and assist in the functioning of the enterprise. They are still promoters for ViSalus but are not believed to be active.

25

37.     Defendant Anthony Lucero and defendant Rhonda Lucero (collectively, the "Luceros"), are individuals residing in Texas. The Luceros own and operate defendant Mojos Legacy, LLC ("Mojos Legacy"), a California limited liability company. Mojos Legacy operated under promoter no. 372097. Mojos Legacy was paid $4 million for the Luceros recruiting tens of thousands of people into the scheme. Luceros/Mojos Legacy were also parties to various agreements with Defendants ViSalus, Power Couple and/or AB25 and other promoters to fund promoter activity and obtain special incentives and bonuses not available to regular promoters. They were a recipient of a "Special Incentive Group" contract in which they received a bounty based on the number of $499 "Executive Success System" kits sold. These agreements allow the company to serve the promotion business, funnel money outside the compensation plan system, allow side agreements with other promoters, and assist in the functioning of the enterprise. It is not known whether the Luceros are still active promoters.

38.     Defendant Gary J. Reynolds ("Reynolds), is an individual residing in Lincoln, Nebraska. Reynolds owns and operates Defendant BeachLifestyle Enterprises, LLC ("BeachLifestyle"), a Nevada limited liability company. Reynolds/BeachLifestyle operated under promoter number 264074 in the ViSalus pyramid scheme. BeachLifestyle was paid over $2 million for Reynolds (often with

his wife Alita Reynolds who may have her own promoter place in the system) recruiting tens of thousands of people into the scheme. Reynolds also received equity in Visalus in 2007, and was later paid a sum believed to be in excess of $600,000 for his equity interest in Visalus. Reynolds had previously operated as a recruiter/promoter elsewhere, and is familiar with the laws and regulations surrounding MLMs, knows the difference between a "legal" and "illegal" MLM, and has continued to serve as a promoter for years notwithstanding the repeated closings by the FTC of identical companies such as FHTC and Vemma and his actual knowledge of the facts and circumstances surrounding such actions. He continues as a promoter for ViSalus.

39.    Defendant Kevin Merriweather ("Merriweather"), is an individual residing in Jacksonville, Florida. Merriweather became a promoter in 2010, and operated under promoter no. 422384 in the ViSalus pyramid scheme, where he was paid $1.9 million for recruiting tens of thousands of people into the scheme. Merriweather had previously operated as a recruiter/promoter elsewhere, and is familiar with the laws and regulations surrounding MLMs, knows the difference between a "legal" and "illegal" MLM, and has continued to serve as a promoter for years notwithstanding the repeated closings by the FTC of identical companies such

27

as FHTC and Vemma and his actual knowledge of the facts and circumstances surrounding such actions.

## JURISDICTION AND VENUE

40.    All Defendants are subject to the jurisdiction of this Court.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332(d). This Court has personal jurisdiction over each defendant. As set forth above, the Defendants continuously and systematically engaged and engage in business in Michigan.  The Defendants do business as individuals, limited partnerships or limited liability companies in Michigan.  In accordance with 18 U.S.C. § 1965(a) and (b), all of the Defendants are subject to this Court's jurisdiction in that they "transact affairs" in the Eastern District of Michigan.

41.    To the extent not specifically alleged above, each of the individual Defendants in this case who were or are also IPs, have received numerous payments from ViSalus, located in Michigan. Each of those individuals has appeared in advertising and/or promotional materials generated from Michigan and disseminated for a period of years in, among other states, the State of Michigan.

42.    Certain of the individual Defendants, including Blair and Sarnicola, reside or have residences in Michigan. Each of them has systematically communicated with ViSalus in Michigan in connection with ongoing promotional work performed on behalf of the company.

43.    Each of the RAM entities or the companies operating on behalf of individual promoters in this case has likewise transacted business in Michigan by virtue of systematically receiving payments from ViSalus or performing services for ViSalus within Michigan for a period of years.

44.    ViSalus operates in Troy, Michigan. Venue is proper in this Court pursuant to 28 U.S.C. §1391.

## THE PYRAMID SCHEME

45.    One reason why pyramid schemes are illegal is that they must eventually collapse due to market saturation as the market for potential participants fills. There is no natural market demand for the product sold by the scheme's promoters, resulting in little to no demand for the product beyond sales made internally to new recruits. As the market for new distributors saturates, new distributors are left with unsellable, higher-than-market-price inventory and little to no chance to recoup their money

29

from legitimate customers who actually want the product for itself. The only market for the inventory, and the only opportunity to recoup the cost of maintaining the distributorship rights lies in recruiting another person. Another reason why pyramid schemes are illegal is that they naturally funnel money only to a small percentage of people at the top, money that is funded by the large base at the bottom presented by the pyramid's operators with the same false "business opportunity" to make money.

46.     Pyramid schemes are uniformly held to be illegal in both the United States and in Canada. The FTC uses the following test (from *In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1181 (1975), followed by *US v. Gold Unlimited*, 177 F.3d 472 *(6th Cir.)*) to characterize a pyramid scheme:

> [Pyramid] schemes are characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product and (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users. In general such recruitment is facilitated by promising all participants the same 'lucrative' rights to recruit.

47.     Michigan law, MCLA 445.1528, is part of the Michigan Franchise Investment Act. It defines a pyramid, which the Act deems an illegal scheme under Michigan law, as:

> [A]ny plan or scheme or device by which (a) a participant gives a valuable consideration for the opportunity to receive compensation or things of value in return for inducing other

30

persons to become participants in the program or (b) a participant is to receive compensation when a person introduced by the participant introduces one or more additional persons into participation in the plan, each of whom receives the same or similar right, privilege, license, chance, or opportunity.

48.    The Sixth Circuit Court of Appeals has approved the use of a jury instruction which defines a network-sales based pyramid scheme as follows:

MLM [multilevel marketing] programs survive by making money off product sales, not new recruits. In contrast, "pyramids schemes" reward participants for inducing other people to join the program; over time, the hierarchy of participants resembles a pyramid as newer, larger layers of participants join the established structure. Ponzi schemes operate strictly by paying earlier investors with money tendered by later investors. No clear line separates illegal pyramid schemes from legitimate multilevel marketing programs; to differentiate the two, regulators evaluate the marketing strategy (*e.g.,* emphasis on recruitment versus sales) and the percent of product sold compared with the percent of commissions granted.

49.    Substantial federal common law has evolved on the subject of pyramid schemes. Well-recognized elements of a pyramid scheme, particularly in companies attempting to masquerade as a "legitimate" network marketing company, are: (1) whether the entire scheme is more associated with recruiting other participants rather than selling the alleged product to outside customers; (2) whether sales are primarily made internally to new distributors rather than to outside customers; (3) whether there is a high drop out or "churn" rate among newly-signed distributors (indicating the reason why product was purchased was for the business opportunity to recruit others);

31

(4) whether the scheme's promoters spread implied or express promises of great wealth or financial independence if one is to participate in the "business opportunity"; (5) whether the scheme's promoters cause distributors to load up on the product (inventory loading) in order to receive commissions; and (6) whether there is market saturation leading to collapse.

50.    Each of these elements is present in the pyramid scheme devised and operated by the Defendants. No one Defendant, or even a small group of persons, could have orchestrated the operation of this pyramid scheme.  It required the coordinated efforts and individual acts of many individuals, some of which are named Defendants, to achieve the size, visibility, and false sense of legitimacy that allowed the ViSalus scheme to lure the Plaintiffs into enrolling for this "opportunity."  Each of these coordinated individual acts promoted the presence and continued operation of the pyramid.

51.    The only way for an individual to obtain the right to sell the ViSalus weight loss products is to pay ViSalus money to become its distributor. ViSalus pitches the distributorship of its products as a "business opportunity."  ViSalus refers to these people, like the individual Plaintiffs and all others in the class, as members of the "Individual Promoter Sales Force." By enrolling as an IP, the IP Sales Force,

including Plaintiffs and all members of the class, have paid for the right to sell a product.

52.    No training or experience is necessary to become an IP. A person can become an IP through a personal "event" in which information is given out by the company, or through another IP, who may or may not hand out written or audiovisual materials.   A written form takes the prospective enrollee through several sign up steps, the most important of which involves the payment by the enrollee to ViSalus of a fee. The enrollee chooses whether to become a "basic" distributor (at $49), or a distributor with additional features of the ViSalus promoter system (at either $499 or $999). In written form, the enrollee may be handed a form like this:



53.    The two high-priced distributorship rights packages, the $499 Executive Success System ("ESS") or the $999 ESS with samples (also known as the "Star Kit"), bundle expanded rights to commissions and bonuses (over the base package) with some product and a quantity of product samples. The company pushed the $499 and $999 distribution kits at prospective distributors.

54.    Kerrigan, Mikovich and Valli, were each presented with the proposal that they purchase these packages. The ViSalus marketers urged them (and the hundreds or thousands of other attendees at these or similar meetings) to buy the $499 or $999 packages to become a distributor under the Compensation Plan because they

will have more "success" and receive better "training" with these more expensive packages rather than the "basic" $49 package.

55.    In addition to Defendant ViSalus making the presentations, Defendant Sarnicola has appeared on videos and appeared in person at meetings such as those attended by the Plaintiffs (along with tens of thousands of others who subsequently purchased these IP kits) pushing the prospective purchasers to buy the $499 or $999 kits for a greater "opportunity" to make money than purchase of the $49 kit alone.

56.    Upon enrolling, the new enrollee (like Kerrigan, Mikovich and Valli) provided ViSalus with a social security number and a credit card number. Additional features presented for purchase include an auto-ship program at up to $249/month of shakes, which creates a monthly automatic shipment of product charged to the IP's credit card. New IPs were also pitched and sold a recurring, monthly website subscription for the sum of (depending on the year in question) $24 to $29 per month. The website purports to give the IP a personalized way to sell ViSalus product and to keep track of benefits. In reality, the website is hosted by ViSalus and the recurring monthly charge is virtually all profit to the company and is bundled with the IP distributorship purchased from the company.  Various fees associated with the process are added as well, such as an annual "administrative fee," $3 handling fees and so on.

57.    Plaintiffs Mikovich and Valli and, upon information and belief Kerrigan, were enrolled in the monthly website subscription and auto-ship programs. They did so in reliance on the representations and/or omissions made in the Compensation Plan and at the presentations and in the ViSalus website that such purchases would be more advantageous to them in the IP business.

58.    In reality, ViSalus product sales are primarily made to new distributors recruited into the system. The principals of the scheme know this and know that the company's sales are directly correlated to the number of new recruits. For example, in the 1st quarter of 2012, during ViSalus' peak year of operation, its reported sales of $136.7 million were the result of purchases by and through 92,000 recruits, for an average of $1,485 per IP. In the first quarter of 2013, after its sales slide began in earnest, sales of $104.3 million were the result of 70,200 recruits, again for an average of $1,485 per IP. In the first quarter of 2014, sales of $57.4 million were the result of the work of 36,100 IPs, for an average of $1,590 per IP.

59.    The ViSalus Compensation Plan operates by promoting an IP upwards through a variety of tiers and structures, and paying a multitude of "commissions" and "bonuses" to the IP. (See **Exhibits A** and **B**). If the new IP sells ViSalus weight-

loss shakes to legitimate outside customers the "business opportunity" only generates a token income. The presence of outside customers is incidental: the purpose and goal of the Compensation Plan is to recruit new people to become IPs.

60.    The scheme's promoters (each of the named Defendants) know that without a constant stream of new recruits and sales to new recruits the whole operation would grind to a halt in a matter of weeks. The Defendants likewise know that the sole reason they were paid, or promised to be paid, massive amounts of money by the company was if they were successful in recruiting a large number of people to become promoters for the company.

61.    Simply by retailing the weight-loss shakes to legitimate outside customers, the IP has virtually no chance to cover the monthly cost of his product. In order to remain "active" and retain the right to "earn" a commission, the new IP must maintain a $125/month purchase level. The Compensation Plan pays a sales commission on sales monthly over $200. Monthly sales of between $201 and $500 are paid 10%, or $30. Sales of $501 to $1,000 are paid 15%, or $75. Sales of $1,000 to $2,500 are paid 20% or $300. Thus, in order to just stay ahead of the monthly cost to *be* an IP eligible to earn the bonus, the IP must find enough customers *each* month who order over $1,000 worth of weight-loss shake product. Very few IPs do that.

37

62.    In contrast to these small sales commissions, the monetary incentives built into the Compensation Plan lucratively reward recruiting activity. Many of the numerous "commissions" and "bonuses" available to IPs are nothing more than direct payments for recruiting, or as the FTC characterizes it, "the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users," or under Michigan law, "the opportunity to receive compensation or things of value in return for inducing other persons to become participants in the program," or "to receive compensation when a person introduced by the participant introduces one or more additional persons into participation in the plan, each of whom receives the same or similar right, privilege, license, chance, or opportunity." Among the explicit recruiting-based payments made to IPs are the following.

63.    Once a distribution kit is purchased, the IP receives a First Order Bonus when he or she enrolls a new promoter into the system. That bonus is a 20% commission on all products ordered by the new IP beyond their promoter cost. The First Order Bonus is paid to all IPs "upline" of the sponsoring IP at a decreasing percentage, so that an IP can get paid this bonus for the recruiting activities of previously-recruited distributors up to three levels below the IP.

64.    A successful recruiter is paid a higher amount of per capita commission. A Fast Start Bonus is paid to an IP when he or she successfully recruits a new distributor who purchases a $499 ESS or $999 Star Kit. If the IP is at an "Associate" rank, the company pays a bonus is $50. If the IP is at a "Director" rank at the time of the recruitment the bonus is $100. The company's bonus increases to $130 if the IP is at a "Regional Director" rank and up to $180 if the IP is at an "Ambassador" rank. The higher "ranks" are eligible for "override" bonuses of $10 to $15 as well. Thus, the IP is given a monetary incentive to rise in "rank." The only way to rise in rank is to build a "team" of recruited new distributors and to "assist" them in themselves becoming highly-ranked by recruiting others.

65.    The company's training materials depict the bonuses as follows:





66.    The types and amounts of bonuses offered to new distributor recruits are directly dependent on the recruiting success of the IP. ViSalus has summarized the incentives as follows:

> "An individual promoter with the rank of associate can earn "team commissions" on a monthly basis equal to 5% of the [Bonus Volume, or "the amount of each product sale that counts towards bonuses and commissions. In most cases, BV is equal to the selling price of each product"] generated during such period in the two down-line "levels" below him in his or her down-line sales organization. **As an individual promoter achieves higher ranks, he or she is able to earn 5% of the monthly BV generated by an increased number of levels below them**. …

41

In addition, an individual promoter with the rank of ambassador can earn additional commissions through the leadership depth bonus, which pays 2% on all the bonus volume from level nine through the remaining levels in such individual promoter's down-line sales organization. **When an ambassador has another ambassador in their down-line sales organization, the leadership depth bonus will increase to 4% of bonus volume through that second ambassador's eight levels, and the top ambassador will still earn a 2% leadership depth bonus through the remaining levels in the top ambassador's down-line sales organization**."  (quote appears in a ViSalus prospectus, 9/2012, emphasis added)

67.    These "team commissions" are depicted in the ViSalus Plan Book like this:



68.    The Rising Star Weekly Enrollers Pool commission is another direct commission for recruiting others. An IP who "qualifies" for a share of that commission, which amounts to 2% of the company's revenue, is guaranteed at least $75 for the week he or she qualifies. A significant portion of the "qualifying"

requirement is enrolling or recruiting, three new IPs into the system. Thus, this bonus

is a direct bonus for recruiting another into the system.

69.    The company has described this commission as follows:

- "We place a portion of the BV [bonus volume] from the previous four weeks of company-wide production into a "rising star **weekly enroller's** [sic] pool," and one quarter of this pool is paid each week. The amount placed in the pool is shared among those who qualify for the pool.

- We place a portion of BV from the month's company-wide production into a "leadership pool" that is shared by promoters who achieve the rank of presidential director or ambassador during such period, **with each such individual promoter being entitled to an amount based upon the highest rank achieved in each sales leg of his down-line sales organization** during such period.

- We place another portion of BV from the month's company-wide production into a "leadership pool" that is shared by promoters who achieve the rank of ambassador during such period, **with each such individual promoter being entitled to an amount based upon the highest rank achieved in each sales leg of his down-line sales organization** during such period.

- We offer an "ambassador bonus" to individual promoters who achieve one of five ambassador ranks in a given month, **with the amount of the bonus based on the sublevel of ambassador rank** obtained, as well as the length of the period of time for which such sublevel was maintained."

(emphasis added.)

43

70.    Regardless of the token inclusion of a sales requirement into the distributor's plan, all of the scheme's promoters understood that the plan rewarded recruiting above all else. In a lawsuit filed in this court, ViSalus admitted, "In order to encourage distributors to encourage growth of product sales **through the recruitment of other distributors**, ViSalus … rewards its top performing distributors through a generous compensation plan." (Par. 8, *ViSalus v. Bohn,* Eastern District of Michigan, Case No. 2:13-cv-10366, January 29, 2013 (emphasis added)). According to the company,

> "As distributors meet certain goals designed to measure the sales success of the network of distributors that they bring to ViSalus, they are assigned a "rank" to recognize their success. The metric used to measure a distributor's sales success and assign ranks is known as Growth Qualification Volume ("GQV"). The GQV measures the volume of sales generated by the distributor's team. **A distributor's success in recruiting, training, and developing other distributors—which is known as their downline network—is measured by the number of distributors that they directly recruit and the rank achieved by these distributors.**" (Par. 9, emphasis added).

71.    In a Welcome Booklet extolling "the power of 3," ViSalus emphasizes that just finding three new people and helping them find three new people "do what you just did" generates so-called "Immediate Income" and "Leadership Income"

bonus levels. These bonuses are explicitly paid for successful recruiting at even the lowest level of participation:

**Understanding The Power of 3**

The best way to get your ViSalus™ business started is to invite some friends over to your home for a Challenge Party so they can try the products and hear about the Body by Vi™ Challenge. Your support team will help you out, but the key is to keep it casual and fun.

First, focus on finding at least 3 people who want to be Challenge Kit Customers so that you can get your product for free each month. Once you've done that, you'll want to find 3 people who are interested in becoming Distributors and promoting the Challenge. Help them do what you just did, and you're on your way!

It's the Power of 3, and it lets you earn 3 kinds of income through ViSalus:

1. **Immediate Income:** Get paid every Monday for referring new Customers and new Distributors to the Challenge.

2. **Recurring Income:** Get paid over and over again as all of the Customers in your referral line continue to use ViSalus products.

3. **Leadership Income:** Help other Distributors become successful and take advantage of special Bonuses and Promotions reserved for ViSalus Leaders.

72.    In various other publications ViSalus tells IPs that they can be paid in weekly bonuses or by encouraging others to join ViSalus and moving up the ranks to the different levels of so-called Directors or Ambassadors based on what the enrollees, that is recruited IPs, under them purchase. This emphasis on recruiting is made at all levels of promotion.

73.    The ranking system explicitly pays for recruiting success, and prospective enrollees are shown the alleged value of that success. A "new" Ambassador receives a $25K check, and recruits are told that "potential earnings" of

$10-$14K per month are available. A "1-Star" Ambassador, who helped sponsor another Ambassador, has represented "potential earnings" of $14-$20K per month. A "2-Star" Ambassador, who sponsored two Ambassadors in his/her downline, has represented "potential earnings" of $20-$30K per month. The Ambassador "ranking" continues with a represented upward tier of "potential earnings" of $40-$75K per month for a "5-star" Ambassador. The next tier of Ambassadors continues to "Diamond" and "Royal," who may obtain "potential earnings" of up to $150K per month. These tiers and their explicit money claims are widely distributed on the Internet and in personal meetings sponsored and encouraged by the company.

74.     That the incentives tilt to recruiting over selling to outside customers is built into the pyramid scheme's very operation. Defendants make virtually all their sales of the weight-loss product on the initial enrollment sale to a new IP and that IP's subsequent transaction to his or her new recruit, and comparatively few sales are made to true outside customers. For example, in a lawsuit filed by ViSalus against a distributor in this Court, ViSalus acknowledged that a high-ranking IP had 1,755 distributors and only 152 customers in his "downline." The IP's wife allegedly had 16,300 distributors and 24,850 customers in her "downline" (*ViSalus Inc. v. Hockmuth et al.,* 5:14-cv-11762), making the entire huge downline succeed in each distributor selling to less than two customers.

46

75.    The only way that the weight-loss shakes could be sold in the market is through a pyramid scheme that couples the "business opportunity" with the purchase of the shake. Standing alone, the ViSalus weight loss shakes compete against a glut of similar market products, often much cheaper and available on local store shelves. ViSalus itself compares its products to "competitors" such as Herbalife (an MLM), Shaklee (an MLM), MonaVie (an MLM), Pharmanex (an MLM), Melaluca (an MLM), Isagenix (an MLM), Evolv, Slimfax, Myoplex and MetRx. Without the lure of becoming a new recruit and him/herself recruiting others and getting paid, the ViSalus product has little to no market appeal. Defendants know that IPs purchase grossly more product by dollar volume than non-IPs, and it is the IPs rather than outside customers who are the product's actual "customer" base.

76.    Defendants know there is little natural demand for the weight loss shakes – particularly at the prices ViSalus charges for them – outside the sale to new distributor system. Customers buy significantly less product or at significantly lower volume than distributors do. A search of eBay listings, for example, shows thousands of failed attempted sales at full price and completed sales of the product at an average price well below that charged the IP. Craigslist ads show product dumping, with people asking for much less than the auto-ship price:

> Selling 11 bags of ViSalus Meal Replacement Shake Mix and 1 bag of misc. flavor packs. We used to be a dealer for this but we have a overstocked of leftovers from promotions. These bags go for over $90.00 for a months supply which is 2 bags. So at 11 bags for $400.00 you are getting a STEAL and can't find it anywhere this cheap' the stuff works great as well. OR make me an offer on them all!

> ([http://chicago.craigslist.org/nwc/hab/4526020739.html](http://chicago.craigslist.org/nwc/hab/4526020739.html), *June 18, 2014*)

77.    ViSalus has a tremendous churn or turnover rate (sometimes known in the network industry as "breakage"), estimated as nearly 200% per year.  Each "churned" IP is "non-active." A non-active IP cannot receive commissions, and has lost money with the company.

78.    The actual average amount paid in commissions to the vast majority of ViSalus IPs is much less than the IP's cost of getting into the system in the first place. In the absence of bonuses paid for recruiting (described earlier) this "average" level of sales activity by a distributor generates very little commissions per IP per year (and only to "active" IPs at that). Thus, even the average "active" distributor (who continues to purchase product from the company to stay "active") comes out well short of the cost of recouping his or her distribution costs unless he or she participates in recruiting activities.

79.     The true average ratio of "customers" to "IPs" (even by the "nonactive" definition employed by the company to mask the true small number of customers), is no more than 2:1. The majority of the sale activity for each recruited IP occurs during and shortly after his or her signup. Defendants know that the vast bulk of the people recruited to be distributors lose money.

80.     Pyramid schemes suck in participants by appealing to the notion that the new participant may get to be as rich as the examples promoted by the scheme's promoters. Although the get rich promises are often accompanied by small print disclaimers or words like "earnings potential" appear in the company's "official" written materials, sophisticated promoters, like Defendants here, spread the word in other ways that the same, vast riches of people "just like you" are attainable by anyone who "works" the system, *i.e.,* recruits other suckers to join the pyramid beneath them in their "downlines."

81.     Although the Defendants know that the overwhelming majority of new signups will lose money as a distributor, the overriding message ViSalus promotes is that of profitability, earnings, and getting rich by participating in the "business opportunity." These messages appear on the web at ViSalus' own website, in written

promotional materials, and are disseminated through and with the active assistance of the Defendants described below.

82.     Virtually every ViSalus promotion, from its own website to YouTube videos of its meetings and conventions to its monthly magazine touts the alleged monetary "success" of its distributors. These often include or feature depictions of the Defendants like Pacetti, Wilson, O'Toole, or Sarnicola. ViSalus does not identify these as professionals who have been paid for recruiting others, but portrays them as people just like the newest recruit who worked the "lucrative" ViSalus system selling weight-loss shakes to a willing public to personal riches.

83.     The allegedly most "successful" company distributors are publicly identified as ViSalus "Ambassadors." Graded as 1-star up to "Global" Ambassadors (and recently a new rank called Diamond), these promoters cooperate in success stories posted on the ViSalus website or the blog the company runs. The company often holds out Promoter Defendants like the Craigs, O'Toole, Pacetti, and the Kirklands and others as examples of success. Sarnicola is often shown in promotional materials with his wife on glamorous vacations.  In these videos, he often claims, "even if you fail this by 99% it's still an extra $24,000." A selected handful of other promoters, often appearing as couples or with their children on stage, are rewarded

50

publicly in presentations throughout the United States, Canada and now the United

Kingdom.

84.    Videos and downloadable PowerPoint presentations sponsored and

disseminated by the company on its own and pushed to websites tout the same

message of "free" luxury cars, "financial freedom" and "exponential" income, as in

the following:



85.    In addition to the company's own branded materials, the Defendants

actively push a web and social media presence. The company and its promoters

maintain numerous individual accounts on Facebook, YouTube, and Twitter,

associated with the ViSalus "opportunity." The Defendants push out their videos, or

the videos produced by Promoter Defendants to YouTube and Vimeo, and spread content out to a variety of MLM-related websites frequented by people who may be attracted to the pyramid scheme.

86.    The Defendants' Internet presence actively pushes its money-making "opportunity" on (undisclosed) paid network marketing "blogs" (in reality paid advertisers). These sites typically publish inflated or false or misleading lists of so-called Top Earners of the ViSalus system.  They feature bogus "interviews" between the Promoter Defendants or "interviews" on paid sites in which the millions of dollars that can be "earned" by associating with ViSalus are explicitly or implicitly stated. All or virtually all of the Promoter Defendants, in addition to Blair and Sarnicola, have cooperated in being "interviewed" about the ViSalus system and have spread the word about their incredible money-making success in the system. The purpose of all of this activity is twofold: the company can spread its recruiting and money-making message apart from its conventions and events, and can maintain a distance from sites and feeds that tout the money-making claims on its behalf.

87.    The effect of all of this coordinated Internet activity is to blanket the web with visions of being a ViSalus "promoter" and getting rich in the process. A search on Vimeo results in nearly 300 ViSalus-related videos, many if not most

showing in some fashion or other allegedly how to make lots of money from the ViSalus opportunity.  A simple Google search for "ViSalus" and "unlimited earning potential" yields over 38,000 hits. A search for "ViSalus millionaires" yields 394,000 hits.  A search for ViSalus and "exponential earnings potential" yields over 12,000 hits. A search on YouTube for ViSalus and "earnings potential" yields over 340 videos. Thousands of the "interviews" and lists of "Top Earners" with associated dollar figures are spread through a variety of anonymously-owned network-marketing opportunity websites (many concealed by Domains By Proxy owner identity). In short, the company and its promoters have succeeded in associating throughout the web the promise of getting rich with distributing ViSalus weight-loss shakes.

88.    The company produces slick slideshows of its own that spread the money-making message. For example, Regional Director, the rank above a Director in the ViSalus system, is a status achieved by continuing as an "active" promoter with three qualifying "downlines" and a minimum group volume of $12.5K in sales a month. ViSalus-produced videos and PowerPoint presentations disseminated by the company suggest that the average income of a Regional Director is around $1- $3K a month and imply that new IP's will soon find themselves driving a "shiny black

new Bimmer [BMW automobile]." In a downloadable PowerPoint from its website,

defendants show and widely disseminate illustrations like this:



89.     The company has pushed the so-called "Bimmer Club" as an overt

inducement to recruit new IPs. ViSalus boasts of the number of BMWs it has given

away to IPs both directly in a variety of its own marketing materials and through

third-parties. For example, in 2010 ViSalus lured a well-known promoter named Rick

Gutman from MonaVie to join ViSalus and build a new promoter "team." In a

promotional video put up by the company, Gutman discussed his "decision" to walk

away from selling $50 vitamin-laced juice for MonaVie to selling $250 soy and

Splenda shakes for ViSalus. In the video he tells prospective promoters that he

"knows" his team has gotten 600 BMWs "free." This statement, and many more like

it concerning the "Bimmer Club," are not true.

90.    In reality, the BMW cars are only conditionally and partially subsidized. The IP remains legally responsible for the lease payments. The ViSalus "payments" for the BMW continue only for as long as the IP can maintain a certain level of sales by himself and his "downline," thus ensuring continual internal product loading and recruiting activity.

91.    The company pushes the slogan, "3 For Free Stars and Cars" on numerous web videos of ViSalus events.  In a typical video describing the promotion, for example, Defendant Sarnicola, shown on stage, encourages the room to repeat his slogan and explains how easy it is for an IP to get the product for free and the car too, all by supporting other team members in one's "downline" and urging them to reach 'Rising Star' status by getting additional individuals to join the pyramid.  The posted video shows a variety of slides including this:



92.     The ranking system emphasizes the amount of money that an IP can make. The company self-publishes its own magazine, sent to IPs as part of the so-called Vi-Net subscription (a $24/month charge), and partners up with "Success" magazine, a glossy network marketing vehicle, to show what IPs are being promoted and how successful they are.

93.     The company emphasizes how much money moving "up" in rank is worth. For example, the next rank up from Regional Director is the National Director. The company claims that the average income of a National Director ("ND") is between $3K and $6K a month, and NDs are invited to attend the "ND Experience,"

an "inside secret" training for the promoter to learn how to encourage additional individuals to join ViSalus.

94.    As is typical with all direct-selling companies, part of the overall scheme is to generate excitement for the "opportunity" to make money.  In a public filing, ViSalus explained how that excitement is spread:

> "We generate excitement around the ViSalus products and brand through events held throughout the year. At challenge parties, which are held in private homes or public spaces such as hotel conference rooms, prospective customers and individual promoters gather to learn about the ViSalus opportunity. These challenge parties may be attended by as many as a thousand people. Regional events, held several times a year, also range in size up to several thousand people … Thousands of people attend our national events, which are typically held three times per year and also provide training opportunities and recognition on a large scale. Our largest national event is Vitality, held once a year. Approximately 18,000 individuals registered to attend our July 2012 Vitality event in Miami, Florida."

95.    It is well-established in the network marketing business that one hook to get new recruits in the door is the check-waving ritual. The ritual is typically performed before a large crowd, videotaped and photographed, and images of the happy recipient shown to potential recruits in printed materials, on the Internet and wherever they can be spread. The defendants all participate in this show. For example, Defendant Jackson is shown on stage like this:



96.    While ViSalus has staged the check ritual countless times it adds a twist to the ritual: *the checks are not actually paid*.  The company does not explain that the distributors waving the giant check were brought on board through special deals. Nor does it explain, except in very small print, that it will pay the check in 10 years and only if the recipient continues to be "active" with the company, and if, and only if, it chooses to do so.

97.    The dissemination of the check-waving is an integral part of nearly all of ViSalus' printed or Internet materials. The Promoter Defendants are featured in

company-sponsored materials, such as a downloadable PowerPoint from the ViSalus

website. For example, Defendant Pacetti is prominently shown holding a $1 million

check:



98.    The company's so-called "founders" Blair, Mallen and Sarnicola also

distribute professionally-edited videos posted on the web which tout the success of

the system, the company and themselves. For example, through a series of videos

posted on the ViSalus.com website, Mallen, the Chief Marketing Officer,

enthusiastically pitches how easy it is to start earning an income.  As he explains, the

more people an individual can 'help' with the serious spread of the obesity epidemic,

the more money there is to be made. Other videos feature Sarnicola walk prospective

enrollees in the IP system through the wealth that Sarnicola has made, implying that the new enrollee can too earn $350K per month as Sarnicola has allegedly done. Blair has self-published a book and appears in many videos, the object of which is to suggest if not explicitly state that his wealth is due to the success that ViSalus weight-loss shakes have in the market.

99.    Some of the Promoter Defendants (Pacetti, Wilson, Jackson and O'Toole) as well as Sarnicola, appear on the company-created and sponsored reality series "The Pyramid Thing." The series widely disseminates the message of achievable success, wealth and earnings allegedly obtained by being a ViSalus IP and following the company's recruiting plan. There have been over 90 "episodes" of the show published on the Internet.

100.    There are literally hundreds of "testimonials" disseminated on video through the Internet by the scheme's promoters that say, imply or point to wealth to be made by "joining" ViSalus as a promoter. For example, another top ViSalus earner (who was later sued by ViSalus after taking her "team" to a competitor network company) stated the following facts and figures in an "interview" posted by one of the anonymously owned websites that carries ViSalus-related information:

> "How many people did you sponsor?

Ted, these are amazing numbers.  I have personally sponsored 48 people.  Those 48 people have turned into a team of over 8,000 active as of July 2012! That's the kind of duplication you hear about and dream about and with ViSalus is a reality.  Our success is truly about our incredible team.

*Those are impressive numbers—What's your secret?*

Oh easy, not really a secret, it's a straightforward formula, which provides viral growth when partnered with ViSalus' tools driven system….

- o  We get started TODAY.
- o  We get people into Profit Mode TODAY."


101.   Typically, ViSalus tries to hook potential enrollees to ViSalus with the notion that they can lose weight using the ViSalus shakes and obtain a healthy lifestyle by drinking the shakes daily. Defendant Sarnicola and his wife Ashley often team up to speak at events – Ashley Sarnicola begins with an inspirational speech about getting motivated to be healthy and then turns the stage over to her husband who encourages the potential enrollees to "help" others to get healthy too. This initial pitch is the excuse to then make the real pitch.  While the excitement is high, potential enrollees are persuaded with the idea that they also can make large amounts of money and drive free luxury automobiles funded by the company by selling the ViSalus products to friends and family and strangers.

102.   The coupling of the "business opportunity" with the initial come-on of buying a diet shake is constant in every ViSalus promotional material and the events and parties it sponsors. ViSalus immediately pushes individuals to become promoters with materials that revolve around jingles like "3 for Free" and "ViSalus is going to pay someone for the referrals, it might as well be you and not the person that referred you."  The structure of the bonus system is, naturally, in the shape of a pyramid:



103.   ViSalus training videos and promotional materials encourage new promoters to immediately set up a "Challenge Party" where close friends and family are invited and encouraged to join the team.  ViSalus provides promoters with an aggressive step-by-step scripted approach for the challenge party and suggests

marketing tactics such as "if your friends can't make it to your party, go to their house" or "invite them to attend an open challenge party near their location" – there is one available every day in a multitude of locations listed on the ViSalus event calendar. At the party the promoter is taught to pitch the opportunity along with the diet shake. Promoters are also persuaded to attend Regional Success Training events and participate in daily or weekly Challenge Overview calls so that they can stay motivated and in touch with other successful promoters and receive advice on how to get their business profitable as quickly as possible. The substance of the training consists of how to recruit others into the pyramid as quickly as possible. For a time, the company teamed up with a web-marketing firm to "teach" new recruits how to duplicate their recruiting.

104.   The potential distributor is not told that the recruiting opportunity is not evenly or fairly applied: the Defendants have not only run an unlawful pyramid scheme but managed to run an unlawful and otherwise *crooked* pyramid scheme.  The promotional materials give the explicit impression that the compensation system is neutral: join, sell, recruit and be paid. For one example among many others, distributors like Sarnicola, Craig, Pacetti, the Kirklands and O'Toole are prominently quoted by the company in its downloadable PowerPoint, "If we can do it, so can you!":







(**Exhibit B**).

105.   In reality, these Defendants "did it" because the promoters stacked the deck and paid them for positions or gave them preferential treatment in the pyramid "downline." The commission and bonus system set out by the Compensation Plan and implemented by the Defendants is enormously complicated and opaque to non-insiders. The funneling of commissions and bonuses, together with deductions of various fees charged by ViSalus, the monthly ranking of each of the over 500,000 IPs and other people labeled as "customers," and the precise placement of each individual within a "downline" or "upline" is handled by a sophisticated database designed and maintained by a company named Exigo.  The placement of each IP within the system determines how much commission that IP will receive. The assignment of new recruits to be in a particular IP's "downline," or the association of customer sales to

a particular IP is not visible to an IP. The entire system can be manually overridden by the ViSalus administrators.

106.   For example, Sarnicola has admitted in an interview that the company paid a professional marketer named Robert Dean $350K to move to ViSalus. That payment was routed through third parties and undisclosed to people being asked to enroll in the "business opportunity." The new professional recruits, like Defendant Wilson, O'Toole, Pacetti and Fortner, were given preferential "upline" treatment, payments, assigned existing "downlines" and/or assisted in placement ahead of other IPs.

107.   The recruitment of professional marketers and their "downlines" artificially swelled the numbers of IPs. By contrast, in all of its promotional materials, on its website, and in the hotel rallies ViSalus continued to give the impression that its "huge" growth, especially from 2010 to 2012, was due to the popularity of its weight-loss shakes among the general public and the money its distributors were making.

108.   ViSalus manipulated its database and set up certain promoters to their advantage. It admitted as much in court filings in this court. In *ViSalus v. Bohn*, the

company sued Lorene Bohn for allegedly breaching her non-competition agreement and taking herself and her 264-distributor downline to an alleged network-sales competitor, OceanView. In the lawsuit ViSalus admitted:

> ViSalus helped Bohn build her downline network to ensure her success in her company by placing distributors and customers in her organization even though Bohn did not recruit such distributors or customers. (Par. 16).

109.   The FTC in 1979, in a decision involving the Amway Corporation, set forth what is commonly known as the "70% rule." That rule mandates that a seller ensure that its distributors do not buy inventory for the purpose of obtaining commissions, but actually retail 70% the product they buy to outside customers during each purchase cycle.

110.   ViSalus' Compensation Plan and policies and procedures mention the 70% rule, but there is no mechanism by which it is enforced. As a result, there are widespread purchases made that violate the rule. The auto-ship program is virtually mandated, and once in it is virtually impossible to turn off. As a result, IPs are often loaded with weight-loss shakes that are impossible to sell on the open market. The ViSalus "business opportunity" is now saturated in the United States. The number of IP's enrolling in the "business opportunity" rose from 8,000 in 2010, to 29,000 on

June 30, 2011, to 59,000 on December 31, 2011 and to 114,000 on June 30, 2012.

The company at one point in 2012 had over 140,000 promoters. The numbers

collapsed soon thereafter, falling to 76,000 on December 31, 2012 and to less than

half of that, 35,000 as of the end of 2013. The company is now laying off much of its

corporate staff, and the number of IPs has now dwindled even more.

111.   The company has expanded to Canada and the UK and other European

nations, and is trying to market itself in other foreign markets without success.  The

US sales of the company have collapsed since the third quarter of 2012. The

company's revenues are now a third of those at its peak, and those due almost

exclusively from sales through and to new recruits and new markets that the company

is frantically trying to establish.

112.   The Defendants know that the sales of network marketing companies

like ViSalus in a given market eventually collapse, and new markets must be found

where the "business opportunity" is not yet tapped out.  Virtually all network sales

companies that survive the initial two or three year (transient) sales rise, move sales

internationally. RAM, the Goergens, and the ViSalus co-founders Sarnicola, Blair

and Mallen, attempted an IPO of ViSalus in 2012 which was pulled at the last minute

due to concerns from the underwriters.  During the IPO, these defendants estimated

68

that the North American market will become saturated, but that there was room to still grow, hence the viability for an IPO.

113.    Many of the imported distributors from other network companies have now left for other networking companies. For example, Defendants Wilson and Jackson are now engaged in LifeVantage, another MLM, and have ceased to be IP's for ViSalus. All or virtually all of the IPs who were recruited between 2010 and 2013, like Plaintiffs, have lost their money paid to ViSalus for the "business opportunity." And, as detailed elsewhere, shortly after the peak of the recruited sales force peaked, various Defendants pulled out over $140 million from the pyramid scheme. The company has again gone private, with Defendants Goergens, Sarnicola, Mallen and Blair, obtaining ViSalus stock back from Blyth.

## CLASS ACTION ALLEGATIONS

114.    Plaintiffs Kerrigan, Mikovich and Valli bring this suit as a class action pursuant to the FED. R. CIV. P. 23(b)(2&3).

115.    Kerrigan, Mikovich and Valli bring this action individually and for a class tentatively defined as:

> All purchasers of the ViSalus "business opportunity" (the "Class"). Excluded from the Class are all persons named as a defendant (or a spouse of a defendant or a related entity of defendant) and any purchaser who has not experienced a financial loss as a result of their ViSalus distributor enrollment.

116.   Kerrigan, Mikovich and Valli's claims are typical of the claims of the class in that they paid money to become IPs in the Defendants' pyramid scheme and lost money as IPs.


117.   Kerrigan, Mikovich and Valli will fairly and adequately represent the interests of the class because their claims are typical of those of the class and their interests are fully aligned with those of the class.  Kerrigan, Mikovich and Valli have retained attorneys that are experienced and skilled in complex class action litigation, including in class action pyramid scheme litigation.


118.   Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged herein, because such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.

70

119.    The Defendants have acted on grounds that apply generally to the class, *i.e.*, running a pyramid scheme, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. (FED. R. CIV. P. 23(b)(2)).    If Kerrigan, Mikovich and Valli prove that the defendants operate a pyramid scheme, the Court should enjoin the defendants from operating that pyramid scheme in the future.    In the alternative, the Court may issue an injunction without a class being named.

120.    This case presents questions of law or fact common to class members that predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. (FED. R. CIV. P. 23(b)(3)).

121.    The questions of law and/or fact common to the class, include but are not limited to the following:

    a.    Whether the Defendants were operating an unlawful pyramid scheme;

    b.    Whether the Defendants encouraged or required class members pay money to the defendants for the illusory "right" to sell ViSalus product;

    c.    Whether the Defendants engaged in acts of mail and/or wire fraud when operating the unlawful pyramid scheme; and

71

        d.      Whether the Defendants caused injury to the business or property of class members.

122. These and other questions of law and/or fact that are common to the class predominate over any questions affecting only individual class members. No element of establishing liability requires individualized proof.

123. Kerrigan, Mikovich and Valli's claims are typical of the claims of the class.

124. A class action under FED. R. CIV. P. 23(b)(3) is superior because:

        a.      No class member has an interest in individually controlling the prosecution of his/her/its separate action. No class member can be expected to incur the cost of attorneys' fee and cost to recover their $499 ESS or $999 ESS plus other payments to become an IP and maintain IP status.

        b.      There is no other pending litigation over these issues.

        c.      It is manifestly desirable to concentrate the litigation of the class's claims in Michigan and this district.

        d.      The Court will encounter no difficulties in managing this case as a class action.

## COUNTS

### COUNT ONE
### VIOLATION OF 18 U.S.C. §§ 1961(5), 1962(c) AGAINST DEFENDANTS VISALUS, RAM ENTITIES, ROBERT GOERGEN, SR., TODD GOERGEN, HASHTAG ONE, O'TOOLE, PACETTI, GOODER, PROSPEX, SARNICOLA, BLAIR, AND MALLEN

125.   RICO prohibits the following conduct:

It shall be unlawful for **[1]** any person **[2]** employed by or associated with **[3]** any enterprise **[4]** engaged in, or the activities of which affect, interstate or foreign commerce, **[5]** to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs **[6]** through a pattern of racketeering activity or collection of unlawful debt. 18. U.S.C. § 1961-68 (numbering added to text of statute)

126.   Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

127.   RICO requires that a "person" violate its provisions." 18 U.S.C. § 1962(c-d).  A RICO "person" includes any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).  A RICO person can be either an individual or a corporate entity. All Defendants named in this count are RICO persons.

## THE RICO ENTERPRISE

128.   Defendants ViSalus, Robert Goergen, Sr., Todd Goergen, Ropart Asset I, Ropart Asset II, Rock Ridge, Ropart Asset Management, HashTag One, Sarnicola, Blair, Mallen, O'Toole, Prospex, Gooder, and Pacetti, have acted as an "association-in-fact" for a common purpose, have and maintained relationships between and among each other (and nonparties), and the association-in-fact has a longevity sufficient to permit those associates to pursue the enterprise's purpose - - the establishment and perpetuation of an unlawful pyramid scheme in which hundreds of thousands of people have lost money. The operation and management of the association in fact was generally led, at various times, by Defendants Robert Goergen, Sr., Todd Goergen, Sarnicola, Blair and Mallen. The individual promoter Defendants O'Toole and Pacetti, through wholly-owned Gooder and Prospex, generally operated certain field aspects of the enterprise, taking direction from ViSalus, Sarnicola, Blair and Mallen. Later, in approximately 2013, O'Toole/Prospex and Pacetti/Gooder began to manage the scheme along with Sarnicola, Blair, Mallen and the Goergens. RAM provided funds to enable the association to grow and management and strategic advice to grow and expand the pyramid scheme. RAM's own operation was directed by Robert Goergen, Sr., and Todd Goergen. Later, HashTag One provided financial incentives to certain recruiters.

74

129.    The "association-in-fact" began in 2005 and has continued to today. Each of the Defendants charged in Count 1 has been a part of the association-in fact as follows: ViSalus: 2005-present; Robert Goergen, Sr.: 2005-2013; Todd Goergen: 2005-present; Sarnicola: 2005-present; Blair: 2005-present; Mallen: 2005-present; O'Toole/Prospex: 2009- present; Pacetti/Gooder: 2010-present; RAM: 2005-2012; HashTag One: 2014-present.

### A.    Roles of ViSalus, Robert Goergen, Sr., Todd Goergen, RAM, Blair, Sarnicola, and Mallen In The Management of the Enterprise

130.    In 2002, Defendant Blair, a self-proclaimed ex-Los Angeles gang member, met Robert Goergen Sr. in an unrelated business. Robert Goergen, Sr. invested money in Blair's unrelated company. Robert Goergen, Sr. at the time and for many years thereafter until 2013, was the chief executive and major shareholder at Blyth, Inc., a publicly-traded company operating direct-selling subsidiaries such as candle and home-décor seller PartyLite, Inc. Three years later in 2005, Blair learned of a network marketing company operating in Troy, Michigan, called Free Network. Sarnicola and Mallen were involved in the company's operations, which was selling long-distance telephone service through independent promoters.

131.    Sarnicola, Blair, and Mallen each had years of "network marketing experience" prior to ViSalus. Sarnicola said in an interview:

> I was introduced at the age of 18 by a stranger while working at the mall making $5.50 per hour. I had NO CLUE what Network Marketing was, but I knew I wanted to be "rich one day," so Networking seemed to be a great way to do that."

132.    Robert Goergen, Sr., and Todd Goergen were sophisticated business people. When they first got involved in ViSalus, each knew the difference between a pyramid scheme and a direct-selling commissions system. Since the 1970's, Robert Goergen, Sr., operated and owned a 30% stake in Blyth, Inc., ("Blyth") which had a core business of selling candles and other items by home-based parties operated by independent sales people. Todd Goergen had been in charge of M&A at Blyth and invested in direct selling companies for RAM.

133.    In December, 2005, the Goergen family investment vehicle, Ropart Asset I, invested $1.5 million into ViSalus, through its holding company FVA Ventures, Inc. Ropart Asset I became an approximately 25% member in the then-LLC (the LLC later re-formed as a corporation in 2012). Blair, Sarnicola and Mallen kept approximately 19% each of the remaining ViSalus membership interest. Defendant Ropart Asset I was capitalized by Robert Goergen, Sr., Todd Goergen and others, primarily Goergen family members. Defendant Ropart Asset Management

managed the investments made by Ropart Asset I. Later, Defendant Ropart Asset II, managed by Defendant Rock Ridge, made a further investment and loans in and to ViSalus. The effect of these investments initially was to capitalize the company and enable it to expand.

134.    Upon making the ViSalus investment, Defendant Ropart Asset Management (the managing company for Ropart Asset I) and ViSalus's holding company, FVA Ventures, also entered into a broad-ranging management agreement. Under that agreement, which was extended for several years between at least 2006 and 2010, RAM and its executives, Todd Goergen, Jonathan Shapiro, and others, provided almost daily advisory and management services to the ViSalus operation. Among other people, RAM provided Todd Goergen and other management personnel to ViSalus to assist in its operation. ViSalus has identified Todd Goergen's role both during his management of RAM and later as follows:

> Todd A. Goergen joined ViSalus on August 1, 2012 as chief strategy officer. He was first appointed to the ViSalus board of directors in 2005 as a designee of [Ropart Asset Management] pursuant to its rights under its investment agreement with ViSalus. Mr. Goergen has served as Managing Member of RAM since 2001. RAM makes direct investments in small to mid-size companies. In addition, Mr. Goergen is a Managing Member of Ropart Investments, LLC, a private investment partnership. Between 1999 and 2000, Mr. Goergen was the Director of Acquisitions and Corporate Development at Blyth. …Mr. Goergen brings deep knowledge of our business, financial expertise and broad experience in growing and managing recently founded companies to our board.

In 2012, Todd Goergen became the Chief Operating Officer of ViSalus at a $500,000 a year salary.

135.   At the same time, and coinciding with the RAM investment, the ViSalus operating agreement, originally formed in November, 2005, was amended to provide for RAM (specifically Defendant Ropart Asset Management) or RAM designees to have a significant and controlling role in the ViSalus operation. For example, RAM could appoint and remove managers of the company and sit on the company's board. Robert Goergen, Sr. and Todd Goergen at various times assumed the designee powers given to RAM. Both sat on the board of ViSalus and were privy to every facet of the organization, including its financial and field operations. Thus, from the beginning of the capitalization of ViSalus, RAM played a key role in creating, supporting and growing the pyramid scheme, and the Goergens were intimately knowledgeable about the company's activities through their active RAM activities.

136.   Between 2006 and the present, each of Sarnicola, Blair, Mallen, and Todd Goergen, had a co-equal role in the daily decision-making of the enterprise, while Robert Goergen, Sr., had a supporting role and provided financial advice. Todd Goergen operated through RAM and RAM's management agreement with ViSalus

78

and his board activities for ViSalus. The remaining Founders were responsible for daily operation and development of the promoter field.

137.   Beginning in 2006, and continuing until an eventual recapitalization in 2014, RAM played a significant role in the management and operation of the enterprise. On repeated occasions early on, between 2006 and 2007, RAM, through both Ropart Asset I and Ropart Asset II, and under management by Rock Ridge and Ropart Asset Management (each led by Todd Goergen), loaned operating capital to ViSalus and took additional equity positions in return for operating cash. Ropart Asset I invested a total of $1.418 million equity and $688,000 in loans. Ropart Asset II invested $600,000 in equity and $2.919 million in loans between 2005 and 2007. The loans were backed by promissory notes from ViSalus.

138.   When they and RAM initially invested in ViSalus in 2005, the Goergens insisted that the deal not be publicized. Later, the Goergens publicly acknowledged their connection to the running and operation of ViSalus.  This was in part to give the company an air of legitimacy. ViSalus played on its association with Blyth, a publicly-traded company in the direct sales business that has never been "tainted" with the idea that it is a pyramid scheme, to grow its credibility with new recruits.  At various times it also played on its association with RAM.

139.    In the role of experienced businessmen associated with Blyth and RAM, both the Goergens were pitched as members of ViSalus' "Executive Team." In a 2012 "interview" in front of a ViSalus screen and on stage at a convention, Robert Goergen, Sr., announced that he had a role in ViSalus' "strategic" decisions since 2008. In another video on July 24, 2011, "Billionaire" CEO Robert Goergen, Sr., spoke at a ViSalus convention about his "beliefs" in the future of the company.

### B.    ViSalus Operation

140.    Coinciding with or shortly before the RAM investment in 2005, Free Network was renamed ViSalus Sciences and began selling a wholly different line of products, vitamins and later skin-care products. Although its website and promotional materials played on the "sciences" behind its products, it did not have any kind of laboratories, had no connection with any legitimate hospital or university research project, and employed no one with credentials to sustain any manner of health-related claims for its products.

141.    ViSalus promoted an affiliation with Dr. Michael Seidman, an ear, nose, and throat specialist at Henry Ford Hospital, West Bloomfield, Michigan.  Once Blair joined ViSalus, the three "co-founders" pitched Seidman as a patent-holder, recipient

of 20 years of NIH grants, and world-famous vitamin and nutrition researcher behind its weight-loss shakes.  At all times, however, Seidman had his own practice in an unrelated field, ran his own side business vitamin supplements company, and the company paid him a license fee.

142.   The company hired Michael Sheffield and listed as a part of its management team in the realm of "MLM Consulting." Sheffield advertised himself as an expert witness in the field of compensation plans and listed many notorious network marketing companies as clients. The Compensation Plan was created in 2006 through Sheffield. All of the shareholders of ViSalus were involved in its implementation, although Sheffield's primary contact was Defendant Mallen. The company hired Exigo, Inc., a Dallas-area software company to implement the Compensation Plan and began actively recruiting promoters to sell the "business opportunity" to people across the United States.

143.   A significant event occurred in 2008. In August, 2008, Blyth, RAM, Sarnicola, Blair, Mallen, Robert Goergen, Sr., and Todd Goergen, entered into a Membership Interest Purchase Agreement ("MIPA") for Blyth to purchase the ViSalus equity owned by each defendant over a series of transactions that were to begin in 2008 and conclude in 2012. The price of the membership interest that Blyth

would pay was pegged to the company's profitability at the time of each closing, with Blyth committing to pay a potentially very high amount per membership interest depending on the ViSalus EBIDTA in 2011 and 2012. In 2008, Blyth initially paid a relatively small sum for a small interest in ViSalus. The MIPA deal provided a significant incentive to the Corporate Defendants to increase ViSalus' earnings.

144.   On October 21, 2008, Blyth acquired 43.6% equity interest in ViSalus for $13.0 million. In April 2011, Blyth completed the second phase of acquisition of ViSalus for approximately $2.5 million and an increased ownership to $57.5%.

145.   After the initial 2008 transaction took place, Blair, Sarnicola and Mallen continued as the company's top controlling management. They also remained and played the roles of the company's front men to the public. They appeared at the ViSalus meetings and conventions, recorded videos, allowed their presentations to be recorded and distributed, oversaw the operation of the Compensation Plan, became or continued to be personally involved in the company's strategic decision-making, and otherwise managed the significant affairs of the company. Blair retained the title of CEO, and Mallen continued the Chief Marketing Officer. Sarnicola stayed in management but in early 2010, he announced that he was leaving ViSalus, and assumed the role as the top of the distributor chain of the ostensibly "independent"

promoters, which role he continues to hold. Sarnicola continued to manage the affairs of the enterprise after his "leaving.

146. In January 2012, in the third purchase transaction, Blyth paid approximately $22.5 million cash (+ 681,324 shares of common stock valued at $14.6 million) for an increased ownership to 72.7%. In April 2012 Blyth paid an additional $6.2 million bringing the third phase total to $43.3 million. In December 2012, Blyth purchased an additional 8.2% of ViSalus to increase the ownership to 80.9% for a payment of $60.6 million. An additional payment of $25.3 million was made for a buyout of an employee equity incentive ("EIP") plan. Among the recipients of that portion of the purchase were defendants Trzcinski/TRZ, Jackson/Red Letters, and Reynolds.

147. Without valuing the exchanged share amounts, or including what each of the individual shareholders received in compensation and, in Sarnicola's case in payments for being the "top" field operative in the pyramid scheme (approximately $10-11 million) the Blyth MIPA transactions paid at least $30 million each to Sarnicola, Blair, and Mallen. It is believed that some or all of that money has been transferred or paid directly to the wholly-owned companies of each of these Defendants, Power Couple, AB25, OCD, and BAM. Both Goergens also personally

benefitted from the MIPA deal. In 2012 Todd Goergen received a $1.7 million payout and Robert Goergen, Sr., received $5.1 million payout for their personal share of ViSalus. Todd Goergen also received shares with a redemption value of $4.5 million, and Robert Goergen, Sr., received shares with a redemption value of $13.2 million in ViSalus in 2012. Both of them, and their respective trusts, received significantly more through the RAM investment in ViSalus. Defendants Ropart Asset I and Ropart Asset II received over $50 million for their investment in ViSalus by 2012. That money was paid out in 2012 to the capital owners of Ropart Asset I, and Ropart Asset II, Trust, Robert Goergen, Sr., and Todd Goergen.

## C.    Growth of the Pyramid Scheme

148.   RAM, the Goergens, Sarnicola, Blair, and Mallen each played a significant role in ramping up the pyramid scheme in advance of a hoped-for IPO in late 2012. Each of them had a financial incentive in a high market valuation of ViSalus due to MIPA and because they each hoped that ViSalus's apparent success would pay off in an IPO. Each of them were aware that the company's valuation depended on sky-high revenues and that these revenues could only come from the artificial influx of promoters, by the outright purchase of network marketers, and by illegal recruiting activities down the chain fueled by recruiting bonuses. Each of them controlled the business operation of ViSalus to accomplish these illegal activities.

149.   To achieve the high valuation that these five Defendants hoped would eventually result in an IPO, and to increase the value of the equity subject to MIPA purchase, RAM provided necessary operating capital to the company to enable it to offer professional recruiters money and incentives to come work for the expansion.

150.   With the RAM stability, ViSalus began to systematically induce and buy professional marketers from other network companies like MonaVie and GeneWize to "join" ViSalus. This deliberate influx greatly accelerated the number of IPs that recruited others into the system. The flow of new promoters, sometimes singly and sometimes in groups, was designed to induce an aura of "success" or "momentum" into the ViSalus operation. As in other pyramid schemes, the influx of distributors who were able to bring over "downlines" from other companies, which sometimes numbered in the thousands of people, would swell the revenue numbers (each new distributor would buy certain amount of product and pay the IP fee); would make innocent potential buyers of the product, like Plaintiffs, believe that there was something "revolutionary" about the ViSalus vitamins and weight-loss shakes and vitamins; and would lend credence to the pitch that ViSalus' marketing department would repeat through any channel possible, that tens of thousands of people were

flocking to the "business" or "income opportunity" because it paid so well and was backing such a popular product.

151.  In fact, as set forth above, the "new" high-ranking distributors, including the Independent Promoter Defendants, were paid to work for ViSalus, controlled their pre-existing "teams" of people, and allowed themselves to be presented as distributors "just like" innocent recruits when in fact they were anything but. Many if not all of the Independent Promoter Defendants, and many others, signed contracts with ViSalus or with Defendants Power Couple or AB25 or with each other to get advance commissions, move or start with certain "volume," and got other concessions. These agreements were orchestrated by Sarnicola, Blair and Mallen, with the knowledge and cooperation of the Georgens and RAM. There were dozens or hundreds of these agreements, some with individuals and some with large groups of recruiters defecting from other MLM companies.  Each of them agreed to keep the fact of the "purchase" of these professionals from innocent recruits.

152.  During the time that the scheme ramped up, each of the Corporate Defendants knew that the Compensation Plan paid more for recruiting than for the ostensible third-party customer sales. The plan was designed to do that and was continually tweaked by the defendants to promote more recruiting. A Q&A prepared

by senior management for a Blyth annual meeting in 2012 acknowledged this exact point:

> [Q] What is the incentive for a leader to sign up a new promoter versus simply selling product to that person?
>
> [A] By having more Promoters within your organization "downline" you improve your opportunity to increase your commission since you therefore have a larger sales force working for you… *In addition, depending on your enroller's rank, they may earn more from a Fast Start Bonus triggered by the sale of an ESS versus having that same person buy a similar amount of product…Finally, any initial product orders trigger yet another bonus that is more lucrative to the enroller that that which is generated by a personally enrolled customer's order.*

153.    The Corporate Defendants exchanged understandings about a "recruiting culture" developed by the Compensation Plan. These defendants met regularly through board meetings, strategy sessions, monthly sales reviews, and in Blyth board meetings, to discuss the precise numbers of new recruits brought in each month, which promoters were recruiting the most, which promoters sold the most number of ESS kits, and so on. Special incentive plans were developed in 2011 to be secretly given to top promoters, including many or most of the Independent Promoter Defendants in this case, that paid a bounty based on the number of new recruits who purchased an ESS kit.

154.    At the board level top management, including the Corporate Defendants, tracked which of the many weekly and monthly performance bonuses were paid for

the act of recruiting versus for retail sales. Corporate Defendants knew that the only real bonus paid out for product sales to non-IPs, the "personal customer commissions," amounted to 9%, and the remaining 91% paid, amounting to hundreds of millions of dollars (often over 50% of all net sales booked by the company) depended on recruiting others.

155.   The Corporate Defendants knew that most of the new IPs were buying a $499 ESS kit, ordered a month or two worth of product, and dropped out. They acknowledged between themselves that "the majority of Distributors have short ViSalus lives."

156.   The Corporate Defendants knew the company's retention rates for both customers and promoters and shared them among themselves at board and monthly meetings. The Defendants thus knew that the average "customer "was "active" for less than three months, and the average distributor less than five months, leaving the IPs churned out at a rate of over 200% per year.

157.   The Corporate Defendants also knew there were no appreciable numbers of legitimate retail customers for the products. Board presentations showed ratios of less than one customer per promoter. That ratio never rose above 3:1, and then only

briefly and because of special promotions that temporarily made obtaining customer orders more valuable to recruiters than recruiting. One reason for that was that the company made **11X** more profit from a recruit than from a customer.

158.    When ViSalus was not directly doing deals with professional promoters, the Corporate Defendants provided the means for Sarnicola to cut special deals with the ostensibly independent promoters like Defendants O'Toole, Pacetti and others. For example, Defendant Pacetti, through Defendant Gooder, entered into a sub-contract with Defendant Power Couple. O'Toole, through Defendant Prospex, contracted with ViSalus directly. Many of these, as set out above, entered into contracts in 2011, 2012, 2013, and 2014 that provided special bounty payments based on the number of ESS kits that were sold.  Those agreements were never disclosed to the people who were going to get recruited and continue to be withheld from the newest rounds of people getting recruited today.

159.    Defendant Pacetti has been given credit by ViSalus for generating much of the pyramid scheme in 2011. Prior to joining ViSalus, Pacetti was a top distributor with MonaVie, another weight-loss network company selling vitamin-laced juice through a network selling system. He joined the enterprise in 2010, recruited by Sarnicola. ViSalus promotes him as a "Top Earner" who achieved his "status" in only

45 days. He and Gooder were a knowing and willing participant in the promotion of the ViSalus pyramid scheme, and later played a role in the management of the scheme.

160.    Pacetti's Lamborghini was featured in an "episode" of "The Pyramid Thing." He often appeared in videos and live before thousands or tens of thousands of prospective distributors giving training on how to "get" "free BMW's" and achieve wealth through the ViSalus "business opportunity," such as, for example, a video appearance in 2012 titled "Roadblocks on Your Road To A BMW." He touts the power of the ViSalus system in many videos and live appearances that are taped, for example a 2011 appearance explaining the "power of leverage," Along with a number of the other Individual Promoter Defendants, Pacetti is part of a 2011 ViSalus-published presentation in which he is depicted giving testimonials to the company and the opportunity. These statements were also false and/or misleading.

161.    Defendants O'Toole/Prospex have appeared multiple times at ViSalus events in Canada and the United States. O'Toole directly reports to Sarnicola, with whom he appeared in "The Pyramid Thing."  O'Toole was a knowing and willing participant in the promotion of the ViSalus pyramid scheme. As part of the scheme

he allowed himself to be quoted as earning over $200K per month by using the company's easy-to-follow formula:

> **Jason O'Toole**, ViSalus Nr. 2 Top Earner was rewarded with $1 million bonus in June 2011. Jason went from over $100K in debt and never making it in [multi-level-marketing], to earning over **$200,000** as of April 2012.

O'Toole has operated a promoter business for ViSalus since at least 2010 through, among other means, his website at www.jasonotooleonline.com. In addition to offering his services to others as a network marketing "coach" and lead generator through Defendant Prospex, O'Toole represents himself to be the top "earner" for ViSalus, and appears in ViSalus promotional materials as a "millionaire" or "Crown Ambassador." O'Toole has been featured in numerous videos posted to YouTube by ViSalus or others extolling his alleged financial success due to their ViSalus distributor relationship. For example, in a 2012 video, O'Toole is seen with a $1 million check. He spoke in a 2010 video about his "Healthy and Wealthy" success for ViSalus. In 2013, O'Toole recorded a "March To Your Bimmer" video as part of the enterprise. The statements O'Toole/Prospex have made are false and/or misleading.

162.   In later years, as their influence over sizeable downlines under them grew, Pacetti/Gooder and O'Toole/Prospex, became more involved with and began to co-manage the enterprise. They entered into the special incentive contracts

described above. Another secret deal gave promoter Defendant O'Toole a company American Express card for his operational expenses. They both participated in numerous strategic sessions with Sarnicola, Blair, Mallen and Todd Goergen where they executed non-disclosure agreements before being exposed to the company's future strategy. Each led or co-led a series of promoter "development" groups called "Leaders In Training" which identified "promising" recruiters and taught them recruiting strategies. In 2014, Defendant O'Toole, through Defendant O'Toole Int'l Holdings, became a co-owner of defendant HashTag One and gave out equity in that company to other promoters as a reward for recruiting people into the scheme. Pacetti and O'Toole, as well as the other Independent Promoters Defendants, organized systematic meetings and calls to push the message of "recruit, recruit, recruit" to the advancing recruiters in the system. Pacetti even taught special "training" events for the higher level promoters how to "distort reality" for new recruits who may objected to joining. Gooder and Prospex were reimbursed and/or paid for these sessions by the Corporate Defendants.

163.   Each of the Independent Promoter Defendants understood that the role they were to play was to recruit as many unsuspecting people as possible into the ViSalus scheme, to pretend that they were simply people "just like" unwitting participants invited to attend the ViSalus presentation, that they were to use scripted

materials at the conventions, that they were to appear in ads and to give false testimonials. Each of them understood and knew, based on their prior experience, that the ViSalus plan promoted recruiting over product sales. Each of them understood that they were to use social media to coat the Internet in the message that ViSalus was a great income opportunity. Each of them understood that the terms of their distributor relationship with ViSalus was materially different than the people they were to recruit.

164.    Each of the Independent Promoter Defendants actively participated in the promotion of the pyramid scheme and were handsomely rewarded for building huge, multi-level "downlines" of recruits. In return, each of these defendants and others made false statements intended to be disseminated to unsuspecting recruits purporting to be "just like" the new recruit, all with the intent to lure people into the system that each defendant knew was highly unlikely to make any money, or could only make money by committing illegal recruiting activities, *i.e.,* victimizing someone else.

165.    Each of these Independent Promoter Defendants published "interviews" in which they claimed to have made incredible amounts of money by "joining" the program. With ViSalus' cooperation and knowledge, support, assistance and the

knowledge and cooperation of Sarnicola, Blair and Mallen, they published fawning statements of their alleged success through ViSalus, on their own websites, and through links to each other's sites, thus enabling easy search engine optimized-messages of ViSalus wealth to be found throughout the web. Each of these statements and videotaped appearances in which the false messages in furtherance of the expansion of the pyramid scheme was a predicate act of racketeering.

166.   Blair, Sarnicola and Mallen continued to personally appear as the front men of ViSalus, recording a multitude of videos which purported to explain the compensation system for IPs, and advertised the "business opportunity" for "entrepreneurs" to "join" ViSalus. The growth campaign was a runaway success in 2010, accelerated in 2011, and went through the roof in 2012.

167.   The company's annual sales in 2010 were $32.8 million.  Its sales in 2011 were $230 million.  Its sales in 2012 were $623 million, almost 20 times higher in two years.  At the same time, the company added tens of thousands of new distributors, from well under 10,000 to over 114,000 people, increasing each year by over 50,000 in 2011 and 65,000 in 2012.

### D.     Roles Of Other Promoter Defendants

168.   Defendant Fortner joined ViSalus as a promoter in June, 2010. He is believed to have ceased the active ViSalus promotion business in approximately 2013. He maintained a ViSalus promotional website at www.aaronfortner.com. Fortner was previously a distributor for GeneWize.

169.   As part of his work to promote the pyramid scheme, Fortner falsely claimed to make over $100K a month due to his relationship with ViSalus. He claimed in published materials on the Internet that he was paid or promised to be paid over $4 million as a result of being a ViSalus distributor.  He appeared in videos produced by himself promoting ViSalus.  One such video shows Fortner appearing at the 2012 Miami Vitality Event sponsored by ViSalus. In another, in 2013, Fortner at an Atlanta convention claimed that his life was "radically changed" by his being a ViSalus distributor. Fortner conducted numerous recruiting seminars or events on behalf of the enterprise, touting the income that could be made through a ViSalus distributorship. He was featured in 2014 on the ViSalus Vi-Life blog, stating:

> There is nothing more satisfying than sharing professional, financial and emotional victories with my team partners. It happens often, and I'm hooked on the feeling."
>
> That commitment to shared success is what helped Aaron achieve the Diamond Ambassador in only a matter of weeks after the rank was introduced to the Vi Community.

95

This statement was untrue and/or misleading.

170.   Fortner was a knowing and willing participant in the promotion of the ViSalus pyramid scheme. For example, in a 2013 published interview, Fortner exhorted that:

> To get to the next Promoter rank, you need to completely trust in the promotions that ViSalus offers and then do exactly what the plan says. I made a personal commitment to achieve Diamond Ambassador, and then I learned how to get there as fast as possible. Sometimes the best leader is the best follower–one who consistently follows the play. The system is already in place; you just need to follow it.

This statement was untrue and/or misleading.

171.   Defendants Jackson/Red Letters were connected to ViSalus through Defendant Fortner. Jackson operates a website promoting ViSalus at and a YouTube channel called "Wealth With Rachel," in which she touted the ViSalus opportunity. She posted numerous YouTube videos touting her alleged successful financial relationship with ViSalus. She was featured in numerous videos and printed materials extolling her alleged financial success due to the ViSalus distributor relationship. She was a featured "ViSalus Top Money Earner" in ViSalus promotional materials. She conducted numerous recruiting seminars or events. Jackson actively appeared as a promoter for ViSalus, and gave testimonials to the ability of the system to generate a

high income and appeared in ads and on a ViSalus convention stage with a not-real check. She was touted as the youngest 5-star ViSalus Ambassador in 2011. In 2012 she gave a "testimonial" about the power of ViSalus, again holding a $500,000 check. The statements she made in these materials were false and misleading.

172.    Jackson/Red Letters was a knowing and willing participant in the promotion of the ViSalus pyramid scheme. In an "interview" she gave to tout her alleged success with ViSalus Jackson said:

> Our team has expanded greatly, representing every single state in the US and every single province in Canada. We now have over **6,000** active (*active!* that's the only number that counts guys) promoters on our team and tens of thousands of customers. In April 2012, we're on track to close out over **$4,000,000** in group revenue. That's translated to an income for Josh & I [sic] that's topping **$100,000** a month [sic] our 14 month in ViSalus (emphasis in the original).

The statements made in the interview were false and/or misleading.

173.    Defendants Craig/M-Power have been featured as a "$4 million" ViSalus distributor on the Internet. Craig and his wife are featured as "5-Star ViSalus Ambassadors" waving a $1 million check on stage. They operate a website promoting ViSalus. The Craigs have conducted numerous recruiting seminars or events designed to induce unsuspecting people into the pyramid scheme. Craig has allowed himself to be featured in numerous videos and written and mailed brochures,

magazines, and DVD's extolling his alleged financial success. Among others, Craig is listed as a Top Earner in an article featuring Defendant Sarnicola, touting the distributor success at ViSalus. Craig was a knowing and willing participant in the promotion of the ViSalus pyramid scheme. In 2011, in a PR release by ViSalus, Craig described himself as,

> In less than two years he has taken a group from zero to over 40,000 people, grown monthly group revenue to over $9 million and has helped over 120 people earn over 6 figures per year.

The statements attributed to Craig are false and/or misleading. The "downline" he has touted as having developed was transferred to him by Sarnicola.

174.    Defendants Petrilli/9248 and Varon/NHCI were long-time professional network marketers who began in the late 1990's with Excel Communications, an eventually bankrupt Texas direct sales company selling phone subscriptions. They were recruited by Sarnicola in approximately 2008. They agreed to be represented as average distributors without disclosing to innocent recruits that they were given different financial arrangements. Petrilli and Varon were featured in various ViSalus materials, at times pictured holding checks of $250,000 on stage or at conventions disseminated by ViSalus. They were knowing and willing participants in the promotion of the ViSalus pyramid scheme. They, along with many other promoter Defendants (Sarnicola, Craig, Pacetti, O'Toole, and the Kirklands), were keynote

speakers in 2011 at the "Regional Success Tour" where the topics included "Learn

How To Make $100,000+ From Home," "Watch BMW's Be Given Away," and the

like. They conducted numerous recruiting seminars.

175.  In 2011 Petrilli and Varon gave an "interview" where they said the

following:

> Lori and Frank have earned millions of dollars in Network
> Marketing in the past 12 years and have helped close to
> **250,000** people enter into the industry. Since their start on
> February 15th of 2011, in ViSalus they have watched their team
> grow from 14 distributors to almost **10,000 in less than 40
> weeks**. They have broken every rank achievement record since
> joining ViSalus including the fastest to Ambassador – 13 days,
> fastest to 4 Star Ambassador – 45 days and fastest to 5 Star
> Ambassadors – 150 days…. Frank says, "ViSalus allows any
> individual, no matter what their background to rise to a new
> pinnacle of achievement." 'It's actually quite amazing." Lori
> says, "The differences in this team's backgrounds is startling
> and yet they all share an amazing level of achievement, there are
> thousands working "very" part time and earning a fantastic extra
> income" She continues: "…and hundreds who have won a free
> BMW and are earning up to tens of thousands a month and all
> of this achieved in less than nine months, it's quite
> extraordinary.' " "That level of universal reward is a living
> validation that success can be achieved by all who claim it to be
> theirs" Lori says, "we've never seen anything like this before
> simply because there never has been anything like it…. this is
> it!' "

The statements made in the interview were false and/or misleading.

176.   Defendants Wilson/ABGL were recruited from a competitor network marketing company, MonaVie, in 2010. Prior to Wilson's involvement with MonaVie, Wilson was a distributor and pitchwoman for GeneWize, a company selling nutritional supplements. ViSalus promoted Wilson as a "Diamond Ambassador" on its website and through news releases. Wilson was a knowing and willing participant in the promotion of the ViSalus pyramid scheme. Wilson gave an "interview" in 2012 in which she touted that she was a "seven figure earner" in just 17 months. Similar claims about her success were made by her in in 2012. Wilson gave an "interview" to be published on YouTube in 2012 in which she touted ViSalus. She has published numerous other videos touting the distribution system since 2010. Wilson (along with Defendants Pacetti and O'Toole) also appeared on "The Pyramid Thing" Internet reality series promoted by ViSalus, Sarnicola, Blair and Mallen. Wilson agreed to be portrayed on "The Pyramid Thing" as an average, successful distributor. Wilson's appearances were false and/or misleading.

177.   Defendants Kirkland/Freedom Legacy are identified as a "5-Star Ambassador" for ViSalus and was a former top distributor for multi-level network company MonaVie. Since 2011 the Kirklands have been featured in videos and written promotional materials mailed by ViSalus. They have conducted numerous recruiting seminars or events where they promote their alleged financial success as a

result of being a ViSalus distributor. Kirkland, along with his wife, filmed and published a YouTube video on the HealthPlusWealth channel entitled "Promoter Testimonial," in which they claimed to generate $2 million a month" in sales, their "big expense" is a $29 Vi-Net subscription, and stated: "I don't know of anything else where you can have a six-figure income with an overhead of $29/month." These statements were false and/or misleading. Kirkland was a knowing and willing participant in the promotion of the ViSalus pyramid scheme. He, along with many other promoter Defendants (Sarnicola, Craig, Pacetti, O'Toole, Petrilli and Varon), were keynote speakers in 2011 at the "Regional Success Tour" where the topics included "Learn How To Make $100,000+ From Home," "Watch BMW's Be Given Away," and the like.

178. Defendant Gary J. Reynolds, also known as Simply "G", is one of ViSalus' original Ambassadors. Achieving the rank of 5-Star Ambassador, he has successfully recruited tens of thousands promoters into ViSalus. Reynolds is a co-founder of the Body by Vi 90-day Challenge and Project 10 Challenge and actively participates in ViSalus' leadership training, the Leadership & Influence Development (LID) group. Prior to working in the field, Reynolds worked as the Director of Sales, North America for ViSalus. Reynolds continues to promote ViSalus and himself as "Network Marketing Expert" through his website simplyg.com.

179.   Defendant Kevin Merriweather, together with his wife Stephanie, signed up with ViSalus in 2010.  Merriweather has and continues to participate in numerous ViSalus events promoting his ultra-premium lifestyle and status as a 5-Star Ambassador.  Merriweather is subject of numerous online videos publicizing ViSalus and his prosperity.  Merriweather also actively participates in ViSalus' LID group and continues to promote ViSalus through his social media webistes and http://www.m5.bodybyvi.com/.

### E.   RAM, Pacetti, O'Toole and Other Defendants' Roles In Management Of The Enterprise After The Scheme Began to Collapse In Late 2012

180.   On September 4, 2014, Blair, Mallen, Sarnicola, Trust, Roberg Goergen, Sr., and Todd Goergen, who were ViSalus shareholders, entered into a recapitalization agreement with Blyth. Blyth kept 10% of ViSalus stock and returned the remaining 90%, minus a fractional share, to these Defendants.

181.   Certain of these Defendants agreed, as part of the September 4, 2014 recapitalization, to provide ViSalus a $12 million revolving credit facility. The commitments were 40% by Robert Goergen, Sr. and 20% each by Blair, Sarnicola, and Mallen. This facility has helped ViSalus to continue to operate the scheme.

182.   At the same time, on September 10, 2014, the defendant members of defendant HashTag One, (Ropart Asset Management II, OCD, BAM Ventures, AB25, and O'Toole Int'l, on behalf of their respective owners RAM, Blair, Mallen, Sarnicola and O'Toole), offered 4% of HashTag One to thirty 5-Star Ambassadors as a reward for their recruiting activity for ViSalus.

183.   HashTagOne did give an interest to a number of current promoters, including Pacetti, Craig, and others named in this complaint.

184.   Also at the same time, ViSalus itself began to award equity to recruiting promoters on the condition that they do not leave and go elsewhere. During this time as well, ViSalus began making payments to HashTag One under the Exigo system, even though HashTag One is not a promoter. The effect of this series of transaction is to funnel money out of ViSalus and into the pockets of the defendants as a result of the pyramid scheme, including the owner-defendants involved in the enterprise.

## RICO ENTERPRISE

185.   A defendant can be both a RICO "person" and part of another RICO "enterprise." Plaintiffs and the class allege the following:

- Each Defendant is a RICO "person."

- Each individual defendant, *i.e.*, each person, combination of persons or combination one or more person and an entity as defined above, is a RICO "person."

- the Defendants named in this Count are an "enterprise," (*e.g.*, a *de facto* corporation acting as a single legal entity, or, alternatively, an association in fact).

186.   There was an identifiable hierarchy and framework within the enterprise.  It is directed by the Goergens, through RAM, and the three self-identified co-founders of ViSalus, to whom the remaining Defendants named in this Count report. The hierarchy has operated within the framework of the inter-related operation of non-party Blyth, and ViSalus as set forth herein.

## ALL DEFENDANTS ARE "EMPLOYED BY OR ASSOCIATED WITH" THE RICO "ENTERPRISE"

187.   Under Section 1962(c), a defendant must be "employed by or associated with" the RICO enterprise.  Section 1962(c) operates equally to both "insiders" and "outsiders" who participate directly or indirectly in the conduct of the enterprise's

affairs through a pattern of racketeering activity. All Defendants named in this Count are employed by or associated with the enterprise, as set forth in detail previously.

188.    They conduct and participate in the operation or management of the pyramid scheme through a pattern of racketeering activity, by conducting the affairs and supporting the acts of the pyramid scheme. The Goergens, RAM, Sarnicola, Blair, and Mallen use the assets of ViSalus to direct, in whole or part, the affairs of the pyramid scheme, including the operation of the pyramid scheme and the distribution of unlawful profits to individuals associated with the scheme. Todd Georgen, Sarnicola, Blair and Mallen control and direct the websites, web presentations, events, sponsored conventions and speeches of each of them, and the dissemination of video of same, and the individual promoter Defendants named in this Count. Pacetti/Gooder and O'Toole/Prospex joined this part of the operation in approximately 2013 and at least O'Toole operates through HashTag One as part of the management of the enterprise. They then have an ascertainable structure separate and apart from the pattern of racketeering activity.

189.    The other promoters are also "employed by or associated with" each other and the remaining Defendants for purposes of RICO. They conduct and participate in the operation or management of the pyramid scheme through a pattern

of racketeering activity, by conducting the affairs and supporting the acts of the pyramid scheme. They receive payments and benefits for operating at or near the top of the "downline" pyramid, engage in wholesale recruiting at the direction of Sarnicola, Blair and Mallen, communicate regularly with ViSalus and Sarnicola, Blair and Mallen regarding personal appearances at recruiting conventions, operate websites that induce innocent people to engage in the illegal pyramid, and cooperate with the other Defendants to lend their names to promotional materials, make false statements, and in some instances, appear in the Internet reality series. While appearing as ostensible "independent" distributors for purposes of convincing innocent recruits to join the "business opportunity," each of them takes direction from and is in contact with each other and Sarnicola, Blair and Mallen.

## ALL RICO "PERSONS" ARE DISTINCT
## FROM THE RICO "ENTERPRISE"

190.  RICO requires the involvement of a RICO "enterprise." 18 U.S.C. § 1964 (a-d). An "enterprise" "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(5). The enterprise itself is not the liable entity, rather it is the RICO person who conducts the affairs of the enterprise through a pattern of racketeering activity.

191.   ViSalus and the individual Defendants described in this complaint are distinct from each other. The individual Defendants are distinct from the corporate defendant. The corporate Defendant is distinct from the RICO enterprise because it is functionally separate, performs different roles within the enterprise and uses its separate legal incorporation to facilitate racketeering activity. For example, ViSalus operates legally in part by selling its products to consumers without operating as a pyramid scheme.

192.   In addition, the different functionality of non-party Blyth, by design, helped facilitate the pyramid scheme. Blyth operates its own direct selling division, marketing candles and other products through PartyLite, a different system of direct selling. It had been in existence since 1976, founded by Defendant Goergen, Sr. Sarnicola, Blair and Mallen publicly bragged about the Blyth "billion dollar" company "standing behind" or "partnering" with the ViSalus sales scheme. Such promotion was made with the knowledge of Goergen Sr. and Goergen, each of whom held positions in ViSalus or was identified publicly as a member of the ViSalus Board.

193.   Blyth was presented as the financially stable, strong and legitimate company which would give credence to the outlandish money pitches and offers of

BMWs made by the young and "hip" ViSalus. The intent behind the tie-in with Blyth was to prop up the legitimacy of the ViSalus scheme. ViSalus and its co-founders (Blair, Sarnicola and Mallen), needed the reputation, experience and legitimacy that the Goergens brought to their operation. For example, the company released a press release that said in part:

> Our partnership with the founders of ViSalus is mutually beneficial in that Blyth is entering a third direct selling product category marketing consumable wellness goods and ViSalus can leverage expertise from Blyth's direct selling core competency, as well as various corporate functions required by a growing enterprise. Moreover, longer term, our experience entering international markets should be beneficial to ViSalus' expansion.

### THE DEFENDANTS ENGAGED IN ACTIVITIES WHICH AFFECT INTERSTATE AND FOREIGN COMMERCE

194.   Each of the Defendants named in this Count engaged in, and/or each others' activities affect, interstate or foreign commerce. The pyramid scheme has operated in the United States and Canada and in recent years in the United Kingdom.

### THE DEFENDANTS PARTICIPATED IN THE CONDUCT OF THE ENTERPRISE'S AFFAIRS

195.   Each of the Defendants named in this Count conducted, or participated directly or indirectly, in the conduct of such enterprise's affairs as set forth above.

### THE DEFENDANTS ENGAGED IN A
### "PATTERN OF RACKETEERING ACTIVITY" OVER AN
### EXTENDED PERIOD OF TIME WITH A THREAT OF
### <u>REPETITION INTO THE FUTURE</u>

196.  RICO requires a "pattern of racketeering activity." A "pattern of racketeering activity" is one that is performed by at least two acts of racketeering activity, or violations of a "predicate" offense (an act "indictable under any of" certain provisions of" 18. U.S.C. § 1961 (1) (D)). *See* 18 U.S.C. § 1961(5). A "pattern of racketeering activity" can be a past conduct that by its nature projects into the future with a threat of repetition.  It can also be conduct over a closed period through a series of related predicates extending over a substantial period.  Both of these apply here.

197.   The Defendants' pattern of racketeering activity is well established and has continued from 2004 to the present and intends to continue into the future.  The Defendants have taken every imaginable step to sell the pyramid program to IPs and potential IPs.  They each also expect to continue to receive income from the pyramid scheme.  With each new person recruited, the Defendants increase the value of their control of the pyramid scheme.  The Defendants have stated their intentions to continue to grow the pyramid throughout the United States, have expanded to Canada and to the UK. They have announced an intention to expand to additional

international markets in 2014. They have recently announced a new round of "professional marketers" who have "joined" the company, intending to attempt to replicate the false boom of 2010-2012, and have flooded the web with "ground floor" opportunities in Germany and Austria to perpetuate the scheme there. It is certain that their conduct is a continuing threat due to their racketeering activities.

## DEFENDANTS HAVE USED AND CAUSED TO BE USED FRAUDULENT MAIL AND WIRE COMMUNICATIONS IN INTERSTATE COMMERCE, 18 U.S.C. § 1341 AND 18 U.S.C. § 1343

198.   Mail and wire fraud are enumerated predicate acts that can constitute RICO "racketeering activity" under Section 1961(1)(D).

199.   Mail fraud occurs when an individual devises a plot to defraud and subsequently uses the mail in furtherance of it. 18 U.S.C. § 1341. The Defendants named in this Count have transmitted, caused to be transmitted or invited others to transmit material, by mail or private or commercial carriers, such as UPS, for the purpose of executing their scheme or artifice to defraud in violation of RICO. Likewise, they have distributed the by UPS (mail) to many individuals literally hundreds of thousands or millions of pieces of promotional literature, statements, checks, and other mailings all between 2005 and the present. Without limitation, each statement sent monthly to an IP distributor is a mailing and an act of mail fraud,

and each promotional literature sent by U.S. Mail is a mailing and an act of mail fraud.

200.   Wire fraud occurs when an individual devises a plot to defraud and subsequently uses wire means in furtherance of it. 18 U.S.C. § 1343. The defendants have used the Internet since 2005 to disseminate, publish and spread the pyramid scheme throughout the United States and (since 2011) Canada and (since 2013) the United Kingdom for the purpose of executing their scheme or artifice to defraud in violation of RICO. Thus, the Defendants have transmitted, caused to be transmitted and invited others to transmit, by means of wire in interstate commerce, writings, signs, signals, pictures, or sounds for the purpose of executing their scheme or artifice to defraud in violation of 18 U.S.C. §1343.   Without limitation, for example, each transmission of a video to be posted on YouTube, Vimeo, Facebook, or through Twitter, or establishment of a website to disseminate information about the pyramid scheme or transmission of signals, pictures or information to such website is a separate act of wire fraud.

201.   Defendants committed at least two predicate acts of mail and/or wire fraud relevant to this Count. These, along with factual allegations against other Defendants, are described throughout this complaint and are summarized:

111

**ViSalus:**

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | www.visalus.com<br><br>ViSalus blog | 2012 | | Placed "interview" emphasizing making money from being a distributor |
| W | Pyramid Scheme Victims | http://www.businessforhome.org/2011/12/lori-petrilli-and-frank-varon-visalus-top-earner-interview/ | 12/17/11 | | Placed "interview" emphasizing making money from being a distributor |
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=5qK0tQBAdDs<br><br>(HealthPlusWealthCA's Channel) | 2/18/12 | | Placed "interview" emphasizing making money from being a distributor |
| W | Pyramid Scheme Victims | **http://www.10incomes.com/page/tina-hockmuth-visalus-top-earner-interview** | 8/17/12 | | Placed "interview" emphasizing making money from being a distributor |

| W | Pyramid Scheme Victims | http://thepyramidthing.com | January 30, 2011-current  (https://web.archive.org/web/*/http://thepyramidthing.com/) | | Promotional material aimed at emphasizing financial rewards from participating in opportunity |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | www.visalus.com  www.slideshare.com  numerous other web sites | 7/3/09-current | | Promotional materials including money-making calculations |
| M/W | Pyramid Scheme Victims | www.visalus.com  numerous other web sites | 2009-current | | Welcome Booklet, describing "Power of 3", emphasizing financial rewards from participating in opportunity |
| W | Pyramid Scheme Victims | www.visalus.com  https://web.archive.org/web/20130510091852/http://visalus.com/rewards/promoter-rewards) | 5/21/13 | | Promotional materials showing money rewards |

| W | Pyramid Scheme Victims | www.youtube.com | 2013-current | | Videos published by N. Sarnicola and wife about opportunity and money. |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | Numerous websites, ViSalus Blog | Approx. 2012 | | The Jacksons receiving $500,000 check from ViSalus |
| W | Pyramid Scheme Victims | www.visalus.com<br><br>republished numerous websites | Approx. 2012 | | K. Pacetti receiving $1,000,000 check from ViSalus |
| W | Pyramid Scheme Victims | http://visalus.com/pdf/visalus_rst.pdf | 2010-current | | Promotional material aimed at emphasizing financial rewards<br><br>Promotional material emphasizing financial opportunity. ("Learn How To Makes $100,000+/year from home") |
| W | Pyramid Scheme Victims | www.youtube.com<br><br>(Healthy and Wealthy ViSalus) | 7/3/11 | | New paid promoter discussing "free" BMW's |

114

| | | | | | |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | www.visalus.com<br><br>republished numerous other websites | 2014 | | "Promoter- 3 For Free, Stars and Cars "brochure showing rewards for participating in opportunity |
| W | Pyramid Scheme Victims | **http://www.businessforhome.org/2012/04/rachel-jackson-visalus-top-earner-interview/** | 4/21/12 | | Placed "interview" emphasizing making money from being a distributor |
| W | Pyramid Scheme Victims | **http://www.businessforhome.org/2013/09/aaron-fortner-visalus-hits-diamond-ambassador/** | 9/10/13 | | Placed "interview" emphasizing making money from being a distributor |
| M | Pyramid Scheme Victims | www.youtube.com<br><br>www.slideshare.com<br><br>republished numerous websites | Various, beginning in 2008 and continuing | | "Exponential Income Potential" video showing financial rewards for participating in opportunity<br><br>"3 For Free Stars & Cars" video showing financial rewards |

| M/W | Pyramid Scheme Victims | www.visalus.com<br><br>(http://visalus.com/sites/default/files/docs/corporate/visalus_overview_presentation.pdf)<br><br>available for download, republished numerous websites | 10/1/13-current | | Slides showing earnings and other inducements |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | http://www.businessforhome.org/2012/05/visalus-jason-otoole-and-jennifer-creamer-hit-200000-per-month/ | 5/15/12 | | Placed "interview" emphasizing making money from being a distributor |
| W | Pyramid Scheme Victims | http://www.businessforhome.org/2012/04/nick-sarnicola-visalus-top-earner-interview/. | 4/11/12 | | Placed "interview" emphasizing making money from being a distributor |
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=qRoZs5DuNdA#t=459 | 2005 | | Predicted exponential growth for ViSalus |

| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=4e2aIwuBf58 | 2013 | | Promotional material emphasizing financial opportunity. |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=4e2aIwuBf58 | 2/4/14 | | Promotional material emphasizing financial opportunity. |
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=HzkvZsqRxNg&list=PL9AE2E471EC2A8876 | 2010 | | Promotional material emphasizing financial opportunity. |
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=RgBYGNtCZhs | 5/24/10 | | Promotional material emphasizing financial opportunity. |
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=WBzlItXbUts | 10/18/11 | | Predicted exponential growth for ViSalus |
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=MyAGowf9wuc | 3/4/13 | | Promotional material emphasizing financial opportunity. |

| W | Pyramid Scheme Victims | http://visalusblog.com/share/aaron-fortner/ | 3/11/14 | | Promotional material emphasizing financial opportunity. |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=m9lceQURJe4 | 4/28/12 | | The Jason O'Toole receiving $1,000,000 check from ViSalus |
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=BQy_U0V81io | 6/30/10 | | Promotional material emphasizing financial opportunity. |
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=QAx_xD-2Ee0&list=PLR0SMmBOeMZ8eosPDD1jDPJFt4ivQRyCk. | 4/4/13 | | Promotional material aimed at emphasizing financial rewards<br><br>"March to Your Bimmer in 30 days or Less" |
| W | Pyramid Scheme Victims | http://www.businessforhome.org/2012/07/visalus-900-ambassadors-10-million-in-monthly-earnings/. | 7/13/12 | | Promotional material emphasizing financial opportunity. |
| W | Pyramid Scheme Victims | http://www.prweb.com/releases/Direct-Selling-ViSalus/Distrib | 11/21/11 | | Promotional material aimed at emphasizing |

| | | | | | |
|---|---|---|---|---|---|
| | | utor-Challenge/prweb8980946.htm. | | | financial rewards from scheme |
| W | Pyramid Scheme Victims | http://www.prnewswire.com/news-releases/visalus-crown-ambassador-kyle-pacetti-delivers-positive-growth-in-2014-257502701.html | 5/1/14 | | Predicted exponential growth for ViSalus<br><br>Promotional material emphasizing financial opportunity. |
| M/W | Pyramid Scheme Victims | http://visalus.com/sites/default/files/docs/corporate/visalus_overview_presentation.pdf. | 2011 | | Promotional material emphasizing financial opportunity. |
| M/W | Pyramid Scheme Victims | http://events.arriveby25.com/wp-content/uploads/2011/04/Regional_Success_Tour_2011a.pdf. | 2011 | | Promotional material aimed at emphasizing financial rewards from scheme |
| W | Pyramid Scheme Victims | http://www.prnewswire.com/news-releases/visalus-announces-tara-wilson-as-new-diamond- | 9/10/13 | | Promotional material aimed at emphasizing financial rewards from scheme |

| | | | | | |
|---|---|---|---|---|---|
| | | ambassador-223237351.html. | | | |
| M/W | Pyramid Scheme Victims | ViSalus Compensation Plan (**Exhibit A**) | 2008 | | Compensation Plan |

**N. Sarnicola:**

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | http://thepyramidthing.com (https://web.archive.org/web/*/http://thepyramidthing.com/) | January 30, 2011- current | | Promotional material aimed at emphasizing financial rewards from participating in opportunity (approximately 96 episodes) |
| W | Pyramid Scheme Victims | www.youtube.com | 2013- current | | Videos published by N. Sarnicola and wife about opportunity and money. |
| W | Pyramid Scheme Victims | http://visalus.com/pdf/visalus_rst.pdf | 2010- current | | Promotional material aimed at emphasizing financial rewards<br><br>Promotional material emphasizing financial opportunity. ("Learn How To Makes $100,000+/year from home") |

| W | Pyramid Scheme Victims | http://www.businessforhome.org/2012/04/nick-sarnicola-visalus-top-earner-interview/ | 4/11/12 | | Placed "interview" emphasizing making money from being a distributor |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=4e2aIwuBf58 | 2013 | | Promotional material emphasizing financial opportunity. |
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=4e2aIwuBf58 | 2/4/14 | | Promotional material emphasizing financial opportunity. |
| W | Pyramid Scheme Victims | http://www.businessforhome.org/2012/07/visalus-900-ambassadors-10-million-in-monthly-earnings/ | 7/13/12 | | Promotional material emphasizing financial opportunity. |
| M/W | Pyramid Scheme Victims | http://events.arriveby25.com/wp-content/uploads/2011/04/Regional_Success_Tour_2011a.pdf | 2011 | | Promotional material aimed at emphasizing financial rewards from scheme |

**Robert Goergen, Sr./Living Trust:**

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| M/W | Pyramid Scheme Victims | Emails between ViSalus, Ropart and Blyth Mgmt. i.e. Email from Rob Goergen to Shapiro and Todd Goergen, with cc to Bob Barghaus and Bob Goergen VS094794-95 | 11/10/09 | | Changes to ViSalus Comp Plan |
| M/W | Pyramid Scheme Victims | Emails between ViSalus and Blyth Mgmt. i.e. Email from Rob Goergen to John Purdy and Tolmie with cc to Bob Barghaus, Bob Goergen, Tyler Schuessler, and Todd Goergen VS038293-94 | 8/16/10 | | Agendas for ViSalus leadership training and sales meetings; BOD meetings |
| M/W | Pyramid Scheme Victims | Emails between ViSalus, Ropart, and Blyth Mgmt. i.e. Email from Rob Goergen to | 4/23/09 | | Advance agreements and recruiting professional promoters |

| | | Bob Barghaus, Bob Goergen, Todd Goergen, Ryan Blair, Shapiro, Mallen, Sarnicola, and others VS037790-91 | | | |
|---|---|---|---|---|---|
| M/W | Pyramid Scheme Victims | Documents and communication surrounding the Joinder Agreement | 4/15/12 | | Joinder Agreement |
| M/W | Pyramid Scheme Victims | Documents and communication surrounding the Recapitalization Agreement VS009401-97 | 9/4/2014 | | Recapitalization Agreement between ViSalus, Inc., Blyth, and Series B Holders |

**Todd Goergen:**

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| M/W | Pyramid Scheme Victims | Emails between ViSalus Mgmt. and Todd Goergen i.e. Email from Ryan Blair to Todd Goergen VS107771-71 | 11/24/10 | | Agreements between ViSalus and Nick Sarnicola |
| M/W | Pyramid Scheme Victims | Emails between ViSalus Mgmt. and Todd Goergen i.e. Email from Shapiro to Mallen, Blair, Todd Goergen, and Sarnicola VS001706-7 | 9/20/11 | | Funding agreements and investments from Ropart to ViSalus |
| M/W | Pyramid Scheme Victims | Emails between ViSalus Mgmt. and Todd Goergen i.e. Email from Tyler Schuessler to John Purdy, Blair, John Tolmie, Mallen | 1/31/11 | | ViSalus operation/ViSalus disclosure |

125

| | | | | | |
|---|---|---|---|---|---|
| | | and Todd Goergen VS002539 | | | |
| W/M | Pyramid Scheme Victims | Emails/Letter between ViSalus Mgmt. to promoters i.e. letter from Blair to promoters VS003348 | 3/13/2014 | | Hashtag One units being awarded to ViSalus promoters as bonus |

**R. Blair:**

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | http://visalus.com/pdf/visalus_rst.pdf | 2010-current | | Promotional material aimed at emphasizing financial rewards<br><br>Promotional material emphasizing financial opportunity. ("Learn How To Makes $100,000+/year from home") |
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=X-uwEtwotc0, | 2011 | | Predicted exponential growth for ViSalus |
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=LQ964eQHFg0 | 4/11/15 | | Promotional material emphasizing financial opportunity. |
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=1umrC-k0JwY | 11/7/11 | | Promotional material emphasizing financial opportunity. |
| M/W | Pyramid Scheme Victims | http://events.arriveby25.com/wp- | 2011 | | Promotional material aimed at emphasizing |

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| | | content/uploads/2011/04/Regional_Success_Tour_2011a.pdf. | | | financial rewards from scheme |

**B. Mallen:**

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | http://visalus.com/pdf/visalus_rst.pdf | 2010-current | | Promotional material aimed at emphasizing financial rewards  Promotional material emphasizing financial opportunity. ("Learn How To Makes $100,000+/year from home") |
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=HzkvZsqRxNg&list=PL9AE2E471EC2A8876 | 2010 | | Promotional material emphasizing financial opportunity. |
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=RgBYGNtCZhs | 5/24/10 | | Promotional material emphasizing financial opportunity. |

| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=WBzlItXbUts | 10/18/11 | | Predicted exponential growth for ViSalus |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | http://blakemallen.com/ | 2011-current | | Predicted exponential growth for ViSalus |
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=dud7qE2XDQg | 9/17/11 | | Predicted exponential growth for ViSalus |
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=MyAGowf9wuc | 3/4/13 | | Promotional material emphasizing financial opportunity. |

**M. Craig:**

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| M/W | Pyramid Scheme Victims | www.visalus.com<br><br>(http://visalus.com/sites/default/files/docs/corporate/visalus_overview_presentation.pdf)<br><br>available for download, republished numerous websites | 10/1/13-current | | Slides showing earnings and other inducements |
| W | Pyramid Scheme Victims | http://visalus.com/pdf/visalus_rst.pdf | 2010-current | | Promotional material aimed at emphasizing financial rewards<br><br>Promotional material emphasizing financial opportunity. ("Learn How To Makes $100,000+/ye |

| | | | | | ar from home") |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | http://www.mikecraigvisalus.com/ | 5/14/10-12/13/13 (site offline) | | Promotional material aimed at emphasizing financial rewards from scheme |
| W | Pyramid Scheme Victims | http://www.businessforhome.org/2012/07/visalus-900-ambassadors-10-million-in-monthly-earnings/. | 7/13/12 | | Promotional material emphasizing financial opportunity. |
| W | Pyramid Scheme Victims | http://www.prweb.com/releases/Direct-Selling-ViSalus/Distributor-Challenge/prweb8980946.htm. | 11/21/11 | | Promotional material aimed at emphasizing financial rewards from scheme |
| M/W | Pyramid Scheme Victims | http://events.arriveby25.com/wp-content/uploads/2011/04/Regional_Success_Tour_2011a.pdf. | 2011 | | Promotional material aimed at emphasizing financial rewards from scheme |

## A. Fortner:

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | http://www.businessforhome.org/2013/09/aaron-fortner-visalus-hits-diamond-ambassador/ | 9/10/13 | | Placed "interview" emphasizing earning money from being a distributor |
| W | Pyramid Scheme Victims | www.aaronfortner.com<br><br>(site currently offline) | 6/28/08-12/16/14,<br><br>particular record referenced in complaint published 9/04/13<br><br>(archive.org records) | | Promotional material aimed at emphasizing financial rewards from participating in opportunity |
| W | Pyramid Scheme Victims | http://tvstreamtimes.co/stream/aaron-fortner | 2012 | | Placed "interview" emphasizing earning money from being a distributor |
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=uL6yqfEfl50 | 11/16/13 | | Placed "interview" emphasizing earning money |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | from being a distributor |
| W | Pyramid Scheme Victims | http://visalusblog.com/share/aaron-fortner/ | 3/11/14 | | Promotional material emphasizing financial opportunity. |

**R. Jackson:**

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | http://visalus.com/pdf/visalus_rst.pdf | 2010-current | | Promotional material aimed at emphasizing financial rewards |
| | | | | | Promotional material emphasizing financial opportunity. ("Learn How To Makes $100,000+/year from home") |
| W | Pyramid Scheme Victims | Numerous websites, ViSalus Blog | Approx. 2012 | | The Jacksons receiving $500,000 check from ViSalus |
| W | Pyramid Scheme Victims | http://www.businessforhome.org/2012/04/rachel-jackson-visalus-top- | 4/21/12 | | Placed "interview" emphasizing earning |

| | | earner-interview/ | | | |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | http://boomski.bodybyvi.com/ | 2012-current | | Promotional material emphasizing financial opportunity. |
| W | Pyramid Scheme Victims | https://www.youtube.com/user/WealthWithRachel | 2013 | | Placed "interview" emphasizing earning money from being a distributor |
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=JWc81CZY6Ig | 2/26/15 | | Promotional material emphasizing financial opportunity |
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=UVvrTKSaE8w&index=13&list=PL580D4818743A4581. | 7/17/12 | | The Jacksons receiving $500,000 check from ViSalus |
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=bQr4dG3CLd8. | 10/27/11 | | Placed "interview" emphasizing earning money from being a distributor |

| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=IQPlDSUDp7I | 8/17/12 | | The Jacksons receiving $500,000 check from ViSalus |
|---|---|---|---|---|---|

**T. Kirkland:**

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| M/W | Pyramid Scheme Victims | www.visalu s.com  (http://visal us.com/sites /default/file s/docs/corp orate/visalu s_overview _presentatio n.pdf)  available for download, republished numerous websites | 10/1/13-current | | Slides showing earnings and other inducements |
| W | Pyramid Scheme Victims | https://www .youtube.co m/watch?v= 5qK0tQBA dDs  (HealthPlus WealthCA's Channel) | 2/18/12 | | Placed "interview" emphasizing earning |

| W | Pyramid Scheme Victims | http://timandholley.weebly.com/ | 11/9/11-current<br><br>(archive.org records) | | Promotional material showing the Kirklands holding $250,000 check from ViSalus |
|---|---|---|---|---|---|
| M/W | Pyramid Scheme Victims | http://events.arriveby25.com/wp-content/uploads/2011/04/Regional_Success_Tour_2011a.pdf . | 2011 | | Promotional material aimed at emphasizing financial rewards from scheme |
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=5qK0tQBAdDs | 2/8/12 | | Promotional material aimed at emphasizing financial rewards from scheme |

**J. O'Toole:**

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| M/W | Pyramid Scheme Victims | www.visalus.com<br><br>(http://visalus.com/sites/default/files/docs/corporate/visalus_overview_presentation.pdf)<br><br>available for download, republished numerous websites | 10/1/13-current | | Slides showing earnings and other inducements |
| W | Pyramid Scheme Victims | http://www.jasonotooleonline.com | 2010 (estimated) to today | | Promotional material aimed at emphasizing financial rewards from participating in opportunity |

140

| W | Pyramid Scheme Victims | http://www.businessforhome.org/2012/05/visalus-jason-otoole-and-jennifer-creamer-hit-200000-per-month/ | 5/15/12 | | Placed "interview" emphasizing earning |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | http://thepyramidthing.com (https://web.archive.org/web/*/http://thepyramidthing.com/) | January 30, 2011-current | | Promotional material aimed at emphasizing financial rewards from participating in opportunity |
| W | Pyramid Scheme Victims | http://visalus.com/pdf/visalus_rst.pdf | 2010-current | | Promotional material aimed at emphasizing financial rewards

Promotional material emphasizing financial opportunity. ("Learn How To Makes $100,000+/year from home") |

| | | | | | |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=m9lceQURJe4 | 4/28/12 | | The Jason O'Toole receiving $1,000,000 check from ViSalus |
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=BQy_U0V81io | 6/30/10 | | Promotional material emphasizing financial opportunity. |
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=QAx_xD-2Ee0&list=PLR0SMmBOeMZ8eosPDD1jDPJFt4ivQRyCk. | 4/4/13 | | Promotional material aimed at emphasizing financial rewards<br><br>"March to Your Bimmer in 30 days or Less" |
| M/W | Pyramid Scheme Victims | http://events.arriveby25.com/wp-content/uploads/2011/04/Regional_Success_Tour_2011a.pdf. | 2011 | | Promotional material aimed at emphasizing financial rewards from scheme |

**K. Pacetti:**

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | www.visalus.com ViSalus blog | 2012 | | Placed "interview" emphasizing earning |
| M/W | Pyramid Scheme Victims | www.visalus.com (http://visalus.com/sites/default/files/docs/corporate/visalus_overview_presentation.pdf) available for download, republished numerous websites | 10/1/13-current | | Slides showing earnings and other inducements |
| W | Pyramid Scheme Victims | www.visalus.com republished numerous websites | Approx. 2012 | | K. Pacetti receiving $1,000,000 check from ViSalus |

| W | Pyramid Scheme Victims | http://visalus.com/pdf/visalus_rst.pdf | 2010-current | | Promotional material aimed at emphasizing financial rewards

Promotional material emphasizing financial opportunity. ("Learn How To Makes $100,000+/year from home") |
| W | Pyramid Scheme Victims | http://thepyramidthing.com

(https://web.archive.org/web/*/http://thepyramidthing.com/) | January 30, 2011-current | | Promotional material aimed at emphasizing financial rewards from participating in opportunity |
| W | Pyramid Scheme Victims | http://www.prnewswire.com/news-releases/visalus-crown-ambassador-kyle-pacetti-delivers-positive-growth-in-2014- | 5/1/14 | | Predicted exponential growth for ViSalus

Promotional material emphasizing financial opportunity. |

| | | 257502701.html | | | |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=41RyxN5yhMY&list=PL9uZwAPMkPObMQExqHa_C9rT5baC2gdFv, | 11/8/12 | | Promotional material aimed at emphasizing financial rewards from participating in opportunity |
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=fMsFiquYJAk. | 7/25/11 | | Promotional material emphasizing financial opportunity. |
| M/W | Pyramid Scheme Victims | http://visalus.com/sites/default/files/docs/corporate/visalus_overview_presentation.pdf. | 2011 | | Promotional material emphasizing financial opportunity. |
| M/W | Pyramid Scheme Victims | http://events.arriveby25.com/wp-content/uploads/2011/04/Regional_Success_Tour_2011a.pdf. | 2011 | | Promotional material aimed at emphasizing financial rewards from scheme |

**T. Wilson:**

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | http://thepyramidthing.com (https://web.archive.org/web/*/http://thepyramidthing.com/) | January 30, 2011-current | | Promotional material aimed at emphasizing financial rewards from participating in opportunity |
| W | Pyramid Scheme Victims | http://www.prnewswire.com/news-releases/visalus-announces-tara-wilson-as-new-diamond-ambassador-223237351.html. | 9/10/13 | | Promotional material aimed at emphasizing financial rewards from scheme |
| W | Pyramid Scheme Victims | http://www.10incomes.com/page/tara-wilson-hits-80-000 | 2012 | | Promotional material aimed at emphasizing financial rewards from scheme |

146

| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=v37J-IC3iA0 | 5/8/12 | | Promotional material aimed at emphasizing financial rewards from scheme |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=r_BGxmS2m1c | 9/19/11 | | Promotional material aimed at emphasizing financial rewards from scheme |

**Ropart Asset Management Fund I and II/**
**Ropart Asset Management Company:**

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | Emails between Ropart and ViSalus Mgmt. i.e. VS094794-95 | 11/10/09 | | ViSalus Compensation Structure and Comp Plan |
| W | Pyramid Scheme Victims | Emails between Ropart, ViSalus and Blyth Mgmt. i.e. VS004113-14; VS024439 | 9/13/10; 9/26/12 | | Membership Interest Purchase Agreement |
| W | Pyramid Scheme Victims | Emails between Ropart and ViSalus Mgmt. i.e. VS005409-12 | 3/10/09 | | Ropart providing management services to ViSalus |
| W | Pyramid Scheme Victims | Emails between Ropart and ViSalus Mgmt. i.e. VS001706-7 | 9/20/11 | | Investments from Ropart to ViSalus |
| M/W | Pyramid Scheme Victims | Documents and Communications surrounding Promissory note between founders and Ropart Fund I | 12/12/08 | | Loan to FVA Ventures/ViSalus |

148

| | | i.e. Ropart 000001-3 | | | |
|---|---|---|---|---|---|
| M/W | Pyramid Scheme Victims | Documents and Communications surrounding Promissory note between founders and Ropart Fund I i.e. Ropart 000007-9 | 3/23/2009 | | Loan to FVA Ventures/ViSalus |
| M/W | Pyramid Scheme Victims | Documents and Communications surrounding the Operating Agreement of Ropart Fund II Ropart000085-115 | 1/1/06 | | Ropart Fund II Operating Agreement |
| M/W | Pyramid Scheme Victims | Documents and Communications surrounding the Security Agreement between FVA/ViSalus and Ropart Fund II | 2/1/2010 | | Security Agreement for loan |

**Rock Ridge Asset Management:**

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | Emails between Rock Ridge and ViSalus Mgmt. i.e. Email from Tolmie to Goergen VS 036092 | 7/25/13 | | Expense reimbursements incurred by Rock Ridge on behalf of ViSalus |
| W | Pyramid Scheme Victims | Emails between ViSalus and Ropart Mgmt. i.e. Email from Tolmie to Shapiro VS023794 | 3/23/13 | | Funding through Rock Ridge |
| W | Pyramid Scheme Victims | Emails between ViSalus and Ropart Mgmt. i.e. Email from Shapiro to Tolmie VS023893 | 3/22/13 | | Ownership percentages and sharing ViSalus profits |

**Power Couple, Inc. (Sarnicola):**

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| M/W | Pyramid Scheme Victims | Letters and Emails between ViSalus Mgmt. and Nick Sarnicola i.e. VS106486-87 | 4/1/13 | | Power Couple Agreement with ViSalus – Market Development |
| M/W | Pyramid Scheme Victims | Emails from ViSalus to promoters i.e. SK061017-36 | 8/22/12 | | Power Couple funding bonus to Ambassadors |
| M/W | Pyramid Scheme Victims | Emails and Letters from Power Couple to ViSalus promoters i.e. VS035880-81 | 11/8/13 | | Performance B onus Agreements from Power Couple to Promoters |
| M/W | Pyramid Scheme Victims | Emails and letters from Power Couple to ViSalus promoters i.e. SK011610-11 | | | Commission Advance Agreements from Power Couple to Promoters |

151

| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=OKseLlm9O3g<br><br>YouTube | 2013 | | Power Couple Vlog11 – Lifetime Challenge Bonus Promotion |

**ArriveBy25 (Sarnicola):**

| Mail/ Wire | Directed To | Where Published/ Subject | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| W/M | Pyramid Scheme Victims | Emails and letters between ViSalus Mgmt. and Ropart i.e. VS021132 | 4/2/14 | | Funding HashTag One |
| W/M | Pyramid Scheme Victims | Emails, faxes, letters from ArriveBy25 to ViSalus promoters i.e. VS021221-22 | 6/5/10 | | Commission Advance Agreements between ArriveBy25 to Promoters |
| W/M | Pyramid Scheme Victims | Emails and letters from ArriveBy25 to ViSalus promoters i.e. SK021229-32 | 6/29/11 | | Performance Agreements between ArriveBy25 to Promoters |

**BAM Ventures, Inc. (Mallen):**

| Mail/ Wire | Directed To | Where Published/ Subject | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | Emails and letters between ViSalus Mgmt. and Ropart i.e. VS021132 | 4/2/14 | | Funding HashTag One |
| W | Pyramid Scheme Victims | Emails by Blake Mallen on behalf of BAM Ventures, Inc. i.e. SK019055; VS 002757-67 | 8/13/09; 2/12/14 | | Promotional topics; Recruiting promoters; Sales team topics; |
| W | Pyramid Scheme Victims | Emails from ViSalus Mgmt. and Ropart i.e. VS001566-68 | 2/26/13 | | BAM financials |

**<u>OCD Marketing (Blair):</u>**

| Mail/<br>Wire | Directed<br>To | Where<br>Published | Date or<br>Date Range<br>of<br>Document | Where<br>Cited In<br>Comp. ¶ | General Content |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | Emails relating to Hashtag Agreement i.e. VS021132 | 4/2/14 | | Funding HashTag One |
| W/M | Pyramid Scheme Victims | Emails and letter between Blair and ViSalus promoters i.e. VS026529 | | | Commission advances and performance bonus |
| W/M | Pyramid Scheme Victims | Emails and letters between Blair and Blyth Mgmt. i.e. VS022294-323 | 3/12/14 | | Questionnaire from Blyth to Blair to prepare Blyth annual report |

**Prospex Automated Wealth Systems, Inc. (O'Toole):**

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | Emails from O'Toole to ViSalus promoters i.e. SK010529 | 5/30/13 | | ViSalus promotional materials via Blog |
| W | Pyramid Scheme Victims | Emails between ViSalus promoters i.e. SK054718 | 7/10/11 | | Sharing Prospex blog link |
| W | Pyramid Scheme Victims | Emails between O'Toole and ViSalus promoters i.e. SK081178-80 | 5/7/10 | | O'Toole taking on personal students to build a business |

## O'Toole International Holdings, Inc. (O'Toole):

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| W/M | Pyramid Scheme Victims | ViSalus Mgmt. and Int. Holdings i.e. VS105304 | 9/10/14 | | Consent Resolutions in lieu of HashTag meeting |
| W/M | Pyramid Scheme Victims | Documents and Communications surrounding HashTag Units i.e. VS1052634 | 9/11/14 | | Unit recipient |

**Gooder, LLC (Pacetti):**

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | Emails between ViSalus and Gooder/Pacetti i.e. VS93852 | 3/11/14 | | Special Incentive Agreement between ViSalus and Gooder, LLC |
| W | Pyramid Scheme Victims | Emails between ViSalus Promoters i.e. SK036563 | 5/14/14 | | LID Group |
| W/M | Pyramid Scheme Victims | Documents and Communications surrounding HashTag Units i.e. VS1052634 | 9/11/14 | | Unit recipient |

**Red Letters, LLC (Jackson):**

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | Emails between ViSalus promtoters i.e. SK073024 | 5/14/14 | | LID Group |
| W | Pyramid Scheme Victims | Emails between ViSalus and Jackson i.e. VS125788 | 5/2/15 | | Commission to Red Letters |
| M/W | Pyramid Scheme Victims | Documents and Communications surrounding HashTag Units i.e. VS1052634 | 9/11/14 | | Unit recipient |

**M-Power Path, Inc. (Craig):**

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | Emails from M-Power Path to ViSalus promoters i.e. SK021924-25 | 2/6/12 | | Promoter business advice – gifts and taxes |
| W | Pyramid Scheme Victims | Emails from M-Power Path to ViSalus Promoters i.e. SK023496 | 10/24/12 | | Mass emails to Promoter re conference calls, events, ViSalus trainings |
| M/W | Pyramid Scheme Victims | Documents and Communications surrounding HashTag Units i.e. VS1052634 | 9/11/14 | | Unit recipient |

**A Berry Good Life, Inc. (Wilson):**

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | Emails between ViSalus promoters i.e. SK052050 | 5/29/11 | | Promoting Wilson/Berry Good Life |
| W | Pyramid Scheme Victims | Emails between ViSalus promoters i.e. SK057203 | 1/3/12 | | Backdating orders |
| W | Pyramid Scheme Victims | Emails between ViSalus Promoters i.e. SK073025 | 5/14/14 | | LID Group |
| M/W | Pyramid Scheme Victims | Documents and Communications surrounding HashTag Units i.e. VS1052634 | 9/11/14 | | Unit recipient |

### 9248-2587 Quebec, Inc. (Petrilli):

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | YouTube; Various websites i.e PL0167-178 | | | Placed "interview" emphasizing making money from being a distributor; ViSalus events |
| M/W | Pyramid Scheme Victims | Documents and Communications surrounding HashTag Units i.e. VS1052634 | 9/11/14 | | Unit recipient |
| W | Pyramid Scheme Victims | Emails between ViSalus and Petrilli i.e. VS93852 | 3/11/14 | | Special Incentives Agreement |

## Network Dynamics America Corp. (Varon):

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | YouTube; Various websites i.e PL0167-178 | 12/17/11 | | Placed "interview" emphasizing making money from being a distributor; ViSalus events |
| W | Pyramid Scheme Victims | Emails between promoters i.e. SK058772-80 | 5/28/12 | | ViSalus promotions |

## __Freedom Legacy, LLC (Kirklands):__

| __Mail/ Wire__ | __Directed To__ | __Where Published__ | __Date or Date Range of Document__ | __Where Cited In Comp. ¶__ | __General Content__ |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | Emails between promoters i.e. SK022447-53 | 2012 | | Included in Contests |
| M/W | Pyramid Scheme Victims | Letter and emails from ViSalus to Kirklands i.e. HKirkland000001 | 6/20/13 | | Confidential information and non-compete |
| W | Pyramid Scheme Victims | YouTube; various websites i.e. PL0032-35; PL417-426 | | | Promotional videos; Placed "interview" emphasizing making money from being a distributor; ViSalus events |

**Residual Marketing, Inc./Got Heart Global, Inc. (Fortner):**

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| M/W | Pyramid Scheme Victims | Documents and Communications surrounding HashTag Units i.e. VS1052634 | 9/11/14 | | Unit recipient |
| W | Pyramid Scheme Victims | Emails between ViSalus promoters and ViSalus Mgmt. i.e. SK000327-330 | 6/16/14 | | ViSalus strategy and planning group |
| W | Pyramid Scheme Victims | Emails between ViSalus Mgmt. and Fortner i.e. SK073025 | 5/14/14 | | LID Group |
| W | Pyramid Scheme Victims | Emails between ViSalus Mgmt. and Fortner i.e. SK077172-74 | 11/2/15 | | Transfers to Got Heart Global |
| W | Pyramid Scheme Victims | Emails from ViSalus to Got Heart Global i.e. SK047866 | 7/11/16 | | Payments to Got Heart Global from ViSalus |

165

**Wealth Builder International (MacDonald):**

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | Emails between MacDonald and ViSalus Promoters i.e. SK010260 | 12/16/12 | | Bridge Agreement |
| M/W | Pyramid Scheme Victims | Documents and Communications surrounding HashTag Units i.e. VS1052634 | 9/11/14 | | Unit recipient |
| W | Pyramid Scheme Victims | Emails between promoters i.e. SK010055 | 8/8/12 | | ViSalus events |
| W | Pyramid Scheme Victims | YouTube; various websites i.e. PL0374-395 | | | Promotional videos and screenshots; Promotional videos; Placed "interview" emphasizing making money from being a distributor; ViSalus events |

**JakeTRZ, Inc. (Trzcinski):**

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | Emails from ViSalus to JakeTrz i.e. SK015272-79 | 1/11/12 | | Mass emails promoting ViSalus events |
| W | Pyramid Scheme Victims | Emails from ViSalus to JakeTrz i.e. SK016279-282 | 3/14/12 | | Mass emails promoting ViSalus contests |
| W | Pyramid Scheme Victims | Emails from ViSalus to JakeTRZ i.e. SK041529 | 5/3/16 | | Bimmer Club Membership renewal |

**Mojos Legacy, LLC (Luceros):**

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | Emails between ViSalus and Mojos Legacy i.e. VS93852 | 3/11/14 | | Special Incentive Group Agreement |
| M/W | Pyramid Scheme Victims | Documents and Communications surrounding HashTag Units i.e. VS1052634 | 9/11/14 | | Unit recipient |
| W | Pyramid Scheme Victims | YouTube; various websites i.e. PL 0427-463 | 2010-2014 | | Promotional videos and screenshots; Promotional videos; Placed "interview" emphasizing making money from being a distributor; ViSalus events |

### Gary J. Reynolds/BeachLifestyle Enterprises:

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=svjexbnS0Vs  YouTube Video | 2012 | | Promotional Video |
| W | Pyramid Scheme Victims | Emails between ViSalus promoters i.e. SK000005-6 | 6/17/14 | | LID Group |
| W | Pyramid Scheme Victims | Emails between ViSalus promoters i.e. SK074969-70 | 11/24/14 | | Enrolling promoters |

**Kevin Merriweather:**

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | Emails between ViSalus promoters i.e. VS013179 | 4/14/14 | | Publishing links to "The Pyramid Thing" on social media |
| W | Pyramid Scheme Victims | Emails between ViSalus promoters i.e. SK000031-32 | 6/16/14 | | LID Group |
| M/W | Pyramid Scheme Victims | Documents and Communications surrounding HashTag Units i.e. VS1052634 | 9/11/14 | | Unit recipient |
| W | Pyramid Scheme Victims | YouTube; Various websites i.e. PL0254-262 | | | Promotional videos and screenshots; Promotional videos; Placed "interview" emphasizing making money from being a distributor; ViSalus events |

**HashTag One, LLC:**

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| W | Pyramid Scheme Victims | Emails between ViSalus Mgmt. and Ropart i.e. VS003951 | 3/13/14 | | Hastag equity as incentive to keep ViSalus promoters |
| M/W | Pyramid Scheme Victims | Documents and Communications surrounding HashTag Units i.e. VS1052634 | 9/11/14 | | Unit recipient |
| M/W | Pyramid Scheme Victims | Emails and letters to ViSalus promoters i.e. VS003348 | 3/13/14 | | Awarding Hashtag units based on ViSalus performance |

202. Each of the Defendants named in this Count acted with requisite intent to establish, perpetuate and/or carry out the pyramid scheme to defraud. Each Defendant named in this Count acted with either specific intent to defraud or with such recklessness with respect to the false or misleading information mailed or wired in furtherance of the pyramid scheme as to constitute requisite *scienter* to commit

mail and wire fraud. That *scienter* can be inferred from, among other things at least

the following:

- ViSalus has acknowledged that "pyramid schemes" are "illegal" and there is a "risk" that a governmental agency or court could … require ViSalus… to alter [its] distribution model or cease operations.

- Defendants Blair, Mallen, Sarnicola, Robert Goergen Sr., and Todd Goergen each understood that the operation of the business could be deemed illegal. For example, Blair in 2011 gave an interview, published on YouTube, in which he explained that recruiting-based compensation systems are illegal. https://www.youtube.com/watch?v=sTlJu2SBTdQ&list=PL615EC34EC3FC78DF. Each of these individuals made all fundamental decisions regarding the scheme's operation and finances and knew that the true facts concerning the operation of the scheme fit every criterion of an illegal pyramid or were reckless to that possibility. Each of these defendants was not a passive investor in ViSalus, rather each was an active and knowing participant in the operation of the company and the commission of the pyramid scheme that formed the core of its operation. Each of the individual defendants was aware of the Compensation Plan, the company's essential form of doing business, identified himself with the company as a management employee, and formulated specific decisions relating to the operation of the pyramid scheme.

- Sarnicola, Mallen, Blair, Wilson, Pacetti and O'Toole and Sarnicola participated in the reality show "The Pyramid Thing" (*see* www.thatpyramidthing.com ) in part spoofing and ridiculing the notion that the ViSalus network sales are in fact an illegal pyramid scheme.  The title and intended thrust of this show demonstrates defendants' acute awareness of ViSalus' vulnerability to being accused

172

of being an illegal pyramid scheme.  Moreover, each of these defendants is a veteran of the chain sales industry who has bragged in public and/or in interviews with his/her familiarity with the idea that pyramid schemes are illegal, further demonstrating *scienter*.

- Defendants Robert Goergen Sr. and Todd Goergen were directly involved in the financing and active management of the ViSalus company and individually knew and/or recklessly disregarded that that the operation of that entity was an illegal pyramid scheme.

- Fortner, Wilson, O'Toole, Pacetti, Varon, Petrilli, Craig and Kirkland were veterans of the network marketing industry and were involved in multiple allegations of their companies operating as a pyramid scheme. There is a network industry awareness that the FTC has closed down similar operations for being an illegal pyramid (for example BurnLounge, Equinox and others) and an awareness on the part of each of these Defendants that recruiting others into a particular sales scheme has been deemed by the FTC and courts to be an illegal pyramid scheme.

- A number of the Individual Promoter Defendants are also in the separate business of "coaching" new recruits on how to themselves recruit others. Some of the individual promoter Defendants (such as Fortner) are members of an alleged industry trade group that issues seminar materials and mp3 downloadable files on the difference between a "legitimate" network sales company and a pyramid scheme. These Defendants therefore have for years had an opportunity to understand that their participation in the ViSalus scheme is an illegal pyramid and/or recklessly disregarded the notion and consciously participated in an illegal pyramid scheme.

## THE DEFENDANTS' PROMOTION OF THE PYRAMID IS A *PER SE* SCHEME TO DEFRAUD UNDER THE MAIL AND <u>WIRE FRAUD STATUTES</u>

203.   The Defendants named in this Count have used a false and fraudulent scheme, or a scheme to defraud within the meaning of federal law, to harm Plaintiffs and the class.   In all respects, these Defendants have conducted their affairs unlawfully, intentionally, willfully and with intent to defraud, that is, knowingly and with such specific intent to deceive as is in violation of the mail and wire fraud statutes. They have done so in order to cause financial gain for themselves and for others, all to the detriment of Kerrigan, Mikovich and Valli and the class.

204.   First, each Defendant named in this Count has promoted the pyramid scheme that, by its very nature, is a *per se* scheme and artifice to defraud to obtain money by false pretenses.  As detailed in this complaint, all Defendants named in this Count have promoted and successfully expanded the pyramid scheme to victimize the named Plaintiffs and the class. Each of the enumerated acts of wire and mail fraud in furtherance of the pyramid scheme is an act of racketeering.

205.   Second, as part of the pyramid scheme, the Defendants named in this Count made numerous false statements in furtherance of the scheme. Examples of the falsity of these statements include:

- Creating and disseminating the false impression that through the pyramid scheme, IPs like Plaintiffs and the class can get "free" BMWs, and/or can get a sizeable monthly or "residual" income.

- Creating and disseminating the false impression that the IP program has "enormous" or "unlimited income potential" and that the IP Sales Force can make enormous money as a result of participating as a promoter for the program.

- Creating and disseminating the false impression that the IP program is a "ground floor" opportunity. The defendants have over the years continually spread the suggestion, or explicitly stated that the opportunity to become a ViSalus promoter is a "ground floor" opportunity even after the sales collapse in late 2012.

- Creating and disseminating the false impression that there are many available persons who will want to purchase the weight-loss shakes and other merchandise and that the purchase of an IP enrollment will enable the purchaser to make money from legitimate sales. In reality, the defendants know that sales of the weight-loss products are made almost exclusively to people who are promoters.

- Creating and disseminating the false impression that the success stories featured by ViSalus are typical or, in some cases, even possible when defendants knew that the persons portrayed were being paid (unreal) amounts of money for committing an illegal activity and/or were assisted by the defendants in setting up a sufficiently large "downline" that the income generated was in fact large.

206. Third, as part of the pyramid scheme the Defendants named in this Count omitted material facts for the purpose of and with the intention of the fraudulent

pyramid scheme by obtaining money from the victims. Examples of these omissions include:

- Failure to reveal that the multilevel marketing program and its IP program are illegal pyramid schemes but instead propagate the statements and impression that it is a legal enterprise.

- Failure to reveal that under Compensation Plan the majority of the IP's have and likely will lose their money.

- Failure to disclose that many of the top IP earners paraded by the company (at company-sponsored check waving spectacles and through other publicly disseminated events, videos, documents, and other media) as examples of what IPs can hope to attain through following the ViSalus Compensation Plan were in fact already well established salespeople for other network companies who were recruited to bring large, preexisting "downlines" to ViSalus by the company and were placed in their positions, aided in their attainment of their ViSalus ranks, and/or otherwise compensated beyond what is paid to ordinary IPs under the Compensation Plan.

- Failure to reveal that the company knowingly spread unreal and misleading accounts and claims of the success of its "Director" and "Ambassador" IPs throughout the web, all in an effort to attract new IPs but avoid disclosing a direct connection between the statements and ViSalus.

## PLAINTIFFS AND THE CLASS HAVE PROXIMATELY SUFFERED RICO INJURY TO BUSINESS

207. A "violation" of RICO is committed if "individuals and entities," use the mails or interstate wire facilities in the execution of "any scheme to defraud." 18 U.S.C. §§ 1341, 1343, Sections 1961(1) (B), 1962. Sections 1964 (a), (c) and (d)

authorize persons "injured" in their "business or property,"  "by reason of" RICO's "violation" to sue for appropriate redress, including equity relief, treble damages and attorneys' fees.

208.   Each of the Plaintiffs (and the class sought to be certified) suffered a loss of money composed of the cost they paid to become an IP, together with the website fees, administrative fees, and the cost of merchandise purchased as samples and for purposes of operating the alleged "business opportunity," and the amount they recovered as commissions or other payments. Kerrigan has lost over $1,000, while Mikovich and Valli have each lost in excess of $500. The losses were proximately caused by the actions described in this Count, and may be presumed from, among other things, the presumption that no one would knowingly join an illegal pyramid scheme.

209.   The precise amount lost by the class sought to be certified has not yet been determined but is believed to be well over $360 million. It is believed that each of the unwitting participants in the pyramid scheme sought to be certified as a class has lost $50 to well over $5,000 as a result of purchasing their IP distribution rights. Upon information and belief, the precise amounts that each and every participant in the pyramid scheme has spent on (1) costs associated with the IP "business

177

opportunity" and (2) has received in commissions or bonuses or other payments from ViSalus as a result has been tracked, maintained and accounted for by ViSalus through a proprietary software database maintained by Exigo. Thus, the precise loss of every class member is easily capable of being ascertained in this litigation, and the total business injury capable of being computed for the class.

210.   The predicate acts set forth in this Count each were mailings and/or wire transmission of material in furtherance of the promotion of the pyramid scheme. Each of these predicate acts was intended to falsely convey the impression to people like Plaintiffs that participation as a ViSalus IP was legal; that they had a reasonable opportunity to make money; that people just like them were able to make generous income; and that the commissions or bonuses they would receive would come from the sale of desirable product. The loss suffered by the Plaintiffs and the class was foreseeable and a direct result of the establishment, promotion, and expansion of the pyramid scheme by the Defendants named in this Count. A pyramid scheme depends on continued expansion by continual recruiting of innocent people who do not realize that the only way in which they can achieve the benefits represented by the pyramid scheme's promoters is to recruit and victimize other innocent people into joining. In reality, like all pyramid schemes, the Compensation Plan and all aspects of the promotion of the pyramid scheme were based on recruiting over product sales, and

depended on the known existence of money-losers (like the Plaintiffs and the class) to pay the small group of "winners" inherent in any pyramid scheme. There is a clear causal connection between the promotion and recruiting predicate acts alleged above and the injury suffered by the Plaintiffs and the class.

211.   The predicate acts attributed to the Corporate Defendants, RAM, Robert Goergen, Sr., Todd Goergen, Sarnicola, Mallen, and Blair, also include the creation and dissemination of the Compensation Plan. Under the ViSalus Compensation Plan, as set forth above, innocent participants could only make money by recruiting others who in turn would recruit others. This was a necessary feature of the Plan, understood as such by all of the Defendants named in this Count. It was the goal of each of these Defendants that Plaintiffs subscribe, by the payment of money to ViSalus, to the Compensation Plan. The payment of bonuses and commissions to promoters who were recruiters of participants in the pyramid scheme, like the Plaintiffs and the class, was an intended part of the ViSalus Compensation Plan. Each of the named Plaintiffs were placed by ViSalus in a pyramid "downline" whose top slot was occupied by Sarnicola. Each of the payments made by the Plaintiffs in 2012 and 2013 to purchase IP distribution rights and product, as well as payments they made for website usage, resulted in payment of a bonus or commission payment that was made, directly or indirectly, to RAM, Sarnicola and ViSalus. Defendants Sarnicola, Blair, Mallen,

179

Robert Goergen, Sr., and Todd Goergen, together with ViSalus, directly authored and/or approved of the dissemination of the ViSalus Compensation Plan that was made a part of the IP distribution rights purchased by the Plaintiffs. The dissemination of the ViSalus Compensation Plan, together with predicate acts that purported to falsely emphasize the features of the Compensation Plan (for example, without revealing that under the plan there would be many more "losers" than "winners") was in furtherance of the scheme. Plaintiffs lost money by participating in the Compensation Plan. But for the illegal nature of the bonus and commission payments set forth by the Compensation Plan, Plaintiffs and others would not have lost money. Plaintiffs' losses thus were a direct and proximate cause of their intended participation in the Compensation Plan authored and/or approved by each of these Defendants.

212.    A pyramid scheme depends on recruitment of innocent people. The predicate acts attributed to the promoter Defendants are primarily those that concern the promotion of the scheme and luring innocent people to join the business opportunity. The promoters had an incentive to spread the word. The payment of bonuses and commissions to promoters who were recruiters of more participants was part of the scheme. In 2012 and 2013 many of the other promoters  were named a so-called "Diamond Ambassador" eligible to collect revenue from company-wide sales,

including sales made to new recruits like Kerrigan, Mikovich and Valli. It is believed that these individuals were also Plaintiffs' "uplines" (and "downline" from Sarnicola), and therefore these individuals also received a commission payment, either directly by virtue of being in Plaintiffs' "upline" or indirectly, as a pool bonus, from the money paid by Plaintiffs. But for the illegal nature of the bonus and commission payments set forth by the "business opportunity" and the recruiting materials, ads or promotions made by these Defendants, directed to Plaintiffs and members of the class who were invited to meetings such as those attended by the Plaintiffs, Plaintiffs and others would not have lost money. The dissemination of the ViSalus "business opportunity," by these Defendants together with predicate acts that purported to spread the impression that joining the ViSalus "business opportunity" or that resulted in the recruitment of Plaintiffs, directly or indirectly, proximately caused Plaintiffs' and the class losses.

213.    Certain predicate acts attributed to ViSalus also concern promotion and recruitment. Defendant ViSalus as a corporate entity operated the same scheme, with the same general participants, to attract the collective payment of several hundred million dollars by well over 500,000 participants to become promoters for a fraudulent enterprise. ViSalus had the actual intent to attract such participants as evidenced by a massive web presence, publication of web-related videos, its own and

related websites, and other broadly disseminated offers for people to become promoters for ViSalus. ViSalus disseminated quotations from participants indicating that they have joined the ViSalus "team" as a result of the invitation. Each of the predicate acts alleged above that is directed to promotion and recruitment, is a communication made by ViSalus or with its knowledge, intended to further the goal of the scheme. But for these false and misleading statements and/or omissions Plaintiffs and the class would not have would not have been induced to purchase IP distribution rights. Plaintiffs' losses were a direct and proximate cause of their innocent participation in the pyramid scheme.

214.  Participants in the ViSalus scheme were induced to purchase IP distribution rights without knowledge that they could only make money by victimizing others. Each of the predicate act charged to the Promoter Defendants that concerned promotional and recruiting materials authored by, or which knowingly featured Defendants was made with the intent that it induce Plaintiffs, or the class of unwitting participants like Plaintiffs, into believing that they were participating in a legal enterprise and not an illegal pyramid scheme. Each of the predicate act promotional and recruiting materials authored by, or which knowingly featured Defendants was made with the intent that Plaintiffs join the "downline" organization

of each of them (as each were at various times within each other's organizations as well as in Sarnicola's) and therefore contribute money into the scheme.

215.   In particular, during the conventions or "kick-off events" such as one attended by Plaintiff Kerrigan, or the hotel meetings organized by ViSalus at which new promoters like Kerrigan were encouraged to invite prospective promoters like Mikovich and Valli, new participants were encouraged to look at the promotional materials, social media presence of ViSalus and its "Body By Vi" program, or the "90 Day Challenge" Program, and were handed promotional brochures that featured ads and representations set forth as the predicate acts attributed to these Defendants. Each of these conventions, meetings or events, including those attended by Plaintiffs, featured videos that depicted promotional material described as the predicate acts in this Count.   But for the false belief in the legality of the program, or the alleged "success" of the program induced by these materials, Plaintiffs would not have been induced to contribute money into the scheme.

## COUNT TWO
## ALL DEFENDANTS CONSPIRED TO VIOLATE 18 U.S.C. § 1962(c) AND ARE IN VIOLATION OF 18 U.S.C. §§ 1961(5), 1962(d)

216.   Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

217.   Plaintiffs re-state Paragraphs 1-216 as if fully set forth here.

218.   Each of the Defendants named in this Count have participated in a conspiracy to violate Count One.

219.   Each of the Defendants named in this Count has participated in the pyramid scheme and their participation is necessarily a combination of more than two individuals.

220.   The roles of all of the Defendants named in this Count are set forth in Count 1.

184

221.   Defendants' and nonparty entities' creation, support or maintenance of the pyramid scheme is illegal.

222.   The Defendants named in this Count had a meeting of the minds on the object or course of action, specifically to create, support and maintain the pyramid scheme for their financial benefit as evidenced by each Defendant's voluntary and knowing participation in the pyramid scheme.   These agreements and understandings are described in Count 1.

223.   Each of the Defendants named in this Count and others have committed one or more overt acts to achieve or further the unlawful objects and purposes of the pyramid scheme detailed herein. They include the following:

**Robert Goergen, Sr./Trust**: (1) silently investing in ViSalus when he knew or reasonably should have known that ViSalus was operating as a pyramid scheme; (2) assisting ViSalus in operation as a pyramid scheme by (a) being actively involved with its expansion after 2008, (b) serving on its Board of Directors and making public statements of support and confidence that ViSalus was a legitimate seller of weight-loss products, and (c) lending his name and his publicly-traded company's credibility as a legitimate business

by causing Blyth to purchase the stock of ViSalus, (d) lending his name and credibility as a CEO of a publicly-traded, legitimate business by appearing at conventions, and giving "interviews" extolling ViSalus's future in front of potential distributors. Goergen's actions gave an air of legitimacy to ViSalus which was exploited by ViSalus through print and electronic communications.

**Todd Goergen/RAM/HashTag One**: (1) silently investing in ViSalus when he knew or reasonably should have known that ViSalus was operating as a pyramid scheme; (2) assisting ViSalus in operation as a pyramid scheme by (a) being actively involved with its expansion after 2008 and causing Blyth to provide ViSalus funds and support to give it capital to expand the pyramid scheme, (b) serving on its Board of Directors and making public statements of support and confidence that ViSalus was a legitimate seller of weight-loss products, and (c) lending his name and his publicly-traded company's credibility as a legitimate business by causing Blyth to purchase the stock of ViSalus, (d) lending his name and credibility as a CEO of a publicly-traded, legitimate business by appearing at conventions, and giving "interviews" extolling ViSalus's future in front of potential distributors. Goergen's actions gave an air of legitimacy to ViSalus which was exploited by ViSalus through print and electronic communications.

**Sarnicola/Power Couple/AB25**: (1) serving as one of the co-founders and principal creators of the pyramid scheme, (2) creating and/or approving the creation of the Compensation Plan which pays primarily for recruiting, (3) creating and disseminating countless promotional materials, videos, and public appearances designed to further and expand the pyramid scheme in the United States and abroad, (4) making contractual arrangements with the Goergens and Blyth to provide capital to expand the pyramid scheme and to lend the scheme an air of legitimacy, (5) making deals with professional network marketers to pay them hidden inducements and/or assign them "downlines" as an inducement to further the expansion of the pyramid scheme, (6) acting as the "top" distributor and accepting tens of millions of dollars as gains from the pyramid scheme.

**Blair/OCD**: (1) serving as one of the co-founders and principal creators of the pyramid scheme, (2) creating and/or approving the creation of the Compensation Plan which pays primarily for recruiting, (3) creating and disseminating promotional materials, videos, and public appearances at conventions, regional meetings, and television designed to further and expand the pyramid scheme in the United States and abroad, (4) making contractual

arrangements with the Goergens and Blyth to provide capital to expand the pyramid scheme and to lend the scheme an air of legitimacy, and appearing as the public face of the enterprise with the Goergens, all to give an air of legitimacy to the enterprise, (5) making deals with professional network marketers to pay them hidden inducements and/or assign them "downlines" as an inducement to further the expansion of the pyramid scheme.

**Mallen/BAM**: (1) serving as one of the co-founders and principal creators of the pyramid scheme, (2) creating and/or approving the creation of the Compensation Plan which pays primarily for recruiting, (3) creating and disseminating countless promotional materials, videos, and public appearances designed to further and expand the pyramid scheme in the United States and abroad, (4) making contractual arrangements with the Goergens and Blyth to provide capital to expand the pyramid scheme and to lend the scheme an air of legitimacy, (5) making deals with professional network marketers to pay them hidden inducements and/or assign them "downlines" as an inducement to further the expansion of the pyramid scheme, (6) acting as the "top" distributor and accepting tens of millions of dollars as gains from the pyramid scheme.

**O'Toole/Prospex/O'Toole Int'l Holdings**: (1) accepting payments and/or other inducements, including being given or assigned a "downline" by Sarnicola, Blair and Mallen upon becoming a ViSalus distributor; (2) performing recruiting acts on behalf of ViSalus and the enterprise when he knew or reasonably should have known that he was promoting a pyramid scheme, (3) appearing in print and electronic promotions to give legitimacy to the idea that anyone could achieve six- and seven- figure success in the "business opportunity" when he knew that his own success and financial payments were the result of hidden arrangements that would not be made available to persons who were being recruited.

**Wilson/ABGL**: (1) accepting payments and/or other inducements, including being given or assigned a "downline" by Sarnicola, Blair and Mallen upon becoming a ViSalus distributor; (2) performing recruiting acts on behalf of ViSalus and the enterprise when she knew or reasonably should have known that she was promoting a pyramid scheme, (3) appearing in print and electronic promotions to give legitimacy to the idea that anyone could achieve six- and seven- figure success in the "business opportunity" when she knew that his own success and financial payments were the result of hidden

arrangements that would not be made available to persons who were being recruited.

**Pacetti/Gooder**: (1) accepting payments and/or other inducements, including being given or assigned a "downline" by Sarnicola, Blair and Mallen upon becoming a ViSalus distributor; (2) performing recruiting acts on behalf of ViSalus and the enterprise when he knew or reasonably should have known that he was promoting a pyramid scheme, (3) appearing in print and electronic promotions to give legitimacy to the idea that anyone could achieve six- and seven- figure success in the "business opportunity" when he knew that his own success and financial payments were the result of hidden arrangements that would not be made available to persons who were being recruited.

**Fortner/Residual Marketing/GHGI**: (1) accepting payments and/or other inducements, including being given or assigned a "downline" by Sarnicola, Blair and Mallen upon becoming a ViSalus distributor; (2) performing recruiting acts on behalf of ViSalus and the enterprise when he knew or reasonably should have known that he was promoting a pyramid scheme, (3) appearing in print and electronic promotions to give legitimacy to the idea that anyone could achieve six- and seven- figure success in the "business

opportunity" when he knew that his own success and financial payments were the result of hidden arrangements that would not be made available to persons who were being recruited.

**T. Kirkland/Freedom Legacy/H. Kirkland**: (1) accepting payments and/or other inducements, including being given or assigned a "downline" by Sarnicola, Blair and Mallen upon becoming a ViSalus distributor; (2) performing recruiting acts on behalf of ViSalus and the enterprise when he/she knew or reasonably should have known that he/she were promoting a pyramid scheme, (3) appearing in print and electronic promotions to give legitimacy to the idea that anyone could achieve six- and seven- figure success in the "business opportunity" when he/she knew that their own success and financial payments were the result of hidden arrangements that would not be made available to persons who were being recruited.

**Petrilli/9248**: (1) accepting payments and/or other inducements, including being given or assigned a "downline" by Sarnicola, Blair and Mallen upon becoming a ViSalus distributor; (2) performing recruiting acts on behalf of ViSalus and the enterprise when she knew or reasonably should have known that she was promoting a pyramid scheme, (3) appearing in print and

191

electronic promotions to give legitimacy to the idea that anyone could achieve six- and seven- figure success in the "business opportunity" when she knew that his own success and financial payments were the result of hidden arrangements that would not be made available to persons who were being recruited.

**Varon/NDAC**: (1) accepting payments and/or other inducements, including being given or assigned a "downline" by Sarnicola, Blair and Mallen upon becoming a ViSalus distributor; (2) performing recruiting acts on behalf of ViSalus and the enterprise when he knew or reasonably should have known that he was promoting a pyramid scheme, (3) appearing in print and electronic promotions to give legitimacy to the idea that anyone could achieve six- and seven- figure success in the "business opportunity" when he knew that his own success and financial payments were the result of hidden arrangements that would not be made available to persons who were being recruited.

**Jackson/Red Letters**: (1) accepting payments and/or other inducements, including being given or assigned a "downline" by Sarnicola, Blair and Mallen upon becoming a ViSalus distributor; (2) performing recruiting acts on behalf of ViSalus and the enterprise when he knew or reasonably should

have known that he was promoting a pyramid scheme, (3) appearing in print and electronic promotions to give legitimacy to the idea that anyone could achieve six- and seven- figure success in the "business opportunity" when he knew that his own success and financial payments were the result of hidden arrangements that would not be made available to persons who were being recruited.

**Wealth Builder Management:** (1) accepting payments and/or other inducements; (2) performing recruiting acts on behalf of ViSalus and the enterprise when it knew or reasonably should have known that it was promoting a pyramid scheme].

**Merriweather:** (1) accepting payments and/or other inducements, including being given or assigned a "downline" by Sarnicola, Blair and Mallen upon becoming a ViSalus distributor; (2) performing recruiting acts on behalf of ViSalus and the enterprise when he knew or reasonably should have known that he was promoting a pyramid scheme, (3) appearing in print and electronic promotions to give legitimacy to the idea that anyone could achieve six- and seven- figure success in the "business opportunity" when he knew that his

own success and financial payments were the result of hidden arrangements that would not be made available to persons who were being recruited.

**G.   Reynolds/BeachLifestyle**: (1) accepting payments and/or other inducements, including being given or assigned a "downline" by Sarnicola, Blair and Mallen upon becoming a ViSalus distributor; (2) performing recruiting acts on behalf of ViSalus and the enterprise when he knew or reasonably should have known that he was promoting a pyramid scheme, (3) appearing in print and electronic promotions to give legitimacy to the idea that anyone could achieve six- and seven- figure success in the "business opportunity" when he knew that his own success and financial payments were the result of hidden arrangements that would not be made available to persons who were being recruited.

224.   The Defendants named in this Count used false and fraudulent means and conducted their affairs unlawfully, intentionally, willfully and with the intent to defraud, for their own financial gain and benefit and for the financial gain and benefit of others, all to the detriment of Kerrigan, Mikovich and Valli and others that purchased the IP Program.  These acts, intent and losses are set forth in Count 1.

225.   Each of the Defendants named in this Count has violated Section 1962(c) and is liable, jointly and severally, for the business injury caused to the Plaintiffs and the class by his or her actions.

### COUNT THREE
### VIOLATIONS OF 5 U.S.C. § 78j(b) [SECTION 10B] and 17 C.F.R. § 240.10b-5 [SECTION 10B-5] AGAINST [10b-5(b)] VISALUS, AND [10b-5(a)&((c)] VISALUS, ROBERT GOERGEN, SR., TODD GOERGEN, SARNICOLA, BLAIR, MALLEN, PACETTI AND O'TOOLE [1]

226.   Plaintiffs and the class repeat and re-allege every allegation above as if set forth herein in full.   Plaintiffs' sworn certificates were attached as Exhibits C, D, and E to the SAC.

227.   Plaintiffs allege violations of securities laws in the alternative and without prejudice to their position that their RICO claims, set forth in Counts 1 and 2, are not preempted by the PSLRA. These allegations are not a waiver of their claims made in Counts 1 and 2.

---

[1]   In addition to ViSalus, Plaintiffs believe that the "makers" of the misrepresentations/omissions also include the Goergens, Sarnicola, Blair, Mallen, Pacetti and O'Toole. Plaintiffs reserve the right to seek further amendment to this count at the appropriate time.

228.    All Defendants have admitted and claimed that the sale and offer of sale of IP distributorships, such as those purchased by Plaintiffs and the class is in connection with and constitutes the sale of a security.

229.    The Defendants named in this Count made material misrepresentations and/or omissions in connection with the sale of distributorships to Plaintiffs and the class. The Defendants falsely represented that they were conveying a legal business opportunity, when, in fact, they and each of them knew or recklessly ignored that they were selling and the Plaintiffs were purchasing an interest in an illegal pyramid scheme. In the alternative, Defendants' actions omitted material facts, *i.e.*, that they were selling an interest in a pyramid scheme, in connection with the sale of distributorships.

230.    There is a necessary connection between the Defendants' actions, set forth in this Complaint, and the Plaintiffs' purchase of IP distributorships and other payments made in connection with that purchase. There was a necessary and immediate causal connection between the promotional activities by the Defendants described in this complaint and the Plaintiffs' and the class's purchase. Indeed, the constant goal of all Defendants named in this Count was to expand the scheme and

sell as many distributorships as possible to unsuspecting participants in the pyramid. The instances of omissions and/or misrepresentations and mail and wire fraud alleged throughout this complaint directly supported, and the misstatements therein were the only justification for, the price of the enrollment packages and the cost required of new recruits to purchase the products. The omissions and/or misrepresentations of the value of investing in the ViSalus opportunity is directly reflected in the company's enrollment documents, the only means by which someone may invest in the company.

231. The Plaintiffs necessarily and/or justifiably relied on the misrepresentations and/or omissions. Such reliance may be presumed from, among other things, the presumption that no one would knowingly join an illegal pyramid scheme. In addition, the Plaintiffs reviewed and relied upon the misrepresentations and misrepresentations by omission of the Compensation Plan detailed in paragraphs 8-15 of this Third Amended Complaint. The damages caused by the omissions and/or misrepresentations were a necessary consequence of an inherently illegal scheme to defraud.

232. Defendants' actions were made with such mental state to manipulate, deceive or defraud, or with such recklessness, as to constitute *scienter*. Each of the

Defendants named in this Count had a motive to operate and benefit from the operation of the pyramid scheme, and opportunity to conceal the fact that they were operating a pyramid scheme. Proof of such *scienter* can be inferred from the following:

- Each of the Defendants benefitted in concrete and substantial way from the operation of the pyramid scheme. *See* averments made in connection with Counts 1 (RICO) and 7 (unjust enrichment);

- Each of the Defendants engaged in plainly illegal behavior. *See* averments made in connection with the commission of a pyramid scheme, Paragraphs 39-110; Counts 1 and 2;

- Each of the Defendants had a specific understanding that he was engaged in the commission of a pyramid scheme or that it would be substantially likely that the operation would be found to be a pyramid scheme. *See* generally Paragraph 186. In addition to the facts alleged in Paragraph 186, each of the Defendants named here had personal knowledge of the contents of the Prospectus filed in advance of the IPO, which specifically warned that elements of the operation, or all of the operation, could be found to be a pyramid scheme.

233.  Plaintiffs and the class suffered damages in that they lost moneys through the purchase of their IP distributorships.

234.  Plaintiffs' and the class damages may be measured either in actual damages or may be rescissionary.

## COUNT FOUR
## VIOLATION OF  15 U.S.C. § 77l(a)(2) [Section 12(2)] AGAINST VISALUS[2]

235.  Plaintiffs and the class repeat and re-allege every allegation above as if set forth herein in full.

236.  Plaintiffs allege violations of securities laws in the alternative as permitted and without prejudice to their position that their RICO claims, set forth in Counts 1 and 2, are not preempted by the PSLRA. These allegations are not a waiver of their claims made in Counts 1 and 2.

---

[2] Plaintiffs believe that additional defendants may properly be liable under Section 12(2) and reserve the right to bring a further amendment at the appropriate time.

237.   ViSalus was engaged in the offer or sale of a security in connection with the sale of IP distributorships. ViSalus omitted a material fact necessary in order to make the statement, under the circumstances, not misleading, to wit, that the distributorship was a pyramid scheme. See allegations made above relating to the operation of a pyramid scheme, which are specifically incorporated herein.

238.   Defendant ViSalus is the seller of the distributorship interest. The Compensation Plan incorporated in the distributorship interest is materially false and/or misleading, to wit, it omits to disclose that the seller operates a pyramid scheme.

239.   ViSalus offered or sold a security within the meaning of Section 12(2).

240.   Plaintiffs and the class suffered damages in that they lost moneys through the purchase of their IP distributorships. Causation may be presumed from, among other things, the presumption that no one would knowingly join an illegal pyramid scheme.

241.   Plaintiffs' and the class are entitled to actual damages and/or rescission of their purchase amounts plus equitable interest.

## COUNT FIVE
## VISALUS IS IN VIOLATION OF SECTION 3b, M.C.L.A. SEC. 445.903b MICHIGAN CONSUMER PROTECTION ACT AGAINST VISALUS

242.   Plaintiffs and the class repeat and re-allege every allegation above as if set forth herein in full against Defendant ViSalus.

243.   To the extent that the law provides, Plaintiffs and the class defined by the statute at issue in this Count Three bring this claim on their own behalf and on behalf of each of the class members.

244.   The Defendant has violated the Michigan Consumer Protection Act, MCLS § 445.901 *et seq*. ("MCPA") entitling Plaintiffs and the members of the class to damages and relief under the MCPA.

245.   Defendant is in violation of the "mini-FTC Act" portion of the MCPA at § 445.903b, which requires registration of all business opportunities offered at more than $500, in that ViSalus charges $999 for one of the three ViSalus IP membership levels that all defendants promote, among other things.

## COUNT SIX
## DEFENDANTS VISALUS, SARNICOLA, BLAIR, AND MALLEN
## ARE IN VIOLATION OF M.C.L.A. SEC. 445.903
## <u>MICHIGAN CONSUMER PROTECTION ACT</u>

246.   The Defendants have engaged in "trade or commerce" within the meaning of MCLS § 445.902(1)(g), which specifically includes pyramid and chain promotions in that definition.

247.   The Michigan Consumer Protection Act prohibits unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce such as:

- Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;

- Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and

- Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

248.    Defendants have violated the MCPA in that they authored or knowingly permitted and encouraged the dissemination of the ViSalus Compensation Plan in place in 2011 (**Exhibit A**) to Plaintiffs and others in the class.

249.    Each of the Plaintiffs was shown and given the ViSalus Compensation Plan at the meetings they attended described in this Complaint.  Each of the Plaintiffs reviewed and relied upon the misrepresentations and misrepresentations by omission detailed in paragraphs 8-15 of this Third Amended Complaint.

250.    The Compensation Plan omits to reveal that the benefits and commissions set forth in the Compensation Plan operate as a pyramid scheme.

251.    Had Plaintiffs been made aware that by becoming IPs of ViSalus they were agreeing to participate in the Compensation Plan of a pyramid scheme they would not have done so. In the alternative, their reliance may be presumed from, among other things, the presumption that no one would knowingly join an illegal pyramid scheme.

252.    As a result, Plaintiffs and the class have suffered injury which is compensable under the MCPA together with attorneys' fees.

**COUNT SEVEN**
**ALL DEFENDANTS EXCEPT VISALUS HAVE**
**BEEN UNJUSTLY ENRICHED**

253.   Plaintiffs and the class repeat and re-allege every allegation above as if set forth herein in full.


254.   Plaintiffs bring this claim on their own behalf and on behalf of each of the class members.


255.   Unjust enrichment occurs when a Plaintiff confers a benefit to the defendant, the Defendant accepts and retains the benefit, and Defendant does not pay the Plaintiff the value of the benefit.


256.   The Defendants named in this Count have been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and the members of the class in that the financial benefits obtained by them came as a result of their promotion of the unlawful pyramid scheme. The financial benefits they obtained came from the Plaintiffs and the members of the class, who unwittingly participated in the pyramid scheme and naturally and inevitably lost money in the process.  The unjustly-obtained benefits are comprised of the following three categories of gains.

204

257. First, certain Defendants named in this Count made contractual agreements with each other and with third-party Blyth that depended on the success of the pyramid scheme. The 2008 deal between Blyth on one hand and the Goergens, the Ropart Asset I and Ropart Asset II investment companies controlled by the Goergens, and Sarnicola, Mallen and Blair, on the other hand, provided a set formula for the Blyth buyout of the shares held by the Goergens and Sarnicola, Mallen and Blair which was directly dependent on high revenues booked by ViSalus. These Defendants, as set forth in Counts 1 and 2, took active steps to expand the scope of the pyramid scheme, and increased the number of participants—and therefore the number of inevitable "losers" in order to maximize the amounts each would get— paid for by the shareholders of Blyth-- while and as a result of the ongoing, expanded pyramid scheme. These Defendants were able to obtain payouts under the Blyth contracts on the backs of the Plaintiffs (since 2013 as to the named Plaintiffs, and since 2008 for Plaintiffs in the class). Beginning in October, 2008, and continuing through transactions in April, 2011, January, 2012, December, 2012, and January, 2013, Defendants ViSalus, Ropart Asset, Ropart Asset II, Robert Goergen Sr., Todd Goergen, Blair, Sarnicola and Mallen individually extracted some of the proceeds of the pyramid scheme to their benefit. These Defendants received at least the following

payments which would not have been made but for the success of the unlawful pyramid scheme:

- *October, 2008-* Ropart Asset and Ropart Asset II: $3 million; Blair: $2.5 million; Sarnicola: $2.5 million; Mallen: $2.5 million; ViSalus: $3 million.

- *April, 2011-* Ropart Asset and Ropart Asset II: $1 million; Blair: $300,000; Sarnicola: $300,000; Mallen: $300,000; "others": $600,000

- *January, 2012-* Ropart Asset and Ropart Asset II: $11 million; Blair: $3.333 million and additional shares of ViSalus; Sarnicola: $3.333 million and additional shares of ViSalus; Mallen: $3.333 million and additional shares of ViSalus; "others": $7.6 million.

- *December, 2012-* Goergen Sr: $5.1 million; Goergen: $1.7 million; Blair: $13.3 million; Sarnicola: $13.3 million; Mallen: $13.3 million; "others": $13.6 million. In addition, Blair, Sarnicola and Mallen received $25.3 million in a buyout of an equity incentive plan, and they together with the Goergens received an option for purchase of their remaining shares of ViSalus by 2017 at $147 million. Defendants Trzcinski/TRZ, Jackson/Red Letters, and Reynolds were also among the recipients of the equity incentive plan buyout.

- Thus, the known total amounts received by these defendants are as follows: Ropart Asset I and Ropart Asset II: $50+ million; Goergen Sr: $5.1 million; Todd Goergen: $1.7 million; Blair: $19.5 million plus stock and portion of EIP; Sarnicola: $19.5 million plus stock and portion of EIP; Mallen: $19.5 million plus stock and portion of EIP; "others": $20.8 million.

- In addition, in April and July, 2013, as the sales in ViSalus evaporated, the Defendants declared dividends of $33

206

million and paid $6.1 million to "noncontrolling shareholders," believed to be the Goergens and Blair, Sarnicola and Mallen.

258. Second, the individual promoter Defendants, together with their controlled entities named as Defendants and Sarnicola in his role as the "top" distributor controlling 75% of the "downline" (and Defendants Pacetti/Gooder controlling 10% in 2012, Defendants Fortner/Residual Marketing controlling 10% in 2012, Defendants Kirklands/Freedom Legacy controlling 10%, and Defendants O'Toole/Prospex controlling 10% in 2012, together with the unknown shares of the remaining promoters named in this Count) have each been enriched in various amounts as a result of the performance of their various illegal duties. Regardless of in what year, each of the Promoter Defendants were "upline" from the Plaintiffs and the class, and thus, as a matter of the Compensation Plan implemented by ViSalus, obtained bonuses and commissions as a "Diamond" or other Ambassador distributor, which were necessarily funded by a portion of the Plaintiffs' (and the class's) purchase of a $49, $499, or $999 IP distributorship and purchase of product. These payments were thus directly funded by the Plaintiffs by virtue of the compensation system paying commissions and bonuses "upline" to promoters at the top of the pyramid. The value of these benefits can be computed but is presently unknown. But for the illegal Compensation Plan and the commission of the illegal pyramid scheme,

the Promoter Defendants could not have obtained the funds that came to them via the Compensation Plan.

259.    Third, in addition to the unjust benefits he has obtained as a result of a deal with Blyth, and as the top "upline" distributor, since 2010 Sarnicola has been a "Global Ambassador" for ViSalus. In that role he has received (or acknowledged receiving) $350K per month as a result of being the head of the largest "downline" for the company. Upon information and belief, Sarnicola, through Defendants Power Couple and AB25, was paid approximately $10.7 million for recruiting tens or hundreds of thousands of people into the illegal pyramid scheme, and through Defendant Power Couple, another $1 million per year from ViSalus in assistance and performance payments.    The moneys that he received, in part, as an "upline" distributor came from Plaintiffs' (or the class) payments for the same reasons as set forth above.

260.    The revenue that resulted in these payments came directly from the payments made by Plaintiffs and the class. It would be unjust to permit these Defendants to retain these ill-gotten gains.

## COUNT EIGHT
## VISALUS HAS ENGAGED IN STATUTORY
## AND/OR COMMON LAW CONVERSION

261.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

262.   Plaintiffs bring this claim on their own behalf and on behalf of each of the class members.

263.   Statutory conversion under MCLS § 600.2919a provides that a person damaged by another person's stealing or embezzling property or converting property to the other person's own use may recover three times the amount of actual damages sustained, plus costs and reasonable attorney fees.

264.   ViSalus has wrongfully exerted dominion over plaintiffs' funds inconsistent with plaintiffs' rights to such funds in violation of the statute.

265.   ViSalus is also liable for common law conversion.  Under Michigan law, a common law cause of action for conversion also exits for "[A]ny distinct act of dominion wrongfully exerted over another's personal property in denial or inconsistent with his rights therein."

266.    ViSalus is thus also liable for common law conversion because, as discussed in the other paragraphs of this Complaint, they have wrongfully taken and otherwise exerted dominion over the enrollment and other fees and costs they induced Plaintiffs to pay in connection with the ViSalus IP "business opportunity," denying and/or otherwise inconsistent with the Plaintiffs' rights therein.

## COUNT NINE
## CIVIL CONSPIRACY AGAINST ALL DEFENDANTS

267.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

268.    Plaintiffs bring this claim on their own behalf and on behalf of each of the class members.

269.    The elements of a common law cause of action for civil conspiracy are: (1) a concerted action (2) by a combination of two or more persons (3) to accomplish an unlawful purpose or a lawful purpose by criminal or unlawful means, (4) causing damage to the Plaintiffs.

270.    All Defendants are alleged to have undertaken an "unlawful purpose," that is violation of Section 1962(a) and (d) of RICO; further, these Defendants are

alleged to have violated Section 5 of the MFIL which sounds in tort and unjust enrichment which sounds in tort, and conversion (ViSalus only).

271.    The concerted action to accomplish an unlawful purpose between and among these Defendants is set forth in Paragraphs 44-105 (describing the commission of the pyramid scheme), and Paragraphs 122-167 (the concerted action) all of which are specifically incorporated herein. The combination between and among these Defendants alleged to accomplish the operation and commission of the pyramid scheme is described and set forth in Paragraphs 122-167 and 204-211. In addition, these Defendants performed the following actions:

**Robert Goergen, Sr./Trust**: (1) silently investing in ViSalus when he knew or reasonably should have known that ViSalus was operating as a pyramid scheme; (2) assisting ViSalus in operation as a pyramid scheme by (a) being actively involved with its expansion after 2008, (b) serving on its Board of Directors and making public statements of support and confidence that ViSalus was a legitimate seller of weight-loss products, and (c) lending his name and his publicly-traded company's credibility as a legitimate business by causing Blyth to purchase the stock of ViSalus, (d) lending his name and credibility as a CEO of a publicly-traded, legitimate business by appearing at

conventions, and giving "interviews" extolling ViSalus's future in front of potential distributors. Goergen's actions gave an air of legitimacy to ViSalus which was exploited by ViSalus through print and electronic communications.

**Todd Goergen/RAM/HashTag One**: (1) silently investing in ViSalus when he knew or reasonably should have known that ViSalus was operating as a pyramid scheme; (2) assisting ViSalus in operation as a pyramid scheme by (a) being actively involved with its expansion after 2008 and causing Blyth to provide ViSalus funds and support to give it capital to expand the pyramid scheme, (b) serving on its Board of Directors and making public statements of support and confidence that ViSalus was a legitimate seller of weight-loss products, and (c) lending his name and his publicly-traded company's credibility as a legitimate business by causing Blyth to purchase the stock of ViSalus, (d) lending his name and credibility as a CEO of a publicly-traded, legitimate business by appearing at conventions, and giving "interviews" extolling ViSalus's future in front of potential distributors. Goergen's actions gave an air of legitimacy to ViSalus which was exploited by ViSalus through print and electronic communications.

**Sarnicola/Power Couple/AB25**: (1) serving as one of the co-founders and principal creators of the pyramid scheme, (2) creating and/or approving the creation of the Compensation Plan which pays primarily for recruiting, (3) creating and disseminating countless promotional materials, videos, and public appearances designed to further and expand the pyramid scheme in the United States and abroad, (4) making contractual arrangements with the Goergens and Blyth to provide capital to expand the pyramid scheme and to lend the scheme an air of legitimacy, (5) making deals with professional network marketers to pay them hidden inducements and/or assign them "downlines" as an inducement to further the expansion of the pyramid scheme, (6) acting as the "top" distributor and accepting tens of millions of dollars as gains from the pyramid scheme.

**Blair/OCD**: (1) serving as one of the co-founders and principal creators of the pyramid scheme, (2) creating and/or approving the creation of the Compensation Plan which pays primarily for recruiting, (3) creating and disseminating promotional materials, videos, and public appearances at conventions, regional meetings, and television designed to further and expand the pyramid scheme in the United States and abroad, (4) making contractual

arrangements with the Goergens and Blyth to provide capital to expand the pyramid scheme and to lend the scheme an air of legitimacy, and appearing as the public face of the enterprise with the Goergens, all to give an air of legitimacy to the enterprise, (5) making deals with professional network marketers to pay them hidden inducements and/or assign them "downlines" as an inducement to further the expansion of the pyramid scheme.

**Mallen/BAM**: (1) serving as one of the co-founders and principal creators of the pyramid scheme, (2) creating and/or approving the creation of the Compensation Plan which pays primarily for recruiting, (3) creating and disseminating countless promotional materials, videos, and public appearances designed to further and expand the pyramid scheme in the United States and abroad, (4) making contractual arrangements with the Goergens and Blyth to provide capital to expand the pyramid scheme and to lend the scheme an air of legitimacy, (5) making deals with professional network marketers to pay them hidden inducements and/or assign them "downlines" as an inducement to further the expansion of the pyramid scheme, (6) acting as the "top" distributor and accepting tens of millions of dollars as gains from the pyramid scheme.

**O'Toole/Prospex/O'Toole Int'l Holdings**: (1) accepting payments and/or other inducements, including being given or assigned a "downline" by Sarnicola, Blair and Mallen upon becoming a ViSalus distributor; (2) performing recruiting acts on behalf of ViSalus and the enterprise when he knew or reasonably should have known that he was promoting a pyramid scheme, (3) appearing in print and electronic promotions to give legitimacy to the idea that anyone could achieve six- and seven- figure success in the "business opportunity" when he knew that his own success and financial payments were the result of hidden arrangements that would not be made available to persons who were being recruited.

**Wilson/ABGL**: (1) accepting payments and/or other inducements, including being given or assigned a "downline" by Sarnicola, Blair and Mallen upon becoming a ViSalus distributor; (2) performing recruiting acts on behalf of ViSalus and the enterprise when she knew or reasonably should have known that she was promoting a pyramid scheme, (3) appearing in print and electronic promotions to give legitimacy to the idea that anyone could achieve six- and seven- figure success in the "business opportunity" when she knew that his own success and financial payments were the result of hidden

arrangements that would not be made available to persons who were being recruited.

**Pacetti/Gooder**: (1) accepting payments and/or other inducements, including being given or assigned a "downline" by Sarnicola, Blair and Mallen upon becoming a ViSalus distributor; (2) performing recruiting acts on behalf of ViSalus and the enterprise when he knew or reasonably should have known that he was promoting a pyramid scheme, (3) appearing in print and electronic promotions to give legitimacy to the idea that anyone could achieve six- and seven- figure success in the "business opportunity" when he knew that his own success and financial payments were the result of hidden arrangements that would not be made available to persons who were being recruited.

**Fortner/Residual Marketing/GHGI**: (1) accepting payments and/or other inducements, including being given or assigned a "downline" by Sarnicola, Blair and Mallen upon becoming a ViSalus distributor; (2) performing recruiting acts on behalf of ViSalus and the enterprise when he knew or reasonably should have known that he was promoting a pyramid scheme, (3) appearing in print and electronic promotions to give legitimacy to the idea that anyone could achieve six- and seven- figure success in the "business

opportunity" when he knew that his own success and financial payments were the result of hidden arrangements that would not be made available to persons who were being recruited.

**T. Kirkland/Freedom Legacy/H. Kirkland**: (1) accepting payments and/or other inducements, including being given or assigned a "downline" by Sarnicola, Blair and Mallen upon becoming a ViSalus distributor; (2) performing recruiting acts on behalf of ViSalus and the enterprise when he/she knew or reasonably should have known that he/she were promoting a pyramid scheme, (3) appearing in print and electronic promotions to give legitimacy to the idea that anyone could achieve six- and seven- figure success in the "business opportunity" when he/she knew that their own success and financial payments were the result of hidden arrangements that would not be made available to persons who were being recruited.

**Petrilli/9248**: (1) accepting payments and/or other inducements, including being given or assigned a "downline" by Sarnicola, Blair and Mallen upon becoming a ViSalus distributor; (2) performing recruiting acts on behalf of ViSalus and the enterprise when she knew or reasonably should have known that she was promoting a pyramid scheme, (3) appearing in print and

217

electronic promotions to give legitimacy to the idea that anyone could achieve six- and seven- figure success in the "business opportunity" when she knew that his own success and financial payments were the result of hidden arrangements that would not be made available to persons who were being recruited.

**Varon/NDAC**: (1) accepting payments and/or other inducements, including being given or assigned a "downline" by Sarnicola, Blair and Mallen upon becoming a ViSalus distributor; (2) performing recruiting acts on behalf of ViSalus and the enterprise when he knew or reasonably should have known that he was promoting a pyramid scheme, (3) appearing in print and electronic promotions to give legitimacy to the idea that anyone could achieve six- and seven- figure success in the "business opportunity" when he knew that his own success and financial payments were the result of hidden arrangements that would not be made available to persons who were being recruited.

**Jackson/Red Letters**: (1) accepting payments and/or other inducements, including being given or assigned a "downline" by Sarnicola, Blair and Mallen upon becoming a ViSalus distributor; (2) performing recruiting acts on behalf of ViSalus and the enterprise when he knew or reasonably should

have known that he was promoting a pyramid scheme, (3) appearing in print and electronic promotions to give legitimacy to the idea that anyone could achieve six- and seven- figure success in the "business opportunity" when he knew that his own success and financial payments were the result of hidden arrangements that would not be made available to persons who were being recruited.

**Wealth Builder Management:** (1) accepting payments and/or other inducements; (2) performing recruiting acts on behalf of ViSalus and the enterprise when it knew or reasonably should have known that it was promoting a pyramid scheme.

**Merriweather:** (1) accepting payments and/or other inducements, including being given or assigned a "downline" by Sarnicola, Blair and Mallen upon becoming a ViSalus distributor; (2) performing recruiting acts on behalf of ViSalus and the enterprise when he knew or reasonably should have known that he was promoting a pyramid scheme, (3) appearing in print and electronic promotions to give legitimacy to the idea that anyone could achieve six- and seven- figure success in the "business opportunity" when he knew that his

219

own success and financial payments were the result of hidden arrangements that would not be made available to persons who were being recruited.

**G.    Reynolds/BeachLifestyle**: (1) accepting payments and/or other inducements, including being given or assigned a "downline" by Sarnicola, Blair and Mallen upon becoming a ViSalus distributor; (2) performing recruiting acts on behalf of ViSalus and the enterprise when he knew or reasonably should have known that he was promoting a pyramid scheme, (3) appearing in print and electronic promotions to give legitimacy to the idea that anyone could achieve six- and seven- figure success in the "business opportunity" when he knew that his own success and financial payments were the result of hidden arrangements that would not be made available to persons who were being recruited.

272.   The Defendants named in this count have conspired and combined with each other and engaged in practices to obtain a profit by way of a pyramid scheme, which has caused damage to Plaintiffs and other class members. The damages suffered by the Plaintiffs are naturally foreseeable and proximately caused by the conspiracy.

**COUNT TEN**
**VIOLATION OF SECTIONS 13, 25 AND 28 OF THE MICHIGAN**
**FRANCHISE INVESTMENT LAW AGAINST VISALUS**

273.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

274.   M.C.L.A 445.1513 prohibits the sale of a franchise where the following applies: "(a) The franchisor's method of business includes or would include activities which are illegal where performed."

275.   M.C.L.A. 445.1525 further prohibits the following:

> A person shall not publish an advertisement concerning the offer or sale of a franchise in this state if the advertisement contains a statement that is false or misleading or omits to make any statement necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

276.   M.C.L.A. 445.1528 provides the following:

> (1) A person may not offer or sell any form of participation in a pyramid or chain promotion. A pyramid or chain promotion is any plan or scheme or device by which (a) a participant gives a valuable consideration for the opportunity to receive compensation or things of value in return for inducing other persons to become participants in the program or (b) a participant is to receive compensation when a person introduced by the participant introduces one or more additional persons into

221

participation in the plan, each of whom receives the same or similar right, privilege, license, chance, or opportunity.

(2) A pyramid or chain promotion is declared to be illegal and against the public policy of the state. Any contract made in violation of this section is voidable at the sole option of the purchaser.

277.   ViSalus has violated Sections 13, 25 and 28 by offering and selling to Plaintiffs and the class participation in the pyramid scheme in violations of the statute.

278.   Plaintiffs and the class had a contract with ViSalus.

279.   Plaintiffs and the class are entitled to rescission of their contract in the full amount of each of their payments to ViSalus. Plaintiffs demand judgment in the form of an order requiring the rescission of the contract of each participant in the pyramid scheme.

## COUNT ELEVEN
## VIOLATIONS OF SECTION 5 OF MICHIGAN FRANCHISE INVESTMENT LAW AGAINST VISALUS

280.   Michigan's Franchise Investment Law, M.C.L.A 445.1501 et *seq*. at Section 1505 prohibits the following conduct:

222

A person shall not, in connection with the filing, offer, sale, or purchase of any franchise, directly or indirectly:

(a) Employ any device, scheme, or artifice to defraud.

(b) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

(c) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

281.   M.C.L.A 445.1531 further provides the following:

(1) A person who offers or sells a franchise in violation of section 5 or 8 is liable to the person purchasing the franchise for damages or rescission, with interest at 6% per year from the date of purchase until June 20, 1984 and 12% per year thereafter and reasonable attorney fees and court costs.

282.   Under the Franchise Disclosure Law, ViSalus is liable jointly and severally for violations of the law.

283.   ViSalus' conduct in offering the "Business Opportunity" to be a ViSalus IP constitutes an offering of a franchise under this law. Its conduct as set forth in this Complaint is a scheme or artifice as defined under this section and establishes violations of the sections of the Act set forth above.

223

284.   As a result, the Plaintiffs and the class, to the limits of the applicability of the Franchise Disclosure Law, Section 1531, have been damaged. Plaintiffs and the class are entitled to damages or rescission pursuant to this section.

## **PRAYER FOR RELIEF**

Kerrigan, Mikovich and Valli and the plaintiff class request the following relief:

a.    Certification of the class;

b.    A judgment against the Defendants;

c.    Damages in the amount of the injury to business incurred by Kerrigan, Mikovich and Valli and the class as a result of defendants' conduct and for injury to their business and property, all as a result of defendants' violations of 18 U.S.C. § 1962(c) and (d) and that such sum be trebled in accordance with 18 U.S.C. § 1964(c);

d.    Damages in actual amount or rescission of contracts pursuant to violations of securities laws (alternative and conditional)

e.    Temporary and permanent injunctive relief enjoining the defendants from further unfair, unlawful, fraudulent and/or deceptive acts, including, but not limited to, supporting, continuing or operating the pyramid scheme;

f.    Disgorgement of all proceeds of the pyramid scheme by each defendant;

g.    Relief under the Michigan Franchise Disclosure Act including damages as provided and rescission of any contract made with ViSalus, and damages under the Michigan Consumer Protection Act as provided;

224

h.   The costs of investigation and litigation reasonably incurred, as well as attorneys' fees in accordance with 18 U.S.C. § 1964(c); and

i.   For such other damages, relief and pre- and post-judgment interest as the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Kerrigan, Mikovich and Valli, on their own behalf, and on behalf of the class(es) they represent, demand a jury trial.

Filed this 8th day of March, 2017.

Respectfully submitted,

SOMMERS SCHWARTZ, P.C.

s/ Andrew Kochanowski
Andrew Kochanowski (P55117)
Sarah L. Rickard (P78767)
Lance C. Young (P51254)
Attorneys for Plaintiffs
One Towne Square, Suite 1700
Southfield, MI 48076
(248) 355-0300
akochanowski@sommerspc.com
srickard@sommerspc.com
lyoung@sommerspc.com

PREBEG, FAUCETT & ABBOTT, PLLC
Matthew J.M. Prebeg
(TX Bar No: 00791465)
Brent T. Caldwell
(TX Bar No: 24056971)
Attorneys for Plaintiffs
8441 Gulf Freeway, Suite 307
Houston, TX 77017
(832) 743-9260
mprebeg@pfalawfirm.com
bcaldwell@pfalawfirm.com


WEXLER WALLACE LLP
Edward A. Wallace (IL Reg. No. 6230475)
Attorneys for Plaintiffs
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
(312) 589-6272
EAW@wexlerwallace.com